UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA                      :

      -against-                                      :

GORAN GOGIC                                            :

                                   22 CR 493 (ARR)

                                                  :
------------------------------------------------------------------X

# DEFENDANT GORAN GOGIC'S
## MOTION TO SUPPRESS,
## TO PRECLUDE,
## AND TO COMPEL DISCOVERY

Joseph R. Corozzo
Angela D. Lipsman
Rubinstein & Corozzo, LLP
*Attorneys for Defendant*
*Goran Gogic*
260 Madison Avenue, 22d Fl.
New York, New York 10016
(212) 545-8777 (ph)
(917) 722-8206 (fax)
jcorozzo@rubcorlaw.com
alipsman@rubcorlaw.com

i

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS ............................................................................................................................. 8

    I. The Charges. .......................................................................................................... 8

    II. America Agreed With the Netherlands to Temporarily Suspend the U.S.'s Criminal

    Investigation of SkyECC Until Conclusion of Suspicionless Mass Surveillance. ................... 10

        A. The History of "Operation Argus" and America's Agreement with the Netherlands. .... 10

        B. What Was Produced v. What Remains Outstanding. ....................................................... 26

        C. European Case Law On Admissibility. .............................................................................. 43

    III. The Arrest and Post-Arrest Investigation. ............................................................. 50

DISCUSSION ................................................................................................................ 51

    I. Evidence from the Mass Surveillance Operation Should Be Suppressed. .......................... 51

        A. Shocks the Conscience. ....................................................................................................... 53

        B. Implicates Constitutional Restrictions. ............................................................................. 57

        C. Introduction of the Sky ECC Evidence Would Violate Mr. Gogic's Constitutional Rights

        Under the Due Process Clause. ............................................................................................. 60

    II. The Excel Charts Should Be Precluded. ............................................................... 64

        A. The Excel Charts Are Inadmissible Under FRE 1006 – Summaries to Prove Content... 64

        B. FRE 106 – Rule of Completeness ..................................................................................... 67

C. The Excel Summaries' Probative Value Is Outweighed...................................................... 68

By The Danger of Unfair Prejudice and of Misleading the Jury - FRE 403. ....................... 68

D. Authentication.................................................................................................................... 70

III. Motion to Suppress Evidence Derived from the Violation of

Mr. Gogic's Constitutional Rights When He Was in Custody and Already Indicted. ............. 74

A. Violation of Mr. Gogic's Rights Under *Miranda* and *Edwards v. Arizona*..................... 74

B. Violation of Sixth Amendment Rights................................................................................ 82

IV. Motion to Suppress Evidence Seized from Mr. Gogic's iPhone 13.................................... 82

A. Lack of Probable Cause. .................................................................................................... 82

B. Fruit of the Poisonous Tree. .............................................................................................. 84

C. Court's Inherent Supervisory Power. ................................................................................. 86

D. Preclusion - FRE 401. ....................................................................................................... 87

V. Motion to Compel *Brady* Material and Discovery................................................................ 87

VI. Reservation of Rights. ......................................................................................................... 92

CONCLUSION............................................................................................................................ 92

**TABLE OF AUTHORITIES**

**Cases**

1 KLs 401 Js 10121/22 [Memmingen District Court August 21, 2023].................................... 45

1 Ws 525/23 [Munich Higher Regional Court October 19, 2023] ............................................. 45

525 KLs, 254 Js 592/20 [Regional Court of Berlin July 1, 2021] ............................................. 44

Amarel v. Connell, 102 F.3d 1494, 1516 [9th Cir. 1996].......................................................... 64

Arizona v. Roberson, 486 U.S. 675 [1988]................................................................................ 75

Baker v. Goldman Sachs & Co., 669 F.3d 105, 111 [2d Cir. 2012] .......................................... 67

Bannum, Inc. v. United States, 151 Fed. Cl. 755, 768 (Fed. Cl. 2021) ...................... 64, 65, 66, 72

Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171, n. 14 (1988)............................................ 69

Brady v. Maryland, 373 U.S. 83 (1963) ............................................................................. passim

Case 5 StR 457/21 (Germany Federal Court of Justice March 2, 2022), Available in German at:

https://juris.bundesgerichtshof.de/cgi-

bin/rechtsprechung/document.py?Gericht=bgh&Art=en&Datum=2022&nr=127966 (visited on

September 27, 2024). ......................................................................................................... 48

Case No. 2022-987 QPC (France Constitutional Court April 8, 2022)...................................... 48

Case No. III K 24497/2021 [District Court of Ljubljana December 2, 2022] ............................ 43

Case Number 23/00055 (Netherlands Sup. Ct. February 13, 2024), available in Dutch at:

https://uitspraken.rechtspraak.nl/details?id=ECLI:NL:HR:2024:192 (visited on September 27,

2024). ................................................................................................................................ 48

Case Number 32915-2022, p. 4 [Corte Supreme Di Cassazione July 15, 2022]........................ 44

Case Numbers C-793/19 and C-794/19 (ECJ September 20, 2022)............................................ 43

Commonwealth v. Davis, 220 A.3d 534, 548 (Pa. Sup. Ct. 2019) ................................. 77, 78, 80

Commonwealth v. Jones, 481 Mass. 540, 551 (Mass. Sup. Judicial Ct. 2019) ........................... 81

Conoco Inc. v. Dep't of Energy, 99 F.3d 387, 393 [Fed. Cir. 1997]) .......................................... 64

Curcio v. United States, 354 U.S. 118, 128 [1957] ...................................................................... 78

Doe v. United States, 487 U.S. 201 [1988] .................................................................................... 80

Doninger Metal Products Corp. v. United States, 50 Fed. Cl. 110, 130 [Fed. Cl. 2001] ............. 64

Edwards v. Arizona, 451 U.S. 477, 485 (1981) ..................................................................... passim

Elkins v. United States, 364 U.S. 206, 223 (1960) ....................................................................... 60

Estelle v. Smith, 451 U.S. 454, 462 [1981] ................................................................................... 80

Fisher v. United States, 425 U.S. 391, 394-95 [1976] ................................................................... 79

Florida v. Harris, 568 U.S. 237, 243 [2013] ................................................................................. 82

Furcht v. Germany, 54648/09 (ECHR October 23, 2014) ............................................................ 46

G.A.Q.L. v. State of Florida, 257 So.3d 1058, 1065 (2018) .................................................... 78, 81

In re Fanaras, 263 B.R. 655 [Bankr. D. Mass 2001] .................................................................... 65

In re Olympia Office LLC, 574 B.R. 38 (Bankr. E.D.N.Y. 2017) ................................................ 65

Jade Trading, LLC v. United States, 67 Fed. Cl. 608, 614 (Fed. Cl. 2005) .................................. 64

Kyles v. Whitley, 514 U.S. 419, 432, 115 S. Ct. 1555 (1995) ......................................... 61, 62, 87

Kž-S. no.11/24 (Montenegro Court of Appeals July 9, 2024) ....................................................... 49

Meyer Corp., U.S. v. United States, 2021 Ct. Int. Trade LEXIS 26, *94; 2021 WL 777788 (Ct.

   Intl. Trade March 1, 2021), *vacated in part on other grounds*, *affirmed in part by* 43 F.4th

   1325 (Fed. Cir. Aug. 11, 2022) .............................................................................................. 64, 66

Michigan v. Harvey, 494 U.S. 344, 350 [1990] ........................................................................... 74

Minnick v. Mississippi, 498 U.S. 146, 150 (1990) ................................................................... 74, 75

Miranda v. Arizona, 384 U.S. 436 (1966) .............................................................................. passim

Mohammed v. Obama, 689 F. Supp. 2d 38 (D.D.C. 2009) ........................................................ 51

N.N., Case Number 13/728195-18, File Number 18/4230 (Amsterdam District Court November

    30, 2018) ...................................................................................................................... 16

Needham v. White Laboratories Inc., 639 F.2d 394, 403 [7th Cir. 1981] ................................... 65

Olmstead v. United States, 277 U.S. 438, 485 [1928] [J. Brandeis, Dissenting] ........................ 60

Pendergrass v. United States DOJ, 2005 U.S. Dist. LEXIS 11502, *17 - 18; 2005 WL 1378724

    (D.D.C. June 7, 2005) ................................................................................................ 68

People v. DeGata, 86 N.Y.2d 40 (1995) ...................................................................................... 62

People v. Sneed, 230 NE 3d 97, 120 (Ill. Sup. Ct. 2023) ............................................................ 78

Prokuraturr, C-746/18 (ECJ March 2, 2021) ............................................................................... 43

Quinn v. United States, 349 U.S. 155 [1955] .............................................................................. 74

Riley v. California, 573 U.S. 373 [2014] ..................................................................................... 85

Rochin v. California, 342 U.S. 165 [1952] ................................................................................... 54

SEC Civil Action v. Huang, 2015 U.S. Dist. LEXIS 127853, *10 (E.D. Pa. September 23, 2015)

    .................................................................................................................................... 78

Sentenza 44154-23 (Corte Suprema Di Cassazione October 26, 2023), available in Italian at:

    https://www.cortedicassazione.it/resources/cms/documents/44154_11_2023_pen_noindex.pdf

    (visited on September 26, 2024). .............................................................................. 47

Smith v. Illinois, 469 U.S. 91, 95 [1984] ..................................................................................... 76

Solem v. Stumes, 465 U.S. 638, 646 (1984) ................................................................................ 75

State v. Andrews, 243 NJ 447, 478 (2020) ................................................................................... 78

State v. Pittman, 479 P.3d 1023, 1051 (Sup. Ct. Oregon 2021) ................................................. 81

The People of the State of Illinois v. Spicer, 125 N.E.3d 1286 (3d Dist. 2019) .................... 78, 81

Thompson v. United States, 342 F.2d 137, 140 [5th Cir. 1965]...................................................... 66

United States ex rel. Lujan v. Gengler, 510 F.2d 62, 66 [2d Cir. 1975]................................. 53, 54

United States v. Ahmed, 94 F. Supp. 3d 394 (E.D.N.Y. 2015) ...................................................... 51

United States v. Alleyne, 573 F. Supp. 3d 861, 875 (E.D.N.Y. 2021) .......................................... 76

United States v. Bagley, 473 U.S. 667 [1985] ................................................................................ 61

United States v. Barona, 56 F.3d 1087, 1091 [9th Cir. 1995] ................................................. 53, 57

United States v. Bello, 2019 CCA LEXIS 200, *10; 2019 WL 2061914 (A.F. Crim. App. May 7, 2019) ............................................................................................................................................ 79

United States v. Bescond, 24 F.4th 759, 768 (2d Cir. 2021). ........................................................ 60

United States v. Castro, 813 F.2d 571, 575-76 [2d Cir. 1987] ...................................................... 67

United States v. Djibo, 151 F. Supp. 3d 297 (E.D.N.Y. 2015)...................................................... 85

United States v. Doe (In re Grand Jury Subpoena Duces Tecum), 670 F.3d 1335 (11th Cir. 2012) ............................................................................................................................... 78, 79, 81

United States v. Doe, 465 U.S. 605 [1984].................................................................................... 80

United States v. Eap et al., 3:21-cr-00822 (GPC) (S.D. Cal.) .......................................... 3, 23, 60

United States v. Eldarir, 681 F. Supp. 3d 43 (E.D.N.Y. 2023).............................................. 79, 80

United States v. Emmanuel, 565 F.3d 1324, 1330 [11th Cir. 2009].................................... 53, 54

United States v. Frazier, 479 F.2d 983, 985 (2d Cir. 1973).......................................................... 69

United States v. Getto, 729 F.3d 221, 228 (2d Cir. 2013) .................................................... passim

United States v. Ghailani, 751 Supp. 2d 502, 508 (S.D.N.Y. 2010)............................................ 52

United States v. Gouveia, 467 U.S. 180 [1984]............................................................................. 82

United States v. Gumaer, 765 Fed. Appx. 608, 613 (2d Cir. 2019)............................................. 82

United States v. Hubbell, 530 U.S. 27, 34 (2000). .................................................. 76, 77, 79, 80

United States v. Jimenez, 419 F. Supp. 3d 232, 233 (D. Mass. 2020)..........................................78

United States v. Kattar, 840 F.2d 118, 127 [1st Cir. 1988] ............................................................88

United States v. Kirschner, 823 F. Supp. 2d 665, 669 (E.D. Mich. 2010) ....................................78

United States v. Lee, 723 F.3d 134 [2d Cir. 2013] .........................................................................53

United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996)....................................................................76

United States v. Maturo, 982 F.2d 57, 60-61 [2d Cir. 1992] ..........................................................53

United States v. Miller, 116 F.3d 641, 680 (2d Cir. 1997)..............................................................76

United States v. Mitchell, 76 M.J. 413, 419 (Armed Forces App. 2017) ................................. 77, 79

United States v. Morel, 2010 WL 2545479 (E.D.N.Y. 2010) .........................................................75

United States v. Nagelberg, 434 F.2d 585, 587 n.1 [2d Cir. 1970] ................................................54

United States v. Northern Metro. Found. For Healthcare Ctr., Inc., 2021 U.S. Dist. LEXIS

154046, *9; 2021 WL 3634765 (E.D.N.Y. August 16, 2021).................................................66

United States v. Pabon, 871 F.3d 164, 182 (2d Cir. 2017) .............................................................82

United States v. Patane, 542 U.S. 630 (2004)................................................................................85

United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) ...........................................................61

United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).............................................................74

United States v. Russell, 411 U.S. 423, 431 - 432 (1973) ..............................................................51

United States v. Shvartsman, 23 CR 307 (LJL), 2024 U.S. Dist. LEXIS 50597 (S.D.N.Y. March

20, 2024) ......................................................................................................................... 79, 80

United States v. Smith, 706 F. Supp. 3d 404, 408 (S.D.N.Y. 2023) ......................................... 79, 81

United States v. Su, 1997 WL 695655 (S.D.N.Y. 1997).................................................................75

United States v. Warrant, 2019 U.S. Dist. LEXIS 147836, 2019 WL 4047615, at *2 [N.D. Cal.

Aug. 26, 2019] .........................................................................................................................78

United States v. Williams, 930 F.3d 44, 58 (2d Cir. 2019) .................................................. 67, 68

Wright v. Southwest Bank, 554 F.2d 661, 663 (5th Cir. 1977). .................................................. 64

Yalçınkaya v. Türkiye, Case No. 15669/20 (ECtHR September 26, 2023) ...................... 45, 46, 62

Youngblood v. West Virginia, 547 U.S. 867, 869 – 870 (2006) ........................................... 61, 87

**Statutes**

18 U.S.C. § 2 ................................................................................................................................... 9

18 U.S.C. § 2518 ........................................................................................................................... 58

18 U.S.C. § 3238 ......................................................................................................................... 8, 9

18 U.S.C. §§ 3551 et seq. ............................................................................................................. 8, 9

21 U.S.C. § 960(b)(1)(B)(ii) ....................................................................................................... 8, 9

46 U.S.C. § 70503(a)(1) .................................................................................................................. 8

46 U.S.C. § 70503(b) ................................................................................................................... 8, 9

46 U.S.C. § 70504(b)(2) ............................................................................................................... 8, 9

46 U.S.C. § 70506(a) ................................................................................................................... 8, 9

46 U.S.C. § 70506(b) ...................................................................................................................... 8

Article 222-37, paragraph 1 of the French Penal Code ............................................................... 17

**Other Authorities**

Bill Goodwin & Morgan Ayre, *Canadian arrested by France after cooperating with US on Sky ECC cryptophone investigation*, Computer Weekly (September 5, 2024), Available at: https://www.computerweekly.com/news/366609662/Canadian-arrested-by-France-after-cooperating-with-US-on-Sky-ECC-cryptophone-investigation?v%E2%80%A6 (visited on September 16, 2024) ............................................................................................. 14, 23, 59

Cahn, "Fact Skepticism: An Unexpected Chapter," 38 NYU L Rev 1025 [1963] ...................... 88

Christian Lödden and Johannes Makepeace, *Same same but different: SkyECC oder wie europäische Strafverfolgungsbehörden eine Milliarde Nachrichten über 21 Monate lang abgefangen haben,* 12/2023 Onlinezeitschrift für Höchstrichterliche Rechtsprechung zum Strafrecht 384, 385 (December 2023), Available in German at: https://www.hrr-strafrecht.de/hrr/archiv/23-12/index.php?sz=7#384 (visited on September 27, 2024) 16, 18, 22, 55

Clayston Lawyers, Locations, Clayston.com, Available at: https://clayston.com/ (visited on September 30, 2024). ................................................................................................... 15

*Court of Justice of the European Union*, Overview, Available at: https://european-union.europa.eu/institutions-law-budget/institutions-and-bodies/search-all-eu-institutions-and-bodies/court-justice-european-union-cjeu_en (visited on September 28, 2024). ..................... 48

CURIA, *Court of Justice,* Jurisdiction, Available at: https://curia.europa.eu/jcms/jcms/Jo2_7024/en/ (visited on September 28, 2024). ................. 49

Daniela Pulido, *Panama court acquits all defendants in 'Panama Papers' and 'Car wash' cases*, Jurist news (June 30, 2024), Available at: https://www.jurist.org/news/2024/06/panama-court-acquits-all-defendants-in-panama-papers-and-car-wash-cases/ (visited on October 3, 2024) 39, 70

Debra Cassens Weiss, *Leader of hacked 'Panama Papers' law firm is one of 28 people acquitted*, ABA Journal (July 1, 2024), Available at: https://www.abajournal.com/news/article/leader-of-hacked-panama-papers-law-firm-is-one-of-28-people-acquitted#:~:text=White%20Collar%20Crime-,Leader%20of%20hacked%20'Panama%20Papers'%20law%20firm%20is,one%20of%2028%20people%20acquitted&text=Image%20from%20Shutterstock)-

,A%20Panamanian%20judge%20has%20acquitted%2028%20people%2C%20including%20a %20founder,hacked%20from%20the%20law%20firm. (visited on October 3, 2024)....... 39, 70

European Union Court of Justice Press Release No. 77/24 (April 30, 2024)............................... 49

Europol and Eurojust – *First Report of the observatory function on encryption* § 1 (2019) (available at: https://www.eurojust.europa.eu/sites/default/files/assets/eurojust-2019-01-joint-ep-ej-report-observatory-function-on-encryption-en.pdf) (visited on September 11, 2024).... 10

Europol and Eurojust – *Third Report of the Observatory Function on Encryption* § 3.1.1 (June 2021) ............................................................................................................................ 10, 11, 55

Europol Press Release – *New major interventions to block encrypted communications of criminal networks* (updated March 12, 2021), Available at: https://www.europol.europa.eu/media-press/newsroom/news/new-major-interventions-to-block-encrypted-communications-of-criminal-networks (visited on September 12, 2024).................................................................. 22

FBI Top Secret Briefing - *Encryption: The Threat, Applications, and Potential Solutions* (February 19, 1993) https://archive.epic.org/crypto/clipper/foia/crypto_threat_2_19_93.html (visited on September 12, 2024). ........................................................................................ 13

Fed. R. Evid. 106 advisory committee note [1972 Proposed Rules] .......................................... 68

Federal Bureau of Investigation Advanced Telephony Unit - *Telecommunications Overview*, p. 23 – 24 (1992), Available at: https://www.cs.columbia.edu/~smb/doc/Telecommunications_Overview_1992.pdf (visited on September 12, 2024) ...................................................................................................... 14

Helen Lyons, *'Reading all Sky ECC messages would take us 685 years,' police say*, The Brussels Times (March 12, 2021), Available at: https://www.brusselstimes.com/159580/reading-all-sky-ecc-encrypted-messages-would-take-us-685-years-belgium-police-say-belgian-criminal-

underworld-federal-prosecutor-money-laundering-corruption-arms-trafficking-violent-crime-cocaine-fire (visited on September 18, 2024). ........................................................................... 22, 26

*Hoe Nederlands is de hack van berichtenserver Sky?* Crimesite (July 20, 2024) (Available at: https://www.crimesite.nl/hoe-nederlands-is-de-hack-van-berichtenserver-sky/#google_vignette) (visited on July 23, 2024). .................................................................. 18

J. & B. Frank, *Courts on Trial* [1963]; ................................................................................... 88

Jan-Jaap Oerlemans and Sofie Royer, *The Future of Data-Driven Investigations in Light of the Sky ECC Operation,* 14(4) New Journal of European Criminal Law 434-458, 437  (2023), Available at: https://journals.sagepub.com/doi/epub/10.1177/20322844231212661 (visited on September 26, 2024) ........................................................................................................ passim

Jennifer Sisa Granick and Daniel Kahn Gillmor, *The Vital Role of End-to-End Encryption*, ACLU, (October 20, 2023) (Available at: https://www.aclu.org/news/privacy-technology/the-vital-role-of-end-to-end-encryption) (visited on September 13, 2024) ......................... 11, 13, 55

Letter to President Bill Clinton from Public Interest and Civil Liberties Organizations, Cryptographers and Security Experts, and Industry and Academia (January 24, 1994), Available at: https://archive.epic.org/crypto/clipper/crypto_experts_letter_1_94.html (visited on September 12, 2024) ............................................................................................ 13

Matt Rosenberg, *How Many People Share Your Birthday?* Thought Co. (May 25, 2024) Available at: https://www.thoughtco.com/how-many-share-your-birthday-1435156#citation-1 (visited on September 23, 2024) ................................................................................................ 83

Merriam-Webster. (n.d.). *Argus*. Merriam-Webster.com Dictionary, Available at: https://www.merriam-webster.com/dictionary/Argus (visited September 27, 2024) ............... 21

Meta, *100 million using WhatsApp across the United States*, WhatsApp Blog, Available at: https://blog.whatsapp.com/100-million-using-whatsapp-across-the-united-states (July 25, 2024) visited on September 30, 2024). ................................................................................ 13

Meta, *About Disappearing Messages,* WhatsApp Help Center, Available at: https://faq.whatsapp.com/673193694148537/?helpref=uf_share (visited on September 30, 2024) ..................................................................................................................... 15

Meta, *How to make a video call*, WhatsApp Help Center, Available at: https://faq.whatsapp.com/1862285217468140/?helpref=uf_share (visited on September 30, 2024). ..................................................................................................................... 12

Meta, *How to make a voice call*, WhatsApp Help Center, Available at: https://faq.whatsapp.com/1153602608602452/?helpref=uf_share (visited on September 30. 2024). ..................................................................................................................... 12

Meta, *What end-to-end encryption on Messenger means and how it works.* Available at: https://www.facebook.com/help/messenger-app/786613221989782/?helpref=uf_share (visited on September 12, 2024) ............................................................................................ 11

*Rafael Villena y Scheffler*, Clayston.com, Available at: https://clayston.com/hamburg/member.php?name=scheffler (visited on September 30, 2024); .................................................................................................................................... 15

Secret Briefing - *Clipper Encryption – AT&T Telephone Security Device Model 3600* (February 9, 1993)*,* Available at: https://archive.epic.org/crypto/clipper/foia/att3600_2_9_93.html (visited on September 12, 2024). ......................................................................................... 13

Skelton, Sebastian, *Dutch police used deep learning model to predict threats to life*, Computer Weekly (May 14, 2021), Available at:

https://www.computerweekly.com/news/252500738/Dutch-police-used-deep-learning-model-to-predict-threats-to-life?vgnextfmt=print, (visited on September 12, 2024) .......................... 25

Sonja Raath, *Will the EU's Chat Control legislation undermine encryption and privacy*? ExpressVPN, (July 2, 2024; updated July 7, 2024) Available at: https://www.expressvpn.com/blog/eu-chat-control-legislation/ (visited on October 1, 2024). 57

Stavros KelepourisYannick VerberckmoesJeroen Van Horenbeek**,** *Reconstructie: dit was Operatie Sky volgens de man die de telefoons van de onderwereld kraakte*, translated to: *Reconstruction: this was Operation Sky according to the man who cracked underworld phones,* DeMorgen (March 20, 2021), Original Available at: https://www.demorgen.be/voor-u-uitgelegd/reconstructie-dit-was-operatie-sky-volgens-de-man-die-de-telefoons-van-de-onderwereld-kraakte~bb940470/ (visited on October 2, 2024).......................................... 20, 58

The Editors of GreekMythology.com, "*Argus Panoptes: The Hundred-Eyed Giant,* " GreekMythology.com (November 30 2023), Available at: https://www.greekmythology.com/Myths/Creatures/Argus_Panoptes/argus_panoptes.html. (visited on September 26, 2024). ....................................................................... 21

United States Census Bureau, U.S. and World Population Clock, Available at: https://www.census.gov/popclock/) (visited on September 23, 2024) ..................................... 83

WhatsApp Help Center – *About end-to-end encryption* (Available at: https://faq.whatsapp.com/820124435853543/?helpref=uf_share) (visited on September 13, 2024). ............................................................................................................................. 11

Wim van de Pol, *Frans strafdossier: Nederland zette criminele burgerinfiltrant in om Sky ECC-telefoons te verkopen*, Crimesite (September 17, 2024) (Available at:

https://www.crimesite.nl/frans-strafdossier-nederland-zette-criminele-burgerinfiltrant-in-om-

sky-ecc-telefoons-te-verkopen/) (visited on September 17, 2024). .................................. passim

## Rules

Fed. R. Crim. Pro. 16 ............................................................................................ 88

FRE 1006 ..................................................................................................... passim

FRE 106 ......................................................................................... 6, 67, 68, 69

FRE 401 ....................................................................................................... 7, 87

FRE 403 ..................................................................................................... 6, 68, 69

FRE 901 ..................................................................................................... 6, 70, 74

FRE 901(a).................................................................................................... 70

FRE 901(b).................................................................................................... 70

FRE 901(b)(1)................................................................................................ 70

FRE 902 ..................................................................................................... 6, 70, 71

FRE 902(11).................................................................................................. 71

FRE 902(13).................................................................................................. 71, 72

FRE 902(14).................................................................................................. 71, 72

FRE 902(6).................................................................................................... 71

Rule 902(11) ................................................................................................. 71

## Constitutional Provisions

Confrontation Clause ....................................................................................... 63, 88

Due Process Clause of the Fifth Amendment ................................................... passim

Fifth Amendment ............................................................................................ passim

Fourth Amendment ......................................................................................... passim

xvi

Sixth Amendment ................................................................................................... 6, 8, 82, 85

## PRELIMINARY STATEMENT

In 2019, the U.S. Government was on the verge of indicting the founder of a company called Sky Global, and an individual who was allegedly a distributor of Sky Global's products. At the time, Sky Global sold their own cell phones with certain features. One of these features was a communications platform called Sky ECC that was pre-installed on the phones.

Sky ECC featured a security method known as end-to-end encryption. This theoretically means that only the sender and recipient of a communication would be able to actually read the communication, while any third party trying to hack the communication would be unable to decipher it without having the necessary keys to unlock its meaning.

End-to-end encryption is not unique to Sky ECC, nor is it new. It is a security feature that had, by that time, become routinely and widely used in order to protect private communications from being hacked by, i.e., criminals.

As early as the 1990s, U.S. law enforcement was working on how to thwart end-to-end encryption, as federal agencies predicted that the technology could be used by criminals as a means of protecting themselves from being wiretapped.

In 2018, the U.S. participated in an international conference organized to find a way to hack the Sky ECC servers.

Before the U.S. Attorney's Office for the Southern District of California went to the grand jury in their Sky Global investigation, Netherlands officials communicated with U.S. officials.

It turned out that the Netherlands was also investigating Sky Global, and that they knew where Sky ECC's servers were located. The Netherlands was, at the time, still working on how

1

to seize all communications sent over the Sky ECC network and how to thereafter decrypt the communications.

The contemplated seizure was not going to be targeting particular suspects or based on any individualized suspicion. It would, instead, be global, against all of Sky ECC's users worldwide, premised on nothing more than their use of the platform.

The Netherlands would enter into a written agreement, called a Joint Investigation Team Agreement ("JIT Agreement"), with France (where the servers were located), Belgium (as Belgium had been investigating Sky Global as well), and Europol (who would be responsible for analyzing the communications, packaging them into intelligence packages, and then distributing these packages to law enforcement in various countries, depending on what countries the communications related to).

Unsurprisingly, the U.S. did not want to sign a written agreement that would implicate our country in what would unquestionably be a massive, worldwide search without probable cause, in direct violation of the Fourth Amendment (not to mention U.S. statutory requirements for the interception of electronic communications).

But the U.S. did not have to. Netherlands' agreement with France, Belgium, and Europol provided for Sky ECC data to be shared with the parties to the agreement, and, with the consent of the parties, to be shared with non-signatories, as well.

There was one thing that the U.S. would have to do in order to benefit from the mass suspicionless surveillance, and that was to put the U.S. criminal investigation on ice until after the surveillance concluded—or, if not entirely on ice, to at least hold off on issuing arrest warrants in the Sky Global investigation. After all, an arrest in America's investigation of Sky

2

Global would tip off Sky ECC users, who would then, presumably, stop using the platform before the commencement of the mass surveillance.

And so the U.S. agreed not to go forward with any arrests in the U.S. investigation until after the mass surveillance concluded. The U.S. upheld its end of the bargain—refraining from indicting individuals in the Southern District of California until precisely three days after the mass surveillance had concluded in hundreds of raids. See United States v. Eap et al., 3:21-cr-00822 (GPC) (S.D. Cal.) Doc. # 1 – Indictment (filed March 12, 2021).

The Europeans upheld their end of the bargain by providing evidence from the suspicionless Sky ECC hack to the U.S.

The defendant moves for an order excluding this evidence from the hack from trial. While there is a general rule known as the international silver platter doctrine which permits the introduction of evidence provided by foreign officials, there are exceptions to this rule which apply here.

The first is that the Court has the authority to exclude evidence where it was obtained by methods so egregious that it shocks the conscience. This is to protect the judiciary from becoming, or at least being perceived as, complicit in conduct that violates basic standards of decency. Torture is an easily agreed upon example of egregious conduct, but the exception is by no means limited to the use of torture.

The conduct here was the mass interception of 170,000 users' communications worldwide, not because there were any individualized grounds to suspect any given individual of being involved in a crime, but simply because law enforcement alleged that the mere use of the platform was suspicious.

3

Let there be no mistake that if that does not shock the conscience, then we are giving Big Brother carte blanche to watch us. The Sky ECC hack, having been conducted on a global scale, undoubtedly extended to communications sent within the United States. Sky ECC was not the first end-to-end encrypted communications platform that was the subject of mass surveillance and there is no reason to believe that it will be the last. The next one could easily be WhatsApp, an end-to-end encrypted platform routinely used by Americans and others. If the judiciary does not take a stand against mass surveillance now, Americans will surely be subject to it again in the future. It would also be a violation of the Due Process Clause to deprive Mr. Gogic of his liberty (by convicting and sentencing him) on the basis of evidence obtained through conduct that shocks the conscience.

The second exception to the international silver platter doctrine that applies here is that it implicates constitutional restrictions. More specifically, the U.S. reached an agreement with European authorities for the purpose of evading constitutional requirements. The U.S. held off on indictments or arrests in the U.S.'s Sky Global investigation until the mass surveillance concluded in exchange for data from the mass surveillance.

There is, respectfully, no plausible argument that this agreement was struck or honored out of anything but the intent to benefit from the mass interception of private communications without probable cause (or individualized suspicion), conduct that would blatantly violate the Fourth Amendment if performed by the United States.

Here, the introduction of evidence from the Sky ECC mass surveillance would also violate the defendant's rights under Brady and its progeny. The defendant is entitled to material, favorable evidence, i.e. evidence where the non-disclosure would undermine confidence in the verdict—regardless of whether or not it is presently in the possession of the U.S. Attorney's

4

Office. The prosecutor has an obligation under the Due Process Clause to obtain favorable evidence known to investigators. As relevant here, that means that the defendant has a constitutional right to examine the underlying data from which Excel spreadsheets were purportedly generated to assess the accuracy, authenticity, and reliability of the Excel spreadsheets.[1]

Alternatively, the Court does not need to reach the constitutional issue. The introduction of this evidence would violate both Federal Rules of Evidence ("FRE") 106 and 1006. FRE 1006 – Summaries to Prove Content explicitly states that a party cannot introduce summaries or charts until AFTER the other party has had a reasonable opportunity to inspect the underlying data to test the accuracy of the summaries or charts.[2]

Therefore, here, where the Government's evidence consists of summaries or charts (specifically voluminous Excel spreadsheets), the Government cannot introduce those spreadsheets under FRE 1006, Summaries to Prove Content, where, as here, the defendant has not been provided with the underlying data to confirm the accuracy of the Excel spreadsheets.

---

[1] As we will discuss, the Government turned over Sky ECC evidence to undersigned counsel in the form of Excel spreadsheets with some accompanying media. According to the Government, these productions were "more complete" than what they had previously turned over to our co-counsel prior to our retention. 10/26/23 Rule 16 Letter.

    For clarification, although we use "Excel spreadsheets" or "Excel charts" throughout Mr. Gogic's Motions to refer to the Sky ECC evidence produced by the Government, the Defendant moves to suppress and/or preclude **ALL** of the Sky ECC productions, including but not limited to the Government's first, "less complete" production. We hope that it goes without saying that a "less complete" production should not, under any legal theory, be more admissible than a "more complete" production, but, should it prove necessary, we will be prepared to supplement this memorandum and/or address the issue at any oral argument.

[2] "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." FRE 1006.

5

Notably, FRE 1006 is a bright line rule, with no exceptions for purportedly not being able to share the underlying data.

The Rule of Completeness, FRE 106, is also implicated as, pursuant to that rule, where one party introduces only portions of a record, the other party is permitted to introduce other portions as necessary to provide context or to avoid a misleading impression from excerpts.

Here, we have been provided with Excel spreadsheets listing thousands of alleged messages from a participant to a conversation, divorced from the context of what the other participant would have said. Under FRE 106, we should be entitled to introduce messages from the other participant to put messages purportedly from the defendant into context and avoid misleading the jury—but we cannot because the Government has not shared the messages from the other participant.

Further, under FRE 403, the probative value of the spreadsheets is outweighed by the unfair prejudice to the defendant where, as here, the defendant has not been able to confirm their accuracy by comparing the charts to the original data (as required by FRE 1006 – Summaries to Prove Content), and cannot remedy the danger that FRE 106, the Rule of Completeness, is intended to address (misleading impressions from taking excerpts out of context).

The evidence should also be precluded because, as we discuss *infra*, the Government cannot authenticate the spreadsheets or accompanying media files under FRE 901, and FRE 902 does not apply.

Turning now from the spreadsheets to the day of the arrest, Mr. Gogic was arrested two days after he was indicted, meaning that his Sixth Amendment right to counsel had already attached. He was interrogated while in custody, meaning that his *Miranda* rights also applied. He

6

invoked his right to counsel by informing the agents who arrested him that he wanted an attorney and wanted to call either his friend or his wife to have them arrange for an attorney.

The interrogation of the defendant should have stopped then and there. It did not.

Instead, the agents used the opportunity to compel Mr. Gogic to reveal the passcode to his iPhone, deceiving him into believing that the only way he could invoke his right to counsel was by unlocking his phone with his passcode while the phone was being held by an agent.

As we will discuss, first, where there is an Edwards violation, as there was here, we do not have to establish that the statement or act was testimonial. Nevertheless, the act of unlocking the phone with the passcode was testimonial, implicitly communicating that the defendant knew the passcode and that the phone was his.

We urge the Court to either adopt the approach of those that hold that the foregone conclusion doctrine applies only to documents, not to the compelled use of or disclosure of a passcode, or to adopt the approach of courts that have held that the foregone conclusion doctrine would require the Government to prove that the *contents of the phone* were known to law enforcement, rather than whether defendant knew his own passcode.

Although a search warrant was thereafter obtained for the iPhone, we ask the Court to preclude it as irrelevant under FRE 401 in the event that the Court is excluding the Sky ECC evidence. The affidavit in support of the search warrant was clear that the phone was only being searched for photographs, recordings, and the like that would, if it matched data from the Sky ECC hack, prove that the Sky ECC phones belonged to the defendant. Therefore, in the absence of evidence from the Sky ECC hack, the phone has no relevance to the case at bar.

Alternatively, we would ask the Court to suppress evidence from the phone as tainted by the egregious conduct underlying the mass surveillance, as well as by the violations of the

7

defendant's Fifth and Sixth Amendment rights. Or, alternatively, the Court could suppress the evidence from the phone on the ground that it was not supported by probable cause that the phone would contain evidence of a crime, when the affidavit indicated law enforcement simply hoped to compare the contents of the phone to the Sky ECC evidence, in hopes that it would match.

Lastly, as the Government has, in response to multiple demands, advised that no more evidence will be forthcoming, we respectfully request an order from the Court directing the Government to produce various Brady material and discovery, including but not limited to the original data and metadata from the Sky ECC hack. In the alternative, if the Government should assert that any material is privileged in some manner, we request the Court order the Government to produce a privilege log and to produce the requested material to the Court for *in camera* review.

**FACTS**

I. The Charges.

On October 28, 2022, Defendant Goran Gogic ("Gogic"), was indicted. He is charged with:

- one count of Conspiring to Violate the Maritime Drug Law Enforcement Act from in or about May 2018 to July 2019 in violation of 46 U.S.C. § 70506(b), 46 U.S.C. § 70506(a), 46 U.S.C. § 70503(b), 46 U.S.C. § 70504(b)(2), 21 U.S.C. § 960(b)(1)(B)(ii); 18 U.S.C. § 3238, 18 U.S.C. §§ 3551 et seq., (Count One);

- and three substantive counts (Counts Two – Four) of Violating the Maritime Drug Law Enforcement Act in violation of 46 U.S.C. § 70503(a)(1), 46 U.S.C. §§

8

70506(a), 70503(b), 70504(b)(2), 21 U.S.C. § 960(b)(1)(B)(ii), 18 U.S.C. § 2, 18

U.S.C. §§ 3238, 3551, et seq. on:

- o  February 17, 2019

- o  March 18, 2019 and

- o  June 19, 2019.

The Government's theory of the case is that there was a conspiracy to transport cocaine

from South America to Europe by sea, and by way of the United States.[3] The Government

alleges that the conspirators were supplying cocaine to Balkan-based cartels,[4] and that Mr. Gogic

"oversaw the logistics for getting the cocaine from South America to Europe… The defendant

coordinated with: (i) crewmembers aboard the maritime commercial cargo vessels used to

transport the… cocaine; (ii) narcotraffickers in Colombia who oversaw and managed the sources

of cocaine and speedboat workers who physically loaded the cocaine…; and (iii) dockworkers at

the ports in Europe who could receive the cocaine once it arrived," Id. p. 5.

The three substantive counts in the Indictment are based on seizures from three different

ships. Specifically, as to Count 2, according to the Government, "On February 27, 2019, federal

agents seized approximately 1,473 kilograms of cocaine secreted aboard the MSC Carlotta at the

Port of New York and New Jersey… agents recovered approximately 60 large bundles that

contained a white powdery substance… Laboratory testing confirmed that the substance was

cocaine." Detention Memo p. 4.

Count 3, according to the Government, is based on a March 18, 2019 seizure of 537

kilograms of cocaine from the MSC Desiree at the Port of Philadelphia. Id. p. 4.

---

[3] Detention Memo, ECF # 3, p. 5.
[4] Id. p. 6.

Count 4, according to the Government, is based on the seizure on June 19, 2019, of "approximately 17,956 kilograms of cocaine secreted aboard the MSC Gayane at the Port of Philadelphia… worth over $1 billion… one of the largest seizures of cocaine in United States history,"[5] and "approximately $48,000 in Euros and U.S. currency," Id. p. 5.

## II. America Agreed With the Netherlands to Temporarily Suspend the U.S.'s Criminal Investigation of SkyECC Until Conclusion of Suspicionless Mass Surveillance.

### A. The History of "Operation Argus" and America's Agreement with the Netherlands.

Encryption has become a standard, basic security feature of electronic communications.[6] "In contemporary society, encryption has become an integral characteristic of everyday life. Strong encryption is an imperative feature of protecting privacy and doing business."[7]

One form of encryption is "end-to-end encryption," which was designed to protect electronic communications from being intercepted or deciphered by anyone other than the communications' participants—to protect the communications' from even being deciphered by the communications provider, such as a telephone or tech company. "End-to-end encryption ensures only you and the person you're communicating with can read or listen to what is sent, and nobody in between, not even WhatsApp. This is because with end-to-end encryption, your messages are secured with a lock, and only the recipient and you have the special key needed to unlock and read them. All of this happens automatically: no need to turn on any special settings

---

[5] Detention Memo p. 5.

[6] "In an ever more digitalized world, encryption has become a basic feature of several products and services, increasingly becoming the default standard for social media and communication platforms." Exhibit A – Europol and Eurojust – *Third Report of the Observatory Function on Encryption* § 3.1.1 (June 2021) (hereafter "Third Europol Report").

[7] Europol and Eurojust – *First Report of the observatory function on encryption* § 1 (2019) (available at: https://www.eurojust.europa.eu/sites/default/files/assets/eurojust-2019-01-joint-ep-ej-report-observatory-function-on-encryption-en.pdf) (visited on September 11, 2024) (hereafter "First Europol Report").

to secure your messages." WhatsApp Help Center – *About end-to-end encryption* (Available at:

https://faq.whatsapp.com/820124435853543/?helpref=uf_share) (visited on September 13,

2024). See also Ex. B - Meta, *What end-to-end encryption on Messenger means and how it*

*works*. Available at: https://www.facebook.com/help/messenger-

app/786613221989782/?helpref=uf_share (visited on September 12, 2024) ("The content of your

messages and calls in end-to-end encrypted conversations is protected from the moment it leaves

your device to the moment it reaches the receiver's device. This means that nobody else can see

or listen to what's sent or said - not even Meta. We couldn't even if we wanted to.")

> The American Civil Liberties Union ("ACLU") describes end-to-end encryption as:

> "the best protection, offering individuals the assurance that their personal data are shielded from prying eyes. As employed in Apple's new iCloud implementation and in messaging apps like WhatsApp and Signal, this technology can ensure that only the sender and the intended recipients can access the content of a message. This level of security not only **protects individuals from cyberattacks** but also empowers citizens to communicate freely without fear of **surveillance, censorship, and warrantless searches** — whether by the government, Big Tech, data brokers, or anyone else.

> "The global public wants strong cybersecurity protections, the ability to conduct private and intimate conversations without surveillance, and safety from abusive governments, retaliatory bosses, abusive partners, fraudsters, intrusive marketers, and criminals alike."

Jennifer Sisa Granick and Daniel Kahn Gillmor, *The Vital Role of End-to-End Encryption*,

ACLU, (October 20, 2023) (Available at: https://www.aclu.org/news/privacy-technology/the-

vital-role-of-end-to-end-encryption) (visited on September 13, 2024) (hereafter "ACLU")

(emphasis added).

> People across the United States of America and throughout the world communicate using

end-to-end encryption every day on a routine basis.[8] It is a standard feature of widely used cell

---

[8] Cf. Third Europol Report § 3.1.1.

11

phone communications apps, such as WhatsApp; more recently, Facebook Messenger (owned by the same parent company as WhatsApp), has begun to institute end-to-end encryption for their users' communications, too.

While the protection of privacy is the crucial feature of end-to-end encryption, there are additional incentives for individuals—law-abiding or otherwise—to use services such as WhatsApp for communication. For example, individuals who only have a domestic telephone plan can nevertheless use services such as WhatsApp to make international calls without having to sign up for an international phone plan or to buy an international calling card. There is no fee for making a call through a messaging service, whether domestic or international, and whether it is a traditional voice call[9] or a call that also includes video.[10] Provided that an individual has internet access, these services can also be used even during a loss of service from one's telephone company (for example, if the user missed a payment to their phone company). For those who do not sign up for unlimited plans with their phone company, it also provides a convenient way to share photographs and recordings without having to fear incurring additional fees from one's telephone provider for exceeding the limits of one's phone plan.

Given the myriad benefits of using such services, it is no wonder that end-to-end encrypted communications services are so widely used in the 21st century. According to the ACLU, WhatsApp "now has **2 billion** monthly active users. In January 2022, Signal Messenger

---

[9] Meta, *How to make a voice call*, WhatsApp Help Center, Available at: https://faq.whatsapp.com/1153602608602452/?helpref=uf_share (visited on September 30. 2024).
[10] Meta, *How to make a video call*, WhatsApp Help Center, Available at: https://faq.whatsapp.com/1862285217468140/?helpref=uf_share (visited on September 30, 2024).

was estimated to have 40 million active users, which does not include its surge of users in Ukraine following the Russian invasion." ACLU (emphasis added).[11]

Foreseeing that encryption was going to become a standard feature of electronic communications,[12] the United States Government first sought a means of thwarting encryption back in the early 1990s. The National Security Agency (NSA) developed a chip, known as the "Clipper Chip", "which allows for real time decryption by law enforcement, acting pursuant to legal process."[13] As a result, "[t]he private sector and the public… expressed nearly unanimous opposition to Clipper." Letter to President Bill Clinton from Public Interest and Civil Liberties Organizations, Cryptographers and Security Experts, and Industry and Academia (January 24, 1994), Available at: https://archive.epic.org/crypto/clipper/crypto_experts_letter_1_94.html (visited on September 12, 2024).

The Government's rationale for the doomed Clipper Chip was that although the Fourth Amendment protects "against unreasonable searches and seizures… This does not, however, prohibit **court authorized searches** performed… **based upon probable cause**… To permit unregulated use of excellent cryptography would establish an electronic sanctuary for conducting criminal activities, unfettered by legal process." Exhibit D - Federal Bureau of Investigation

---

[11] 100 million of WhatsApp's 2 billion users are in the United States. Meta, *100 million using WhatsApp across the United States*, WhatsApp Blog, Available at: https://blog.whatsapp.com/100-million-using-whatsapp-across-the-united-states (July 25, 2024) visited on September 30, 2024). This indicates that close to 1 out of 3 people in the U.S. is on WhatsApp.

[12] Redacted, partially declassified FBI Top Secret Briefing - *Encryption: The Threat, Applications, and Potential Solutions* (February 19, 1993) https://archive.epic.org/crypto/clipper/foia/crypto_threat_2_19_93.html (visited on September 12, 2024).

[13] Exhibit C - Redacted, partially declassified Secret Briefing - *Clipper Encryption – AT&T Telephone Security Device Model 3600* (February 9, 1993), Available at: https://archive.epic.org/crypto/clipper/foia/att3600_2_9_93.html (visited on September 12, 2024).

13

Advanced Telephony Unit - *Telecommunications Overview*, p. 23 – 24 (1992), Available at:

https://www.cs.columbia.edu/~smb/doc/Telecommunications_Overview_1992.pdf (visited on

September 12, 2024) (emphasis added).

Fast forward now from the 1990s to 2018, when the United States was investigating a

communications app called SkyECC,[14] owned by the Canadian company Sky Global Holdings

and Sky Secure Enterprise. The U.S. investigation's "ultimate goal was to arrest the company's

executives in Canada." Exhibit J – Certified Translation of June 14, 2019 Interception

Application, p. 48. SkyECC, similarly to WhatsApp, used end-to-end encryption to ensure

privacy by preventing third parties from intercepting users' electronic communications.[15]

However, whereas the communications service WhatsApp can be (and is) used on cell

phones of all types, in order to use SkyECC, persons would purchase cell phones from Sky

Global that come with the SkyECC app pre-installed. Id. Additionally, a message sent through

SkyECC would be automatically deleted either 30 seconds after the message was read or, if the

---

[14] Exhibit E - Bill Goodwin & Morgan Ayre, *Canadian arrested by France after cooperating with US on Sky ECC cryptophone investigation*, Computer Weekly (September 5, 2024), Available at: https://www.computerweekly.com/news/366609662/Canadian-arrested-by-France-after-cooperating-with-US-on-Sky-ECC-cryptophone-investigation?v%E2%80%A6 (visited on September 16, 2024) (hereafter "Goodwin & Ayre"); Exhibit F - Wim van de Pol, *Frans strafdossier: Nederland zette criminele burgerinfiltrant in om Sky ECC-telefoons te verkopen*, Crimesite (September 17, 2024) (Original Available at: https://www.crimesite.nl/frans-strafdossier-nederland-zette-criminele-burgerinfiltrant-in-om-sky-ecc-telefoons-te-verkopen/) (visited on September 17, 2024), translated to *A French Criminal File Reveals: the Netherlands engaging a criminal civilian infiltrator to sell Sky-ECC phones* (hereafter "van de Pol"); Exhibit G - Moszkowicz Report p. 5.
[15] Aff. In Support of SW ¶ 8.

person's phone was not connected to the network, after 48 hours. Exhibit K - Legal Opinion from Rafael Villena y Scheffler, Esq.[16] p. 1, p. 2 (hereafter "Villena Opinion").[17]

Recall that American law enforcement agencies had been concerned since the early 1990s that encryption would a) become a standard method of keeping everyday electronic communications private, and b) could be exploited by criminals to evade detection by law enforcement.[18] The problem from law enforcement's perspective remained how to intercept private, electronic communications that are designed to be intercept-proof.

However, the American Government was not the only one investigating SkyECC. European authorities had learned that SkyECC messages were transmitted through, hosted and backed up on servers that were located in Roubaix, France.[19]

On November 30, 2018, a judge in Amsterdam denied an application to seize a copy of the entire servers for law enforcement because "it could not be established that the users of SkyECC were using the system exclusively for illegal purposes. Furthermore, there was no concrete suspicion against individual users," Id. p. 3. According to the decision, which is attached as Exhibit V, "it would be too far-reaching to grant unconditional permission to search

---

[16] Mr. Villena y Scheffler, Esq. is a founding partner of the law firm of Clayston, which has offices located in multiple countries. *Rafael Villena y Scheffler*, Clayston.com, Available at: https://clayston.com/hamburg/member.php?name=scheffler (visited on September 30, 2024); Clayston Lawyers, Locations, Clayston.com, Available at: https://clayston.com/ (visited on September 30, 2024). He is based out of the office in Hamburg, Germany. Prior to founding Clayston in 2021, he was a partner in another law firm, WZR Rechtsanwälte, for 18 years, from 2003 – 2021. While, pursuant to the Protective Order, we have not shared discovery with Mr. Villena y Scheffler, he has provided his expertise on the factual and legal background of the Sky ECC hack.

[17] WhatsApp has a similar capability for automatically deleting messages after an interval of time, but, with WhatsApp, this is not a default setting. Meta, *About Disappearing Messages,* WhatsApp Help Center, Available at: https://faq.whatsapp.com/673193694148537/?helpref=uf_share (visited on September 30, 2024).

[18] Exhibits C, D.

[19] Exhibit K - Villena Opinion p. 2.

the contents of that message traffic for evidence of possible criminal offenses by all users of SkyECC. … The mere use of encrypted communication services cannot provide that reasonable suspicion." Exhibit V – Decision, N.N., Case Number 13/728195-18, File Number 18/4230 (Amsterdam District Court November 30, 2018).

Instead of authorizing a search against all users without reasonable suspicion, the Amsterdam District Court authorized investigators to analyze the Sky ECC servers for the limited purpose of analyzing how to intercept Sky ECC communications of specific targets in future investigations. Id.  See also Christian Lödden and Johannes Makepeace, *Same same but different: SkyECC oder wie europäische Strafverfolgungsbehörden eine Milliarde Nachrichten über 21 Monate lang abgefangen haben,* 12/2023 Onlinezeitschrift für Höchstrichterliche Rechtsprechung zum Strafrecht 384, 385 (December 2023), Available in German at: https://www.hrr-strafrecht.de/hrr/archiv/23-12/index.php?sz=7#384 (visited on September 27, 2024), which translates to *Same same but different: SkyECC or how European law enforcement authorities intercepted one billion messages over a period of 21 months*, 12/2023 Online Journal for Sup. Ct. Rulings on Criminal Law 384, 385 (December 2023) (hereafter "Lödden and Makepeace"). See Exhibit U – 9/7/24 Email from Mr. Villena y Scheffler (providing the pertinent excerpt of the Lödden and Makepeace article in both German and English).

The obvious solution to this legal roadblock was forum shopping. First, on December 6, 2018, Belgium and the Netherlands issued European Investigation Orders to the public prosecutor in Lille, France to analyze how the SkyECC servers worked.[20] On February 13, 2019,

---

[20] Jan-Jaap Oerlemans and Sofie Royer, *The Future of Data-Driven Investigations in Light of the Sky ECC Operation,* 14(4) New Journal of European Criminal Law 434-458, 437  (2023), Available at: https://journals.sagepub.com/doi/epub/10.1177/20322844231212661 (visited on September 26, 2024) (hereafter ""NJECL Article"); Villena Opinion p. 3.

16

the Public Prosecutor in Lille, France formally opened a criminal investigation into SkyECC. Exhibit J - Interception Application p. 47.

Then on June 14, 2019, a court in France authorized the interception, recording, and transcribing of ALL incoming and outgoing communications from the SkyECC servers. NJECL Article at 437; Ex. K - Villena Opinion p. 3.

The French June 14, 2019 interception application ("Interception Application") is Annex 3 to the report from attorney Yehudi Moszkowicz. A certified English translation of the Interception Application is attached as Exhibit J to this motion.[21] The purpose of the interception was to search for evidence of different violations of the French Penal Code, including but not limited to evidence of Transportation, possession, supply, transfer, acquisition of narcotics in violation of Article 222-37, paragraph 1 of the French Penal Code. Exhibit J – Interception Application p. 48.

The Interception Application was not based on any individualized suspicion that the aforesaid crimes were being committed, but on the premise that Belgium's investigation "established that… SKYECC… was used exclusively to facilitate criminal activities," with 1,000 SkyECC devices allegedly "linked to criminal activities throughout Belgium." Ex. J - Interception Application p. 47. French law enforcement explained that Belgium's investigation considered "the sale of SKYECC products" to be "suspicious." Id. To wit: Sky ECC phones were allegedly not sold online, but were instead sold to customers by salespersons in person with cash, without the purchaser presenting identification or proof of address to the salesperson, and without receiving a receipt or invoice to document the purchase of the phone. Id. (French law enforcement also referenced an anecdotal example of one sale of one or more Sky ECC phones

---

[21] We note that the Government did not provide the Interception Application during discovery.

17

being made to undercover Belgium investigator(s) "in the back room of a seedy cafe." Id.

Assuming *arguendo* that that is an accurate description of one sale to an undercover officer, we

still fail to see how law enforcement would make the leap from the circumstances of one

particular sale to individualized suspicion to intercept the communications of approximately

170,000 cell phones.)

Therefore, as set forth in the Interception Application, the French authorities were

requesting permission to intercept "incoming and outgoing TCP/IP communications… between

two French servers… (main server) and… (backup server), as well as an interception on the main

server," Ex. J – Interception Application p. 48.

As a result of the June 14, 2019 Interception Order, the Sky ECC servers were first

wiretapped from June 24, 2019 – June 26, 2019. NJECL Article at 437.

The June 14, 2019 Interception Order initially authorized wiretapping the servers for one

month, but was subsequently extended, repeatedly, through December 2020. Ex. K - Villena

Opinion p. 3; Lödden and Makepeace, p. 386.

It was eventually disclosed that although the servers were located in France and the

authorization to seize and hack the servers was issued by France, this initial seizure of the Sky

ECC servers was part of a primarily Dutch law enforcement operation,[22] working with a single

French agent given that the servers were being seized in France.[23] The nations utilized a private

---

[22] Exhibit F - van de Pol p. 2 - 3; Exhibit M - Milch Report p. 15.

[23] *Hoe Nederlands is de hack van berichtenserver Sky?* Crimesite (July 20, 2024) (Available at: https://www.crimesite.nl/hoe-nederlands-is-de-hack-van-berichtenserver-sky/#google_vignette) (visited on July 23, 2024) (which translates to *How Dutch is the hack of Sky's messaging server?*).

agency to conduct the mass surveillance. [24] Elektron, a third party vendor, was retained to to set up the wiretap on the Sky ECC servers to intercept the incoming and outgoing communications.

In short, the Dutch authorities successfully circumvented the Amsterdam investigative judge's 2018 denial of their application to copy the Sky ECC servers by getting the same relief they had been denied from a different venue: France. A Notice of Transfer dated August 20, 2019 confirms that the data from the initial wiretap was sent to Rotterdam Public Prosecution Service prosecutors in the Netherlands, as well as to Belgium authorities. NJECL Article at 438.

By May 27, 2019, when it was clear that the Europeans were about to conduct a mass surveillance of all Sky ECC users' communications without any individualized suspicion, the United States reached an agreement with the Netherlands that the United States would suspend their criminal investigation into SkyECC "pending the outcome of ongoing investigations" by the Europeans. Exhibit J – Interception Application page 48. See also Moszkowicz Report p. 5 (citing same); Exhibit F - van de Pol, p. 2.  The United States' agreement with the Europeans did not come out of nowhere.

Back in late 2018, America participated in a week long international conference to figure out how to hack the Sky ECC servers. DeMorgen, a newspaper based in Antwerp, Belgium, interviewed one of the conference's participants, the law enforcement representative from Belgium identified as "M.", about the history of the Sky ECC hack. Stavros KelepourisYannick VerberckmoesJeroen Van Horenbeek, *Reconstructie: dit was Operatie Sky volgens de man die de telefoons van de onderwereld kraakte*, translated to: *Reconstruction: this was Operation Sky according to the man who cracked underworld phones,* DeMorgen (March 20, 2021), Original Available at: https://www.demorgen.be/voor-u-uitgelegd/reconstructie-dit-was-operatie-sky-

---

[24] Exhibit M - Milch Report, p. 14 (internal citations omitted).

volgens-de-man-die-de-telefoons-van-de-onderwereld-kraakte~bb940470/ (visited on October 2, 2024) (hereafter "DeMorgen Article").

According to the article, "At the end of 2018, M. gets on a plane to Australia. A meeting of some 20 police officers from around the world is scheduled in Sydney: **the U.S.**, Canada, Australia, several European countries. M. is the only one representing Belgium. For a week, **they sit together to decide how to get into the encrypted messaging service**." Exhibit Y – Translation of DeMorgen Article, p. 7 (emphasis added). (According to the DeMorgen Article, $800,000 that the United States gave to Belgium in 2012 ended up being spent by Belgium on the Sky ECC investigation. Id. p. 12.  Our thanks to Mr. Moszkowicz, Esq. for bringing the DeMorgen Article to our attention and for sending a translated version of the article.)

It is indisputable that the wiretap order was not premised on any *individualized* suspicion or limited to authorizing the seizure of only the communications of any particular suspects. The purported premise for intercepting every user's communications was that the mere use of Sky ECC was, in and of itself, inherently suspicious.[25]

Once the communications were intercepted, law enforcement faced another hurdle to their goal: how to decipher the encrypted messages they were intercepting from the Sky ECC servers. Much of the data that they were seizing from the Sky ECC servers beginning in June of 2019 was still encrypted, and thus, unreadable by law enforcement. NJECL Article p. 438.

On November 1, 2019, in order to "identify the users of the communication services and outline criminal organizations," and to "enhance[e] and develop[] the necessary techniques of decrypting the… communications and bring down the server," the Netherlands, Belgium, and

---

[25] Exhibit J - Annex 3 to Moszkowicz Report – Application for Interception Order p. 47 (alleging that Sky ECC "was used exclusively to facilitate criminal activities").

France agreed that they would enter a Joint Investigation Team Agreement (hereafter "JIT Agreement"), which they later executed on December 13, 2019. Exhibit H - certified English translation of the JIT Agreement (Annex 1 to the Moszkowicz Report) § 2.

The JIT Agreement alleges that Sky ECC "devices are chiefly used in organized drug trafficking and the criminal activities linked… That the devices are designed for use by criminal organizations is evident…" Exhibit H – JIT Agreement § 2.

The Dutch authorities found a method of decrypting the SkyECC communications.  In December of 2020, a French judge authorized the interception, and decryption of all incoming and outgoing SkyECC communications. Exhibit K - Villena Opinion p. 3.

Once again, this interception order was NOT restricted to users located in France, or the Netherlands, or even within the European Union. The December 2020 order applied to the communications of ALL SkyECC users <u>worldwide</u>.

From December 18, 2020 to March 9, 2021, law enforcement enacted "Operation Argus,"[26] aptly named after the mythological Greek giant "Argus Panoptes," meaning "the **all-seeing** one,"[27] so named because of his "hundred eyes… unparalleled vigilance and perception." Id. Cf. Merriam-Webster. (n.d.). *Argus*. Merriam-Webster.com Dictionary, Available at: https://www.merriam-webster.com/dictionary/Argus (visited September 27, 2024).

Operation Argus entailed the live monitoring of the private communications of "all messages of all Sky users," "worldwide," without any regard to what country they were located

---

[26] NJECL Article p. 435.

[27] The Editors of GreekMythology.com, "*Argus Panoptes: The Hundred-Eyed Giant*, " GreekMythology.com (November 30 2023), Available at: https://www.greekmythology.com/Myths/Creatures/Argus_Panoptes/argus_panoptes.html. (visited on September 26, 2024) (emphasis added).

21

in.[28] According to Europol, some <u>170,000 individuals</u> in countries around the world were using

SkyECC.[29] Approximately three million messages were sent through SkyECC **every day**. <u>Id.</u>

By March 9, 2021, approximately 1 **Billion** messages were intercepted,[30] and nearly half

of the billion messages had been decrypted, i.e. unlocked. <u>Id.</u>

To put this volume into perspective, law enforcement estimated that it would take 40

officers 685 years to review all of the intercepted communications, or 11 million officers to

review the communications in one day. <u>Id.</u>

The one billion communications were <u>not</u> intercepted based upon any individualized

suspicion. The surveillance was of the communications of ALL Sky ECC users worldwide

premised solely on the use of Sky ECC.

An estimated **10%** of all the users who had their privacy invaded were allegedly

implicated by the intercepted communications. Exhibit E - Goodwin & Ayre, p. 2.  That

indicates that some **90%** of the platform's users were merely innocent victims of law

enforcement's overreach.

Once Operation Argus (the live monitoring of the billion messages) was complete, the

U.S. was no longer obligated to refrain from making arrests in their criminal investigation into

---

[28] Exhibit F - van de Pol, p. 3; Lödden and Makepeace, p. 390

[29] Exhibit L - Europol Press Release – *New major interventions to block encrypted communications of criminal networks* (updated March 12, 2021), Available at: https://www.europol.europa.eu/media-press/newsroom/news/new-major-interventions-to-block-encrypted-communications-of-criminal-networks (visited on September 12, 2024).

[30] NJECL Article p. 435. <u>See also</u> Exhibit F - van de Pol, p. 3; Helen Lyons, *'Reading all Sky ECC messages would take us 685 years,' police say*, <u>The Brussels Times</u> (March 12, 2021), Available at: https://www.brusselstimes.com/159580/reading-all-sky-ecc-encrypted-messages-would-take-us-685-years-belgium-police-say-belgian-criminal-underworld-federal-prosecutor-money-laundering-corruption-arms-trafficking-violent-crime-cocaine-fire (visited on September 18, 2024).

Sky ECC.[31] On March 12, 2021, just three days after the live monitoring was completed, the U.S. investigation culminated in an indictment against and arrest warrants for the founder of the entity behind SkyECC and for an individual who was allegedly a partner, involved in the distribution of Sky ECC phones. See Indictment - United States v. Eap et al., 3:21-cr-00822 (GPC) (S.D. Cal.) Doc. # 1 (March 12, 2021). See also Exhibit F - van de Pol p. 3; Exhibit E - Goodwin & Ayre p. 4. Computer Weekly confirms that those two men were indicted by a grand jury in the Southern District of California on March 12, 2021—three days after Belgian authorities conducted 200 raids as a result of the Sky ECC hack. Exhibit E - Goodwin & Ayre, p. 4.

The Europeans have heavily guarded the specifics about how the mass surveillance was conducted. Details have been withheld even from defense attorneys in European prosecutions relying on evidence from the mass surveillance.

Law enforcement used what is called a "Man-in-the-Middle (MitM) cyber attack… where the attacker secretly positions themselves between two communication partners… to intercept, manipulate, or alter the communication without either party noticing."[32] On information and belief, this was accomplished through what is called ARP Spoofing. Id. p. 14.

---

[31] Crimesite reports that despite the agreement between our nations, the United States did not immediately pause the federal investigation into Sky ECC in May of 2019, but first had undercover officers make controlled purchases of Sky ECC phones. Exhibit F - van de Pol, p. 2.

However, according to Computer Weekly, these undercover purchases were made in or about June of 2019, Exhibit E - Goodwin & Ayre, p. 4, which predates both the JIT Agreement and the decryption of the intercepted messages.

Thus, the U.S. honored its agreement with the Netherlands by pausing America's criminal investigation from at least the time when the JIT Agreement was entered (December 2019) through the conclusion of the live monitoring (March 2021).

[32] Exhibit M - Milch Report p. 13.

ARP Spoofing acts as a sort of Trojan horse—essentially, messages were sent through the Sky ECC network to SkyECC cell phones, which caused these phones to surreptitiously send law enforcement the ciphers, known as "keys", used for encrypting and decrypting their communications. Id. p. 13; Exhibit K - Villena Opinion p. 3.

Pursuant to the JIT Agreement, the original data from the mass surveillance would be forwarded to Europol "as fast as possible."[33] Thanks to the help of a whistleblower, we know that communications "in the Dutch language were to be analyzed by the Dutch authorities, but that messages in any other language were to be analyzed by Europol." Exhibit G - Moszkowicz Report p. 2 (citation omitted). "Europol received all the data gathered by the three countries… and divided them into intelligence packages based on the location from which the messages were sent. Europol was also in charge of disseminating these intelligence packages to the countries that were not parties to the JIT. Before an intelligence package could be sent to another country, however, approval by all parties to the JIT agreement was required." Id. (citing Annex 1 – JIT Agreement, attached as Exhibit H). See also Exhibit H - JIT Agreement § 9.1.

Thus, the Netherlands, Belgium, and French authorities agreed to share the original data from the mass surveillance with Europol, and Europol was tasked with analyzing this data, and using it to prepare intelligence packages to forward to other countries. Exhibit H - JIT Agreement § 9.1; Exhibit G - Moszkowicz Report p. 2.

According to the JIT Agreement, despite specifically alleging that Sky ECC was "chiefly used in organized drug trafficking,"[34] law enforcement would search the intercepted Sky ECC data for "information pointing to an immediate, threatening and serious harm to the physical

---

[33] Exhibit H - JIT Agreement § 9.1 (Annex 1 to Moszkowicz Report); Ex. G - Moszkowicz Report p. 2 (citing same).

[34] Exhibit H – JIT Agreement § 2

integrity of persons." Exhibit H - JIT Agreement § 9.1. See also Exhibit G – Moszkowicz Report, p. 4 (regarding same) (citation omitted).[35]

This was the same excuse law enforcement had used during a previous mass surveillance of another encrypted messaging communications platform: EncroChat. As with the Sky ECC hack, the EncroChat hack was authorized by the French,[36] but turned over to Netherlands law enforcement.[37] (Obviously the Dutch figured out which forum would be more mass-surveillance friendly.) In order to sift through intercepted EncroChat communications, the Netherlands Forensic Institute ("NFI") took a computer algorithm that had been originally developed to search "for drug-related messages sent between suspected criminals in large volumes of communications data, as part of a research and development project,"[38] and allegedly modified this artificial intelligence program to search for "life-threatening messages," such as "planned murders or kidnappings." Id. Allegedly, it was the modified version trained to search for evidence of life threatening scenarios, not the original program designed to search for evidence of drug trafficking, that the NFI shared with Dutch law enforcement to comb through data from the EncroChat mass surveillance. Id. Data from the EncroChat surveillance was then compiled into intelligence packages sent to different law enforcement agencies, Id., much as data from Sky

---

[35] Mr. Moszkowicz's expertise in litigating the admissibility of such evidence has been addressed in prior filings. See, e.g., ECF # 60-1 (Mr. Moszkowicz's CV); ECF # 60-2 (Letter from Mr. Moszkowicz). Although the Government indicated they would oppose any prospective application to share any discovery with Mr. Moszkowicz, our understanding is their objection was unrelated to Mr. Moszkowicz's experience.

[36] Ex. K - Villena Opinion p. 10.

[37] Skelton, Sebastian, *Dutch police used deep learning model to predict threats to life*, Computer Weekly (May 14, 2021), Available at: https://www.computerweekly.com/news/252500738/Dutch-police-used-deep-learning-model-to-predict-threats-to-life?vgnextfmt=print, (visited on September 12, 2024).

[38] According to the NFI, they used webpages and newspaper articles to train their "'drug-talk' software… before introducing it to the messages of suspected criminals, so it could learn how they communicate," Id.

25

ECC was also compiled into intelligence packages and distributed by Europol. The law enforcement agencies, in turn, did not restrict their search of EncroChat data for evidence that lives were endangered, but did a broader search for evidence of drugs trafficking and other crimes. Id.

Given law enforcement's estimate that it would have taken either hundreds of years or millions of analysts to manually review the data, artificial intelligence was employed to sift through the original Sky ECC data and create the intelligence packages. See Exhibit G – Moszkowicz Report, p. 4 ("AI largely made the job of manually reading and analyzing and searching through all messages largely obsolete").

Although the Government has not shared the algorithm with the defense, it is obvious that the algorithm did not adhere to the JIT Agreement's pledge to search only for evidence of an immediate "Threat to Life." A competently written algorithm, trained to search specifically for only threats to life or even threats of imminent physical harm would not have also resulted in numerous arrests for money laundering. Yet, law enforcement specifically boasted of intercepted Sky ECC messages leading them to the raid of an apartment that allegedly laundered "as much as €3 million." Lyons, *'Reading all Sky ECC messages would take us 685 years,' police say.*

Evidently, at the end of the day, the need to prevent imminent threats to life is merely an excuse that the signatories to the JIT Agreement trotted out to conceal their impending actual search for evidence of any form of criminal activity.

B. What Was Produced v. What Remains Outstanding.

In the case at bar, European law enforcement sent U.S. authorities what the Department of Homeland Security describes as "voluminous records of GOGIC's communications on two Sky Phones (or two Sky ECC accounts)." Aff. in Support of SW ¶ 9. A Homeland Security

26

Special Agent swore under oath that these communications include "explicit planning and discussion of narcotics trafficking…. references to the specific cocaine seizures… (…for which GOGIC is charged), and an explicit solicitation… to arrange the murder of an individual… believed to be a law-enforcement informant," Id.

What has been turned over in discovery is **NOT** the original data from the SkyECC surveillance.[39] Instead, what we received are voluminous Excel spreadsheets[40] —in other words, charts, which purportedly contain excerpts of communications intercepted during the mass surveillance. The original data, also known as raw data, does not take the form of Excel charts.[41] "It is obvious  that the data inserted into the Excel tables are not the raw data, as no communication device in the world has ever communicated in the format of a spreadsheet program like Excel." Exhibit M - Milch Report p. 46.[42]

We have asked the Government to share with us what computer algorithm was used to comb through the billion intercepted Sky ECC messages. Exhibit N - 9/16/24 Discovery Demand. The Government has not done so.

The Netherlands developed a software called ChatX[43] and shared ChatX with law enforcement agencies in other countries, such as the United States.[44] Law enforcement agencies

---

[39] Exhibit M - Milch Report, p. 3, 4, 28, 46. See also Exhibit G - Moszkowicz Report p. 4.
[40] With the exception of a production to co-counsel on June 7, 2023, which the Government later admitted was incomplete, 10/26/23 R. 16 Letter, and which we understand to have been produced in PDF format rather than Excel.
[41] Exhibit M - Milch Report p. 3, 4, 46; Exhibit G - Moszkowicz Report p. 4.
[42] Mr. Milch's expertise, both as a criminal defense attorney in Germany who has extensive experience litigating the admissibility of evidence from the Sky ECC hack and similar hacks, and as a former IT consultant, has been discussed in prior filings. See, e.g. ECF # 54-1 (Mr. Milch's CV, as generated by LinkedIn); ECF # 52-2 (Letter from Mr. Milch), which were submitted in both German and English.
[43] Exhibit G – Moszkowicz Report, p. 3.
[44] Exhibit G - Moszkowicz Report p. 4 - 5.

27

use ChatX to access the Sky ECC data from the mass surveillance, including not only the contents of the intercepted communications, but also information about the communications, which is known as "metadata." Id. p. 4. A redacted screenshot, illustrating how communications appear in ChatX, is included in Mr. Moszkowicz's Report. Exhibit G – p. 4.

The metadata available to authorities includes, for example, the geographic location a message was sent from, and IMEI and IMSI numbers, which would identify the cell phones and sim cards that communications were sent from, etc. Id. p. 4.

The Government has not shared metadata from the surveillance, such as the geographic location that the intercepted communications were sent from or the IMEI and IMSI numbers associated with the sent communications. The missing location information is significant because if this information were available to the defense, it could be used to investigate whether the defendant was in the location that Sky ECC messages were sent from at the time that messages were sent. (It would also, for example, indicate what intercepted messages, if any, were sent from within the United States of America at the time of the suspicionless surveillance.)

This geographic location information and other metadata would be available through ChatX. Exhibit G - Moszkowicz Report p. 4; Exhibit M – Milch Report, p. 16

ChatX has not, however, been shared with defense attorneys. Id. We asked the Government to share it with us by letter dated September 16, 2024.

Mr. Gogic retained undersigned counsel on August 8, 2023. Upon coming into the case, we were advised by the Government that discovery was largely complete. At that point in time, the Government had made two discovery productions to co-counsel, who had been retained first.

In the first production on March 23, 2023, the Government indicated that: "the government anticipates calling experts at trial to testify that the narcotics seized are cocaine,

28

about methods and means that drug trafficking organizations employ to transport and import bulk quantities of cocaine, the monetary value of a kilogram of cocaine, including the approximate value in source countries, at transshipment points, in the United States and in Europe, and **geolocation data** as it pertains to the maritime vessels involved in this case. The identity, qualifications, and bases for the conclusions of each expert will be provided to you when they become available." 3/23/23 R. 16 Letter, ECF # 17, p. 2 (emphasis added).

Eighteen months later, we still have not been provided with the Government's expert witness disclosures, nor the geolocation data referenced in the Government's first Rule 16 Letter.

The second, June 7, 2023 production to co-counsel included excerpts from the Sky ECC hack, "produced by the French government, Bates numbered GOGIC000116."[45] The Government acknowledged in their next discovery production that Bates # GOGIC000116 was **not** a complete production of Sky ECC data. Specifically, on October 26, 2023, the Government provided what they called a "more complete production of Sky Data," 10/26/23 Rule 16 Letter, ECF # 32, p. 1.

We thereafter submitted our first formal discovery demand to the Government on November 2, 2023.

On December 6, 2023, we pointed out to the Government that we were missing data from SkyECC, explaining in an email "in the 10/26/23 discovery, we are missing the media (photos, voice messages) referenced in the conversations. In addition, most of the conversations are one-sided." 12/6/23 Email from Defense to Government.

---

[45] R. 16 Letter dated June 7, 2023, ECF # 20.

The Government responded two days later that "it looks like there was an error uploading the prior production to USAfx. We have corrected that and the full data set, as we received it, should now be uploaded and available for you." 12/8/23 Email from Gov.

Upon further review, however, the Government had not actually made additional data available after the December 6, 2023 email to the Government. We explained on January 3, 2024 that, "most Sky conversations are still one-sided. We only have the messages sent by user 28A508. Do you have the other side of the conversation?" 1/3/24 Email to Government.

The Government responded that they did not have the rest of the purported conversations, stating, "It's my understanding that many (but not all) of the Sky conversations that we received are one-sided – I don't currently know whether that's a limitation of what was collected/decrypted by the Europeans or an artifact of how the Europeans produced it to us... we'll seek clarification from Europe." Exhibit W - 1/3/24 Email from Gov.

Defense counsel then made subsequent, formal discovery demands:

- on May 29, 2024, for, *inter alia,* the original data and metadata, all information concerning how the SkyECC data was obtained and collected and decrypted, and all information concerning how the SkyECC data was thereafter processed, both by European law enforcement and by the United States. Exhibit N - 5/29/24 Discovery Demand;

- on July 12, 2024, noting, *inter alia,* that the May 29, 2024 demand was still outstanding; and

- on September 16, 2024, we sent another demand, reminding the Government the prior demands were still outstanding, pointing out that the Excel spreadsheets do

30

not constitute the raw data and metadata, and requesting, *inter alia*, the algorithms and search terms used to process the original data. Exhibit N..

In response, the Government made another production on July 19, 2024, which turned out to be a duplicate of data that was previously produced on October 26, 2023, with the exception of one covering page from France, dated July 12, 2024. Exhibit O - Bates # GOGIC003811.

The cover page (or 1 page "Report") from France stated that they "will proceed with the compilation of the requested information contained in the database from judicial information … (Docket No. 20342000687) concerning SkyECC, using the interface of the Dutch collaborators of the joint investigation team," Id.

From our investigation, we understand that "the interface of the Dutch collaborators" would mean ChatX, but we still have questions. For example: what is the scope of the referenced "database… Docket No. 202342000687"? Is France working from the full, original data from the Sky ECC hack? Has Europol (responsible for packaging and sharing seized data with other countries) only provided excerpts to France?

The 1 page Report refers to multiple documents that have not been provided to defense counsel, including:

- "the letters rogatory… issued on 04/18/2023,"

- a "first referral report," and

- "e-mail authorization from the instructing magistrate for the data to be transmitted directly to the requesting authority,"  Bates # GOGIC003811 - 3812.

31

We requested these items as part of our latest demand for discovery and <u>Brady</u> material on September 16, 2024 after receiving the Report in the original French from the Government.[46] The Government's response was to:

a) provide an English translation of the July 12, 2024 coversheet, Bates #GOGIC003812,

b) advise us that the Excel spreadsheets were sent to the Government in response to the Government's requests to the French authorities for the Sky ECC user IDs the Government associates with Mr. Gogic, and

c) to insist that no other requested discovery or <u>Brady</u> material is within the Government's possession. Ex. X - 9/18/24 Email from Government. (In spite of the Government's representation that the Government cannot produce more material, the Government offered, as we had previously offered in our September 16, 2024 Demand Letter, to confer and discuss the <u>Brady</u> and discovery demands. While we remain willing to confer with the Government once motions have been filed, given the Government's repeated failures to produce demanded materials—including but not limited to materials that were requested last year—and repeated insistence that they turned over everything that can be turned over, we submit the motion to compel <u>Brady</u> and Discovery *infra* is nonetheless ripe.) We still do not know exactly how law enforcement filtered through millions and millions of SkyECC communications for evidence of crimes when the mass surveillance was not aimed at particular individual targets.

We do not have the original data and metadata from SkyECC, and we do not know, for example:

- how the Excel spreadsheets were created,

- when the Excel spreadsheets were created,

---

[46] Ex. N– 9/16/24 Discovery Demand.

- Who created the Excel charts?

- Why data is coming from France, when Europol is the one that was tasked with preparing intelligence packages for different countries? Has the Government been deliberately avoiding sending a request for assistance to the entity that is responsible for preparing and distributing intelligence packages?

Since the Excel spreadsheets do not include complete communications, we also do not know:

- Did Europol receive incomplete information?

- Did France receive incomplete information?

- Were the original communications not completely intercepted?

- Did someone, be it at Europol or France or elsewhere, simply choose excerpts from the fruits of the mass surveillance to create the numerous Excel spreadsheets?  How many changes did the original data and metadata from the mass surveillance undergo in creating the spreadsheets or before the charts were sent to defense counsel?

These are all material questions of fact that need to be answered. It appears the French authorities were involved in at least sharing the Excel spreadsheets and some attachments with the Government in this matter. Exhibit O - Bates #s GOGIC003811 – 3812.

With all due respect to the Government, our discovery demands included a demand for all documentation of how the United States acquired SkyECC data from European law enforcement, the scope of the information sought and received, etc. Ex. N - 5/29/24 and 9/16/24 Demand Letters.

It is impossible that the only documentation of communication that took place between the Government and the European authorities regarding the U.S. acquisition of data from France

33

is a one page document that was dated <u>July 12, **2024**</u>. July of 2024 is over 8 months AFTER the Excel spreadsheets had previously been shared with defense counsel and well over a year after the defendant's arrest. Exhibit O - Bates # GOGIC003811 and in English at Bates # GOGIC003812. Indeed, this 1 page document dated July 12, 2024 appears to indicate that the U.S. Government had previously requested information on or before April 18, **2023.** <u>Id.</u>

Thus, the Government's representation that there is no other responsive documentation in the Government's possession is demonstrably false. The Government even references, in a response to a discovery demand, responsive documentation that was not turned over. The Government confirms that the Government "asked the French authorities to produce data associated with particular Sky PINS that belonged to the defendant... and…. we made the request a second time," Ex. X - 9/18/24 Email from Government.

Although these requests to Europe are part of what defense counsel has demanded, the Government has not turned the requests over. (Just to be clear: the Government also did <u>not</u> provide the JIT Agreement to defense counsel, even though the JIT Agreement presumably would have fallen within the scope of our discovery demands, as it contemplates the sharing of intelligence packages of Sky ECC data prepared by Europol with non-JIT signatories, such as the United States. We had to instead independently obtain the JIT Agreement from a consultant, Mr. Moszkowicz, and then send it to a translator for a certified English translation.)

A major problem from an evidentiary standpoint is that "digital data is at a significantly higher risk of (intentional) manipulation or (unintentional) alterations." Exhibit M - Milch Report p. 47. With Excel spreadsheets, such as those the Government provided to us, "**all tables and columns can currently be edited and altered by anyone without detection or traceability**." Exhibit M - Milch Report p. 47 (emphasis added).

34

As we will discuss, anomalies in the Excel charts and accompanying folders of media files show that there <u>are</u> differences between the original intercepted data and the data that was turned over to the defense in Excel spreadsheets. Though, without access to the original data, we cannot ascertain how many <u>additional</u> differences there are that cannot be detected from inspecting the Excel spreadsheets alone.

The defendant has had the Sky ECC discovery productions from the Government reviewed by two digital evidence experts, Andreas Milch, Esq. and Lee Koch, Esq. Anomalies are discussed in the attached report from Andreas Milch, Exhibit M. Mr. Milch is not only experienced in European litigation concerning the admissibility of evidence from the Sky ECC hack and similar hacks in criminal cases. He is also a technological expert.[47]  Mr. Koch, an attorney and former intelligence analyst for the United States Air Force and National Security Agency, having reviewed both the Sky ECC discovery and Mr. Milch's report, concurs with Mr. Milch "on all points made… including his methods and conclusions." Exhibit Z – Letter and CV from Mr. Koch.

Both Mr. Milch and Mr. Koch are willing to testify at a hearing on Mr. Gogic's motions.

Mr. Milch explains that differences between the original data and the secondhand data can be caused in two ways (1) on purpose and (2) unintentionally. Exhibit M  p. 47. As an example of how metadata can be changed: Excel spreadsheets normally have their own metadata showing when files were created and modified, etc. Ex. M p. 18. Andreas Milch explains that the feature of Excel that would keep track of changes has been disabled in all of the Excel spreadsheets. Exhibit M p. 20. He also explains that the Excel spreadsheets produced by the

---

[47] <u>See</u> ECF # 54-1 (Mr. Milch's CV, as generated by LinkedIn); ECF # 52-2 (Letter from Mr. Milch),

Government on July 19, 2024, at first glance, purport that they were created on July 12, 2024. Id. p. 19 – 20.

However, thanks to Mr. Milch's technological expertise, he was able to get more information by inspecting the Excel files. From his analysis, he was able to determine dates on which the Excel files were created and modified. In one example, an Excel file indicates that it was initially created on November 9, 2020,[48] and modified on November 15, 2022, January 3, 2024, and May 31, 2024. Id. p. 23. In another example, a spreadsheet indicates that it was modified on June 14, 2022, March 1, 2024, and May 31, 2024. Id. p. 24. Mr. Milch notes that evidence of modifications to the Excel spreadsheets is found in the October 26, 2023 discovery production, not only in the July 19, 2024 discovery production. Id. p. 28. Although he provides specific examples of spreadsheets, he concludes that "[s]uch changes can be found in **all** Excel spreadsheets within… **GOGIC003807** and **GOGIC003809**," Exhibit M – Milch Report, p. 28 (emphasis in original).

Therefore, Mr. Milch has concluded, "it cannot logically be the case that these are the unchanged messages allegedly intercepted in Europe, as there is clear evidence of modifications…. the defense must be granted access to the original, unaltered raw data to verify the authenticity and integrity of the data," Id. p. 29.

Of concern, multiple Excel charts turned over by the Government are purportedly one side of conversations that were not one-sided. For example, an Excel spreadsheet entitled conversation_3_export_75256[49] lists 6,445 purported communications spanning a period from

---

[48] Exhibit M p. 22.
[49] Spreadsheets were grouped by the Government under a joint batestamp. The spreadsheet in question is part of batestamp GOGIC003809, located within a subfolder entitled "3_28a508-████."

March 12, 2020 through November 9, 2020. Although the chart represents that there were two participants in this purported conversation, all 6,445 communications listed in the chart were supposedly sent by the same participant.

In another example, an Excel spreadsheet entitled, "conversation_21_export_75265," contains 6,537 purported communications. Again, the chart indicates that this "conversation" involved two participants, but again all 6,537 messages were allegedly sent by only one declarant.[50]

In a third example, an Excel spreadsheet entitled, "conversation_42_export_75270"[51] lists 3,429 purported communications. Again, the spreadsheet represents that there were two different participants to this alleged "conversation," and again all of the thousands of listed messages in the spreadsheet were allegedly sent by only one declarant. These examples are **illustrative**, not exhaustive.

When buying a cell phone from Sky Global, a purchaser would be "assigned an individual six-digit user ID (ECC ID) that could not be changed."[52] From the Government's representation,[53] in order to prepare the Excel spreadsheets, French authorities searched for SkyECC messages by searching for specific SkyECC user IDs.

It appears that in the process of preparing the Excel charts, messages that were sent TO the target IDs were excluded from numerous spreadsheets.

---

[50] This spreadsheet is within bates number GOGIC003809, under a subfolder entitled "21_28a508████████."

[51] This spreadsheet is within a subfolder entitled, "42_28a508-██████" found in bates number GOGIC003809.

[52] Exhibit K - Villena Opinion, p. 1.

[53] Ex. X - 9/18/24 Email from Government.

37

The result is the turnover of charts listing alleged excerpts from conversations that instead read as if they were incomprehensible monologues. By our count, there are 60 Excel spreadsheets that are one-sided. See Exhibit W – 1/3/24 Email from Government (acknowledging that "many (but not all) of the Sky conversations that we received are one-sided"). Again, recall that the interception was not limited to specific Sky ECC users. The surveillance was aimed at all Sky ECC users as a whole, and resulted in the interception of approximately 1 billion Sky ECC communications around the globe by March of 2021.[54] We are therefore unclear on why the Government has turned over spreadsheets purportedly listing messages from one participant to a conversation, rather than give us access to the original, underlying data.[55]

Every electronic file has its own digital fingerprint, called a "hash value." Exhibit M - Milch Report p. 11. These digital fingerprints are crucial to demonstrating authenticity. Id. p. 32, 53, 58. A comparison of hash values in the original and in a copy would prove whether messages have been altered because any change to the contents of a message will result in a new fingerprint. Exhibit M - Milch Report p. 11 - 12, 55. Thus, in June of this year, 28 defendants were acquitted where the court found that the so-called "Panama Papers," 11.5 million digital

---

[54] NJECL Article p. 435. See also Exhibit F - van de Pol, p. 3; Helen Lyons, *'Reading all Sky ECC messages would take us 685 years,' police say*, The Brussels Times (March 12, 2021), Available at: https://www.brusselstimes.com/159580/reading-all-sky-ecc-encrypted-messages-would-take-us-685-years-belgium-police-say-belgian-criminal-underworld-federal-prosecutor-money-laundering-corruption-arms-trafficking-violent-crime-cocaine-fire (visited on September 18, 2024).

[55] In addition to the one-sided Excels spreadsheets, there are other spreadsheets that purport to list messages from "group chats," that is, communications between more than two participants. However, without the original data, we cannot be certain of what the total number of participants in any given "group chat" was, only the participants that are listed for specific communications in the Excel charts. Thus, in addition to the one-sided Excel charts, the "group chats" may be missing communications from one or more participants. We have counted 62 Excel spreadsheets that purport to summarize "group chats."

files leaked from a law firm, "did not comply with digital evidence principles, particularly noting the absence of crucial 'hash' values necessary for verifying the authenticity and integrity of digital data. Consequently, Judge Marquínez concluded that the remaining evidence was insufficient and inconclusive to establish criminal liability for the accused parties." Daniela Pulido, *Panama court acquits all defendants in 'Panama Papers' and 'Car wash' cases*, Jurist news (June 30, 2024), Available at: https://www.jurist.org/news/2024/06/panama-court-acquits-all-defendants-in-panama-papers-and-car-wash-cases/ (visited on October 3, 2024) (hereafter "Pulido").

In acquitting the 28 defendants, Judge Baloísa Marquínez additionally faulted the prosecution's failure to establish a proper chain of custody for the digital evidence. Id. See also Debra Cassens Weiss, *Leader of hacked 'Panama Papers' law firm is one of 28 people acquitted*, ABA Journal (July 1, 2024), Available at:

https://www.abajournal.com/news/article/leader-of-hacked-panama-papers-law-firm-is-one-of-28-people-acquitted#:~:text=White%20Collar%20Crime-,Leader%20of%20hacked%20'Panama%20Papers'%20law%20firm%20is,one%20of%2028%20people%20acquitted&text=Image%20from%20Shutterstock)-,A%20Panamanian%20judge%20has%20acquitted%2028%20people%2C%20including%20a%20founder,hacked%20from%20the%20law%20firm. (visited on October 3, 2024) (hereafter "Weiss").

In analyzing the Excel charts, Mr. Milch found that some messages are missing these fingerprints altogether. Exhibit M - Milch Report p. 49. This is one type of discrepancy that, according to Mr. Milch, are indicative of "manipulation or errors and must be thoroughly investigated." Ex. M - Milch Report p. 55.

The Excel charts reference media files (such as images and audio recordings) that were intercepted by the surveillance. When producing the Excel spreadsheets, the Government also produced folders purportedly containing the referenced media files.

In fact, law enforcement relied on the photographs and other media allegedly sent via SkyECC to identify Mr. Gogic as the user of the SkyECC phones in question. Aff. In Support of S.W. ¶ 10 (indicating that Mr. Gogic was identified as the user of two SkyECC user IDs in question based on, e.g. "recordings in GOGIC's voice; photographs of a young child that appears to be GOGIC's child; and photographs that include distinctive property…. and 'selfies' with the face obscured but which otherwise match GOGIC's appearance").

When a person sends a photograph through a messaging service, such as SkyECC, that photograph has the same digital fingerprint a/k/a "hash value" as the electronic message that it is sent through. Exhibit M, p. 11.

Here, however, we have multiple Excel spreadsheets where the accompanying media that was sent by the Government do <u>not</u> carry the same digital fingerprints as the messages listed in the Excel spreadsheets. Ex. M - Milch Report p. 30 - 38.

In other words, since the digital fingerprints do <u>not</u> match, there is no proof that the photographs and other media sent to us by the Government are the actual media files referenced in the Excel spreadsheets. As explained by Andreas Milch, "This file name is no longer traceable. It is also unclear whether this file was actually sent with this message, as the alleged 'hash value of the image file… does not match… the maessage…. and therefore, no direct connection between the sent message and the image is recognizable… Thus, there cannot be two hash values, **which suggests that the media files were not sent with the message as presented in the Excel table. However, it remains questionable where the image file in the media**

40

**folder originated… This inconsistency, found in all data sent to the aforementioned folder, indicates that these cannot be the original chat data… Only if both hash values—the raw file and the provided file—match can authenticity be assumed,"** Exhibit M - Milch Report p. 31 - 32 (emphasis added).

Mr. Milch identifies numerous instances where media files provided by the Government cannot be matched to any messages in the Excel spreadsheets. Exhibit M - Milch Report, p. – 29 – 38, 43.

Conversely, according to the Excel charts, a number of messages and files were sent in triplicate, as the same messages and media files are listed three times each.[56] Mr. Milch points out that the Excel charts will list the hash values of each of the three messages as identical to each other, which is "technically impossible for three different messages." Ex. M - Milch Report p. 42 - 43. That is, even if the declarant, for reasons unknown, sent the same message three times, because each electronic communication has its own digital fingerprint, the triplicates should not have identical hash values. The actual hash value changes every time a message is sent with end-to-end encryption, "even if the content remains the same." Exhibit M p. 11. And yet, inexplicably, in the Excel tables provided by the Government, the triplicate messages have identical digital fingerprints. Ex. M - Milch Report p. 42 - 44.

Although some of the referenced media was turned over with the Excel spreadsheets, others were not. As an example, Mr. Milch points out that the Excel spreadsheets represent that certain media was sent in triplicate, which means that the same "image file should be found three times in the corresponding media folder, which is not the case." Ex. M - Milch Report p. 37.

---

[56] Ex. M - Milch Report p. 37, 40 - 44.

From our own review of the discovery, there are thousands of media files (6,426 to be precise) that are referenced in the Excel spreadsheets that have not been turned over to defense counsel. For example, spreadsheet conversation_3_export_75256 alone represents that 870 media files were sent over the course of 6,445 messages. Yet we do not have any of these hundreds of media files. The "media folder" that accompanies the spreadsheet in discovery is empty. As another example, the spreadsheet entitled conversation_21_export_75265 represents that there were 408 media files sent across 6,537 messages. Yet once again, none of these hundreds of media files have been turned over, as the "media" folder accompanying the spreadsheet in the discovery is empty. Again, these examples are illustrative, not exhaustive. By our count, the references to thousands of missing media files are spread out across 97 Excel spreadsheets.

Another example of anomalies in the Excel spreadsheets include numerous communications from a single declarant with the exact same timestamp down to the second. In other words, the Excel charts allege that multiple communications were sent by the same person (not by a machine), in the span of only one second, which, according to Mr. Milch is "not only illogical but actually impossible." Exhibit M - Milch Report p. 39. By our count, this occurs in 108 Excel spreadsheets provided by the Government.

Yet another anomaly in the Excel spreadsheets is that some purported messages do not list the date and time that the messages were purportedly sent. We have counted 36 purported messages spread across 11 Excel spreadsheets that omit the date and time the alleged messages would have been sent. Mr. Milch explains that "Missing, duplicate, or incorrect timestamps are suspicious," Exhibit M – Milch Report, p. 55. "The absence of timestamps and the generation of duplicates might indicate interference with data integrity." Id. p. 44.

C. European Case Law On Admissibility.

Although our understanding is this will be the first Court to address the admissibility of Sky ECC evidence in the United States, there has been litigation in Europe over the admissibility of evidence from the Sky ECC surveillance and from the mass interception of other encrypted messaging services, such as EncroChat and ByLock.

In 2021, the European Court of Justice ruled that where "'a party is not in a position to comment effectively on evidence pertaining to a field of which the judges have no knowledge and that is likely to have a preponderant influence on the findings of fact, it must find an infringement of the right to a fair trial and exclude that evidence in order to avoid such an infringement,'" Exhibit K - Villena Opinion p. 8 (quoting Prokuraturr, C-746/18 (ECJ March 2, 2021).

On September 20, 2022, the European Court of Justice ruled that suspicionless mass surveillance (such as the live monitoring of Sky ECC by Operation Argus) violates European Union law. Ex. K - Villena Opinion, p. 7 – 8 (discussing Case Numbers C-793/19 and C-794/19 [ECJ September 20, 2022]).

The District Court of Ljubljana in Slovenia ruled that SkyECC data was inadmissible, finding that it "enabled the highly untargeted collection and processing of personal data from the private lives of a wide range of individuals and … was more akin to mass surveillance than targeted surveillance," Ex. K - Villena Opinion, p. 9 (citing Case No. III K 24497/2021 [District Court of Ljubljana December 2, 2022]).

On July 15, 2022, the Italian Supreme Court held that the defendant has a right to know "'the manner of the investigative activity and the procedure for obtaining such intelligence in order to allow the full exercise of the right of defense,'" Ex. K - Villena Opinion p. 9 (citing

43

Case Number 32915-2022, p. 4 [Corte Supreme Di Cassazione July 15, 2022]). Per the Italian Supreme Court, "law enforcement authorities must disclose how they themselves obtained the SkyECC data. Secondly, it follows from the decision that the SkyECC **data cannot be admitted as evidence** as long as the defense is unable to fully examine the way in which the data was obtained and collected and thus also the reliability and completeness of the evidence." Exhibit K - Villena Opinion p. 9 (emphasis in original).

Additionally, European courts have decided issues that are related in cases that are not specifically dealing with Sky ECC. On July 1, 2021, the Berlin Regional Court, in the context of the mass interception of communications from another platform, EncroChat, ruled that evidence from that mass surveillance was inadmissible as "the requirement of a concrete suspicion of a crime is such an indispensable fundamental value… of German law. Surveillance of telecommunications without cause is fundamentally alien to German law." Ex. K - Villena Opinion, p. 10 – 11 (quoting 525 KLs, 254 Js 592/20 [Regional Court of Berlin July 1, 2021]).

The U.S.'s Federal Bureau of Investigations ("F.B.I.") developed their own communications platform, called ANOM, as a trap. While promising users that their communications would be private, in 2019, the U.S. cooperated with an undisclosed European Union nation in order to set up the FBI's ANOM server there and intercept and decrypt all ANOM communications[57] (an extremely blatant example of our Government acting to evade the requirements of the U.S. Constitution). Mr. Villena y Scheffler advises that "[t]he majority of users of the 'ANOM' crypto cell phones were not US citizens or residents,"[58] which would mean

---

[57] Ex. K - Villena Opinion p. 12.
[58] Ex. K - Villena Opinion p. 12.

44

that there were still some American citizens and residents whose privacy the FBI invaded through ANOM.

The Memmingen District Court, in the context of addressing the ANOM wiretapping, opined that "'this full-scale surveillance of all activities of 'ANOM' users based on a general suspicion amounts to mass surveillance without cause… Information obtained in this way cannot be rededicated for use in criminal proceedings, as such a measure is not permitted under the Code of Criminal Procedure and is also not compatible with constitutional values.'" Ex. K - Villena Opinion p. 13 (quoting Decision 1 KLs 401 Js 10121/22 [Memmingen District Court August 21, 2023]).

The Munich Higher Regional Court, again in the context of the same FBI hack, found "considerable doubts as to whether there is an authorization basis for the data collection under US law or under German law," where the "wiretapping was carried out without restriction, whether the users were previously sufficiently suspicious or not,'" Ex. K - Villena Opinion p. 14 (quoting 1 Ws 525/23 [Munich Higher Regional Court October 19, 2023]).

On September 26, 2023, the European Court of Human Rights held in Yalçınkaya v. Türkiye, Case No. 15669/20 (ECtHR September 26, 2023) that the defendant's right to a fair trial had been violated. Yalçınkaya involved evidence from another service: ByLock. There, while acknowledging that there could have been legitimate reasons why the raw data had not been shared with the defendant in that case,

> "That said, even in such circumstances, the Court must examine whether any prejudice sustained by the applicant on account of the non-disclosure of the relevant ByLock data was counterbalanced by adequate procedural safeguards and whether he was given a proper opportunity to prepare his defence…
>
> "Accordingly … [the Court] cannot but note that the applicant was given no explanation by the domestic courts as to why, and upon whose decision, the raw data – particularly to the extent that they concerned him specifically – were kept from him. He was therefore deprived of the opportunity to present any counter-arguments, such

45

as to contest the validity of those reasons or to dispute that all efforts had been made to strike a fair balance between the competing interests at play and to ensure the rights of the defence…

"Secondly, the applicant's request that the raw data be submitted to an independent examination for the verification of their content and integrity was also not entertained…

"The Court considers that, in principle, the inability of the defence to have direct access to the evidence and to test its integrity and reliability first-hand places a greater onus on the domestic courts to subject those issues to the most searching scrutiny… The Court notes, however, that other than confirming the lawfulness of the data collection procedure and verifying that the applicant had established a connection with the ByLock server, the domestic courts did not address the separate matter of how the integrity of the data obtained from the server had been ensured in all respects…

"The Court is accordingly of the view that giving the applicant the opportunity to acquaint himself with the decrypted ByLock material in his regard would have constituted an important step in preserving his defence rights. This is all the more so considering, once again, the preponderant weight of the ByLock evidence in securing the applicant's conviction…

"The Court considers, in the light of the foregoing, that there were not enough safeguards in place to ensure that the applicant had a genuine opportunity to challenge the evidence against him and conduct his defence in an effective manner and on an equal footing with the prosecution," Yalçınkaya Case No. 15669/20 ¶¶ 330 - 341 (citations omitted), available at: https://hudoc.echr.coe.int/eng?i=001-227636 (visited on September 20, 2024).

See also Legal Summary of Yalçınkaya, available at: https://hudoc.echr.coe.int/fre?i=002-14187 (visited on September 20, 2024); Ex. K - Villena Opinion p. 4 – 6 (discussing Yalçınkaya at length). A prior European Court of Human Rights, Furcht v. Germany, 54648/09 (ECHR October 23, 2014), likewise held that where the defense and the court cannot "legally review the investigative measures, the use of the evidence may constitute a violation of *fair trial*, so that the evidence obtained… is unusable." Ex. K - Villena Opinion p. 6 (citing Furcht).

On October 26, 2023, the Supreme Court of Italy (La Corte Supreme Di Cassazione), vacated a pre-trial detention order that the Court of Milan had premised on evidence from Sky ECC. Sentenza 44154-23 (Corte Suprema Di Cassazione October 26, 2023), available in Italian

at: https://www.cortedicassazione.it/resources/cms/documents/44154_11_2023_pen_noindex.pdf

(visited on September 26, 2024). The Public Prosecutor at the Court of Milan had issued

European Investigation Orders to obtain evidence from the Sky ECC hack for a criminal

investigation into international drug trafficking. In the decision vacating the order of the lower

court and remanding the case to the Court of Milan for further findings, the Italian Supreme

Court noted that the defendant's

> "right… to be able to know and challenge the evidentiary material used against him or her, the Supreme Court has held… that the defense's right of access to the evidence must be guaranteed even if it is collected abroad… to ensure a fair trial, it is required… that the accused be given 'an adequate opportunity' to prepare his defense…

> "the defense has the right to obtain the original, encrypted version of the messages and the security keys necessary for decryption... it does not emerge…. whether the defense… was given the opportunity to obtain the original version of the messages as well as the data necessary to make the encrypted messages intelligible,"

*Legality check of SKY-ECC evidence is mandatory (ITA Supreme Court 44154/23)* available at:

https://canestrinilex.com/en/readings/legality-check-of-skyecc-evidence-is-mandatory-ita-

supreme-court-4415423 (visited on September 26, 2024) (unofficial translation of Decision in

44154/23).

The Italian Supreme Court also opined that it is not sufficient for the Sky ECC hack to

have been ordered by a French judge in compliance with French law or for the Italian prosecutor

to have then obtained evidence from the hack through the European Investigation Orders

("EIOs"). Rather, it remained the responsibility of a judge in the country where the EIOs were

issued—in that case, Italy—to determine "the admissibility and use of the evidence itself (the

interception) according to Italian law." Id.

Of course, as one might expect where different issues are raised before different

tribunals, the case law is not entirely uniform. France, the country that issued the authorizations

47

in the Sky ECC hack and the EncroChat hack, has declared that the French wiretapping statute at issue is consistent with France's Constitution. Case No. 2022-987 QPC (France Constitutional Court April 8, 2022).

On February 13, 2024, the Supreme Court of the Netherlands relied on the grounds that European Union nations are bound by the "principle of trust," pursuant to which European Union judges in one country are legally obligated to assume that orders issued in another European Union country were lawful. Therefore, as the EncroChat hack was authorized by a French court order, under the principle of trust, Netherlands courts cannot question the legality of the French court order authorizing the EncroChat hack. Case Number 23/00055 (Netherlands Sup. Ct. February 13, 2024), available in Dutch at:

https://uitspraken.rechtspraak.nl/details?id=ECLI:NL:HR:2024:192 (visited on September 27, 2024).  Likewise, on March 2, 2022, Germany's Federal Court of Justice ruled that whether or not the French wiretap order for EncroChat could have been issued in Germany pursuant to German law was irrelevant to the admissibility of EncroChat evidence in Germany.[59]

However, most recently, on April 30, 2024, the European Union Court of Justice issued a landmark ruling, which we understand to be the European equivalent of answering certified questions. The European Union Court of Justice is responsible for "[e]nsuring EU law is interpreted and applied the same in every EU country; ensuring countries and EU institutions abide by EU law."[60] Thus, the national courts of any of the members of the European Union

---

[59] Case 5 StR 457/21 (Germany Federal Court of Justice March 2, 2022), Available in German at: https://juris.bundesgerichtshof.de/cgi-bin/rechtsprechung/document.py?Gericht=bgh&Art=en&Datum=2022&nr=127966 (visited on September 27, 2024).

[60] *Court of Justice of the European Union*, Overview, Available at: https://european-union.europa.eu/institutions-law-budget/institutions-and-bodies/search-all-eu-institutions-and-bodies/court-justice-european-union-cjeu_en (visited on September 28, 2024).

"may, and sometimes must, refer to the Court of Justice and ask it to clarify a point concerning the interpretation of EU law, so that they may ascertain, for example, whether their national legislation complies with that law."[61] The Court of Justice's ruling is binding on not only the national court that referred the issue to it, but also on any other courts within the European Union. Id. In the case of M.N., Case C-670/22, (European Union Ct. of Justice April 30, 2024), available in English at: https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:62022CJ0670 (visited on September 20, 2024), the Regional Court of Berlin referred questions concerning the admissibility of evidence from EncroChat in criminal proceedings. The European Union Court of Justice concluded, *inter alia,* "that evidence must be disregarded if the person concerned cannot respond to and make a statement about the evidence in cases of suspected criminal activity." Ex. M - Milch Report p. 34 (citing M.N.). See Exhibit P - European Union Court of Justice Press Release No. 77/24 (April 30, 2024).

Additionally, an appellate court in Montenegro vacated a judgment against Darko Janjić and remanded the case where the lower court had not adequately explained its reasons for admitting evidence from Sky ECC against the defendant. Specifically, "the overturned decision does not contain clear, well argued, sufficient and valid reasons on admitting or not… this evidence (the manner in which it was obtained, legal issues and whether those are in accordance with principles of domestic legal system, as well as with widely accepted rules of international law)." Exhibit T – Certified English Translation of Kž-S. no.11/24 (Montenegro Court of Appeals July 9, 2024), p. 9.

---

[61] CURIA, *Court of Justice,* Jurisdiction, Available at: https://curia.europa.eu/jcms/jcms/Jo2_7024/en/ (visited on September 28, 2024).

III. The Arrest and Post-Arrest Investigation.

On October 30, 2022, Mr. Gogic was at an airport in Miami when he was arrested and taken to Homeland Security Investigation's office at the airport. Mr. Gogic then made statements before being *Mirandized*.[62] The agents asked Mr. Gogic to sign a form waiving his *Miranda* rights, which the defendant refused to do.[63] The interview of Mr. Gogic nevertheless continued, although Mr. Gogic "continuously denied involvement in anything," and "said that he would help agents if he knew something but he does not… if he were to provide information, his family would be in danger so he could not do that." Exhibit Q. The interview lasted approximately half an hour. Exhibit Q.

An iPhone 13 was seized from Mr. Gogic the day of his arrest.[64] During the post-arrest interview, Mr. Gogic told law enforcement that he wanted an attorney, and asked if he could call a friend or his wife to have them get him an attorney. Ex. R - Declaration ¶¶ 8 - 9. Homeland Security advised Mr. Gogic that he would be allowed to make the phone call, but that he would first have to unlock his iPhone with his passcode while an agent was holding the phone, in order to retrieve his friend's or his wife's phone numbers from his phone's list of contacts. Ex. R - Declaration ¶ 10.

As Mr. Gogic understood this to be the only way he would be able to get an attorney, Mr. Gogic complied. Id. ¶ 11. Homeland Security thereby obtained the passcode for the iPhone from Mr. Gogic.[65]

---

[62] Exhibit Q - Agent Interview, bates GOGIC000016.
[63] Id.; Exhibit R - Defendant's Declaration ¶ 8.
[64] Exhibit S - Search Warrant Affidavit ¶ 12, bates GOGIC003077.
[65] Exhibit R - Declaration ¶ 12; Exhibit Q - Agent Interview (listing passcode to iPhone).

As he was arrested in Florida and had to be transported to New York by federal agents, he was not arraigned until January 18, 2023.[66] He is being held without bail at the Metropolitan Detention Center in Brooklyn, New York.

On February 26, 2024, the Department of Homeland Security applied for a warrant to search Mr. Gogic's iPhone. The affidavit in support of the search warrant made no mention of the post-arrest interview during which Homeland Security obtained the passcode to Mr. Gogic's iPhone. Exhibit S – Aff. in Support.

It did, however, allege that there was probable cause to search Mr. Gogic's phone based on Sky ECC data for evidence that would match the Sky ECC data and, therefore "ties GOGIC to the Sky Phones and thus to the charged crimes." Ex. S - Aff. In Support of S.W. ¶ 13.

The search warrant was granted by the Hon. Cheryl L. Pollak on February 26, 2024.

## DISCUSSION

I. <u>Evidence from the Mass Surveillance Operation Should Be Suppressed.</u>

The Due Process Clause of the Fifth Amendment prohibits depriving a defendant of liberty (i.e. obtaining a conviction) on the basis of evidence derived from conduct "so outrageous" that it violates "'fundamental fairness, shocking to the universal sense of justice,'" <u>United States v. Russell</u>, 411 U.S. 423, 431 - 432 (1973) (internal citations omitted).

The Due Process Clause applies regardless of whether the outrageous conduct occurred outside of the United States, such as at Guantanamo Bay, Cuba,[67] or in Djibouti,[68] or in Europe.

---

[66] Minute Entry for Arraignment, ECF # 9.
[67] Cf. <u>Mohammed v. Obama</u>, 689 F. Supp. 2d 38 (D.D.C. 2009)
[68] Cf. <u>United States v. Ahmed</u>, 94 F. Supp. 3d 394 (E.D.N.Y. 2015)

51

<u>Cf.</u> <u>United States v. Ghailani</u>, 751 Supp. 2d 502, 508 (S.D.N.Y. 2010) (defendant moved to dismiss indictment on grounds torture outside of United States violated Due Process Clause; court acknowledged that if "as Ghailani claims, he was tortured in violation of the Due Process Clause, he may have remedies," but that those remedies do not extend to dismissal of the indictment).

The conduct at issue here—mass suspicionless surveillance of the communications of all users of an encrypted messaging platform worldwide—is so egregious as to shock the conscience.

Using that evidence to obtain a conviction, and thereby deprive Mr. Gogic of liberty would violate his Constitutional right to Due Process.

The Fourth Amendment prohibits unreasonable searches and seizures—meaning those conducted without a warrant or a recognized exception to the warrant requirement.

There can be no doubt that if the suspicionless mass surveillance occurred within the United States, it would have violated the Fourth Amendment of the U.S. Constitution.[69] But what happens when an unreasonable search or seizure is committed extraterritorially by foreign law enforcement, who have an agreement with the U.S. that they will then provide that evidence for use in a U.S. court? The general rule is the international silver platter doctrine, providing that evidence obtained through foreign law enforcement will not be suppressed. The Second Circuit has held that there are two exceptions to this rule.

---

[69] Since Sky ECC phones were sold to undercover agents in California, and since the mass surveillance occurred worldwide, we also have no doubt that the mass surveillance did, to some extent, occur within the United States. We are handicapped, however, in that with the Government failing to turn over the metadata about where seized communications were sent from, we cannot analyze whether seized communications in the case at bar were sent from the United States.

Evidence obtained from foreign officials can be suppressed in either of two scenarios:

(1)    where the foreign agents' conduct was so egregious that it "shocks the judicial conscience," United States v. Getto, 729 F.3d 221, 228 (2d Cir. 2013), or

(2)    where there was cooperation between the United States and foreign agents that "may implicate constitutional restrictions," Id., 729 F.3d at 230 (quoting United States v. Lee, 723 F.3d 134 [2d Cir. 2013]).

One reason this case will make legal history is that this is the rare case where both of the exceptions to the foreign silver platter doctrine apply.

A. Shocks the Conscience.

What is meant by "shocks the conscience"? The Second Circuit explains that this exception is not actually rooted in "the Fourth Amendment, but instead from a federal court's authority to exercise its supervisory powers over the administration of federal justice… Pursuant to this authority, 'we may employ our supervisory powers when absolutely necessary **to preserve the integrity of the criminal justice system,**'" Getto, 729 F.3d 221, 229 (quoting United States v. Barona, 56 F.3d 1087, 1091 [9th Cir. 1995], and citing United States v. Maturo, 982 F.2d 57, 60-61 [2d Cir. 1992]; United States v. Emmanuel, 565 F.3d 1324, 1330 [11th Cir. 2009]) (emphasis added).

It is not enough to merely establish that conduct would have violated the Due Process Clause of the Fifth Amendment or the Fourth Amendment. To shock the conscience, the conduct "must be 'egregious,'" Getto, 729 F.3d at 228 (quoting United States ex rel. Lujan v. Gengler, 510 F.2d 62, 66 [2d Cir. 1975]). Examples the Second Circuit provided to illustrate the concept

53

are "'torture, terror,'"[70] "'rubbing pepper in the eyes,'"[71] and forcible stomach pumping. Id., (citing Rochin v. California, 342 U.S. 165 [1952]).

Lest there be any confusion, we should clarify that this list of examples is illustrative, not exhaustive. Courts have **not** held that "shocks the conscience" requires either a physical invasion of a person's body or physical abuse. Rather, those happen to be the most obvious examples of "'conduct that violates fundamental international norms of decency,'" Getto, 729 F.3d 221, 229 (quoting Emmanuel, 565 F.3d 1324, 1331).

The case at bar gives us a different example of conduct so egregious that it violates fundamental norms of decency—suspicionless, mass surveillance. A billion messages were intercepted **worldwide** from approximately 170,000 individuals.

Worldwide would include within the United States of America, where a Sky ECC distributor allegedly sold Sky ECC phones to federal undercover officers in 2019.[72] Conveniently, however, although evidence of the geographical location messages were sent from was intercepted along with the messages themselves,[73] the Excel spreadsheets turned over by the Government are devoid of evidence of what country or countries the messages were sent *from*, which, among other things, hinders anyone from establishing that their rights were violated inside the United States rather than extraterritorially.

The billion messages were not intercepted from named targets, because there were no specific targets. The hack involved the interception of every user of the Sky ECC platform across

---

[70] Getto, 729 F.3d 221, 229 (quoting Gengler, 510 F.2d at 66).
[71] Id. (quoting United States v. Nagelberg, 434 F.2d 585, 587 n.1 [2d Cir. 1970]).
[72] Exhibit F - van de Pol, p. 2 (undercover officers met with alleged distributor in Los Angeles, California to purchase Sky ECC phones).
[73] Ex. G – Moszkowicz Report p. 4.

the globe[74] based on nothing more than that they had chosen to use an encrypted communications platform that European law enforcement figured out how to intercept and decrypt. The mass surveillance was not based on evidence that every one of the thousands upon thousands of people on this platform were all using the platform to commit a crime (or many crimes).

Since at least the early 1990s, law enforcement has been deeply uncomfortable with the concept that technology would become available that would actually keep private electronic communications private. Exhibits C and D. But, as Europol has already conceded,[75] end-to-end encryption is not in and of itself indicia of criminal activity. It is a routinely used security tool, ironically used to prevent criminals from hacking the private communications of others. See ACLU.

Evidently law enforcement is also suspicious about the very act of making a purchase in cash in person in the twenty-first century,[76] to which we can only say that if this is indicia of criminal activity, there would be pending criminal investigations for every American that uses an ATM. It is important at this juncture to remember that throughout the course of history and even through today, legal goods have been and continue to be sold in person, with cash, without having to prove either the purchaser's identity or residence. Even today, you can still walk into a grocery store in New York City, and exchange cash for food and other household products, without having to present photo identification or proof of address to the checkout clerk. Based on

---

[74] Ex. F – van de Pol p. 3 ("Following a man-in-the-middle attack experts manage to hack all users of Sky ECC. From February 15 to March 9, worldwide all messages of all Sky users are collected… a harvest of billions of messages…"); Ex. J – 6/14/19 Interception Application p. 48; Ex. H – JIT Agreement § 2; Lödden and Makepeace, at p. 390.

[75] Exhibit A – Third Europol Report § 3.1.1.

[76] Exhibit J – 6/14/19 Interception Application, p. 47.

55

every day experience and common sense, then, the act of purchasing a phone in cash in person

does not establish reasonable suspicion, let alone probable cause, that criminal activity is afoot.

This hack was a global fishing expedition. Statistically, if you intercept the

communications of enough people worldwide, you will find that out of a billion

communications, some percentage of them will relate to crimes. Specifically, an estimated 10%

of Sky ECC's users were allegedly using the platform to discuss crimes,[77] meaning that

approximately **90%** of the platform's users had their private communications seized for no

reason other than that they were swept up in the breathtakingly large net cast by law

enforcement.

We understand that "shocks the conscience" is not determined by the Fourth

Amendment, but this case does have important implications for the future of the Fourth

Amendment. If the mass surveillance that occurred here—intercepting the private

communications of persons around the globe on the premise that merely using an end-to-end

encrypted platform is evidence of criminality—does not shock the conscience, what hope do

Americans have of maintaining our civil liberties? Today we are dealing with Sky ECC, but what

if the next global hack is aimed at WhatsApp or Facebook's Messenger, both of which now also

employ end-to-end encryption? Are we to look Americans straight in the eye and tell them that

their right to privacy does not prevent Europeans from intercepting all global communications on

WhatsApp, decrypting them, dividing them into intelligence packages, and then delivering these

communications to American law enforcement per their agreement with the American authorities

for use in a U.S. court of law? This is not some far-fetched hypothetical. WhatsApp would be

intercepted next. The Court should be aware that the European Union has *already* proposed

---

[77] Exhibit E - Goodwin & Ayre, p. 2.

legislation called "Chat Control," that, if passed, would entail the mass, suspicionless interception of communications sent over WhatsApp, as well as other encrypted messaging platforms.[78] Recall that nearly 1 out of 3 people in America is currently on WhatsApp,[79] to say nothing of the Americans using other platforms who would also be impacted by Chat Control.

We hope that this shocks the judicial conscience, not only for the sake of Mr. Gogic, but for the sake of the public's respect for the American criminal justice system. Maybe we do not have the same level of privacy in the twenty-first century that existed at the time of the founding, but the act of purchasing a cell phone in person or using a security measure to keep hackers from invading your privacy should not be an invitation for Big Brother to watch you.

Wherefore, because suspicionless mass surveillance is so egregious as to shock the conscience, the Court should exercise its supervisory authority to preclude evidence from the Sky ECC hack in order "'to preserve the integrity of the criminal justice system,'" Getto, 729 F.3d 221, 229 (quoting Barona, 56 F.3d 1087, 1091).

B. Implicates Constitutional Restrictions.

We turn now to the second exception to the international silver platter doctrine, implicating constitutional restrictions. According to the Second Circuit, this exception can be satisfied in two different ways, either: (1) where the foreign official acted as an agent of the United States, or (2) where the United States cooperated with foreign officials in order to evade

---

[78] See Sonja Raath, *Will the EU's Chat Control legislation undermine encryption and privacy*? ExpressVPN, (July 2, 2024; updated July 7, 2024), Available at: https://www.expressvpn.com/blog/eu-chat-control-legislation/ (visited on October 1, 2024).
[79] 100 million of WhatsApp's 2 billion users are in the United States. Meta, *100 million using WhatsApp across the United States*, WhatsApp Blog, Available at: https://blog.whatsapp.com/100-million-using-whatsapp-across-the-united-states (July 25, 2024) visited on September 30, 2024).

the requirements of the U.S. Constitution. <u>Getto</u>, 729 F.3d 221, 230. Because it has previously been held that the former requires *control* over foreign officials and that a request for information will not suffice to demonstrate control, we will spare the Court's time and jump straight to the latter. We are aware that courts do not like to infer law enforcement's intent to evade the requirements of the U.S. Constitution whenever the inference can conceivably, however tenuously, be avoided.

However, there is clear cut evidence of America's intent to evade constitutional restrictions in the case at bar. In 2018, the U.S. met with authorities from other nations, including Belgium, other European nations, Canada, and Australia, in Sydney, Australia. The purpose of this week long international conference was to work together to find a way to hack the Sky ECC servers.[80]

In 2019, the U.S. was already in the middle of investigating the individuals behind Sky ECC when America learned that the Europeans were on the verge of making this planned hack a reality and committing suspicionless, mass surveillance on a global scale.[81] Entering the JIT Agreement as a party would have looked bad for America because in the U.S. conducting suspicionless mass surveillance is still very, very illegal, not only by statute,[82] but also under the Fourth and Fifth Amendments of the Constitution. But why enter the JIT Agreement as a party when a much more palliative option existed? The U.S. could maintain the façade of keeping its hands clean during the interception and then receive the same evidence anyway through requests for mutual legal assistance. The JIT Agreement specifically contemplates parties to the

---

[80] Exhibit Y – Translation of DeMorgen Article, p. 7.
[81] Exhibit G – Moszkowicz Report, p. 5 (citation omitted); Exhibit J – June 14, 2019 Interception Application, p. 48.
[82] 18 U.S.C. § 2518 requires that an order to intercept communications be supported by probable cause.

agreement sharing evidence from the mass surveillance with non-parties. Exhibit G –

Moszkowicz Report, p. 2 – 3; Exhibit H – JIT Agreement at, i.e. §§ 9, 9.1.

The only catch was that the mass surveillance would be thwarted before it ever began if

the U.S. proceeded with indicting Sky ECC's founder and alleged distributor in 2019, as it was

on course to do before the Netherlands figured out how to get the keys to unlock the encrypted

messages. If that happened, nobody would benefit from the planned mass surveillance, not the

U.S. and not Europe.

So the U.S. entered a separate agreement with the Netherlands.[83] The agreement between

the American Government and the Netherlands is memorialized in the initial French June 14,

2019 Application to Intercept the Sky ECC servers, which specifies that, "[f]ollowing a meeting

at Europol on 27 May 2019 with the Belgian and Dutch authorities, it was made clear that the US

authorities had also opened an investigation into SKYECC and that their ultimate goal was to

arrest the company's executives in Canada. However, a tacit agreement between the American

and Dutch authorities allowed the European investigations to continue, with the Americans

suspending further operations pending the outcome of ongoing investigations." Exhibit J –

Certified Translation of Interception Application, p. 48.

In other words, in order for the U.S. to be able to receive intelligence packages from the

global mass surveillance, the U.S. had to agree to hold off on bringing indictments in the

American investigation until the mass surveillance was concluded.

The U.S. upheld its end of the bargain. Despite having evidence from undercover officers

in the investigation since 2019,[84] the U.S. did not bring an indictment in the Sky ECC

---

[83] Exhibit G – Moszkowicz Report, p. 5 (citation omitted).
[84] Exhibit E – Goodwin & Ayre, p. 4.

investigation until three days after the live monitoring concluded in hundreds of raids.[85] Now the JIT parties have upheld their end of the bargain by sending the evidence from the mass surveillance to the Government.

Respectfully, if the U.S.'s participation in the 2018 international conference on hacking the Sky ECC servers, combined with the subsequent agreement not to indict individuals in the U.S.'s Sky ECC investigation until after the conclusion of the mass surveillance in exchange for data from the mass surveillance is not more than enough evidence of the U.S.'s intent to evade the requirements of our Constitution, then we do not know how to reconcile this with instructions to a jury that they can infer a person's intent.

The exclusionary rule was designed to both deter illegal conduct by law enforcement and to protect the integrity of the judiciary. "[T]he federal courts [cannot be allowed to become] accomplices in the willful disobedience of a Constitution they are sworn to uphold." Elkins v. United States, 364 U.S. 206, 223 (1960) (quoting Olmstead v. United States, 277 U.S. 438, 485 [1928] [J. Brandeis, Dissenting]).

Wherefore, we respectfully move for an Order excluding Sky ECC evidence from the case at bar in light of the mass suspicionless surveillance shocking the conscience and, alternatively, in light of the U.S. cooperating with foreign law enforcement in order to evade the requirements of the U.S. Constitution.

> C. Introduction of the Sky ECC Evidence Would Violate
> Mr. Gogic's Constitutional Rights Under the Due Process Clause.

The Due Process Clause applies to all defendants in U.S. criminal courts, whether or not they are U.S. citizens. United States v. Bescond, 24 F.4th 759, 768 (2d Cir. 2021).

---

[85] Id.; see also Exhibit F – van de Pol, p. 3; Indictment, United States v. Eap et al., 3:21-cr-00822 (GPC) (S.D. Cal.) Doc. # 1

60

Under the Due Process Clause, the prosecution has a duty to disclose material favorable evidence to the defendant. Brady v. Maryland, 373 U.S. 83 (1963). It is irrelevant whether the prosecution acted in good faith or bad faith. Kyles v. Whitley, 514 U.S. 419, 432, 115 S. Ct. 1555 (1995) (quoting Brady, 373 U.S. at 87). Evidence is material where the non-disclosure "'undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. 419, 434 (quoting United States v. Bagley, 473 U.S. 667 [1985]).

Importantly, Brady material is not limited to evidence that is already in the actual possession of the prosecutor. Rather, the U.S. Supreme Court has recognized that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," Kyles, 514 U.S. 419, 437. Accordingly, "[t]he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation," United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (citing Kyles, 115 S. Ct. at 1567). See also Youngblood v. West Virginia, 547 U.S. 867, 869 – 870 (2006) (quoting Kyles, 514 U.S. at 438).

Thus, under the Due Process Clause, the issue is not whether the original data and metadata from the Sky ECC hack are already in the possession of the prosecution. The original data and metadata is already in the possession of the same authorities that the Government obtained the Excel spreadsheets and media files from. The Government has an obligation, if it does not possess the original data and metadata already, to obtain the original data underlying the Excel spreadsheets. The defense has already requested the material on Mr. Gogic's behalf. See Exhibit N – 5/29/24 Discovery Demand, p. 1, Request # 1, 9/16/24 Discovery Demand.

The non-disclosure of the original data and metadata is material to Mr. Gogic's defense as it could well undermine confidence in the trial's outcome. The Supreme Court has clarified

61

that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence," Kyles, 514 U.S. 419, 434.

Mr. Gogic cannot have a fair trial if he is convicted on the basis of Excel spreadsheets—documents which are easily modified, both intentionally and inadvertently[86]—without first being given the opportunity to compare the contents of these Excel spreadsheets to the original data. Cf. People v. DeGata, 86 N.Y.2d 40 (1995) (regarding notes from a laboratory regarding DNA testing, although not notes of a trial witness, "[t]he highly technical nature of this evidence… should be subject to the evaluation and strategy of defendant's counsel and experts. We have often repeated that the best judge of the value of evidence to a defendant's case is 'the single-minded devotion of counsel for the accused'") (citations omitted).

Thus, the European Union Court of Justice, in addressing the admissibility of evidence from another encrypted messaging platform, EncroChat, declared that where, "a party is not in a position to comment effectively on a piece of evidence that is likely to have a preponderant influence on the findings of fact, that court must find an infringement of the right to a fair trial and exclude that evidence in order to avoid such an infringement," M.N., C-670/22 ¶ 105 (citation omitted). Likewise, in another case addressing the issue, the European Court of Human Rights ruled that in Yalçınkaya, the defendant's right to a fair trial had been violated where "there were not enough safeguards in place to ensure that the applicant had a genuine opportunity to challenge the evidence against him and conduct his defence in an effective manner and on an equal footing with the prosecution," Yalçınkaya, Case No. 15669/20 ¶ 341 (citation omitted).

---

[86] Exhibit M, p. 47.

While these courts were not interpreting the Fifth Amendment's Due Process Clause, they are nonetheless persuasive about what is necessary to ensure the accused is given a fair trial. We recognize, as the Government has pointed out, that it is United States law that controls in the case at bar. Nevertheless, we believe that this reasoning is persuasive. Our takeaway is that it is important in an adversarial criminal justice system (which we have under the U.S. Constitution), to give the defendant a reasonable opportunity to test the authenticity and reliability of the evidence presented against him. How can one have Due Process of law if the defendant is not given the opportunity to challenge the evidence against him (spreadsheets prepared by law enforcement) through examining the raw, underlying data that was used to create those reports?

Just as the Confrontation Clause gives a defendant the opportunity to confront the witnesses against him, so, too, a defendant needs to be able to inspect the source from which Excel charts are generated so that he can properly confront the proffered digital evidence against him. While the admissibility of spreadsheets summarizing Sky ECC data has not yet been addressed in the U.S., we doubt that the U.S. Supreme Court is prepared to hold that the Due Process Clause affords less protection to the accused than they are accorded under European law.

Wherefore, we respectfully submit that unless and until the defendant is permitted to compare the Excel spreadsheets to the underlying original data and metadata, the Due Process Clause requires the exclusion of the Excel spreadsheets.

In the alternative, the Court can reach the same result pursuant to the Federal Rules of Evidence, which we turn to next.

II. The Excel Charts Should Be Precluded.

    A. The Excel Charts Are Inadmissible Under FRE 1006 – Summaries to Prove Content.

What is not an issue of first impression is the admissibility of Excel spreadsheets purporting to summarize original data.

Pursuant to FRE 1006, a summary, chart, or calculation of voluminous records may only be used to prove the records' content where the proponent of the summary or chart has first made the underlying records "available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." FRE 1006. "'The purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial,'" Meyer Corp., U.S. v. United States, 2021 Ct. Int. Trade LEXIS 26, *94; 2021 WL 777788 (Ct. Intl. Trade March 1, 2021), *vacated in part on other grounds*, *affirmed in part by* 43 F.4th 1325 (Fed. Cir. Aug. 11, 2022)*, (quoting Amarel v. Connell, 102 F.3d 1494, 1516 [9th Cir. 1996]).

"FRE 1006 recognizes 'that the preparation of summaries from other documents carries risks of error or distortion that must be guarded against by giving the opposing party an opportunity to review and object to the underlying documents.'" Bannum, Inc. v. United States, 151 Fed. Cl. 755, 768 (Fed. Cl. 2021) (quoting Doninger Metal Products Corp. v. United States, 50 Fed. Cl. 110, 130 [Fed. Cl. 2001], which in turn had quoted Conoco Inc. v. Dep't of Energy, 99 F.3d 387, 393 [Fed. Cir. 1997]). See also Jade Trading, LLC v. United States, 67 Fed. Cl. 608, 614 (Fed. Cl. 2005). "[I]t is inherently unfair to allow one party to put evidence before the court without allowing his opponent the opportunity to test its validity," Wright v. Southwest Bank, 554 F.2d 661, 663 (5th Cir. 1977).

In In re Olympia Office LLC, 574 B.R. 38 (Bankr. E.D.N.Y. 2017), the court ruled that a report was inadmissible under, *inter alia*, FRE 1006, where the court "cannot determine whether the summaries are in fact accurate to prove the content of the writings which they purport to summarize under FRE 1006," 574 B.R. 38, 51 (citing Needham v. White Laboratories Inc., 639 F.2d 394, 403 [7th Cir. 1981]); In re Fanaras, 263 B.R. 655 [Bankr. D. Mass 2001]).

Here, the Excel spreadsheets are nothing more than summaries or charts that the Government seeks to use to prove the content of the underlying Sky ECC data. Mr. Milch's Report confirms that the Excel spreadsheets are not the underlying records. Ex. M - Milch Report p. 3, 4, 46.

Because the Excel spreadsheets are summaries or charts of the underlying data, the spreadsheets must be precluded unless the Government first complies with the requirements of FRE 1006. FRE 1006 requires that the proponent of the summary or chart make the original underlying records available to the opposing party. We formally asked the Government for the underlying, original Sky ECC data (a/k/a raw data). Exhibit N – 5/29/24 Discovery Demand, p. 1, 9/16/24 Discovery Demand.

The application of FRE 1006 is straightforward. Because the Government has not made the underlying records available to the defense, the Government cannot introduce the Excel spreadsheets at trial. In Bannum, the plaintiff attempted to rely on spreadsheets in their opposition to a summary judgment motion without producing the records underlying the spreadsheets. The court explained that spreadsheets "are easy to manufacture and manipulate. There is no evidence that Bannum has manipulated the spreadsheets presented… and the Court does not suggest that it has; yet, there is likewise no evidence… to support them… The plaintiff has not produced original records, but, instead, has provided only a summary of costs from its

65

general ledger… The spreadsheets, standing alone, would be inadmissible at trial," <u>Bannum</u>, 151 Fed. Cl. 755, 768 - 769.

Likewise in <u>Meyer Corp.</u>, where the plaintiff did not provide a list of the documents underlying various exhibits, and did not make the underlying documents available to the defendant, the exhibits were precluded under FRE 1006. <u>Meyer Corp.</u>, 2021 Ct. Intl. Trade LEXIS 26, *94. So, too, the Hon. Eric Komitee granted a motion to exclude a summary chart where, *inter alia,* "the underlying records had not been produced during discovery," <u>United States v. Northern Metro. Found. For Healthcare Ctr., Inc.</u>, 2021 U.S. Dist. LEXIS 154046, *9; 2021 WL 3634765 (E.D.N.Y. August 16, 2021).

As in <u>Bannum</u> and <u>Meyer Corp.</u>, the Excel spreadsheets are inadmissible because the Government has not produced the underlying records summarized in the spreadsheets as required by FRE 1006.

The Government also cannot evade the requirements of FRE 1006 by using testimony to introduce information from the inadmissible Excel spreadsheets. "[T]estimony reciting information from these inadmissible documents should be disregarded… Accepting testimony based on inadmissible summaries would undermine the very reason for FRE 1006 and should be rejected," <u>Meyer Corp.</u>, 2021 Ct. Intl. Trade LEXIS at 94 – 95 (citing <u>Thompson v. United States</u>, 342 F.2d 137, 140 [5th Cir. 1965]).

Wherefore, pursuant to FRE 1006, Mr. Gogic respectfully moves for an ORDER precluding the Government from introducing either the Excel spreadsheets or testimony as to information taken from the inadmissible Excel spreadsheets.

66

B. FRE 106 – Rule of Completeness

Pursuant to FRE 106, when "a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." FRE 106.

Here, as discussed *supra*, many of the Excel spreadsheets turned over by the Government, in addition to not being the underlying records, only purportedly summarize one side of multiple conversations.[87] The Government asked French officials to extract messages allegedly sent BY Mr. Gogic. But the messages would not have been sent by Mr. Gogic to himself. They were not sent in a vacuum. The Excel spreadsheets indicate that the messages were sent to another user. For approximately 60 spreadsheets, we do not have the messages that Mr. Gogic would have been responding TO, or messages received in response.

Pursuant to FRE 106, if the Government were allowed to introduce portions of Sky ECC conversations, the Court would then have to permit the introduction of other portions of those conversations where "'necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion," United States v. Williams, 930 F.3d 44, 58 (2d Cir. 2019) (quoting United States v. Castro, 813 F.2d 571, 575-76 [2d Cir. 1987]) (and also citing, *inter alia,* Baker v. Goldman Sachs & Co., 669 F.3d 105, 111 [2d Cir. 2012]).

However, there is no way to comply with FRE 106 in the case at bar if the Court permits the Government to introduce purported excerpts from Sky ECC conversations. Despite discovery

---

[87] See Exhibit W – 1/3/24 Email from Gov. (conceding that many of the Excel spreadsheets "are one-sided").

demands, the Government has not disclosed the other side of the purported conversations to the defense, and the defense has no means of independently obtaining the other side of conversations.

Thus, although FRE 106 was expressly designed "to correct, contemporaneously, the 'misleading impression created by taking matters out of context,'" Williams, 930 F.3d 44, 58, (quoting Fed. R. Evid. 106 advisory committee note [1972 Proposed Rules]), the defense would be rendered powerless to remedy the introduction of statements taken out of context. Cf. Pendergrass v. United States DOJ, 2005 U.S. Dist. LEXIS 11502, *17 - 18; 2005 WL 1378724 (D.D.C. June 7, 2005) ("hearing one side of the conversation would be misleading and out of context").

The jury cannot evaluate statements that have been divorced from the proper context. The Government might as well try to introduce a witness' answers from a deposition or before a Grand Jury without introducing the questions that elicited the answers.

We respectfully submit that since the Government has not provided the defense with the context that that they are taking statements out of (i.e. the other side of conversations), the Court should preclude the Government from introducing excerpts in order to avoid violations of FRE 106.

### C. The Excel Summaries' Probative Value Is Outweighed By The Danger of Unfair Prejudice and of Misleading the Jury - FRE 403.

There is a common policy behind the requirements of FRE 1006, FRE 106, and FRE 403—the goal of avoiding unfair prejudice to one party. FRE 1006 works to curb unfair prejudice by explicitly prohibiting one party from introducing summaries or charts without the other party being able to first check their accuracy against the underlying records.

68

FRE 106 targets the unfair prejudice that would result by taking excerpts from communications or other records out of context. The rule of completeness addresses both the "concern that the court not be misled because portions of a statement are taken out of context… [and] the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a *subsequent* presentation of additional material," Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171, n. 14 (1988).

In turn, FRE 403 permits the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury," etc. FRE 403.

Here, the probative value of the Government's Sky ECC evidence is substantially outweighed by unfair prejudice where: (1) the Government has not provided the underlying records that these Excel charts were produced from, as required by FRE 1006, and (2) as the Government has produced one-side of purported conversations that were not one-sided, these excerpts have been divorced from their context—a harm that defendant cannot remedy under FRE 106, because he has not been given the remainder of the purported conversations.

Likewise, the probative value of these one-sided excerpts is also substantially outweighed by the danger of misleading the jury, in the same way that excerpts from a substantially inaudible recording would be misleading. As the Second Circuit has recognized, with a recording that "is substantially unintelligible… the part that can be heard may leave a misleading impression of the entire conversation," United States v. Frazier, 479 F.2d 983, 985 (2d Cir. 1973).

Wherefore, we respectfully request that the Court preclude evidence of the Sky ECC spreadsheets and testimony regarding same given that their probative value would be substantially outweighed by the danger of unfair prejudice and of misleading the jury.

D. Authentication.

The Government will not be able to authenticate the Excel data under FRE 901, nor establish it as self-authenticating under FRE 902.

To be admissible, the proponent must authenticate evidence with proof "sufficient to support a finding that the item is what the proponent claims it is." FRE 901(a). FRE 901(b) sets forth common examples of ways to authenticate evidence, such as through the testimony of a witness with knowledge "that an item is what it is claimed to be," FRE 901(b)(1).

Evidence can, for example, be authenticated by establishing the chain of custody. Mr. Milch explains that there are international standards for documenting a chain of custody of digital evidence. Exhibit M p. 56. According to Mr. Milch, "a complete record of the evidence chain is essential. In the absence of further information on this matter and the lack of metadata in the Excel tables themselves, it can be assumed that the authorities did not adhere to this minimum standard of documentation," Id. p. 56. Thus, while not always dispositive, a break in the chain of custody may prevent authentication of evidence. In a recent example, the Second Liquidator Court for Criminal Cases of Panama's First Judicial Circuit ruled that the so-called "Panama Papers" could not be authenticated where hash values were missing and the evidence "failed to meet the required chain of custody standards." Pulido. See also Weiss.

Here, we have not been given information about the chain of custody of the Sky ECC data, despite requesting such information from the Government. Ex. N – 5/29/24 Discovery Demand and 9/16/24 Discovery Demand.

70

Pursuant to FRE 902, certain evidence is self-authenticating, such as newspapers and periodicals,[88] or certified business records. FRE 902(11). As with traditional business records, certified electronic records are self-authenticating where they are "generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)," FRE 902(13) (emphasis added). Similarly, "Data copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)" would be self-authenticating. FRE 902(14).[89]

The Excel spreadsheets turned over in discovery are not self-authenticating. In the first place, the Government has not produced certifications as would be required for self-authentication under FRE 902 subsections (11), (12), (13) and (14).

In the second place, although the Government has not shared with us the process or system that generated the Excel spreadsheets, given the errors and omissions in the spreadsheets and accompanying media folders, whatever process was used to generate these summaries did not produce an accurate result. Mr. Milch explains that the software used to analyze digital evidence "must be verifiable… The validation of these tools is usually carried out by independent laboratories and certifications. It is questionable whether 'Chat X,' if indeed used here, has any certification. If the tools employed…. are not certified and validatable, this raises significant concerns regarding the reliability and integrity of the evidence… Non-validated tools

---

[88] FRE 902(6).

[89] Though, in any event, custodians of electronic communications, such as emails, can never do more than partially certify such records. That is, a service provider would be unable to certify the substantive contents of communications or that they were sent by a particular person.

71

may contain undetected errors that could lead to incorrect results or manipulative changes to the data," Exhibit M – Milch Report, p. 56 – 57. This is thus another reason the evidence cannot be self-authenticating under FRE 902(13).

Third, the data turned over by the Government cannot be authenticated "by a process of digital identification," FRE 902(14). To the contrary, according to the standards of digital forensics (as with FRE 1006), the Excel summaries cannot be authenticated without, *inter alia,* comparing them to the underlying original data from which they were created. Exhibit M – Milch Report, p. 29, 32, 34, 52 - 53.

An important tool used by digital forensic experts to verify authenticity is an examination of hash values, which serve as digital fingerprints. The hash values of the messages in the Excel spreadsheets and of the media files should perfectly match their counterparts in the original data in order to verify that the data has remained unchanged. Exhibit M - Milch Report, p. 10 - 12, 34, 37, 53, 58. The lack of hash values in the "Panama Papers" was one reason why Judge Marquínez of the Panama's First Judicial Circuit found that the Panama Papers could not be authenticated. See Pulido.

One reason comparing hash values of evidence to the hash values of the original data is so important is because Excel spreadsheets are easily modified, Bannum, 151 Fed. Cl. 755, 768 – 769, and without a log of changes (which we do not have), or a complete chain of custody (which we also do not have), there is no way of ascertaining that the data in the Excel spreadsheets conforms to the original data without comparing them.

The Excel spreadsheets claim that messages were sent three different times. But since that would have created three separately sent messages, the triplicates should each have different hash values. Exhibit M, p. 11, 42 - 43. Yet they do not. Exhibit M – Milch Report, p. 42.

72

Conversely, where media (such as a photograph) was sent in a message, the media and the message it was sent in should always carry the same hash value. Yet that is not the case here. Id., p. 13, 29 - 38

There are hash values that are missing from the discovery. Exhibit M – Milch Report, p. 49.

At any rate, it is impossible for the spreadsheets to conform to the original data because the interception was of ALL Sky ECC users' communications.[90] Therefore, the original data should not contain only half of various conversations. Yet we have counted 60 spreadsheets listing thousands of messages purportedly sent by Mr. Gogic to another individual without disclosing any of the messages from the other Sky ECC user. Cf. Exhibit M – Milch Report p. 46 (noting inconsistencies include "apparent self-conversations"); Exhibit W – 1/3/24 Email from Gov. (acknowledging one-sidedness of many Excel files).

Likewise, the original Sky ECC data contains additional information, such as where messages were sent from, which is not included in the Excel spreadsheets. Exhibit G – Moszkowicz Report, p. 4; Exhibit M – Milch Report, p. 16 - 17

The Government has not produced the underlying original data for inspection, nor shared with us information about what process was used to generate the Excel spreadsheets from this data (aside from telling us that they requested data for particular Sky ECC PIN numbers). We do not know what attempts, if any, were made by the Government to obtain the original data for disclosure, or the algorithm that was applied to sift through the billion seized communications, nor have we been given access to the ChatX program that law enforcement uses to review the

---

[90] Exhibit M – Milch Report, p. 15; Exhibit F – van de Pol, p. 3; Lödden and Makepeace, p. 390.

73

seized communications. All we know is the Government apparently has no intention of making any efforts in the future to make this information available.

Without making the original data available for comparison to the Excel spreadsheets and media files, not only is the evidence inadmissible under FRE 1006, but the Government will not be able to authenticate the spreadsheets or the accompanying media under FRE 901.

Wherefore, the evidence should be precluded.

III. Motion to Suppress Evidence Derived from the Violation of
Mr. Gogic's Constitutional Rights When He Was in Custody and Already Indicted.

A. Violation of Mr. Gogic's Rights Under *Miranda* and *Edwards v. Arizona*.

Under Miranda v. Arizona, 384 U.S. 436 (1966), before being subjected to custodial interrogation, a defendant must be warned that he has the right to remain silent, that he has the right to an attorney, and that if he cannot afford an attorney, one will be provided for him. "A suspect need not rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent," United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996) (citing Quinn v. United States, 349 U.S. 155 [1955]), but the invocation must be unequivocal.

Once an accused has clearly and unequivocally invoked his Fifth Amendment right to counsel, all questioning of the defendant "'must cease'", and he may not be questioned without a lawyer "unless the accused himself initiates further communication, exchanges, or conversations with the police," Edwards v. Arizona, 451 U.S. 477, 485 (1981). "Edwards is 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights,'" Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (quoting Michigan v. Harvey, 494 U.S. 344, 350 [1990]).

74

This is a bright-line rule. <u>Solem v. Stumes</u>, 465 U.S. 638, 646 (1984); <u>Smith</u>, 469 U.S. at 98 (quoting <u>Stumes</u>). "The merit of the <u>Edwards</u> decision lies in the clarity of its command and the certainty of its application. We have confirmed that the <u>Edwards</u> rule provides 'clear and unequivocal guidelines,'" <u>Minnick,</u> 498 U.S. 146, 151 (quoting <u>Arizona v. Roberson</u>, 486 U.S. 675 [1988]). <u>See also</u> <u>United States v. Su</u>, 1997 WL 695655 (S.D.N.Y. 1997) (suppressing statement taken in the absence of accused's attorney and rejecting Government's attempt to create an exception to <u>Edwards</u>); <u>United States v. Morel</u>, 2010 WL 2545479 (E.D.N.Y. 2010) (suppressing statements that were made while in custody after invocation of right to counsel, while denying suppression of statements made when not in custody).

Here, the fact that Mr. Gogic was in custody is established by the fact that he was told at the outset that he was under arrest.[91]  He was then interrogated.[92]

Mr. Gogic refused to sign a *Miranda* waiver.[93] Mr. Gogic, who is not fluent in English, advised the agents that he "did not understand the form and did not understand why [he] was being held." Ex. R - Declaration ¶ 8.

He repeatedly clearly and unequivocally invoked his right to counsel, informing the agents that he "wanted to speak to a lawyer,"[94] and "wanted the assistance of an attorney," and asking to make a phone call to have someone "arrange for [him] to speak with an attorney," Exhibit R - Defendant's Declaration ¶¶ 8 – 9.

---

[91] Ex. Q - Report of Interview, Bates # GOGIC000016.

[92] Ex. R - Defendant's Declaration ¶ 6. This is corroborated by law enforcement's Report of Interview, conceding that Mr. Gogic was interviewed after his arrest. Ex. Q - Report of Interview, Bates # GOGIC000016 (repeatedly using the term "Interview").  Likewise, that the Report states "GG continuously denied involvement in anything," is further indication that law enforcement was deliberately eliciting responses from Mr. Gogic.

[93] <u>Id.</u>; Ex. R - Defendant's Declaration ¶ 8.

[94] Ex. R - Defendant's Declaration ¶ 7.

The interview should have ceased the first time that Mr. Gogic asked to speak to a lawyer. "If there is questioning after the arrestee invokes his right to counsel, his responses may be admitted in evidence 'only on finding that [the arrestee] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked,'" United States v. Miller, 116 F.3d 641, 680 (2d Cir. 1997) (quoting Smith v. Illinois, 469 U.S. 91, 95 [1984] [per curiam]) (emphasis added). The burden is on the Government to prove by a preponderance of the evidence that there was a valid waiver of Miranda rights and that a confession was made voluntarily. United States v. Alleyne, 573 F. Supp. 3d 861, 875 (E.D.N.Y. 2021) (citations omitted); United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996).

In a clear violation of Edwards, instead of terminating the interview when Mr. Gogic invoked his right to counsel, the agents' interview of him continued, lasting for approximately a half hour in total. Exhibit Q - Report of Interview, Bates # GOGIC000016 ("Interview started at appx 715pm… Interview ended at appx 745 pm").

During the remainder of the interview, law enforcement deliberately elicited the passcode to Mr. Gogic's cell phone from him.[95] More specifically, after he had said that he wanted to make a phone call to have his friend or wife get him a lawyer, Homeland Security told Mr. Gogic that he would first have to use his passcode to unlock his cell phone while an agent was holding onto his phone. Ex. R - Declaration ¶¶ 10 - 12. The Department of Homeland Security thereby obtained Mr. Gogic's passcode. Id.; Ex. Q - Report of Interview (recounting passcode to Mr. Gogic's phone).

The Fifth Amendment protects against compelled statements and acts that are "testimonial," United States v. Hubbell, 530 U.S. 27, 34 (2000). Per the "act of production"

---

[95] Ex. Q - Report of Interview Bates GOGIC000016.

doctrine, the Supreme Court has held that an act of production "itself may implicitly communicate 'statements of fact.' By 'producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic,'" Hubbell, 530 U.S. 27, 36 (citation omitted).

 "Because Edwards forbids interrogation following the invocation of the Miranda right to counsel, not just interrogation that succeeds, 451 U.S. at 484-85, it follows that those who seek Edwards protection do not need to establish that the interrogation produced or sought a testimonial statement in order to establish a violation… badgering an unrepresented suspect into granting access to incriminating information threatens the core Fifth Amendment privilege, even if the government already knows that the suspect knows his own password." United States v. Mitchell, 76 M.J. 413, 419 (Armed Forces App. 2017) (suppressing contents of phone due to Edwards violation).

We agree with the Court of Appeals for the Armed Forces that where, as here, there has been an Edwards violation, one does not need to establish that the defendant was compelled to give a testimonial statement in violation of his Fifth Amendment rights. Mitchell, 76 M.J. at 419.

Nevertheless, just as law enforcement cannot compel "the combination to a wall safe," Hubbell, 530 U.S. 27, 44, under the Fifth Amendment, law enforcement cannot compel a defendant to disclose the password to his electronic device. Commonwealth v. Davis, 220 A.3d 534, 548 (Pa. Sup. Ct. 2019) ("under United States Supreme Court precedent, we find that the Commonwealth is seeking the electronic equivalent to a combination to a wall safe — the passcode to unlock Appellant's computer").

A number of courts have held that producing a passcode to a locked phone, either through the act of using the passcode to unlock a phone or by stating the passcode, is "testimonial."

United States v. Jimenez, 419 F. Supp. 3d 232, 233 (D. Mass. 2020) (citing Curcio v. United States, 354 U.S. 118, 128 [1957]; United States v. Warrant, 2019 U.S. Dist. LEXIS 147836, 2019 WL 4047615, at *2 [N.D. Cal. Aug. 26, 2019]); United States v. Sanchez, 334 F. Supp. 3d 1284, 1295 (N.D. Ga. July 11, 2018), *adopted by* 334 F. Supp.3d 1284 (N.D. Ga., Sept. 12, 2018) (collecting cases); SEC Civil Action v. Huang, 2015 U.S. Dist. LEXIS 127853 at *3 (E.D. Pa. September 23, 2015) (denying SEC's motion to compel passcodes; Defendants properly invoked their Fifth Amendment rights as "the act of producing their personal passcodes is testimonial in nature"); United States v. Kirschner, 823 F. Supp. 2d 665 (E.D. Mich. 2010) (quashing subpoena for defendant to testify; defendant's Fifth Amendment privilege against self-incrimination prevents defendant from being compelled to give his password); People v. Sneed, 230 NE 3d 97, 120 (Ill. Sup. Ct. 2023) (the act of entering passcode into phone "is testimonial to the extent that performing the act of entering the passcode implicitly asserts that the person entering it has the ability to unlock the phone") (footnote omitted). See also United States v. Doe (In re Grand Jury Subpoena Duces Tecum), 670 F.3d 1335 (11th Cir. 2012) (reversing civil contempt judgment; defendant properly invoked his Fifth Amendment privilege against self-incrimination in refusing to decrypt hard drives and produce their contents); The People of the State of Illinois v. Spicer, 125 N.E.3d 1286 (3d Dist. 2019); G.A.Q.L. v. State of Florida, 257 So.3d 1058, 1065 (2018); Seo v. State of Indiana, 148 N.E.3d 952, (Ind. Sup. Ct. 2020); Davis, 220 A.3d 534, 548; State v. Andrews, 243 NJ 447, 478 (2020).

The issue is not "that the government is not ultimately interested in the specific alphanumeric combination of a suspect's passcode for its own evidentiary value," United States

78

v. Shvartsman, 23 CR 307 (LJL), 2024 U.S. Dist. LEXIS 50597 (S.D.N.Y. March 20, 2024).[96] If

that were the standard, then the Supreme Court would not have any issue with compelling the

combination to a wall safe, either, as law enforcement would likewise not be interested in the

intrinsic evidentiary value of a safe's combination. But that is not the case. "The Government

attempts to avoid the analogy by arguing that it does not seek the combination or the key, but

rather the contents. This argument badly misses the mark. In Fisher, where the analogy was born,

and again in Hubbell, the Government never sought the 'key' or the 'combination' to the safe for

its own sake; rather, the Government sought the files being withheld," Doe (In re Grand Jury

Subpoena Duces Tecum), 670 F.3d 1335, 1346 (citing Hubbell, 530 U.S. at 38; Fisher v. United

States, 425 U.S. 391, 394-95 [1976]).

Using the passcode to unlock a phone is an act of production, which is testimonial and

incriminating as it "constitute[s] 'an implicit statement' that he owned the phone and could

access it," United States v. Bello, 2019 CCA LEXIS 200, *10; 2019 WL 2061914 (A.F. Crim.

App. May 7, 2019) (citing Mitchell, 76 M.J. 413, 418). It communicates, "the implied statement:

'I am the person who knows the password for this phone,'" United States v. Smith, 706 F. Supp.

3d 404, 408 (S.D.N.Y. 2023). United States v. Eldarir, 681 F. Supp. 3d 43 (E.D.N.Y. 2023),

which reached a different result, is distinguishable as it involved using biometrics to unlock a

phone. Biometrics is somewhat of a catch-all term that involves using a person's physical

features to unlock a phone (such as a fingerprint), instead of having to enter a passcode. While

finding that using a fingerprint was not testimonial, the Hon Lashann Dearcy Hall nevertheless

---

[96] In Shvartsman, the S.D.N.Y. found that providing the phone's passcode to the officer was testimonial and incriminating, and that the foregone conclusion doctrine did not apply. However, there was no *Miranda* violation in Shvartsman because the court found that that defendant was not in custody, and no Fifth Amendment violation where the court found that the defendant's disclosure of the passcode was voluntary.

acknowledged in <u>Eldarir</u> that "the compelled disclosure of Defendant's passcode may have constituted a testimonial act," 681 F. Supp. 3d 43, n. 5.

After establishing that using and disclosing a passcode is testimonial, we then move on to does the foregone conclusion doctrine apply? Some courts have held that the foregone conclusion doctrine does not apply in this context, reasoning that the U.S. Supreme Court has specifically used the doctrine with respect to the production of records. "The Supreme Court has spoken to this exception… and its application has been considered only in the compulsion of specific existing business or financial records… Its circumscribed application is for good reason. First, the Fifth Amendment privilege is foundational. Any exception thereto must be necessarily limited in scope and nature… it would be a significant expansion of the foregone conclusion rationale to apply it to a defendant's compelled oral or written testimony… until the United States Supreme Court holds otherwise, we construe the foregone conclusion rationale to be one of limited application, and, consistent with its teachings in other decisions, believe the exception to be inapplicable to compel the disclosure of a defendant's password," <u>Davis,</u> 220 A.3d 534, 549 - 551 (citing <u>Hubbell</u>, <u>United States v. Doe</u>, 465 U.S. 605 [1984]; <u>Doe v. United States</u>, 487 U.S. 201 [1988]; <u>Estelle v. Smith</u>, 451 U.S. 454, 462 [1981]) (footnotes and other citations omitted). <u>See also Shvartsman</u>, 2024 U.S. Dist. LEXIS 50597 (the foregone conclusion doctrine does not apply at all to compelling the defendant's passcode, but drawing a distinction between that and the act of unlocking the phone).

We respectfully ask the Court to adopt either the approach taken by the courts that have held that the foregone conclusion doctrine does not apply at all to the compelled disclosure of a passcode, or, in the alternative, to hold with courts that have held the doctrine requires the prosecution to establish with reasonable particularity that law enforcement already knew "the

80

contents of the phone," rather than that the defendant knew the phone's passcode. Spicer, 125 N.E. 3d 1286, 1291 (citing G.A.Q.L., 257 So. 3d 1063 – 1065). See In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011, 670 F.3d 1335, 1347 (foregone conclusion doctrine did not apply where "It is not enough for the Government to argue that the encrypted drives are capable of storing vast amounts of data, some of which may be incriminating… the Government…does not know what, if anything, is held on the encrypted drives") (emphasis in original).

The Government cannot establish that the contents of Mr. Gogic's cell phone were already known by law enforcement where law enforcement subsequently applied for permission to do a search to find out if the contents of Mr. Gogic's cell phone would match the contents of the seized Sky ECC data.

Other courts have instead found that the prosecution must prove beyond a reasonable doubt that the prosecution already knew that the defendant knew the phone's passcode. State v. Pittman, 479 P.3d 1023, 1051 (Sup. Ct. Oregon 2021); Commonwealth v. Jones, 481 Mass. 540, 551 (Mass. Sup. Judicial Ct. 2019). Here, seizing the phone from Mr. Gogic would not establish beyond a reasonable doubt that Mr. Gogic knew the phone's passcode. In Pittman, the Oregon Supreme Court remanded the case for further fact finding on whether the foregone conclusion applied; it was insufficient that the lower court had found probable cause the defendant knew the phone's passcode and contents of the phone based on the fact that "the phone was found in defendant's purse," 479 P.3d 1028, 1049. Last year in Smith, the foregone conclusion doctrine was applied where the defendant had been using his phone in front of federal agents prior to being asked for the passcode "thereby admitting his knowledge of the password," 706 F. Supp. 3d 404, 409—a fact not present here.

Wherefore, Mr. Gogic moves to suppress evidence derived from the violation of <u>Miranda</u> and <u>Edwards</u>, including but not limited to from the elicitation of Mr. Gogic's passcode, as well as any statements made after his invocation of the right to counsel.

B. Violation of Sixth Amendment Rights.

Mr. Gogic's Sixth Amendment right to counsel had already attached at the time of his arrest. He was indicted on October 28, 2022,[97] but not arrested until October 30, 2022. Ex. Q - Report of Interview, Bates # GOGIC000016.

The Sixth Amendment right to counsel attaches "'when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing.'" <u>United States v. Gumaer</u>, 765 Fed. Appx. 608, 613 (2d Cir. 2019) (quoting <u>United States v. Gouveia</u>, 467 U.S. 180 [1984]).

Mr. Gogic's right to counsel thus attached at the point of indictment on October 28, 2022, two days <u>before</u> the post-arrest interview on October 30, 2022.

As he invoked that right by telling the agents that he wanted a lawyer, we respectfully submit that any information obtained from Mr. Gogic thereafter, including but not limited to his phone's passcode, was obtained in violation of Mr. Gogic's Sixth Amendment rights.

IV. <u>Motion to Suppress Evidence Seized from Mr. Gogic's iPhone 13.</u>

Mr. Gogic moves to suppress evidence seized from his iPhone 13.

A. Lack of Probable Cause.

The Fourth Amendment requires that search warrants be supported by probable cause "'that contraband or evidence of a crime is present,'" in the place to be searched, <u>United States v. Pabon</u>, 871 F.3d 164, 182 (2d Cir. 2017) (quoting <u>Florida v. Harris</u>, 568 U.S. 237, 243 [2013]).

---

[97] Indictment, ECF Doc. # 1, filed on October 28, 2022.

82

The affidavit in support of the search warrant, however, did not present probable cause that there would be evidence of a crime on Mr. Gogic's iPhone. Rather, it argued that the iPhone would contain evidence that Mr. Gogic used the iPhone, such as "evidence of travel, and photographs of distinctive objects, locations, and individuals (including GOGIC's child)." Ex. S - Aff. In Support ¶ 13.

The supporting affidavit then argued that *IF* the geolocation data, recordings, photographs, or other information on Mr. Gogic's iPhone matched those from the Sky ECC hack, this would be evidence that Mr. Gogic had committed the charged crimes. Id.

However, that law enforcement wanted to do a comparison of the contents of the iPhone to data seized in the Sky ECC hack is not the same as establishing that the Government had probable cause that there was any evidence of a crime on the iPhone.

If it were, the Government could obtain a search warrant to compare just about any phone to data seized from the Sky ECC hack to see if there was a match. The Government would have no trouble coming up with a wide number of potentially matching phones. For instance, the affidavit relied on, *inter alia,* "a reference to what appears to be a birthday dinner on GOGIC's true birthdate," in the Sky ECC data. Ex. S - Aff. In Support ¶ 10.

Mathematics tells us that Mr. Gogic should have the same birthday as at least 22 million people in the world (dividing the current world population of over 8 billion people by 365 days).[98] (And the pool would be worldwide, not limited to the United States. Mr. Gogic was not

---

[98] Matt Rosenberg, *How Many People Share Your Birthday?* Thought Co. (May 25, 2024) Available at: https://www.thoughtco.com/how-many-share-your-birthday-1435156#citation-1 (visited on September 23, 2024) (citing United States Census Bureau, U.S. and World Population Clock, Available at: https://www.census.gov/popclock/) (visited on September 23, 2024).

living in the United States.) So a reference in Sky ECC data to a birthday dinner on a particular date does not actually narrow down the pool of potentially matching phones.

Law enforcement also cited, among other things, "'selfies' with the face obscured but which otherwise match GOGIC's appearance," Ex. S - Aff. In Support ¶ 10. We are somewhat troubled by the premise that law enforcement can successfully identify a person from a photograph when the person's face is obscured within that photograph. We are rather more troubled if this alleged identification procedure factors into probable cause to search a person's phone—not for evidence of a crime, but for matching photographs.

The Affidavit in Support also references "distinctive property" and "distinctive locations", which the Search Warrant would authorizethe iPhone to be searched for. However, the Affidavit does not indicate that law enforcement already had any reason to tie Mr. Gogic to the "distinctive property (e.g. watches, vehicles, clothing, boxing and gym equipment)," or to the "distinctive locations (hotels, gyms)," Ex. S - Aff. In Support ¶ 10.

Law enforcement mentioned these items and locations as part of its request to comb through Mr. Gogic's iPhone to search for potential overlap between the iPhone and evidence from the Sky ECC hack.

We respectfully submit that this is not probable cause that evidence of a <u>crime</u> would be found on a phone, it is a request to go on a fishing expedition to see if law enforcement can tie a defendant to information already in their possession.

Wherefore, we move to suppress evidence from Mr. Gogic's iPhone.

B. <u>Fruit of the Poisonous Tree.</u>

In the alternative, we move to suppress the evidence from Mr. Gogic's iPhone as the fruit of the poisonous tree. We anticipate that the Government will dispute that the search warrant was

84

the fruit of the violations of the defendant's rights under the Fifth and Sixth Amendments. However, we note that what is or is not included in the search warrant affidavit is not necessarily dispositive. In United States v. Djibo, 151 F. Supp. 3d 297 (E.D.N.Y. 2015), the federal agent obtained defendant's passcodes in violation of *Miranda*, and first used these passcodes to conduct a warrantless search, before subsequently obtaining a warrant to search the device. The Government unsuccessfully argued that evidence obtained from the search warrant was not tainted by the prior warrantless search of the phone, despite the application having "made no mention of having already looked at 921 pages of data from the phone." Id. at 309, where the agent's testimony at the suppression hearing conflicted with the proffered grounds for the search warrant in the supporting affidavit.

The court in Djibo distinguished United States v. Patane, 542 U.S. 630 (2004), in which the Supreme Court held that a *Miranda* violation did not require suppression of a Glock thereafter found in Patane's bedroom. Among the reasons Djibo found Patane "should not be applied here is because, as the Riley court held, a cell phone is not just a physical object containing information. It is more personal than a purse or a wallet, and certainly more so than the firearm that was used in evidence against Respondent Patane. It is the combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually and sometimes even sexually, in the owner's life, and it pinpoints the whereabouts of the owner over time with greater precision than any tool heretofore used by law enforcement without aid of a warrant. In today's modern world, a cell phone passcode is the proverbial 'key to a man's kingdom.'" Djibo, 151 F. Supp. 3d 297, 310 (citing Riley v. California, 573 U.S. 373 [2014]).

85

### C. Court's Inherent Supervisory Power.

Alternatively, we ask the Court to exclude evidence from the defendant's iPhone through the same method and on the same grounds as that of evidence from the suspicionless mass surveillance—by exercising the Court's inherent "supervisory powers over the administration of federal justice… 'when absolutely necessary **to preserve the integrity of the criminal justice system,**'" <u>Getto</u>, 729 F.3d 221, 229 (citation omitted) (emphasis added).

We have discussed *supra* how the hacking of Sky ECC users' communications worldwide without any individualized suspicion whatsoever is so egregious as to shock the conscience, permitting the Court to exclude such evidence pursuant to the Court's supervisory powers.

We also discussed *supra* the clear and unmistakable evidence of the United States' intent to evade constitutional requirements in order to benefit from the suspicionless mass surveillance without having to be seen to get America's hands dirty. The only reason America promised the Netherlands that the U.S. would postpone the arrest of, i.e. the founder of Sky Global (the company behind Sky ECC) from 2019 to 2021 was so that America would be able to benefit by receiving information from the mass surveillance through mutual requests for legal assistance. If America had not postponed the arrests, the entire mass surveillance operation would have been blown long before the live monitoring began, and, consequently, there would have been no intercepted Sky ECC data for the U.S. to request.

The search warrant for Mr. Gogic's iPhone is explicitly premised on this evidence from the mass surveillance. Ex. S - Aff. In Support ¶¶ 8, - 10, 13 – 14.

Just as the Court should exclude evidence from the mass surveillance to protect the integrity of the criminal justice system, so too, the fruit of the egregious conduct at issue should likewise be excluded to avoid bringing contempt upon the judicial system.

D. Preclusion - FRE 401.

In any event, the alleged relevance of evidence from the iPhone, as set forth in the Affidavit in Support of the Search Warrant, is merely to corroborate evidence from the Sky ECC data and tie it to Mr. Gogic.

Therefore, if the Court is granting defendant's motion to suppress and/or preclude the Sky ECC spreadsheets and accompanying media files, the evidence from the iPhone then becomes irrelevant under FRE 401.

Wherefore, assuming the Sky ECC evidence is not being admitted, the evidence from Mr. Gogic's iPhone should be precluded under FRE 401.

V. Motion to Compel *Brady* Material and Discovery.

The defendant has made multiple demands to the Government for discovery and Brady material. The Government's response has been that the Government does not possess demanded material.

However, as discussed *supra*, Brady material is not limited to material that is presently in the actual possession of the prosecution. Rather, the Government has an affirmative duty under the Due Process Clause to discover and obtain evidence that is known to investigators. Kyles, 514 U.S. 419, 437 – 438; Youngblood, 547 U.S. 867, 869 – 870. The "failure to provide reasonably available material that might be helpful to the defense and which does not pose any risks to witnesses or to ongoing investigation is contrary to requirements of due process and to

87

the purposes of the Confrontation Clause…. a 'criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth.' … The result of full disclosure of information which may be relevant, where the disclosure offends no privilege, is more reliable factfinding, which benefits the prosecution and the public as well as the defense," United States v. Zanfordino, 833 F. Supp. 429 at 432 – 433 (quoting United States v. Kattar, 840 F.2d 118, 127 [1st Cir. 1988] and citing J. & B. Frank, *Courts on Trial* [1963]; Cahn, "Fact Skepticism: An Unexpected Chapter," 38 NYU L Rev 1025 [1963]).

We have also discussed *supra* that under the Due Process Clause, as well as under FRE 1006, Mr. Gogic is entitled to the data underlying the Excel spreadsheets.

Accordingly, we respectfully move for an Order compelling the Government to disclose under Brady and its progeny, under the explicit terms of FRE 1006, and/or pursuant to Fed. R. Crim. Pro. 16:

1.  The names and ECC IDs of the individuals whose Sky ECC communications were acquired;

2.  the full raw data and metadata for Sky ECC, including but not limited to:

    a.  location data;

    b.  all Internet Protocol ("IP") addresses involved in the Sky ECC communications;

    c.  the International Mobile Equipment Identity (IMEI) numbers and International Mobile Subscriber Identity (IMSI) numbers for devices involved in the Sky ECC communications;

    d.  The original hash values of the Sky ECC messages;

3.  Chat-X software (the software program developed by the Netherlands for law enforcement both there and abroad to access the decrypted Sky ECC data and metadata);

88

4. All documentation of and information concerning the United States' acquisition of Sky ECC data from European law enforcement, including but not limited to:

   a. All reports from and communications with Europol and France, including but not limited to all documentation concerning the U.S.'s requests for and receipt of intelligence packages in the case at bar;

   b. Any other communications between U.S. and European authorities regarding the case at bar, whether electronic, written, or otherwise, including but not limited to memorialized communications;

   c. any and all other information, and materials that were shared by European law enforcement concerning the case at bar,

   d. the scope of the United States' requests for information sought and received,

   e. the grounds for the Government's requests;

   f. The documents referenced by the French authorities in Exhibit O - Bates # GOGIC003811 – 3812, including:

      i. the referral record;

      ii. The rogatory letter;

      iii. The application and Magistrate's approval email authorizing the data to be sent directly to the requesting authorities;

5. All documentation and information concerning the acquisition and decryption of the Sky ECC data, including but not limited to the precise means by which the Sky ECC data was obtained and collected by European law enforcement, precisely how the Sky ECC data was decrypted (including but not limited to the decryption keys used) and by whom the data was acquired and decrypted;

6. All other information and documentation concerning how the Sky ECC data was processed by European law enforcement and by the United States, including but not limited to search algorithms and search terms used for processing and filtering the Sky ECC data;

7. Any and all outstanding law enforcement reports, including but not limited to:

   a. reports relating to the search of all three ships, including but not limited to inventories of what was seized from each ship;

   b. any outstanding lab reports;

   c. The complete HSI report Bates stamped GOGIC003725 and GOGIC003726;

   d. The complete HSI report Bates stamped GOGIC003803-GOGIC3806

8. Any and all outstanding warrants & affidavits, including but not limited to:

   a. Search warrant and affidavit for MSC Gayane;

   b. Search warrant and affidavit for MSC Desiree;

   c. Search warrant and affidavit for MSC Carlotta;

   d. The arrest warrant issued for Goran Gogic and supporting affidavit;

9. Any video or audio recordings of the October 30, 2022 interview of and arrest of Mr. Gogic, as well as any recordings from October 31, 2022 and all notes from and reports from October 30, 2022 – October 31, 2022;

10. Any other outstanding photographs, recordings, or videos of defendant;

11. An inventory of all property seized from Mr. Gogic;

12. Any outstanding audio recordings & translations from the three ships;

13. All materials related to the electronic navigation systems of: (1) MSC Carlotta, (2) MSC Gayane and (3) MSC Desiree, including but not limited to: electronic charts, engine

90

revolution indicators, course and engine movement recorders, speed distance recorders, and any other electronic navigational aids;

14. A copy of the "narco phone" seized on the MSC Gayane;

15. Any documentation and/or recordings of interviews of crew members;

16. Any documentation indicating travel by the defendant from 2017 – 2022 (including but not limited to that referenced in the affidavit in support of the warrant to search defendant's phone); and

17. Any outstanding transcripts.

In the event that the Government argues that any of the requested information cannot be disclosed to the defense due to some form of privilege, we respectfully request that the Court direct the Government to produce said evidence to the Court for *in camera* review and produce a privilege log to the defense, including the Government's grounds for non-disclosure, so that any claim of privilege can be litigated and evaluated by the Court. (We note that in the United States, the Government is not permitted to simply conceal discoverable information from defense counsel on the theory that it is classified. Rather, because even in cases involving charges of terrorism defendants have the right to Due Process, there exist procedures for American defense counsel to inspect even classified discovery after counsel receives the requisite security clearance. The Government never once raised this as an issue at any point in the case at bar, leading us to conclude that whatever the reason for the withholding of Brady material and discovery, it is not due to the materials containing any classified information.)

91

VI. <u>Reservation of Rights.</u>

Mr. Gogic reserves the right to raise objections to the admissibility of evidence at trial as appropriate, and reserves the right to submit any subsequent supplemental expert reports or disclosures.

**CONCLUSION**

WHEREFORE, Defendant Goran Gogic respectfully moves for an Order:

1. Excluding evidence from the Sky ECC mass surveillance due to the worldwide interception being so egregious as to shock the conscience, the U.S.'s agreement with the Netherlands having been designed to evade the requirements of the U.S. Constitution, and/or pursuant to the Fifth Amendment;

2. Alternatively, precluding the introduction of the Sky ECC files, and testimony regarding same pursuant to FRE 1006, FRE 106, FRE 403, and/or FRE 901;

3. Suppressing evidence from the violation of Mr. Gogic's rights under *Miranda, Edwards*, and the Sixth Amendment, including but not limited to any statements made after Mr. Gogic invoked his right to counsel, his act of entering his passcode into his iPhone, and evidence obtained as a result of same;

4. Suppressing evidence from Mr. Gogic's iPhone due to:

   a. The search warrant being unsupported by probable cause,

   b. The warrant being the product of conduct that shocks the conscience and America's arrangement with the Netherlands to evade the requirements of the U.S. Constitution; and/or

   c. The evidence being tainted by the violation of Mr. Gogic's Fifth and Sixth Amendment rights;

92

5. Alternatively, precluding evidence from Mr. Gogic's iPhone pursuant to FRE 401, as the evidence will be irrelevant at trial if the Court is suppressing and/or precluding the Sky ECC evidence; and

6. Directing the Government to produce the demanded *Brady* material and discovery or, in the alternative, to produce same to the Court for *in camera* review, and to produce a privilege log to the Court and defense counsel so that any claim of privilege may be litigated; and

7. For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      October 4, 2024

Respectfully submitted,

*/s/ Joseph R. Corozzo*
Joseph R. Corozzo, Esq.
Angela D. Lipsman, Esq.
Rubinstein & Corozzo, LLP
*Attorneys for Defendant*
*Goran Gogic*
260 Madison Avenue, 22d Fl.
New York, New York 10016
(212) 545-8777 (ph)
(917) 722-8206 (fax)
jcorozzo@rubcorlaw.com
alipsman@rubcorlaw.com

cc: A.U.S.A.s Nomi Berenson and Robert Pollack (via ECF and/or email)
    Sanford Talkin, Esq. (via ECF and/or email)

93