# MILCH §
## Rechtsanwälte

**Head Office Gießen:**
Karl-Keller-Str. 30
D-35396 Gießen

T.: (0641) 498800-90
F.: (0641) 498800-91

kontakt@kanzlei-milch.de
www.kanzlei-milch.de

**Office Frankfurt a.M.:**
Sebastian-Kneipp-Str. 41
60439 Frankfurt am Main
www.milch.legal

MILCH § · Karl-Keller-Str. 30 · 35396 Gießen

Herrn Rechtsanwalt
Joseph R. Corozzo
Rubinstein & Corozzo, LLP
260 Madison Avenue (22nd Floor)
NY-NY 10016 New York (USA)



---

Corozzo, Joseph

**Case: Goran Gogic, New York**

Our Reference: 136/24 AM07

Date: 30.09.2024

---

**Andreas Milch**
Dipl.-Jurist (Univ.)
Attorney at Law Specialist
Lawyer for Criminal Law
Areas of Expertise:
Civil Law
Labor Law
Traffic Law
Criminal Law

**Florian Krüger**
Attorney at
Law*
Areas of
Expertise:
Civil Law
Traffic Law
Tenancy Law

* employed as an associate

In cooperation with:
**Folkert Milch**
Attorney at Law
53604 Bad Honnef

Bank Details:

IBAN:
DE 49 5135 0025 0205 0454 13
BIC:
SKGIDE5FXXX
Sparkasse Gießen

VAT ID No.: DE301336489

Your case-related data will be stored!
Privacy Policy in accordance with GDPR: https://kanzlei-milch.de/datenschutz

## Report on the analysis of SKY-ECC data provided to the defense in the case against Mr. Gogic dated 30.09.2024

## (Status of the last data delivery: 19.07.24)

**Preamble:**

I would like to preface by stating that the following insights are based on my experience from a variety of SKY-ECC cases in which I have personally participated as a criminal defense attorney or advisor to the defense. I possess in-depth IT knowledge, which I apply alongside my legal expertise as a criminal defense attorney; however, the following assessment does not substitute for obtaining a digital forensic report but aims to demonstrate what

errors and anomalies in the present data occur and to demonstrate to the court that for a fair trial, it is essential to obtain the original raw data from the French authorities and have it examined through digital forensics.

When I subsequently mention individual examples and uncover anomalies in the present data, such as multiple messages, missing metadata, and differing hash values, I will present this using specific cases. However, the issue does not only occur in the examples mentioned but extends across all the data sets presented here.

For review, I had the following SKY-ECC data in Excel spreadsheets along with media folders:

1. Data delivery from 26.10.2023: Main folder "Sensitive_GOGIC000897"
2. Data delivery from 19.07.24: Main folders "GOGIC003807" and "GOGIC003809"

Below, I present my report following the analysis of the aforementioned Sky-ECC data regarding anomalies in light of digital forensic standards, along with my thoughts on the matter and suggested actions.

Before I delve into the individual anomalies in the chats here, I will first outline the approach taken by the European authorities and the actual forensic standards.

This serves to provide a better understanding.

## A. No original data

The Sky-ECC chat data presented here do not represent the original data. The following explanation will demonstrate this.

**Justification:**

Communication data from mobile devices stored in Excel spreadsheets are not considered original data, as they merely represent a **copy** or a **modification** of the original data generated on the mobile device. Here are some specific reasons:

1. **Format change**:

   When communication data (e.g., messages, sent media files, etc.) are transferred to an Excel spreadsheet, the original format of the data is altered. Excel stores data in a tabular format, which differs from the original file formats on mobile devices.

2. **Metadata loss**:

   During the transfer of data to an Excel spreadsheet, important metadata is often lost, such as timestamps, device information, or specific file headers, which are essential for forensic analysis.

3. **Manual processing**:

   Data stored in Excel can be easily edited or manipulated without any trace. This diminishes the evidential value of the data, as it can no longer be considered unchanged and authentic.

4.  **No audit logs**:

The original communication data on a mobile device may be secured by checksums or other methods that guarantee their immutability. Excel does not have such mechanisms to ensure that the data has not been altered.

For these reasons, communication data stored in Excel is not original data but rather a representation or modification of the originals, lacking the same integrity and authenticity.

## A.  Original format of SKY-ECC communication

**I.**

Sky ECC was a secure communication platform primarily used in encrypted networks and known for its high security standards.

While it is clear that communication was not conducted in the format of a spreadsheet program like Excel, the following explanations are necessary to understand how the system operated and in what file format communication took place.

Devices that operated with Sky ECC communicated as follows:

1.  **End-to-End Encrypted Messages**:

Sky ECC utilized encrypted messaging protocols that ensured that any message sent between two devices could only be read by the sender and the recipient.

These messages were sent in a special, encrypted format that was unreadable to unauthorized individuals.

2. **PGP Encryption**:

The basis of the encryption method used in SKY-ECC was Pretty Good Privacy (PGP). This encryption technology allowed messages, files, and other communication data to be encrypted in such a way that they could only be decrypted with the corresponding private key.

SKY-ECC did not solely rely on PGP as an encryption technology; it also employed a custom variation of it, its own proprietary encryption solution designed to provide even greater security. The exact details and algorithms of the technology used are not publicly documented.

However, the principle of the encryption technology was comparable, as PGP served as the foundation.

In addition to the standard encrypted text messages, Sky ECC also offered encrypted file transfers from special containers.

These files were also transmitted in an encrypted format, ensuring they were not stored in an unencrypted form during transfer and while at rest.

There was an option to take photos directly and send them. In this case, the photos were not stored on the device but were only transmitted to the server.

The specifics were also as follows:

a. **Self-destructing messages:** Sky ECC provided the option to send messages that self-destructed after a certain period, meaning they were completely deleted from both the device and the server and were not recoverable.

b. **Special container files:** In some cases, messages and files could be stored in special encrypted container files that could only be opened and decrypted within the Sky ECC platform.

These formats and security measures made communication via Sky ECC extremely resilient against eavesdropping attempts and unauthorized access, which was also the main incentive for use by individuals who placed a high value on data privacy.

II.      **The "Pretty Good Privacy (PGP)" Technique in Detail:**

Pretty Good Privacy (PGP) is still used today as an encryption technology in the IT sector and was developed for the secure transmission of data, particularly emails.

It provides robust end-to-end encryption through the use of a combination of symmetric and asymmetric cryptography.

How PGP Works in Detail:

**1. Key Pair (Asymmetric Encryption)**

- **Public Key:** Each user has a public key that can be freely distributed. This key is used to encrypt messages.

- **Private Key:** The private key is secret and is kept solely by the owner. It is used to decrypt messages that have been encrypted with the corresponding public key.

## 2. Encryption of Content (Symmetric Encryption)

When a message is sent, PGP first generates a **unique symmetric session key**. This key is temporary and is used solely for the encryption of that specific message.
- The actual message is then encrypted using this session key with a fast symmetric encryption algorithm (e.g., AES).

## 3. Encryption of the Session Key

- The session key is then encrypted with the recipient's public key. This means that only the recipient, who possesses the corresponding private key, can decrypt this session key.
- The encrypted message now consists of two parts: the encrypted message itself and the encrypted session key.

## 4. Shipping and Decryption

- The encrypted session key and the encrypted message are sent to the recipient.
- The recipient uses their private key to decrypt the session key.
- With the decrypted session key, the recipient can finally decrypt the message itself.

**5. Digital Signature (Optional)**

To ensure the authenticity and integrity of the message, the sender can additionally attach a **digital signature** to the message.

- This signature is created by applying a hash function to the content of the message and encrypting the resulting hash value with the sender's private key.

- The recipient can verify the signature using the sender's public key by decrypting the hash value and comparing it with a self-computed hash of the received message. If the values match, the message remains unchanged and is indeed from the sender.

**6. Summary:**

PGP combines the security of asymmetric encryption (for the secure transmission of the session key) with the speed of symmetric encryption (for the actual message encryption). This enables effective and secure communication that ensures confidentiality, integrity, and authenticity.

**7. What file format did PGP encryption use for communication:**

PGP (Pretty Good Privacy) uses specific file formats for communication and the exchange of encrypted data. The two main formats that occur when using PGP are:

**a. ASCII Armor (.asc)**

- **Description:** ASCII Armor is a format that converts binary data into an ASCII representation. It is often used to transmit PGP-

encrypted data over communication channels that only support text, such as email

**Usage:** In this format, PGP messages or signatures are saved as text files with the extension ".asc." A typical PGP message in ASCII armor format begins with "BEGIN PGP MESSAGE" and ends with "END PGP MESSAGE."

**Advantage:** Since it is plain text, it can be easily copied, pasted into emails, or used on platforms that do not support binary formats.

## b. Binary format (.pgp)

- **Description:** This is the standard format for PGP-encrypted files. It is a binary format that is more efficient as it does not require additional conversions (like ASCII Armor).
- **Usage:** Files that are directly encrypted with PGP typically have the file extension .pgp. This format is ideal when the file is encrypted and decrypted by a PGP-compatible program without being transmitted over a text-based medium.
- **Advantage:** The binary format is more compact and efficient than ASCII Armor since no additional conversion to text is necessary.

## c. Additional formats:

- **.sig**: This format is commonly used for digital signatures generated by PGP.

- **.gpg**: GPG (GNU Privacy Guard), a free implementation of PGP, sometimes uses the file extension .gpg, which corresponds to the binary .pgp format.

### d. File Format for Transmitted Media Files (Photos, etc.) in PGP

When PGP (Pretty Good Privacy) transmits photos and other media files, it uses the same file formats as for transmitting text messages: **Binary format (.pgp)** and **ASCII Armor (.asc).** These formats are capable of encrypting and transmitting any file types, including images, videos, and other media files.

**aa. File formats for media files:**

- **Binary format (.pgp):** Media files are encrypted in binary format and receive the ".pgp" extension. This format is efficient and directly suitable for exchange between PGP-compatible programs.
- **ASCII Armor (.asc):** Alternatively, media files can be converted to ASCII Armor to enable transmission over text-based channels. In this case, the file is transformed into a text representation and receives the ".asc" extension.

**bb. Hash values and integrity::**

- **Standalone hash values:** When a media file is encrypted with PGP, the file is typically compressed first and then encrypted. During this process, a hash value (e.g., SHA-256 in the case of Sky) of the original, unencrypted file is generated to ensure integrity. This **hash value** serves to verify that the file has not been tampered with during transmission.

The hash value is included in the PGP message or the PGP signature. The hash value is essentially the digital fingerprint of each file, which cannot be altered. An encrypted file sent multiple times with PGP (Pretty Good Privacy) receives its own **hash value** with **each transmission**. This is because PGP adds additional information (metadata) during each encryption process; these metadata change with every encryption, even if the content remains the same.

This, in turn, results in a different hash value for the file with each transmission.

- **Hash value of the message:** When a media file is sent along with a message, the entire message, including the attachment (the media file), has a shared hash value. This shared hash is then used in the digital signature to protect both the text and the attached file.

## 8. Characteristics of a SHA-256 hash value

A SHA-256 hash value (Secure Hash Algorithm 256-bit) is a string consisting of 64 hexadecimal characters (0-9 and a-f), which is 256 bits (32 bytes) long. SHA-256 is a cryptographic hash algorithm that transforms an input (e.g., a file, text, or message) into a fixed, unique output of 256 bits (32 bytes).

**Example of a SHA-256 hash value:**

„3f8d3c3d1b6781bc06ff24e1ab02f3fafe658a1dcdc9f54aeb8e46a1e5c29721"

This hash value represents a specific input, but even the smallest difference in the input will result in a completely different hash value.

SHA-256 is commonly used to secure the integrity of data, as even a minimal change in the original data will completely alter the hash value.

**Features of a SHA-256 Hash Value:**

1. **Length:** The hash value is always 64 characters long, regardless of the size of the original input.
2. **Determinism:** The same input value always produces the same hash value.
3. **Uniqueness:** A small change in the input (e.g., changing a letter) results in a completely different hash value.
4. **Irreversibility:** It is practically impossible to reconstruct the original data from the hash value.
5. **Collision Resistance:** It is extremely unlikely for two different inputs to generate the same hash value.

SHA-256 is used in many areas, including digital signatures, certificates, and data integrity verification.

**9. Summary:**

- **File Format:** Media files are transmitted in .pgp (binary) or .asc (ASCII Armor).
- **Hash Values:** Each media file typically has its own hash value that ensures its integrity. If the file is part of a message, that message also has a common hash value that protects the entire message, including the media files.

This ensures that both the file itself and the entire message have not been tampered with and remain unchanged during decryption by the recipient.

PGP primarily uses .asc for ASCII armor files and .pgp for binary files.

These formats allow for the secure encryption, signing, and transmission of both text messages and files, regardless of whether the medium prefers text or binary data.

However, the data prepared in the Excel sheets does not contain these file extensions. Additionally, the media files are stored as JPG in a separate folder.

It is interesting that the Excel sheet wants us to believe that the media files have their own hash value, which is different from the hash value of the message.

More on that further down.

**III. Process of the Hack by Authorities Based on Current Findings**

Based on current findings from other investigations, the SKY-ECC hack was carried out using a **Man-in-the-Middle (MitM)** cyber attack.

A **Man-in-the-Middle (MitM)** attack is a type of cyber attack where the attacker secretly positions themselves between two communication partners (e.g., a user and a website) to intercept, manipulate, or even alter the communication without either party noticing.

**1. Interception of Communication**

- The attacker positions themselves between the two communication partners. This can happen in various ways:
  - **Network Sniffing**: The attacker utilizes an unsecured network (e.g., public Wi-Fi) to monitor traffic. If

the communication is not adequately secured, they can intercept data packets.

- o **DNS Spoofing:** The attacker manipulates the DNS server, directing users to a fake website that they control.
- o **ARP Spoofing:** The attacker sends false ARP messages in the network to impersonate a specific device (e.g., a router) and thereby redirect traffic through their machine.

In the SKY hack, "ARP Spoofing" was presumably used. Unfortunately, details about the exact process of the hack are not known.

Montenegrin media were the first to report that the authorities had employed a private provider to carry out the hack:

https://www.pobjeda.me/clanak/francuski-sud-je-radi-provale-skaj-aplikacije-angazovao-privatnu-firmu

Quote from the article:

„*According to the documentation of the French judicial authorities, which came into the possession of the accused Milan Brajović and his lawyer Tomković, and which Pobjeda had access to, it is stated that the French investigators hired the private company "Elektron" to use a probe to intercept SKY ECC data from the OVHCLOUD server which is located in Roubaix, France.*

*- The company, not the French police, hacked the Sky application. There is no legal action taken by the French judiciary that could be equated with the legal action provided for by our legislation in connection with obtaining data from the SKY application - lawyer Tomković points out.*"

On June 3, 2024, the website "crimesite.nl" reported that Dutch lawyer Yehudi Moszkowicz had access to a highly confidential action plan that the criminal police of the national police had developed for handling chats from the messaging service Sky ECC.

This document allegedly shows that the public prosecutor's office has not yet informed the courts about the actual hacking process. According to the website, the action plan is titled "Operation Plan 13Werl."

It states that the investigation began back in 2019, focusing on the alleged legal entities Sky Secure Enterprise and Sky Global Holdings, the providers of the Sky ECC encryption app.

The French investigating judge then authorized the installation of an IP interception between two Sky servers in Roubaix. The resulting data was sent directly to the Dutch investigation. Some keys were recovered, but at that time, no message traffic had yet been decrypted. Large-scale decryption only occurred later, in 2021, when the police monitored live messages of all Sky users for several months.

According to Moszkowicz, the action plan explains exactly how the rollout of the Sky hack worked and what would happen to the decrypted messages afterward.

Moszkowicz: *"This information is of great importance for the applicability of the groundbreaking ruling by the European Court of Justice from April 30. Because if it is determined that a phone was located in a country other than France, this could potentially lead to the exclusion of evidence."*

It had already leaked and been published on Crimesite that the police possess a mysterious program called "Chat X."

**M I L C H §**

The plan now allegedly reveals that Dutch specialists developed the Chat X program.

With this "interface," a type of search engine, the police could search through hundreds of millions of chats from Encro and Sky.

Contrary to the statements made by the prosecution in many court cases, the action plan clearly explains how the location data of all chats were available during the hack.

Through the investigation, it was possible to determine exactly in which country and city each Sky user sent their messages.

The website Crimesite.nl further notes that prosecutors apparently did not tell the truth in many cases when they stated that location data from chats could not be made available to the court.

Source:

https://www.crimesite.nl/uitgelekt-geheim-plan-recherche-over-sky-ecc/

Here, we will be able to learn more from our colleague Moszkowicz.

From other SKY-ECC cases, I am personally aware that the police differentiate between police data and admissible court data.

On several occasions, BKA officers admitted during court proceedings, in response to inquiries from me and my colleagues, that the police do have access to location data from the "Sky-ECC chats," but this data is not being disclosed.

Unfortunately, German courts have so far not followed through on such requests. It appears that this is a broad political decision made by the justice ministries of the individual federal states. The fact remains, however, that the investigative authorities possess more data than they are disclosing. So, it's a

deliberate selection being made. Location data is regularly withheld, even though it could potentially serve to exonerate the individuals involved.

**2. Manipulation of Data**

- After intercepting the communication, the attacker can alter the data before forwarding it. Examples include:
  - **Altering Messages:** The attacker can modify the content of messages, such as changing account numbers in a bank transaction.
  - **Injecting Malicious Code:** The attacker could insert malicious code into legitimate websites to install malware on the victim's device.

**3. Forwarding to the Victim**

- The attacker forwards the modified or intercepted communication to the actual target, so the recipient (e.g., the user) remains unaware of the manipulation.

**4. Compromise of Security**

- The attacker now potentially has access to sensitive data such as passwords, credit card numbers, or confidential information. <u>Additionally, they can insert false information into the communication to cause harm.</u>

**IV.    No Metadata in the Provided Excel Tables**

Excel tables typically include metadata. This metadata contains information about the file itself, which is automatically generated by Excel

or can be additionally customized by the user. Here are some of the key types of metadata that can be stored in an Excel file:

**1. File Properties (Document Information):**

- **Title**: A custom title that the user can set.
- **Author:** The name of the user who created the file. This is often automatically filled in by Excel.
- **Creation Date:** The date and time when the file was created.
- **Modification Date:** The date and time of the last change.
- **File Size:** The size of the file in kilobytes (KB) or megabytes (MB).
- **Comments:** Annotations or notes that the user can add.
- **Keywords:** Tags that can be added for better file discoverability.

**2. Specific Excel Metadata:**

- **Table Structure:** Information about the layout of the tables, such as the number of sheets, columns, and rows.
- **Used Formulas:** Details about the formulas and functions used in the table.
- **Cell Formatting:** Information regarding the formatting of the cells, including font, color, cell size, conditional formatting, etc.
- **Links:** Information about external and internal links embedded in the table.
- **Custom Properties:** User-defined metadata fields that can be added by the user.

**3. Security and Access Metadata:**

- **Permissions:** Information about which users have access to the file and what permissions have been granted to them.
- **Change Log:** Excel maintains a log that tracks changes to the file, especially when the file is used for sharing and collaboration.
- **Password Protection:** Information about existing passwords or encryptions applied to the file.

**4. User-Specific Metadata:**

- **Macros and Scripts:** If the file contains macros or embedded VBA scripts, these are also stored as metadata.
- **Custom Views:** Excel can save different views and filters applied to the data.

**5. Summary:**

Excel stores a variety of metadata that includes both technical details about the file and information regarding the use and structure of the data. This metadata can be extracted using specific tools or programs and provides valuable insights about the file, even though it may not be immediately visible to the average user.

However, in the present case of the SKY-ECC chat protocol data, it appears that this metadata from the Excel tables has been deleted.

The data was sent to me in a zip-compressed format.

As can be seen in the exemplary screenshot, the creation date of the Excel files in the main folder "GOGIC003807" is specified as July 12, 2024, at 10:28 AM (CET). Earlier dates were not saved in the Excel table, nor was the original creation date of the Excel table preserved.

This pertains to the data transmission dated July 19, 2024. It is thus reasonable to conclude that the data was prepared for transmission to the defense by the US authorities on July 12, 2024, at 10:28 AM. Therefore, these cannot be the original Excel tables as sent from France, as the data from France was most likely transmitted to the US authorities well before July 12, 2024.

The screenshot is representative; the metadata is identical across all Excel tables in the main folders "GOGIC003807" and "GOGIC003809."

Neither the individual worksheets nor the workbook is write-protected, allowing

for any changes to be made.

Changes made in the past are not traceable. The "Track Changes" function is disabled in all Excel files.

***SCREENSHOT GOGIC003807:***



*SCREENSHOT „GOGIC003809"*



One can employ a trick to access additional hidden metadata:

Excel documents saved in XLSX format consist of XML files based on the XML Spreadsheet Format, which are themselves compressed in a ZIP archive. Therefore, if you rename the file extension from

.xlsx   to   .zip   it can be extracted normally (e.g., using

7zip). Inside, you will find individual files and subdirectories, including:

| Name | Größe | Gepackte Größe | Geändert am | Erstellt am | Letzter Zugriff | Attribute | Verschlüsselt | Kommentar | CRC |
|------|-------|----------------|-------------|-------------|-----------------|-----------|---------------|-----------|-----|
| theme | 6.994 | 1.456 | | | | | | | 544GFA18 |
| worksheets | 1.579 | 501 | | | | | | | CC02B8AC |
| _rels | 697 | 232 | | | | | | | F05B7544 |
| sharedStrings.xml | 1.092 | 463 | 1900-01-31 00:00 | | | -rw------- | x | | A0D67675 |
| styles.xml | 1.051 | 426 | 1900-01-31 00:00 | | | -rw------- | x | | D52B1990 |
| workbook.xml | 679 | 388 | 1900-01-31 00:00 | | | -rw------- | x | | BFED88F9 |

The intriguing aspect of this hidden file is that the stored **shared strings** are recorded in <u>chronological order</u>.

First, it is noticeable that the modification date of the hidden files is set to a fictional timestamp, **"1980-01-31 00:00."**

I then unpacked the shared strings from the file **"conversation** ███████████ and opened it with an editor (WordPad); here is what is stored:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/main
" count="32" uniqueCount="30"><si><t>timestamp_utc</t></si><si>
<t>timestamp_amsterdam</t></si><si><t>message_from_id</t></si>
<si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date</t></si><si><t>new since
2022-06-14</t></si><si><t>new since 2022-11-15</t></si><si><t>
new since 2024-03-01</t></si><si><t>new since 2024-05-31</t>
```

This file allows for tracking when changes were made to it.

It appears that the file was originally created on **November 9, 2020, at 21:13:13 (CET)**.

The entries labeled "new since" describe changes to the content of the file. Clearly, substantive changes were made to the file on **November 15, 2022**, **January 3, 2024**, and **May 31, 2024**.

It's also interesting to take a closer look at the shared strings file of **conversation**████████:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="2705" uniqueCount="644"><si><t>timestamp_utc</t>
</si><si><t>timestamp_amsterdam</t></si><si><t>
message_from_id</t></si><si><t>message</t></si><si><t>
chat_title</t></si><si><t>message_id</t></si><si><t>
chat_id</t></si><si><t>language</t></si><si><t>countrycode</t>
</si><si><t>media_sha1</t></si><si><t>media_filename</t></si>
<si><t>filename</t></si><si><t>conceptname</t></si><si><t>
ingest_date</t></si><si><t>new since 2022-06-14</t></si><si>
<t>new since 2022-11-15</t></si><si><t>new since
2024-03-01</t></si><si><t>new since 2024-05-31</t></si><si>
<t>2020-11-08 16:29:05</t></si><si><t>2020-11-08 17:29:05</t>
```

Here, substantive changes to the file were also made on **June 14, 2022**, **March 1, 2024**, and **May 31, 2024**.

Similarly, if we examine the file **conversation** ███████████ :

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="116" uniqueCount="62"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date</t></si><si><t>new
since 2022-06-14</t></si><si><t>new since 2022-11-15</t></si>
<si><t>new since 2024-03-01</t></si><si><t>new since
2024-05-31</t></si><si><t>2020-10-22 15:25:44
<t>2020-10-22 17:25:44               28A508<
                            28A508, 5UIP0T<
```

The same changes can be found in all subfolders of the main folder **GOGIC003809.**

For example, in the subfolder ████████████ in the file **conversation**████████████:



Also in the file **conversation**████████**6** in the subfolder ████████████

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns=███████████████████████████████████████████████
in" count="91" uniqueCount="52"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date████████████████>new
since 2022-06-14</t></si><si><t>new since 2022-11-15</t></si>
<si><t>new since 2024-03-01</t></si><si><t>new since
2024-05-31███████████████████████
```

Likewise, in the file **conversation_2_export_75256** as well as in all other subfolders of the main folder **GOGIC003809:**

```xml
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="604" uniqueCount="238"><si><t>timestamp_utc</t>
</si><si><t>timestamp_amsterdam</t></si><si><t>
message_from_id</t></si><si><t>message</t></si><si><t>
chat_title</t></si><si><t>message_id</t></si><si><t>
chat_id</t></si><si><t>language</t></si><si><t>countrycode</t>
</si><si><t>media_sha1</t></si><si><t>media_filename</t></si>
<si><t>filename</t></si><si><t>conceptname</t></si><si><t>
ingest_date</t></si><si><t>new since 2022-06-14</t></si><si>
<t>new since 2022-11-15</t></si><si><t>new since
2024-03-01</t></si><si><t>new since 2024-05-31
```

All Excel spreadsheets in the main folder **SENSITIVE_GOGIC000897** (data delivery dated **October 26, 2023**) have also been modified.

Using the file **conversation** ▆▆▆▆▆▆▆▆▆▆ **xlsx**, the changes affecting all Excel spreadsheets in the folder **SENSITIVE_GOGIC000897** are illustrated. Here, too, modifications were made on **June 14, 2022**, and **November 15, 2022**. These are also not the original, untouched data, but rather a modified version:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="77" uniqueCount="48"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>conceptname</t></si><si><t>
ingest_date</t></si><si><t>new since 2022-06-14
<t>new since 2022-11-15<
```

Such changes can be found in **all** Excel spreadsheets within the subfolders of the main folders **GOGIC003807** and **GOGIC003809** in the respective hidden shared strings files.

Therefore, it cannot logically be the case that these are the unchanged messages allegedly intercepted in Europe, as there is clear evidence of modifications.

It is insufficient to provide the defense only with a modified selection of messages; the defense must be granted access to the original, unaltered raw data to verify the authenticity and integrity of the data.

Simply relying on the integrity of the data acquisition and processing by the French authorities, without further verification, and concluding that the data is complete and genuine would be a regression of the rule of law.

The proceedings must be adversarial and always ensure equality of arms between the parties involved. Equality of arms is not guaranteed if the defense is denied access to the evidence essential for effectively contesting the legality of the defendant's detention.

## V. Additional Findings from the Initial Evaluation of the Sky-ECC Chats Provided to Me

The following are some exemplary insights from my initial evaluation of the SKY-ECC chats, highlighting anomalies and phenomena that run like a common thread throughout all the data.

These are not isolated incidents; rather, they recur consistently across all the data:

**M I L C H §**

**Main Folder "GOGIC003807"**

1. **Folder "conversation_███████████**
   **(Correspondence 5UIP0t ./ ████████):**

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

<u>Result:</u>

The media file sent in line 42, ████████████ cannot be found

by entering the file name ████████████ or by entering

the alleged chat ID of the message

██████████████████████████

in the corresponding "Media" folder.

The claimed hash value in column "J" for the media file ████████████ is

████████████████████ "

It is to be expected that the authorities will argue that the file is associated with

the dubious second hash value ██████████████████████ "

indicated in column "J" and can be found in the folder. Under the following file

names, which include the numerical sequence of the alleged hash value, an image

file can be found in the media folder:



It is then clear that the file name has been changed here.

The                    file name                    is                    now:

████████████████████████████████████

████████

Originally, the file name according to the Excel chat logs was ██████ ████████████ This file name is no longer traceable. It is also unclear whether this file was actually sent with this message, as the alleged "hash value" of the image file (line J: ████████████████████████ ) does not match the chat ID of the message (line F: ████████████████████████ ), and therefore, no direct connection between the sent message and the image is recognizable.

As mentioned above under **"II.7/d/bb,"** the generated hash value for a media file sent with a message is the same as that of the message itself.

Thus, there cannot be two hash values, which suggests that the media files were not sent with the message as presented in the Excel table. However, it remains questionable where the image file in the media folder originated. This indicates that the assignment of media files allegedly sent with each message was done manually (or through the use of software or artificial intelligence).

This inconsistency, found in all data sent to the aforementioned folder, indicates that these cannot be the original chat data and that the file names were subsequently changed manually.

Hash values are never stored visibly in the file name; they can only be calculated with a tool and the respective file. The determined hash value of the provided file must then be compared with the hash value of the original file. Only if both hash values—the raw file and the provided file—match can authenticity be assumed. However, this is only valid if the actual raw file is available for comparison.

The French authorities provide the alleged hash value "███████████████████████████████ in the Excel table under line "J" as well as in the file name.

On Windows and MAC OS, file hashes can be easily retrieved using command line commands. For MAC, the Terminal (command prompt) should be opened. The command "shasum -a 256" followed by the file path is entered to read the hash value of the file. My verification yielded the following results:



The hash value of the image file with the file name

███████████████████████████████████████████████

is therefore

███████████████████████████████████████████████

and not as claimed and indicated by the French authorities:

█████████████████████████████████

This means, conversely, that the alleged hash values of the image files indicated in the **Excel tables, which are also specified in the names of the media files**, do not <u>**match**</u> the actual **hash values of the media files in the folders**.

**There is therefore no correlation between the messages in the Excel tables and the media files in the media folders, as the hash values are different!**

The same would be true if we could compare the hash values of the present messages according to the Excel table with the hash values of the original messages in raw format, namely that they do not match. This is also the reason why the French authorities continually refuse to provide the original raw data.

A verification of the integrity and authenticity of the allegedly transmitted messages and files can only take place if the defense is provided with the original data.

The European Court of Justice clarified in its ruling of April 30, 2024 (670/22) that evidence must be disregarded if the person concerned cannot respond to and make a statement about that evidence in cases of suspected criminal activity. (Judgment of the Court in Case C-670/22 of April 30, 2024 (EncroChat)).

Without examining the original data, the defendant cannot make a qualified statement regarding the evidence in this case. This must result in the evidence in the form of the SKY-ECC chat data being disregarded.

In the same file, however, further discrepancies arise:



Result:

The media files allegedly sent in lines 109, 110, and 111 cannot be found either under their file names or the supposed hash values of the messages in the attached media folder.

The same applies to the supposedly sent media files in lines 291, 292, 293, and 294. These are also not found under either the file names or the alleged hash values of the messages in the attached media folder.



Lines 520-522 refer to a ▮▮▮▮▮▮▮▮▮▮" without specifying the file name. However, there is nothing in the corresponding "Media" folder that can be linked to this.

**M I L C H §**

Lines 520-522 refer to a " ▉▉▉▉▉▉▉ without specifying the file name. However, there is nothing in the corresponding "Media" folder that can be linked to this.

The same applies to lines 698-700, where data cannot be identified in the media folder.



The files allegedly sent in the chats of lines 1255–1257 and 1264–1272 also cannot be identified in the corresponding media folder.

Identification via the filename or the message hash value is not possible:

The media files from the chats in lines 1353-1356 and 1647-1650 cannot be assigned either through the filename or the message hash value.

This image message was also sent multiple times (in this case, three times), which is not conclusive. Therefore, the image file should be found three times in the corresponding media folder, which is not the case. If the investigative authorities argue that they have assigned the media file to the time and chat participants, this does not constitute a definitive assignment. What purpose does the specified hash value of the message serve?

Evidence must always be verifiable, which, in the case of digital evidence, is only possible through the assignment of a hash value between the chat file and the media file. If an assignment has been made based on the sending time of the message and the sender, this constitutes a manual assignment and thus a manipulation of the original file.

The above applies to all media data listed in the Excel tables I reviewed. A definitive assignment is not possible.

Here are some additional exemplary excerpts:



Here too, no assignment between the message and the attachment can be established due to digital forensic guidelines. It is also unusual for message attachments to simply be labeled "███████████." I know from other proceedings that a filename is typically always designated as an image or audio file.

Additionally, there is no assignment of the following image files ("IMG"):



### 2. Main Folder "GOGIC003809"

a. File "conversation ███████████" (Conversation 28a508 ./ ██████)



The peculiarity is clearly evident in this example. Here, the sender of the message "28A508" allegedly sent four messages in just one second on ████████████████████████████ ████████████████

This is not only illogical but actually impossible.

The undersigned made an effort to type quickly and took 11 seconds to do so (even with a laptop!).

**b. File "conversation**██████████████**"**

Similarly, the file "conversation_██████████1" contains messages that were sent three times.





**M I L C H §**

### 3. Main folder "GOGIC003807"

#### a. File "conversation███████████████"



Here, the image file ████████████" is claimed to have been sent three times in a row ███████████████ at ██████████████████████ ██████████████. Additionally, three different chat IDs (hash values of the message) were produced (see column "F"):



The hash value of the accompanying media file is supposed to be the same, namely:



**MILCH§**                                                          Page **43** of **59**

This is— as already stated above— technically impossible for three
different messages. Each media attachment would have needed
to have its own hash value per message sent. This is particularly
true since, according to findings from other SKY-ECC cases,
it was not directly possible to send file attachments via SKY-ECC;
rather, the user could only take and send photos themselves.
File attachments could only be sent from so-called "containers."

A file with the filename ███████████████ cannot be found in the media

folder. This phenomenon occurs repeatedly in the chat messages.

For example, here as well:

    **b.  File:** ████████████████████



Here, too, the file ████████████ is said to have been sent 5 times within

the same second.

For the message itself, 5 different chat IDs were generated, but for each sent

media file, only one hash value was recorded, namely

███████████████████████

which is supposed to be the same across all files.

To date, the authorities have not provided any explanations as to why individual messages are allegedly claimed to have been sent multiple times within the same second.

However, there is also no logical explanation for this.

Furthermore, the authenticity of the evidence is crucial.

Do the chats genuinely originate from the defendant? Are these the original data (probably not!).

The fragmented and flawed presentation of the chats (missing metadata, duplicate messages, incorrect hash values) calls the integrity of the evidence into question.

The use of artificial intelligence for reconstructing or manipulating data could represent another reason for inadmissibility. The absence of timestamps and the generation of duplicates might indicate interference with data integrity. In this context, obtaining an expert digital forensic report is absolutely necessary.

These phenomena can have various causes:

**M I L C H §**

**Software-related errors:**

The use of specific software to process the data could lead to these inconsistencies. For instance, the authorities might be using special programs like "Chat X," which could cause such errors. In this case, the authorities should be required to disclose whether the software used is licensed or at least provide a "whitepaper" to clarify its functionality.

**Manipulation:**

The possibility of subsequent alteration of the data cannot be ruled out from a digital forensic perspective, based on the aforementioned points.

This would be associated with a failure in evidence presentation and investigation (cf. KG Berlin, Decision of 22.12.2015 – (5) 161 HEs 33/15 (13/15)).

Subsequent manipulation could call into question the purpose and intent of the evidence collection.

If artificial intelligence or special software was indeed used for the reconstruction or analysis of the chats, the traceability and verifiability of the results are questionable. In such cases, the Federal Court of Justice demands transparency in the methodology and validity of the techniques employed (BGH, Decision of 28.7.2014 – I ZB 51/13).

The admissibility of the Sky-ECC chats is questionable due to the outlined irregularities and legal requirements.

In particular, formal and technical objections must be thoroughly examined.

A comprehensive evidence review, which also assesses potential technical sources of error and methods, is essential before the chats can be considered admissible as court evidence.

It is evident, upon reviewing the available chats, which have been processed in an Excel file format, that these data sets exhibit notable inconsistencies. Specifically, duplicate and one-line messages can be identified. Additionally, there are pure text messages interspersed with unreadable strings of numbers and characters, as well as apparent self-conversations.

Whether a specialized and error-verified software or artificial intelligence (which seems plausible given the volume of data) was used for the entire decryption and transmission/transcription processes, or if the data were manually evaluated and transferred by a person—either through "copy & paste" or by typing entire conversations or each message individually—remains unknown.

In light of this, the question arises:

Who guarantees that this data was accurately transferred and that the content in the Excel sheets was ever actually exchanged as conversations in that form?!

It is obvious that the data inserted into the Excel tables are not the raw data, as no communication device in the world has ever communicated in the format of a spreadsheet program like Excel.

As outlined above, communication typically occurs in different file formats.

Measured against the standards of data authenticity and integrity, the submitted Excel data is therefore unable to provide evidence of the commission of a crime.

The chat messages in question consist of data that includes text, photos, and voice messages.

However, unlike ordinary evidence of this kind, digital data is at a significantly higher risk of (intentional) manipulation or (unintentional) alterations.

This is already evident from the fact that the submitted Excel files, or the tables contained within them, are not protected; all tables and columns can currently be edited and altered by anyone without detection or traceability.

Moreover, even the integrity of the extracted raw data—meaning in the state prior to the alleged transcription into the Excel tables—remains continuously at risk during storage and especially during subsequent processing operations.

A particular problem in the evaluation of digital data arises from two specific characteristics of digitally stored and processed data: data is volatile and manipulable.

The data utilized here consists of network data, as the French authorities have stated, without detailing the exact process of the hack, that they employed a so-called "Man-in-the-Middle Server (MiM Server)."

The term manipulation encompasses both unconscious and conscious changes to the data sets through deletion, addition, alteration, or overwriting of the data— often in the case of deliberate manipulation, with the aim of changing the informational content of the data.

Unconscious manipulations include changes to data inadvertently caused by the user of a data processing system (such as altering a log file simply by accessing data or modifying the metadata of a file through moving, resaving, etc.), as well as system-induced automatic changes to files (e.g., through automatically executed updates and upgrades, or automatic synchronization processes with cloud storage).

The problematic aspect in this context is that the evidentiary value of digital data depends on the condition that the presented data genuinely originates from the specified source (e.g., an information technology system, such as the Sky-ECC servers) and that the data have not been altered either during their collection or subsequently.

Based on the aforementioned points, there are significant doubts regarding the evidentiary value of the data presented.



This appears to be a selection of two messages with the same text, ████████," without any digital forensic approaches, as there is not even an alleged hash value provided.



The above applies to this selection of individual chats as well.

Notably, it is claimed that a chat attachment, ███████████," was sent on ████████, and a hash value for the media file is even provided ██████████████████████████), yet there is no media file present in the media folder at all.

Subsequent manipulation could call into question the purpose and intent of the evidence collection.

If artificial intelligence or specialized software was indeed used for the reconstruction or analysis of the chats, the traceability and verifiability of the results are questionable.

In such cases, the Federal Court of Justice demands transparency in the methodology and validity of the techniques employed (BGH, Decision of 28.7.2014 – I ZB 51/13).

## VI. Digital Forensic Standards for Verifying the Authenticity of Data

In IT forensics, the terms authenticity (origin authenticity) and integrity (unchanged and completeness) have become established for these characteristics.

Both in IT forensics and in criminal procedural literature, it is recognized that the evidentiary value of data largely depends on the preservation of the authenticity and integrity of the data from the collection to the utilization and evaluation of the data by the court

Indirectly, the traceability of the preservation of authenticity and integrity also impacts the evidentiary value of the data.

According to the current state of technology in IT forensics, authenticity and integrity should be ensured through various means, encompassing both organizational and technical measures.

Organizational measures primarily include adherence to the so-called chain of custody, documentation of all processing steps, and restriction of access to the secured data.

The chain of custody requires a seamless chronological documentation of who had possession of the secured data at any given time.

Ideally, this allows for the entire "lifespan" of the data to be traced back to the source of its collection, thereby demonstrating authenticity.

The documentation of all processing steps allows for the traceability of all changes made to the data or the exclusion of changes.

Restricting (physical and electronic) access to the data or their storage media supports the aforementioned measures, as it eliminates undocumented changes.

In this case, there is no chronological documentation of the individual data acquisition, processing, and intermediary steps leading to the data product presented as evidence in this procedure. There is no documentation of all processing steps that would enable the traceability of all changes made to the data or the exclusion of changes. The "lifespan" of the file back to its source cannot be traced.

Since the original data set is required both to demonstrate authenticity and as a reference object to exclude possible changes in later copies, it aligns with IT forensic standards that forensic analyses are always conducted on a 1:1 copy of the original data set.

In a so-called live acquisition, the data is secured during the operation of the information technology system using either software available on the system or by deploying specific backup software by the investigators. The techniques for live acquisition are diverse, and the necessary use or influence on the IT system makes it nearly impossible to rule out changes to the data during the copying process.

To be able to trace any changes made, it is in line with IT forensic standards to comprehensively document these changes (for example, through precise video documentation of the actions performed by investigators on the IT system, the programs used, etc.; the use of specific computer programs for documenting the given commands is also recommended) and, if necessary, to perform the acquisition according to the four-eyes principle.

To exclude changes to the collected data sets or to quickly detect manipulation, the calculation and comparison of so-called hash sums are used in IT forensic practice.

**M I L C H §**

For this purpose, the mathematical tool known as hash functions is utilized. These functions generate a "digital fingerprint" in the form of a string from the input data set.

The commonly used functions exhibit two central properties:

On one hand, it is highly unlikely, if not impossible, to derive the input data set from the calculated hash sum (one-way function).

On the other hand, it is very unlikely, if not impossible, for two different data sets to produce the same hash sum.

Due to these two properties, changes to copies of data sets compared to the original data set can be easily detected or, conversely, excluded by comparing the hash sum of the copy with that of the original data set. Accordingly, the hash sums should be stored separately from the data sets and kept in an IT-secure manner.

Therefore, all data processes from the time of the hack and the initial storage of the data to the final processed version presented to the court as evidence by the prosecuting authorities must be traceable by the defense and the court.

The disclosure of the original raw data for the comparison of the hash values of the presented files (in the processed Excel format) with the raw files in their unprocessed format is therefore urgently necessary to verify the evidence.

Without the possibility of verification, the presented data holds no evidentiary value, which, in turn, must lead to the acquittal of the defendant.

As demonstrated, the proper handling of data as evidence in accordance with IT forensic standards (particularly ensuring integrity and authenticity) and the application of IT forensic standards during data analysis for evidentiary purposes (reliability of the method, error-free and correct application of the method, qualification of personnel, and documentation of all steps) are crucial in determining the evidentiary value of data and the outcomes of data analysis processes. Therefore, any undermining of this evidentiary value through the revelation of errors in data handling or the unreliability or overestimated reliability of data analysis methods is of significant importance for an effective defense.

In order for the defense to investigate errors and misjudgments regarding reliability and, if necessary, file corresponding evidence requests during the main hearing, it must have access to the data used as evidence, information about how the data was handled, and the data analysis methods employed.

**Digital Forensic Standards and Methods**

The authenticity of digital evidence is central to forensic investigations. To ensure that digital data remains unchanged and reliable, there are various standards and methods in digital forensics that are applied. Here are some of the essential components:

## 1. Hash Values

### a. Hash Algorithms

The calculation of hash values (e.g., using SHA-256 or MD5) is an established standard for ensuring data integrity. A hash value is a type of digital fingerprint of the data, and any change to the data will result in a change of the hash value.

### b. Consistency of Hash Values

To ensure authenticity, it must be confirmed that the hash values of the present data match those of the original data. Deviations, as mentioned in the facts, indicate manipulation or errors and must be thoroughly investigated.

## 2. Timestamp Authentication

### a. Timestamp Analysis

Missing, duplicate, or incorrect timestamps are suspicious and can be uncovered through a detailed analysis of logs and other metadata. Original timestamps should match those on backup copies and log files.

### b. Use of Trusted Timestamping Services

The use of Trusted Timestamping Services, which guarantee an immutable record of timestamps, can nearly eliminate the possibility of manipulation. It is not known whether this method was applied during the data collection process.

However, the irregularities mentioned earlier in the chats suggest otherwise.

## 3. Chain of Custody

### a. Documentation of the Chain of Custody

The "Chain of Custody" is a protocol that documents the path of evidence from collection to presentation in court. Each transfer action must be recorded in writing to minimize opportunities for manipulation. Therefore, a complete record of the evidence chain is essential. In the absence of further information on this matter and the lack of metadata in the Excel tables themselves, it can be assumed that the authorities did not adhere to this minimum standard of documentation.

### b. Compliance with Standards

The chain of custody must comply with international standards, such as ISO/IEC 27037:2012 "Guidelines for Identification, Collection, Acquisition, and Preservation of Digital Evidence".

## 4. Forensic Imaging

### a. Creation of Forensic Copies

When collecting digital evidence, an immutable "forensic copy" of the data is created, often in a write-protected format. This copy serves as the basis for all further analyses and must remain untouched throughout the entire investigation (see ISO/IEC 27040).

## 5. Software Validation

### a. Examination of Employed Analysis Tools

The tools used for analyzing digital evidence must be verifiable and validatable. This is particularly relevant for programs used for data reconstruction, such as "Chat X."

The validation of these tools is usually carried out by independent laboratories and certifications. It is questionable whether "Chat X," if indeed used here, has any certification.

If the tools employed for analyzing and reconstructing digital evidence are not certified and validatable, this raises significant concerns regarding the reliability and integrity of the evidence. The court may classify the evidence as inadmissible due to the lack of validation of the tools used. The use of non-certified tools could constitute a violation of the principles of evidence presentation.

The use of non-validated tools could compromise the defendant's right to a fair trial. A fair trial requires that evidence is collected using reliable and tested methods. Non-validated tools may contain undetected errors that could lead to incorrect results or manipulative changes to the data, which could undermine the defendant's right to proper evidence gathering and defense.

**b. Assessment of Accuracy and Reliability**

  Tools must be consistent and provide correct results. The assessment of their accuracy and reliability is conducted through documented tests and benchmark studies.

**Summary:**

To ensure the authenticity of digital evidence, established digital forensic standards must be applied.

Central to this are the consistency of hash values, the verifiable storage and distribution of timestamps, the seamless documentation of the chain of custody, the creation of immutable forensic copies, and the validation of the analysis tools used.

Only through adherence to these standards can the integrity and authenticity of digital evidence be ensured in court.

However, this is lacking in the present case.

Digital forensic standards have not been adhered to in this instance.

A fair trial requires exactly that; otherwise, the evidence in the form of the "SKY-ECC chats" should be dismissed.

**Recommendations:**

**Suggestion,**

**It should be requested in court**:

1. To submit the original, unaltered raw data intercepted in France in their original, unprocessed file format, which has not yet been prepared in the form of an Excel table.

2. Access to the SKY-ECC geolocation data, IP and MAC addresses, IMEI data, and IMSI data related to the communication.

3. Obtaining an official statement from the French authorities regarding the case,

**M I L C H §**                                                    Page **59** of **59**

including the disclosure of all individuals involved in the SKY-ECC

hack and the subsequent data processing

4. Obtaining an official statement from the French authorities and the FBI, with

a complete disclosure of all individuals who have worked on the files since the

hack

5. Obtaining an official statement from the French authorities regarding the

exact procedures used in the data analysis of the hack.

The French authorities should be required to answer the following

questions:

Did private companies participate in the hack?

Was a program used for the data analysis of the hack? Is this

program licensed? If so, by whom and how?

Was artificial intelligence used for the hack and the subsequent data analysis

and processing? If so, how and to what extent?

How was the data transfer at SKY-ECC encrypted, and how was the

decryption performed?

Best regards

**M I L C H**
Andreas
Attorney-at
Law
Specialist Lawyer for Criminal Law

# VERIFICATION

I, Andrew Rona, hereby certify that I translated the attached document called

"Report 300924" on 59 pages

from *GERMAN* into English and that, to the best of my ability, it is a true and correct translation.
I further certify that I am competent in both languages *GERMAN* and English to render and certify such translation.

_____  OCT. 2/2024

Andrew Rona       Date

# MILCH§
### Rechtsanwälte

**Zentrale Gießen:**
Karl-Keller-Str. 30
D-35396 Gießen

T.: (0641) 498800-90
F.: (0641) 498800-91

kontakt@kanzlei-milch.de
www.kanzlei-milch.de

**Büro Frankfurt a.M.:**
Sebastian-Kneipp-Str. 41
60439 Frankfurt am Main
www.milch.legal

_____

**Andreas Milch**
Dipl.-Jurist (Univ.)
Rechtsanwalt
Fachanwalt für Strafrecht
Fachgebiete:
Zivilrecht
Arbeitsrecht
Verkehrsrecht
Strafrecht

**Florian Krüger**
Rechtsanwalt*
Fachgebiete:
Zivilrecht
Verkehrsrecht
Mietrecht

* im Angestelltenverhältnis

In Kooperation mit:

**Folkert Milch**
Rechtsanwalt
53604 Bad Honnef

Bankverbindung:
IBAN:
DE 49 5135 0025 0205 0454 13
BIC:
SKGIDE5FXXX
Sparkasse Gießen

USt.-Id.Nr.: DE301336489

Ihre fallbezogenen Daten werden gespeichert!
Datenschutzerklärung gem. DSGVO:
https://kanzlei-milch.de/datenschutz

MILCH § · Karl-Keller-Str. 30 · 35396 Gießen

Herrn Rechtsanwalt
Joseph R. Corozzo
Rubinstein & Corozzo, LLP
260 Madison Avenue (22nd Floor)
NY-NY 10016 New York (USA)



| |
|---|
| **Corozzo, Joseph** |
| **Case: Goran Gogic, New York** |
| Unser Zeichen: 136/24 AM07 |
| Datum: 30.09.2024 |

## Bericht über die Auswertung der Verteidigung überlassenen SKY-ECC-Daten

## in der Sache gegen Herrn Gogic vom 30.09.2024

## (Stand der letzten Datenüberlieferung: 19.07.24)

**Präambel:**

Vorausgeschickt teile ich mit, dass nachfolgende Erkenntnisse aus meiner Erfahrung aus einer Vielzahl von SKY-ECC-Fällen basiert, an denen ich selbst als Strafverteidiger oder Berater der Verteidigung mitgewirkt habe. Ich verfüge über vertiefte IT-Kenntnisse, die ich zusammen mit meinem juristischen Wissen als Strafverteidiger anwende, dennoch ersetzt nachfolgende Einschätzung nicht die Einholung eines digital-forensischen Gutachtens, sondern soll aufzeigen, welche

Seite **1** von **59**

Fehler und Abnormalitäten in den vorliegenden Daten auftreten und dem Gericht aufzeigen, dass für ein faires Verfahren es unumgänglich ist, die **original Rohdaten** von den französischen Behörden beizuziehen und digital-forensisch untersuchen zu lassen.

Wenn ich nachfolgend einzelne Beispiele nenne und Abnormalitäten in den vorliegenden Daten aufdecke, wie z.B. Mehrfach-Nachrichten, fehlende Meta-Daten, abweichende Hashwerte, so präsentiere ich dies anhand von Beispielen. Die Problematik taucht aber nicht nur bei den genannten Beispielen auf, sondern erstreckt sich quer durch sämtliche hier vorliegende Datensätze.

Zur Überprüfung lagen mir folgende SKY-ECC-Daten in Exceltabellen nebst Medienordnern vor:

1.  Datenlieferung vom 26.10.2023: Hauptordner „Sensitive_GOGIC000897"
2.  Datenlieferung vom 19.07.24: Hauptordner „GOGIC003807" und „GOGIC003809"

Nachfolgend gebe ich meinen Bericht nach Auswertung vorbenannter Sky-ECC-Daten zu Auffälligkeiten im Lichte digital-forensischer Standards ab, sowie meinen Gedanken dazu nebst Handlungsvorschlägen wieder.

Bevor ich auf die einzelnen Auffälligkeiten in den hiesigen Chats eingehe, führe ich zunächst zum Vorgehen der europäischen Behörden und eigentlichen forensischen Standards aus.

Dies dient dem besseren Verständnis.

## A. Keine Original Daten

Bei den hier vorliegenden Sky-Ecc-Chat-Daten handelt es sich nicht um die Original-Daten. Dies wird nachfolgende Begründung aufzeigen.

**Begründung:**

In Excel-Tabellen gespeicherte Kommunikationsdaten von Mobilgeräten sind schon deshalb keine Originaldaten, weil sie lediglich eine **Kopie** oder eine **Bearbeitung** der ursprünglichen Daten darstellen, die auf dem Mobilgerät erzeugt wurden. Hier sind einige spezifische Gründe:

1.  **Formatänderung**:

    Wenn Kommunikationsdaten (z. B. Nachrichten, versandte Mediendaten etc.) in eine Excel-Tabelle übertragen werden, wird das ursprüngliche Format der Daten geändert. Excel speichert Daten in einem tabellarischen Format, das sich von den originalen Dateiformaten auf Mobilgeräten unterscheidet.

2.  **Metadatenverlust**:

    Bei der Übertragung von Daten in eine Excel-Tabelle gehen oft wichtige Metadaten verloren, wie z. B. Zeitstempel, Geräteinformationen oder spezifische Datei-Header, die bei der forensischen Analyse jedoch wichtig sind.

3.  **Manuelle Bearbeitung**:

    Daten, die in Excel gespeichert sind, können leicht bearbeitet oder manipuliert werden, ohne dass dies nachvollziehbar ist. Dies mindert die Beweiskraft der Daten, da sie nicht mehr als unverändert und authentisch gelten können.

4. **Keine Prüfprotokolle**:

Die originalen Kommunikationsdaten auf einem Mobilgerät könnten durch Prüfsummen oder andere Methoden gesichert sein, die ihre Unveränderlichkeit garantieren. In Excel gibt es keine derartigen Mechanismen, die sicherstellen, dass die Daten nicht verändert wurden.

Aus diesen Gründen sind in Excel gespeicherte Kommunikationsdaten keine Originaldaten, sondern eine Repräsentation oder Bearbeitung der Originale, die nicht die gleiche Integrität und Authentizität besitzen.

### A. Original-Format der SKY-ECC-Kommunikation

**I.**

Sky ECC war eine sichere Kommunikationsplattform, die vor allem in verschlüsselten Netzwerken eingesetzt wurde und für ihre hohen Sicherheitsstandards bekannt war.

Es liegt zwar auf der Hand, dass die Kommunikation nicht im Format eines Tabellenkalkulationprogramms wie Excel geführt worden ist, um zu verstehen, wie das System arbeitete und in welchem Dateiformat kommuniziert worden ist, sind aber nachfolgende Erläuterungen notwendig.

Geräte, die mit Sky ECC arbeiteten, kommunizierten wie folgt:

1. **Ende-zu-Ende-Verschlüsselte Nachrichten**:

Sky ECC verwendete verschlüsselte Nachrichtenprotokolle, die sicherstellten, dass jede Nachricht, die zwischen zwei Geräten gesendet wurde, nur vom Absender und Empfänger gelesen werden konnte.

Diese Nachrichten wurden in einem speziellen, verschlüsselten Format gesendet, das für Unbefugte nicht lesbar war.

2. **PGP-Verschlüsselung**:

   Die Basis der bei SKY-ECC verwendeten Verschlüsselungsmethode war Pretty Good Privacy (PGP). Diese Verschlüsselungstechnologie ermöglichte es, Nachrichten, Dateien und andere Kommunikationsdaten so zu verschlüsseln, dass sie nur mit dem entsprechenden privaten Schlüssel entschlüsselt werden konnten.

   SKY-ECC nutzte nicht ausschließlich PGP als Verschlüsselungstechnologie, sondern zusätzlich eine eigens programmierte Abwandlung davon, seine eigene proprietäre Verschlüsselungslösung, die für noch mehr Sicherheit sorgen sollte, wobei die genauen Details und Algorithmen der verwendeten Technologie nicht öffentlich dokumentiert sind.

   Das Prinzip der Verschlüsselungstechnik war jedoch vergleichbar, da PGP die Grundlage darstellte.

   Neben den standardmäßig verschlüsselten Textnachrichten bot Sky ECC auch verschlüsselten Dateiversand aus speziellen Containern.

   Auch diese Dateien wurden in einem verschlüsselten Format übertragen, sodass sie während des Transfers und im Speicher nicht in unverschlüsselter Form vorlagen.

   Es bestand die Möglichkeit Fotos direkt aufzunehmen und zu verschicken. Die Fotos wurden in dem Fall nicht auf dem Gerät gespeichert, sondern nur an den Server übermittelt.

Die Besonderheiten waren zudem:

a. **Selbstzerstörende Nachrichten**: Sky ECC bot die Möglichkeit, Nachrichten zu senden, die sich nach einem bestimmten Zeitraum selbst zerstörten, d.h., sie wurden vom Gerät und dem Server vollständig gelöscht und waren nicht wiederherstellbar.

b. **Spezielle Container-Dateien**: In einigen Fällen könnten Nachrichten und Dateien in speziellen verschlüsselten Container-Dateien gespeichert worden sein, die nur innerhalb der Sky-ECC-Plattform geöffnet und entschlüsselt werden konnten.

Diese Formate und Sicherheitsmaßnahmen machten die Kommunikation über Sky ECC extrem widerstandsfähig gegen Abhörversuche und unberechtigten Zugriff, was auch den Hauptanreiz für die Nutzung durch Personen darstellte, die besonderen Wert auf Datenschutz legten.

### II.    Die "Pretty Good Privacy (PGP)"-Technik im Detail:

Pretty Good Privacy (PGP) wird als Verschlüsselungstechnologie auch heutzutage im IT-Bereich genutzt und wurde für die sichere Übertragung von Daten, insbesondere E-Mails, entwickelt.

Sie bietet eine robuste Ende-zu-Ende-Verschlüsselung durch den Einsatz einer Kombination aus symmetrischer und asymmetrischer Kryptografie.

So funktioniert PGP im Detail:

**1. Schlüsselpaar (Asymmetrische Verschlüsselung)**

- **Öffentlicher Schlüssel (Public Key)**: Jeder Benutzer hat einen öffentlichen Schlüssel, der frei verteilt werden kann. Dieser Schlüssel wird verwendet, um Nachrichten zu verschlüsseln.

- **Privater Schlüssel (Private Key)**: Der private Schlüssel ist geheim und wird ausschließlich vom Besitzer aufbewahrt. Er wird verwendet, um Nachrichten zu entschlüsseln, die mit dem zugehörigen öffentlichen Schlüssel verschlüsselt wurden.

-

## 2. Verschlüsselung des Inhalts (Symmetrische Verschlüsselung)

- Wenn eine Nachricht verschickt wird, erstellt PGP zunächst einen **einmaligen symmetrischen Sitzungsschlüssel**. Dieser Schlüssel ist temporär und wird nur für die Verschlüsselung dieser einen Nachricht verwendet.
- Die eigentliche Nachricht wird dann mit diesem Sitzungsschlüssel unter Verwendung eines schnellen symmetrischen Verschlüsselungsalgorithmus (z. B. AES) verschlüsselt.

## 3. Verschlüsselung des Sitzungsschlüssels

- Der Sitzungsschlüssel wird anschließend mit dem öffentlichen Schlüssel des Empfängers verschlüsselt. Das bedeutet, nur der Empfänger, der den passenden privaten Schlüssel besitzt, kann diesen Sitzungsschlüssel entschlüsseln.
- Die verschlüsselte Nachricht besteht nun aus zwei Teilen: der verschlüsselten Nachricht selbst und dem verschlüsselten Sitzungsschlüssel.

## 4. Versand und Entschlüsselung

- Der verschlüsselte Sitzungsschlüssel und die verschlüsselte Nachricht werden an den Empfänger gesendet.
- Der Empfänger nutzt seinen privaten Schlüssel, um den Sitzungsschlüssel zu entschlüsseln.
- Mit dem entschlüsselten Sitzungsschlüssel kann der Empfänger schließlich die Nachricht selbst entschlüsseln.

**5. Digitale Signatur (Optional)**

- Um die Authentizität und Integrität der Nachricht zu gewährleisten, kann der Absender die Nachricht zusätzlich mit einer **digitalen Signatur** versehen.
- Diese Signatur wird erstellt, indem der Absender eine Hash-Funktion auf den Inhalt der Nachricht anwendet und den resultierenden Hash-Wert mit seinem privaten Schlüssel verschlüsselt.
- Der Empfänger kann die Signatur mit dem öffentlichen Schlüssel des Absenders überprüfen, indem er den Hash-Wert entschlüsselt und mit einem selbst berechneten Hash der empfangenen Nachricht vergleicht. Stimmen die Werte überein, ist die Nachricht unverändert und tatsächlich vom Absender.

**6. Zusammenfassung:**

PGP kombiniert die Sicherheit der asymmetrischen Verschlüsselung (für die sichere Übertragung des Sitzungsschlüssels) mit der Geschwindigkeit der symmetrischen Verschlüsselung (für die eigentliche Nachrichtenverschlüsselung). Dies ermöglicht eine effektive und sichere Kommunikation, die sowohl Vertraulichkeit, Integrität als auch Authentizität gewährleistet.

**7.Welches Dateiformat nutzte die PGP-Verschlüsselung bei der Kommunikation:**

PGP (Pretty Good Privacy) verwendet für die Kommunikation und den Austausch von verschlüsselten Daten spezifische Dateiformate. Die beiden Hauptformate, die bei der Verwendung von PGP auftreten, sind:

a**. ASCII Armor (.asc)**

- **Beschreibung**:    ASCII Armor ist ein Format, das binäre Daten in eine ASCII-Darstellung umwandelt. Es wird oft verwendet, um PGP-

**M I L C H §**

verschlüsselte Daten über Kommunikationswege zu übertragen, die nur Text unterstützen, wie z. B. E-Mail

- **Verwendung**: In diesem Format werden PGP-Nachrichten oder - Signaturen als Textdateien mit der Endung „.asc" gespeichert. Eine typische PGP-Nachricht im ASCII-Armor-Format beginnt mit „BEGIN PGP MESSAGE" und endet mit „END PGP MESSAGE".

  **Vorteil**: Da es sich um reinen Text handelt, kann es leicht kopiert, in E-Mails eingefügt oder auf Plattformen verwendet werden, die kein binäres Format unterstützen.

## b. Binärformat (.pgp)

- **Beschreibung**: Dies ist das Standardformat für PGP-verschlüsselte Dateien. Es handelt sich um ein binäres Format, das effizienter ist, da es keine zusätzlichen Umwandlungen (wie bei ASCII Armor) erfordert.
- **Verwendung**: Dateien, die direkt mit PGP verschlüsselt werden, erhalten in der Regel die Dateiendung .pgp. Dieses Format ist ideal, wenn die Datei von einem PGP-kompatiblen Programm verschlüsselt und entschlüsselt wird, ohne dass sie über ein textbasiertes Medium übertragen wird.
- **Vorteil**: Das Binärformat ist kompakter und effizienter als ASCII Armor, da keine zusätzliche Konvertierung in Text notwendig ist.

## c.  Zusätzliche Formate:

- **.sig**: Dieses Format wird häufig für digitale Signaturen verwendet, die von PGP erzeugt werden.

- **.gpg**: GPG (GNU Privacy Guard), eine freie Implementierung von PGP, verwendet manchmal die Dateiendung .gpg, die dem binären .pgp-Format entspricht.

### d.  Dateiformat für übersandte Medien-Dateien (Fotos etc.) bei PGP

Wenn PGP (Pretty Good Privacy) Fotos und andere Mediendateien überträgt, verwendet es die gleichen Dateiformate wie bei der Übertragung von Textnachrichten: **Binärformat (.pgp)** und **ASCII Armor (.asc)**. Diese Formate sind in der Lage, beliebige Dateitypen, einschließlich Bilder, Videos und andere Mediendateien, zu verschlüsseln und zu übertragen.

### aa. Dateiformate für Mediendateien:

- **Binärformat (.pgp)**: Mediendateien werden im Binärformat verschlüsselt und erhalten die Endung „.pgp". Dieses Format ist effizient und direkt für den Austausch zwischen PGP-kompatiblen Programmen geeignet.
- **ASCII Armor (.asc)**: Alternativ können die Mediendateien in ASCII Armor konvertiert werden, um die Übertragung über textbasierte Kanäle zu ermöglichen. In diesem Fall wird die Datei in eine Textdarstellung umgewandelt und erhält die Endung .asc.

### bb. Hashwerte und Integrität:

- **Eigenständige Hashwerte**: Wenn eine Mediendatei mit PGP verschlüsselt wird, wird die Datei in der Regel zuerst komprimiert und dann verschlüsselt. Während dieses Prozesses wird ein **Hashwert** (z. B. bei Sky: SHA-256) der ursprünglichen, unverschlüsselten Datei erzeugt, um die Integrität zu gewährleisten. Dieser Hashwert dient dazu, sicherzustellen, dass die Datei während der Übertragung nicht manipuliert wurde.

Der Hashwert wird in der PGP-Nachricht oder der PGP-Signatur
enthalten. Der Hashwert ist quasi der digitale Fingerabdruck jeder Datei,
der nicht verändert werden kann. Eine mit PGP (Pretty Good Privacy)
mehrfach versandte, verschlüsselte Datei erhält **bei jedem Versand** einen
**eigenen Hashwert.** Das liegt daran, dass PGP bei jedem
Verschlüsselungsprozess zusätzliche Informationen (Metadaten)
hinzufügt, diese Metadaten ändern sich bei jedem
Verschlüsselungsvorgang, selbst wenn der Inhalt gleich bleibt.

Was wiederum zu einem bei jedem Versenden unterschiedlichen
Hashwert der Datei führt.

- **Hashwert der Nachricht**: Wenn eine Mediendatei zusammen mit einer
  Nachricht verschickt wird, hat die gesamte Nachricht, einschließlich des
  Anhangs (der Mediendatei), einen gemeinsamen Hashwert. Dieser
  gemeinsame Hash wird dann in der digitalen Signatur verwendet, um
  sowohl den Text als auch die angehängte Datei zu schützen.

## 8. Merkmale eines SHA-256-Hashwerts

Ein SHA-256-Hashwert (Secure Hash Algorithm 256-bit) ist eine Zeichenkette aus
64 hexadezimalen Zeichen (0-9 und a-f), die 256 Bits (32 Bytes) lang ist. SHA-256
ist ein kryptografischer Hash-Algorithmus, der eine Eingabe (z. B. eine Datei, ein
Text oder eine Nachricht) in eine fixe, eindeutige Ausgabe von 256 Bit (32 Bytes)
umwandelt.

**Beispiel eines SHA-256-Hashwerts:**

„3f8d3c3d1b6781bc06ff24e1ab02f3fafe658a1dcdc9f54aeb8e46a1e5c29721"

Dieser Hashwert repräsentiert eine bestimmte Eingabe, aber jeder kleine
Unterschied in der Eingabe führt zu einem völlig anderen Hashwert.

SHA-256 wird häufig für die Sicherung der Integrität von Daten verwendet, da selbst eine minimale Änderung der Originaldaten den Hashwert vollständig verändert.

**Merkmale eines SHA-256-Hashwerts:**

1. **Länge**: Der Hashwert ist immer 64 Zeichen lang, unabhängig von der Größe der ursprünglichen Eingabe.
2. **Determinismus**: Derselbe Eingabewert ergibt immer denselben Hashwert.
3. **Einzigartigkeit**: Eine kleine Änderung der Eingabe (z. B. das Ändern eines Buchstabens) führt zu einem völlig anderen Hashwert.
4. **Irreversibilität**: Es ist praktisch unmöglich, die ursprünglichen Daten aus dem Hashwert zu rekonstruieren.
5. **Kollisionsresistenz**: Es ist extrem unwahrscheinlich, dass zwei verschiedene Eingaben denselben Hashwert erzeugen.

SHA-256 wird in vielen Bereichen verwendet, einschließlich digitaler Signaturen, Zertifikate und zur Überprüfung der Datenintegrität.

**9. Zusammenfassung:**

- **Dateiformat**: Mediendateien werden in .pgp (binär) oder .asc (ASCII Armor) übertragen.
- **Hashwerte**: Jede Mediendatei hat normalerweise einen eigenen Hashwert, der ihre Integrität sichert. Wenn die Datei Teil einer Nachricht ist, hat diese Nachricht ebenfalls einen gemeinsamen Hashwert, der die gesamte Nachricht einschließlich der Mediendateien schützt.

Dies stellt sicher, dass sowohl die Datei selbst als auch die gesamte Nachricht nicht manipuliert wurden und bei der Entschlüsselung durch den Empfänger unverändert sind.

PGP verwendet also hauptsächlich .asc für ASCII-Armor-Dateien und .pgp für binäre Dateien.

Diese Formate ermöglichen es, sowohl Textnachrichten als auch Dateien sicher zu verschlüsseln, zu signieren und zu übertragen, unabhängig davon, ob das Medium Text oder Binärdaten bevorzugt.

Vorliegende in den Exceltabellen aufbereiteten Daten enthalten diese Dateiendungen jedoch nicht. Auch die Mediendateien sind als JPG in einem separaten Dateiordner hinterlegt.

Interesssant ist, dass uns die Exceltabelle dabei Glauben schenken möchte, die Mediendateien haben einen eigenen Hashwert, der anders als der Hashwert der Nachricht sei.

Dazu aber weiter unten mehr.

### III. Ablauf des Hacks durch die Behörden nach bisherigen Erkenntnissen

Nach bisherigen Erkenntnissen aus anderen Ermittlungsverfahren erfolgte der SKY-ECC_Hack mittels eines **Man-in-the-Middle (MitM)**-Cyber-Angriffs.

Ein **Man-in-the-Middle (MitM)**-Angriff ist eine Art Cyberangriff, bei dem der Angreifer sich heimlich zwischen zwei Kommunikationspartner (z. B. einen Benutzer und eine Website) schaltet, um die Kommunikation abzufangen, zu manipulieren oder sogar zu verändern, ohne dass die beiden Parteien dies bemerken.

### 1. Abfangen der Kommunikation

- Der Angreifer positioniert sich zwischen den beiden Kommunikationspartnern. Dies kann auf verschiedene Weise geschehen:
  - **Netzwerk-Sniffing**: Der Angreifer nutzt ein unsicheres Netzwerk (z. B. öffentliches WLAN) und überwacht den Datenverkehr. Wenn

**M I L C H §**    Seite **14** von **59**

      die Kommunikation nicht ausreichend gesichert ist, kann er
      Datenpakete abfangen.

    o **DNS-Spoofing**: Der Angreifer manipuliert den DNS-Server, sodass
      die Benutzer auf eine gefälschte Website geleitet werden, die er
      kontrolliert.

    o **ARP-Spoofing**: Der Angreifer sendet gefälschte ARP-Nachrichten
      im Netzwerk, um sich als ein bestimmtes Gerät (z. B. ein Router)
      auszugeben und so den Datenverkehr durch seinen Rechner zu
      leiten.

Bei dem SKY-Hack wurde vermutlich „ARP-Spoofing" angewandt. Näheres zu dem Ablauf des Hacks ist leider nicht bekannt.

Montenegrinische Medien berichteten als Erstes, dass die Behörden sich hier eines privaten Anbieters bedient hätten, um den Hack durchzuführen:

https://www.pobjeda.me/clanak/francuski-sud-je-radi-provale-skaj-aplikacije-angazovao-privatnu-firmu

Zitat aus dem Artikel:

„*According to the documentation of the French judicial authorities, which came into the possession of the accused Milan Brajović and his lawyer Tomković, and which Pobjeda had access to, it is stated that the French investigators hired the private company "Elektron" to use a probe to intercept SKY ECC data from the OVHCLOUD server which is located in Roubaix, France.*

*- The company, not the French police, hacked the Sky application. There is no legal action taken by the French judiciary that could be equated with the legal action provided for by our legislation in connection with obtaining data from the SKY application - lawyer Tomković points out.*"

Am 03. Juni 2024 teilt die Webseite „crimesite.nl" mit, dass der niederländische Anwalt Yehudi Moszkowicz über einen sehr geheimen Aktionsplan, den die Kriminalpolizei der Landespolizei für die Bearbeitung von Chats des Nachrichtendienstes Sky ECC ausgearbeitet hat, verfügen würde.

Dieses Dokument würde zeigen, dass die Staatsanwaltschaft den wirklichen Hackablauf bislang nicht den Gerichten mitgeteilt hat. Laut der Webseite laute der Aktionsplan „Einsatzplan 13Werl".

Hiernach haben die Ermittlungen bereits im Jahr 2019 begonnen und konzentrierten sich auf die mutmaßlichen juristischen Personen Sky Secure Enterprise und Sky Global Holdings, die Anbieter der Sky-ECC-Verschlüsselungs-App.

Der französische Untersuchungsrichter hat sodann die Installation eines IP-Abgriffs zwischen zwei Sky-Servern in Roubaix genehmigt. Die daraus resultierenden Daten gingen direkt an die niederländische Untersuchung. Einige Schlüssel wurden wiederhergestellt, aber es wurde wohl zu diesem Zeitpunkt noch kein Nachrichtenverkehr entschlüsselt. In großem Umfang geschah dies erst danach, im Jahr 2021, als die Polizei mehrere Monate lang Live-Nachrichten aller Sky-Nutzer beobachtete.

Laut Moszkowicz erklärt der Aktionsplan genau, wie der Rollout des Sky-Hacks funktionierte und was danach mit den lesbar gemachten Nachrichten passieren würde.

Moszkowicz: *„Diese Informationen sind von großer Bedeutung für die Anwendbarkeit des bahnbrechenden Urteils des Europäischen Gerichtshofs vom 30. April.* Denn wenn festgestellt wird, dass sich ein Telefon in einem anderen Land als Frankreich befand, könnte dies möglicherweise zum Beweisausschluss führen."

Es war bereits durchgesickert und auf Crimesite veröffentlicht worden, dass die Polizei über ein mysteriöses Programm namens „Chat X" verfügt.

Der Plan zeige wohl nun, dass niederländische Spezialisten das Chat-X-Programm geschrieben haben.

Mit dieser „Schnittstelle", einer Art Suchmaschine, könnte die Polizei die Hunderte Millionen Chats von Encro und Sky durchsuchen.

Im Gegensatz zu den Aussagen der Staatsanwaltschaft in vielen Gerichtsverfahren wird im Aktionsplan klar dargelegt, wie die Standortdaten aller Chats während des Hacks verfügbar waren.

Durch die Untersuchung konnte genau ermittelt werden, in welchem Land und in welcher Stadt jeder Sky-Nutzer seine Nachrichten verschickte.

Die Seite Crimesite.nl merkt weiter an, dass Staatsanwälte offenbar in vielen Fällen nicht die Wahrheit gesagt, als sie erklärten, Standortdaten aus Chats könnten dem Gericht nicht zur Verfügung gestellt werden.

Quelle:

https://www.crimesite.nl/uitgelekt-geheim-plan-recherche-over-sky-ecc/

Hier werden wir mehr von dem Kollegen Moszkowicz erfahren können.

Mir selbst ist aus anderen SKY-ECC-Verfahren bekannt, dass die Polizei zwischen polizeilichen Daten und gerichtsverwertbaren Daten unterscheidet.

Mehrfach wurde von BKA-Beamten in Gerichtsverhandlungen auf Rückfragen durch mich und meine Kollegen eingeräumt, dass die Polizei über Standort-Daten zu den „Sky-Ecc-Chats" verfüge, diese aber nicht herausgegeben werde.

Leider gingen deutsche Gerichte Anträgen hierauf bisher nicht nach. Offensichtlich ist das eine allgemeingültige politische Entscheidung der Justizministerien der einzelnen Bundesländer. Fakt ist jedoch, dass die Ermittlungsbehörden über mehr Daten verfügen, als diese preisgeben. Also eine

**M I L C H §**                                                      Seite **17** von **59**

Auswahl getätigt wird. Standortdaten werden regelmäßig nicht freigegeben, obgleich diese auch zur Entlastung der Betroffenen führen könnten.

**2. Manipulation der Daten**

- Nachdem der Angreifer die Kommunikation abfängt, kann er die Daten verändern, bevor er sie weiterleitet. Beispiele sind:
  - o **Ändern von Nachrichten**: Der Angreifer kann Inhalte in den Nachrichten verändern, z. B. Kontonummern in einer Banktransaktion.
  - o **Einfügen von Schadcode**: Der Angreifer könnte bösartigen Code in legitime Webseiten injizieren, um Malware auf den Rechner des Opfers zu installieren.

**3. Weiterleitung an das Opfer**

- Der Angreifer leitet die modifizierte oder abgefangene Kommunikation an das eigentliche Ziel weiter, sodass der Empfänger (z. B. der Benutzer) nichts von der Manipulation bemerkt.

**4. Kompromittierung der Sicherheit**

- Der Angreifer hat jetzt möglicherweise Zugriff auf sensible Daten wie Passwörter, Kreditkartennummern oder vertrauliche Informationen. <u>Zudem kann er falsche Informationen in die Kommunikation einfügen, um Schaden anzurichten.</u>

**IV.    Keine Metadaten in den vorliegenden Exceltabellen**

Exceltabellen beinhalten normalerweise Metadaten. Diese Metadaten enthalten Informationen über die Datei selbst, die automatisch von Excel erzeugt werden

oder zusätzlich vom Benutzer angepasst werden können. Hier sind einige der wichtigsten Arten von Metadaten, die in einer Excel-Datei gespeichert werden:

### 1. Dateieigenschaften (Dokumentinformationen):

- **Titel**: Ein benutzerdefinierter Titel, den der Benutzer festlegen kann.
- **Autor**: Der Name des Benutzers, der die Datei erstellt hat. Dieser wird oft automatisch von Excel ausgefüllt.
- **Erstellungsdatum**: Das Datum und die Uhrzeit, zu der die Datei erstellt wurde.
- **Änderungsdatum**: Das Datum und die Uhrzeit der letzten Änderung.
- **Dateigröße**: Die Größe der Datei in Kilobytes (KB) oder Megabytes (MB).
- **Kommentare**: Anmerkungen oder Notizen, die der Benutzer hinzufügen kann.
- **Schlagwörter**: Stichwörter, die zur besseren Auffindbarkeit der Datei hinzugefügt werden können.

### 2. Spezifische Excel-Metadaten:

- **Tabellenstruktur**: Informationen über das Layout der Tabellen, wie die Anzahl der Blätter, Spalten und Zeilen.
- **Verwendete Formeln**: Details zu den in der Tabelle verwendeten Formeln und Funktionen.
- **Zellformatierungen**: Angaben zur Formatierung der Zellen, wie Schriftart, Farbe, Zellengröße, bedingte Formatierungen etc.
- **Verlinkungen**: Informationen über externe und interne Links, die in der Tabelle eingebettet sind.
- **Benutzerdefinierte Eigenschaften**: Benutzerdefinierte Metadatenfelder, die durch den Benutzer hinzugefügt werden können.

**3. Sicherheits- und Zugriffsmetadaten:**

- **Berechtigungen**: Informationen darüber, welche Benutzer Zugriff auf die Datei haben und welche Berechtigungen ihnen erteilt wurden.
- **Änderungsprotokoll**: Excel speichert ein Protokoll, das Änderungen an der Datei verfolgt, insbesondere wenn die Datei für die gemeinsame Nutzung und Zusammenarbeit verwendet wird.
- **Passwortschutz**: Informationen über vorhandene Passwörter oder Verschlüsselungen, die auf die Datei angewendet wurden.

**4. Benutzerspezifische Metadaten:**

- **Makros und Skripte**: Wenn die Datei Makros oder eingebettete VBA-Skripte enthält, werden auch diese als Metadaten gespeichert.
- **Benutzerdefinierte Ansichten**: Excel kann unterschiedliche Ansichten und Filter speichern, die auf die Daten angewendet wurden.

**5. Zusammenfassung:**

Excel speichert eine Vielzahl von Metadaten, die sowohl technische Details zur Datei als auch Informationen über die Nutzung und die Struktur der Daten enthalten. Diese Metadaten können durch bestimmte Tools oder Programme ausgelesen werden und bieten wertvolle Informationen über die Datei, auch wenn sie für den durchschnittlichen Benutzer nicht sofort sichtbar sind.

Bei den vorliegenden SKY-ECC-Chatprotokoll-Daten wurden diese Meta-Daten der Excel-Tabellen aber offensichtlich gelöscht.

Mir wurden die Daten im zip-komprimierten Format übersandt.

Wie dem exemplarischen Screenshot zu entnehmen ist, wird als Erstellungsdatum der Exceldateien im Hauptordner „GOGIC003807" der 12.07.2024, 10:28 Uhr (MEZ) angegeben.    Vorrausgehende Daten wurden in der Exceltabelle nicht gespeichert. Die ursprüngliche Erstellung der Exceltabelle ebenfalls nicht.

**M I L C H §**                                          Seite **20** von **59**

Hierbei handelt es sich um die Datenübersendung vom 19.07.2024. So dass es naheliegt, dass die Daten am 12.07.2024, 10:28 Uhr für die Datenübersendung an die Verteidigung durch die US-Behörden aufbereitet worden sind. Mithin kann es sich hierbei nicht um die Original-Exceltabellen handeln, wie sie aus Frankreich übersandt worden sind, da die Daten aus Frankreich mit an Sicherheit grenzender Wahrscheinlichkeit den US-Behörden weit vor dem 12.07.2024 übersandt worden sind.

Der Screenshot ist exemplarisch, die Meta-Daten sind bei allen Excdeltabellen in dem Hauptordner **„GOGIC003807"** und **„GOGIC003809"** gleich.

Weder die einzelnen Arbeitsblätter noch die Arbeitsmappe sind schreibgeschützt.

Es können beliebige Änderungen vorgenommen werden.

Veränderungen in der Vergangenheit sind nicht nachvollziehbar. Die Funktion „Track Changes" ist in sämtlichen Exceldateien deaktiviert.

***SCREENSHOT GOGIC003807:***



*SCREENSHOT „GOGIC003809"*



Man kann aber einen Trick anwenden, um an weitere versteckte Meta-Daten zu gelangen:

Excel-Dokumente, die im XLSX-Format gespeichert werden, bestehen aus XML-Dateien auf der Basis des XML Spreadsheat Format die ihrerseits in einem ZIP-Archiv gepackt sind. Wenn man also die Dateiendung von .xlsx zu .zip umbenennt, kann sie regulär entpackt werden (z.B. mittels 7zip). Darin finden sich nun einzelne Dateien und Unterverzeichnisse:

| Name | Größe | Gepackte Größe | Geändert am | Erstellt am | Letzter Zugriff | Attribute | Verschlüsselt | Kommentar | CRC |
|---|---|---|---|---|---|---|---|---|---|
| theme | 6 994 | 1 456 | | | | | | | 5446FA18 |
| worksheets | 1 579 | 501 | | | | | | | CC02BBAC |
| _rels | 697 | 232 | | | | | | | F05B7544 |
| sharedStrings.xml | 1 092 | 463 | 1980-01-31 00:00 | | | -rw------- | - | | A9D67675 |
| styles.xml | 1 051 | 426 | 1980-01-31 00:00 | | | -rw------- | - | | D52B1930 |
| workbook.xml | 679 | 308 | 1980-01-31 00:00 | | | -rw------- | - | | BFE0B8F9 |

Das Spannende an dieser versteckten Datei ist, dass die abgelegten *Shared Strings* in <u>**chronologischer Reihenfolge**</u> vermerkt werden.

Zunächst fällt auf, dass als Änderungsdatum der versteckten Dateien mit einem Fantasie-Zeitstempel „1980-01-31 00:00" hinterlegt ist.

Sodann habe ich die Shared Strings der Datei **„conversation** ███████████ **"** entsprechend entpackt und über einen Editor (Wordpad) geöffnet, hier ist folgendes hinterlegt:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/main
" count="32" uniqueCount="30"><si><t>timestamp_utc</t></si><si>
<t>timestamp_amsterdam</t></si><si><t>message_from_id</t></si>
<si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date</t></si><si><t>new since
2022-06-14</t></si><si><t>new since 2022-11-15</t></si><si><t>
new since 2024-03-01</t></si><si><t>new since 2024-05-31</t>
```

Anhand dieser Datei kann nachvollzogen werden, wann Änderungen an der Datei vorgenommen worden sind.

Ursprünglich scheint die Datei am 09.11.2020 um 21:13:13 Uhr (MEZ) erstellt worden zu sein.

**M I L C H §**

Die Einträge „new since" beschreiben Änderungen am Inhalt der Datei. So wurden hier offensichtlich inhaltliche Änderungen an der Datei am 15.11.2022, dem 03.01.2024 und dem 31.05.2024 vorgenommen.

Interessant ist es auch, wenn wir uns die Shared-Strings-Datei der Datei **„conversation** ██████████████ **"** näher anschauen:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="2705" uniqueCount="644"><si><t>timestamp_utc</t>
</si><si><t>timestamp_amsterdam</t></si><si><t>
message_from_id</t></si><si><t>message</t></si><si><t>
chat_title</t></si><si><t>message_id</t></si><si><t>
chat_id</t></si><si><t>language</t></si><si><t>countrycode</t>
</si><si><t>media_sha1</t></si><si><t>media_filename</t></si>
<si><t>filename</t></si><si><t>conceptname</t></si><si><t>
ingest_date</t></si><si><t>new since 2022-06-14</t></si><si>
<t>new since 2022-11-15</t></si><si><t>new since
2024-03-01</t></si><si><t>new since 2024-05-31</t></si><si>
```

Hier wurden also auch am 14.06.2022, 01.03.2024 und dem 31.05.2024 an der Datei inhaltliche Änderungen vorgenommen.

Ebenso auch, wenn wir die Datei ███████████████████ " in Augenschein nehmen:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="116" uniqueCount="62"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date</t></si><si><t>new
since 2022-06-14</t></si><si><t>new since 2022-11-15</t></si>
<si><t>new since 2024-03-01</t></si><si><t>new since
2024-05-31</t></si><si><t>2020-10-22 15:25:44</t></si><si>
```

Gleiche Änderungen finden sich in sämtlichen Unterordnern des Hauptordners **„GOGIC003809".**

Exemplarisch    im    Unterordner    ████████████"    **in    der    Datei**

████████████

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="84" uniqueCount="49"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date</t></si><si><t>new
since 2022-06-14</t></si><si><t>new since 2022-11-15</t></si>
<si><t>new since 2024-03-01</t></si><si><t>new since
2024-05-31
<t>2020-09
```

██████████████████████████

Weiter  auch  in  der  Datei  ████████████████"  im  Unterordner

████████████

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="91" uniqueCount="52"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>filename</t></si><si><t>
conceptname</t></si><si><t>ingest_date</t></si><si><t>new
since 2022-06-14</t></si><si><t>new since 2022-11-15</t></si>
<si><t>new since 2024-03-01</t></si><si><t>new since
2024-05-31</t></si><si><t>2020-08-18 12:29:37</t></si><si>
```



Ebenso auch in der Datei ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ sowie <u>allen</u> weiteren

Unterordnern des Hauptordners **„GOGIC003809":**

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="604" uniqueCount="238"><si><t>timestamp_utc</t>
</si><si><t>timestamp_amsterdam</t></si><si><t>
message_from_id</t></si><si><t>message</t></si><si><t>
chat_title</t></si><si><t>message_id</t></si><si><t>
chat_id</t></si><si><t>language</t></si><si><t>countrycode</t>
</si><si><t>media_sha1</t></si><si><t>media_filename</t></si>
<si><t>filename</t></si><si><t>conceptname</t></si><si><t>
ingest_date</t></si><si><t>new since 2022-06-14</t></si><si>
<t>new since 2022-11-15</t></si><si><t>new since
2024-03-01</t></si><si><t>new since 2024-05-31</t></si><si>
<t>2020-09-28 15:28:52</t></si><si><t>2020-09-28 17:28:52</t>
```

Auch sämtliche Exceltabellen im Hauptordner „SENSITIVE_GOGIC000897" (Datenlieferung vom 26.10.2023) sind modifiziert.

Anhand der Datei ███████████████████.xlsx" werden die Veränderungen dargestellt, die sämtliche Exceltabellen in dem Ordner „SENSITIVE_GOGIC000897" betreffen. Auch hier wurden Änderungen am 14.06.2022 und 15.11.2022 vorgenommen. Es handelt sich auch hier nicht um die ursprünglichen, unberührten Daten, sondern eine modifizierte Version:

```
<?xml version="1.0" encoding="UTF-8" standalone="yes"?>
<sst
xmlns="http://schemas.openxmlformats.org/spreadsheetml/2006/ma
in" count="77" uniqueCount="48"><si><t>timestamp_utc</t></si>
<si><t>timestamp_amsterdam</t></si><si><t>message_from_id</t>
</si><si><t>message</t></si><si><t>chat_title</t></si><si><t>
message_id</t></si><si><t>chat_id</t></si><si><t>language</t>
</si><si><t>countrycode</t></si><si><t>media_sha1</t></si><si>
<t>media_filename</t></si><si><t>conceptname</t></si><si><t>
ingest_date</t></si><si><t>new since 2022-06-14</t></si><si>
<t>new since 2022-11-15</t></si><si><t>2020-08-18 12:29:37</t>
```

Solche Änderungen finden sich in **<u>allen</u>** Exceltabellen in den Unterordnern der Hauptordner **„GOGIC003807" sowie „GOGIC003809"** in den jeweiligen, versteckten Shared-Strings-Dateien.

Mithin kann es sich hierbei schon denklogisch nicht um die unveränderten in Europa angeblich abgefangenen Nachrichten handeln, da es hier nachweislich Modifizierungen gegeben hat.

Es ist nicht ausreichend der Verteidigung nur eine veränderte Auswahl von Nachrichten zur Verfügung zu stellen, sondern es muss der Verteidigung Zugang zu den originalen, unveränderten Rohdaten ermöglicht werden, um die Authentizität und Integrität der Daten prüfen zu können.

Das pure Vertrauen in die Lauterkeit der Datenerlangung und -verarbeitung durch die französischen Behörden, ohne nähere Überprüfung, und daraus zu schließen, dass die Daten vollständig und echt sind, wäre ein Rückschritt der Rechtsstaatlichkeit.

Das Verfahren muss kontradiktorisch sein und stets Waffengleichheit zwischen den Prozessparteien gewährleisten. Die Waffengleichheit ist nicht gewährleistet, wenn der Verteidigung der Zugang zu denjenigen Beweismitteln versagt wird, die für die wirksame Anfechtung der Rechtmäßigkeit der Freiheitsentziehung des Angeklagten wesentlich sind.

## V. Weitere Erkenntnisse aus der ersten Auswertung der mir zur Verfügung gestellten Sky-ECC-Chats

Es folgen einige exemplarische Erkenntnisse aus meiner ersten Auswertung der SKY-ECC-Chats, Auffälligkeiten und Phänomene, die sich aber wie ein roter Faden durch sämtliche Daten ziehen.

Es handelt sich also nicht um Einzelfälle, sondern tritt bei allen Daten wiederkehrend auf:

**M I L C H §**                                      Seite **30** von **59**

**Hauptordner „GOGIC003807"**

    1.  **Ordner „**███████████████████████

    **(Korrespondenz 5UIP0t** ████████



<u>Ergebnis:</u>

Die in Zeile 42 gesendete Mediendatei „████████████ kann weder durch Eingabe des Dateinamens ███████████ noch durch Eingabe des angeblichen Chat-ID der Nachricht ████████████████████ ████ " gefunden werden.

Der behauptete Hashwert in der Zeile „J" für die Medien-Datei „IMG-1604960108439" lautet ████████████████████

Es ist zu erwarten, dass die Behörden einwenden wird, dass die Datei über die Zeile „J" und den dort angegebenen dubiosen zweiten Hashwert █████████████████ zugeordnet wird und die Datei in dem Ordner zu finden ist. Unter folgenden Dateinamen, in dem die Zahlenfolge des angeblichen Hashwerts beinhaltet ist, lässt sich im Medienordner eine Bilddatei finden:

**M I L C H §**



Es ist dann aber klar, dass hier der Dateiname geändert wurde.

Der                           Dateiname                    lautet                    jetzt:

„

Ursprünglich war der Dateiname laut der Excel-Chat-Protokolle „IMG-1604960108439". Dieser Dateiname ist nicht mehr auffindbar. Es ist auch nicht nachvollziehbar, dass diese Datei tatsächlich mit dieser Nachricht verschickt wurde, da der angebliche „Hashwert" der Fotodatei (Zeile J:                              nicht mit der Chat-ID der Nachricht (Zeile    F:                                       übereinstimmt und daher kein direkter Zusammenhang zwischen der versendeten Nachricht und dem Bild erkennbar ist.

Wie oben unter **„II.7/d/bb"** dargestellt, ist der gebildete Hashwert bei einem in einer Nachricht mitgesandten Medien-Datei derselbe, wie der der Nachricht.

**M I L C H §**                                                    Seite **32** von **59**

Es kann also keine zwei Hashwerte geben, was dafür spricht, dass die Medien-Dateien also nicht mit der in der Excel-Tabelle dargestellten Nachricht versendet worden sind. Fraglich bleibt dann aber, woher die Bilddatei in dem Medienordner kommt. Es zeigt aber auf, dass die Zuordnung der Mediendateien die angeblich mit der jeweiligen Nachricht versendet worden sind, händisch (oder durch den Einsatz einer Software oder künstlicher Intelligenz) erfolgt ist.

Diese Inkonsistenz, die bei allen an den oben genannten Ordner gesendeten Daten festgestellt wurde, bedeutet, dass es sich nicht um die ursprünglichen Chatdaten handeln kann und die Dateinamen nachträglich manuell geändert wurden.

Hashwerte werden auch niemals sichtbar in dem Dateinamen gespeichert, sondern diese sind nur mit einem Tool und der jeweiligen Datei auszurechnen. Den ermittelten Hashwert der vorliegenden Datei muss man dann mit dem Hashwert der ursprünglichen Original-Datei vergleichen. Nur wenn beide Hashwerte, die der Rohdatei und die der vorliegenden Datei übereinstimmen, ist die Authentizität anzunehmen. Dies aber auch nur, wenn die wirkliche Rohdatei zum Vergleich vorliegt.

Vorliegend geben die französischen Behörden in der Exceltabelle unter Zeile „J" sowie im Dateinamen den angeblichen Hashwert ███████████████████████████████████

Unter Windows und MAC-OS lassen sich Datei-Hashes einfach per Kommandozeilen-Befehl auslesen. Hierfür ist bei MAC das Terminal (die Eingabeaufforderung) zu öffnen. Hier ist der Befehl *„shasum -a 256"* und der Dateipfad einzugeben, um den Hashwert der Datei auszulesen. Meine Überprüfung hat folgendes ergeben:

**M I L C H §**                                    Seite **33** von **59**



Der       Hashwert       der       Imagedatei       mit       dem       Dateinamen

lautet also

und nicht wie von den französischen Behörden behauptet und angegeben:

Das bedeutet im Umkehrschluss, dass die **in den Exceltabellen angegebenen angeblichen Hashwerte der Bilddateien**, die auch im Namen der Mediendateien angegeben werden, **nicht mit dem tatsächlichen Hashwerten** der Mediendateien in den Ordnern **übereinstimmen**.

**Es besteht also keine Zuordnung der Nachrichten in den Exceltabellen zu den Mediendateien in den Medienordnern, da die Hashwerte unterschiedlich sind!**

Gleiches würde auch herauskommen, wenn wir die Hashwerte der vorliegenden Nachrichten laut Exceltabelle mit den Hashwerten der Originalnachrichten im Rohformat vergleichen könnten, nämlich dass diese nicht zusammenpassen. Was auch der Grund ist, warum sich die französischen Behörden stets verweigern, die Original-Roh-Daten herauszugeben.

Eine Überprüfung der Integrität und Authentizität der angeblich mitgesendeten Nachrichten und Dateien kann nur erfolgen, wenn der Verteidigung die Originaldaten zur Verfügung gestellt werden.

Der Europäische Gerichtshof hat in seinem Urteil vom 30. April 2024 (670/22) klargestellt, dass bei Verdacht auf eine Straftat Beweise außer Acht gelassen werden müssen, wenn die betroffene Person hierzu nicht Stellung nehmen und eine Aussage zu den Beweisen treffen kann. (Urteil des Gerichtshofs in der Rechtssache C-670/22 vom 30. April 2024 (EncroChat).

Ohne Prüfung der Originaldaten kann der Angeklagte vorliegend keine qualifizierte Aussage zu den Beweisen treffen. Was zur Folge haben muss, dass der Beweis in Form der SKY-ECC-Chat-Daten außer Acht gelassen werden muss.

In selbiger Datei treten aber weitere Unstimmigkeiten auf:



<u>Ergebnis:</u>

Auch die angeblich in den Zeilen 109, 110,111 versendeten Mediendateien sind weder unter dem Dateinamen noch unter dem angeblichen Hashwert der Nachricht im angehängten Medienordner zu finden.

Gleiches gilt für die angeblich versendeten Mediendaten der Zeilen 291, 292, 293, 294. Diese sind weder unter dem Dateinamen noch unter dem angeblichen Hashwert der Nachricht im angehängten Medienordner zu finden.



Die Zeilen 520-522 sprechen von „▮▮▮▮▮▮▮▮", ohne den Dateinamen anzugeben. Allerdings ist dazu im dazugehörigen „Media"-Ordner nichts zu finden, was hierauf verlinkt werden könnte.

**M I L C H §**                                         Seite **36** von **59**

Die Zeilen   520-522 sprechen von ███████████ ", ohne den Dateinamen anzugeben. Allerdings ist dazu im dazugehörigen „Media"-Ordner nichts zu finden, was hierauf verlinkt werden könnte.

Das Gleiche gilt für die Zeilen 698-700. Daten können im Medienordner nicht identifiziert werden.



Auch diejenigen, die angeblich in den Chats der Zeilen 1255–1257 und 1264–1272 versendet worden sind, können im zugehörigen Medienordner nicht identifiziert werden.

Eine Identifizierung über den Dateinamen oder den Nachrichten-Hashwert ist nicht möglich:



Die Mediendaten aus den Chats der Serien 1353-1356, 1647-1650 können weder über den Dateinamen noch über den Nachrichten-Hashwert zugeordnet werden.

**M I L C H §**

Diese Bildnachricht wurde (wie auch einige frühere Nachrichten) auch mehrmals (hier: dreimal) gesendet, was nicht abschließend ist. Dann müsste die Bilddatei dreimal im zugehörigen Medienordner gefunden werden, was nicht der Fall ist. Wenn die Ermittlungsbehörden einwenden, dass sie die Mediendatei den Zeit- und Chatteilnehmern zugeordnet hätten, handele es sich nicht um eine eindeutige Zuordnung. Welchen Zweck hat der angegebene Hashwert der Nachricht?

Der Beweis muss immer überprüfbar sein, was bei digitalen Beweisen nur durch die Zuordnung eines Hashwerts zwischen der Chatdatei und der Mediendatei möglich ist. Sofern eine Zuordnung anhand des Sendezeitpunkts der Nachricht und des Absenders vorgenommen wurde, handelt es sich um eine manuelle Zuordnung und somit um eine Manipulation der Originaldatei.

Das Vorstehende gilt für alle Mediendaten, die in den von mir geprüften Excel-Tabellen aufgelistet sind. Eine eindeutige Zuordnung ist nicht möglich.

Exemplarisch einige weitere Auszüge:



**M I L C H §**                                            Seite **38** von **59**

Auch hier kann aufgrund digital-forensischer Vorgaben keine Zuordnung zwischen Nachricht und Anhang hergestellt werden. Es ist auch ungewöhnlich, dass Nachrichtenanhänge nur „█████████" heißen. Ich weiß von anderen Verfahren, dass ein Dateiname normalerweise immer als Bild- oder Audiodatei bezeichnet wird.

Auch keine Zuordnung der folgenden Bilddateien („IMG"):



**M I L C H §**                                                  Seite **39** von **59**

## 2. Hauptordner „GOGIC003809"

**a.** Datei „████████████████████████" (Konversation 28a508 ██████████)



Die Kuriosität zeigt sich auch an diesem Beispiel deutlich. Hier soll der Versender der Nachricht „28A508" ████████████████████████████████████████████████████████████████████████████ ████████████████████████

Das ist nicht nur denklogisch, sondern tatsächlich unmöglich.

Der Unterzeichner hat sich bemüht schnell zu tippen und hat hierfür (sogar mit dem Laptop!)   11 Sekunden benötigt.

**M I L C H §**

**b. Datei** ██████████████████████

Ebenso in der Datei ██████████████████████" finden sich dreifach

versende Nachrichten.





**M I L C H §**                                     Seite **42** von **59**

### 3. Hauptordner „GOGIC003807"

#### a. Datei „████████████████████"



Hier soll die Bild-Datei ████████████ am ████████ ██████ ████████████████████████ versandt worden sein. Dabei wurden auch drei verschiedene Chat-ID`s (Hashwert der Nachricht) produziert (siehe Spalte „F"):



Der Hashwert der mitgesandten Mediendatei soll aber ein und derselbe sein, nämlich:



**M I L C H §**                                    Seite **43** von **59**

Dies ist – wie bereits oben ausgeführt- technisch unmöglich bei drei verschiedenen Nachrichten. Jeder Medienanhang hätte dann pro Nachrichtenversand einen eigenen Hashwert bekommen müssen. Dies insbesondere, da es laut Erkenntnissen aus anderen SKY-ECC-Verfahren, es bei SKY-ECC nicht direkt möglich gewesen ist, Dateianhänge zu versenden, sondern der Nutzer konnte nur selbst Fotos machen und versenden. Dateianhänge konnten nur aus sogenannten „Containern" versendet werden.

Eine Datei mit dem Dateinamen ██████████████ findet sich im Media-Ordner nicht. Dieses Phänomen tritt in den Chat-Nachrichten immer wieder auf.

So z.B. auch hier:

   b.  **Datei:** ████████████████████"



Auch hier soll die Datei „████████████" in derselben Sekunde 5x verschickt worden sein.

Auch hier wurde für die Nachricht selbst 5 verschiedene Chat-ID`s generiert, aber für die jeweils versendete Mediendatei nur ein Hashwert, nämlich

███████████████████████████

der in allen Dateien der Selbe sein soll.

Es gibt seitens der Behörden bisher keine Erklärungen, warum einzelne Nachrichten angeblich innerhalb derselben Sekunde mehrfach gesendet worden sein sollen.

Allerdings gibt es hierfür auch keine logische Erklärung.

Weiterhin ist die Authentizität der Beweismittel entscheidend.

Stammen die Chats tatsächlich vom Angeklagten? Handelt es sich um die Original-Daten (wohl nicht!).

Die fragmentierte und fehlerhafte Darstellung der Chats (fehlende Meta-Daten, doppelte Nachrichten, falsche Hashwerte) stellt die Integrität des Beweismittels infrage.

Der Einsatz von Künstlicher Intelligenz zur Rekonstruktion oder Manipulation von Daten könnte ein weiteres Verwertungsverbot darstellen. Das Fehlen von Zeitstempeln und die Dublettenerzeugung könnten auf Eingriffe in die Datenintegrität hinweisen. In diesem Zusammenhang ist eine Einholung eines sachverständigen, digital-forensischen Gutachtens zwingend erforderlich.

Diese Phänomene können diverse Ursachen haben:

**Softwareseitige Fehler:**

Die Nutzung von spezifischer Software zur Aufbereitung der Daten könnte zu diesen Dateninkonsistenzen führen. Die zuständigen Behörden könnten zum Beispiel spezielle Programme wie „Chat X" verwenden, die solche Fehler hervorrufen. Hier wären die Behörden angehalten mitzuteilen, ob die verwendeten Programme über eine Lizenzierung oder zumindest ein „Whitepaper" verfügen.

**Manipulation:**

Die Möglichkeit der nachträglichen Veränderung der Daten kann digital-forensisch nach dem Vorgesagten nicht ausgeschlossen werden.

Damit verbunden wäre ein Beweisführungs- und Untersuchungsversagen (vgl. KG Berlin, Beschl. v. 22.12.2015 – (5) 161 HEs 33/15 (13/15)).

Eine nachträgliche Manipulation könnte Sinn und Zweck der Beweiserhebung infrage stellen.

Sollte tatsächlich eine künstliche Intelligenz oder spezielle Software zur Rekonstruktion oder Analyse der Chats verwendet worden sein, ist die Nachvollziehbarkeit und Überprüfbarkeit der Ergebnisse fraglich. Der Bundesgerichtshof fordert in solchen Fällen Transparenz in der Methodik und Validität der eingesetzten Techniken (BGH, Beschl. v. 28.7.2014 – I ZB 51/13).

Die Verwertbarkeit der Sky-ECC-Chats steht aufgrund der aufgeführten Unregelmäßigkeiten und rechtlichen Anforderungen infrage.

**M I L C H §**                                                      Seite **46** von **59**

Insbesondere müssten formelle und technische Einwände detailliert überprüft werden.

Eine gründliche Beweisaufnahme, die auch die möglichen technischen Fehlerquellen und Methoden bewertet, ist unabdingbar, bevor die Chats als gerichtlich verwertbares Beweismittel angesehen werden können.

Es steht jedenfalls fest, dass bei Durchsicht der vorliegenden Chats, die im Excel-Datei-Format aufbereitet worden sind, auffällig ist, dass sich aus diesen Datensätzen konkrete Hinweise auf deren inhaltliche Inkonsistenz auch dahingehend ergeben, dass sowohl doppelte, als auch einzeilige Nachrichten feststellbar sind. Ferner sind reine Textnachrichten und dann immer wieder eine unlesbare Zahlen-/Zeichenreihe sowie offensichtlich Selbstgespräche

zu erkennen.

Ob für die gesamten Entschlüsselungs- und Übertragungs-/Transkriptionsvoränge eine spezielle und auf Fehleranfälligkeit verifizierte Software oder aber künstliche Intelligenz (was bei dieser Datenmenge naheliegt) verwendet oder diese Daten händisch von einer natürlichen Person ausgewertet und übertragen wurden, etwa per „copy&paste" oder durch Abtippen in einem Schritt für ganze Konversationen oder kleinteilig für jede Nachricht einzeln, ist bereits nicht einmal bekannt.

Vor diesem Hintergrund fragt sich:

Wer steht dafür ein, dass diese Daten korrekt übertragen wurden und die Inhalte in den Excel-Tabellen tatsächlich jemals so als Gespräche ausgetauscht wurden?!

Dass es sich bei den in Exceltabellen eingefügten Daten nicht um die Rohdaten handelt, liegt auf der Hand, denn kein Kommunikationsgerät der Welt kommuniziert oder kommunizierte jemals im Format eines Tabellenkalkulationsprogramms wie Excel.

**M I L C H §**                                           Seite **47** von **59**

Vielmehr wurde oben dargestellt, in welchen Dateiformaten üblicherweise kommuniziert wird.

Gemessen an den an die Datenauthentizität und Datenintegrität anzulegenden Maßstäben sind die vorgelegten Excel-Daten damit nicht in der Lage, einen Beweis der Begehung einer Straftat zu führen.

Bei den Chat-Nachrichten handelt es sich um Daten, die sowohl Text, als auch Fotos und Sprachnachrichten zum Gegenstand haben.

Anders als gewöhnliche Beweismittel dieser Art sind digitale Daten jedoch ungleich höherer Gefahr von (absichtlichen) Manipulationen oder (unabsichtlichen) Veränderungen ausgesetzt.

Dies wird schon daran deutlich, dass die vorgelegten Excel-Dateien bzw. die darin enthaltenen Tabellen nicht geschützt sind; sämtliche Tabellen und Spalten können vorliegend von jedermann bearbeitet und verändert werden, ohne dass dies auffallen wird und nachvollzogen werden kann.

Gleichwohl ist bereits bei den abgeschöpften Rohdaten - also im Zustand vor der vermeintlichen Transkription in die Excel-Tabellen - deren Integrität bei der Speicherung und insbesondere bei nachfolgenden Verarbeitungsvorgängen fortwährend gefährdet.

Ein besonderes Problem im Rahmen der Beweiswürdigung von digitalen Daten ergibt sich durch zwei spezifische Eigenschaften von digital gespeicherten und verarbeiteten Daten: Daten sind flüchtig und manipulierbar.

Bei den vorliegend genutzten Daten handelt es sich um Netzwerkdaten, da die französischen Behörden nach eigenen Angaben, ohne den genauen Ablauf des Hacks detailliert zu beschreiben, einen sogenannten „Man-in-the-Middle-Server (MiM-Server) eingesetzt haben.

Der Begriff der Manipulation umfasst sowohl unbewusste als auch bewusste

Veränderungen an den Datensätzen durch Löschen, Hinzufügen, Verändern oder

Überschreiben der Daten – im Falle bewusster Manipulation nicht selten mit dem Ziel, den Informationsgehalt der Daten zu verändern.

Zu den unbewussten Manipulationen gehören sowohl durch den Nutzer einer

Datenverarbeitungsanlage unbewusst verursachte Veränderungen an Daten (etwa die Veränderung einer Log-Datei durch einen bloßen Zugriff auf Daten oder die Veränderung der Meta-Informationen einer Datei durch Verschieben, Neuabspeichern etc.) als auch systembedingt automatisch eintretende Veränderungen an Dateien (z.B. durch automatisch durchgeführte Updates und Aktualisierungen, automatische Synchronisationsvorgänge mit Cloud-Speichern).

Problematisch ist in diesem Zusammenhang, dass es für den Beweiswert von digitalen Daten darauf ankommt, dass die präsentierten Daten tatsächlich von der angegebenen Quelle stammen (z.B. einem informationstechnischen System, wie hier die Sky-ECC-Server) und die Daten weder bei ihrer Erhebung noch später verändert wurden.

Nach dem Vorgesagten bestehen an dem Beweiswert der vorliegenden Daten erhebliche Zweifel.

**c. Hauptordner „ GOGIC003807 ", Datei** ██████████████



Hier handelt es sich augenscheinlich um eine Auswahl von zwei Nachrichten mit dem selben Text ████████ ohne digital-forensiche Ansätze, da nicht einmal ein angeblicher Hashwert vorliegt.

**d. Hauptordner "GOGIC003807 ", Datei** ██████████████████████ **":**

**M I L C H §**

Das Vorgesagte gilt auch für diese Auswahl einzelner Chats.

Bemerkenswert, ist das hier am ███████████ Chatanhang ██████████ verschickt worden sein soll, und sogar ein Hashwert für die Mediendatei angegeben wird ████████████████████████████ sich im Medienordner aber überhaupt keine Mediendatei befindet.

Eine nachträgliche Manipulation könnte Sinn und Zweck der Beweiserhebung infrage stellen.

Sollte tatsächlich eine künstliche Intelligenz oder spezielle Software zur Rekonstruktion oder Analyse der Chats verwendet worden sein, ist die Nachvollziehbarkeit und Überprüfbarkeit der Ergebnisse fraglich.

Der Bundesgerichtshof fordert in solchen Fällen Transparenz in der Methodik und Validität der eingesetzten Techniken (BGH, Beschl. v. 28.7.2014 – I ZB 51/13).

**VI. Digital-forensische Standards zur Überprüfung der Authentizität von Daten**

In der IT-Forensik haben sich für diese Eigenschaften die Begriffe der Authentizität (Ursprungsechtheit) und Integrität (Unverändertheit und Vollständigkeit) etabliert.

Sowohl in der IT-Forensik als auch in der strafprozessualen Literatur ist anerkannt, dass der Beweiswert von Daten maßgeblich davon abhängt, dass die Authentizität und Integrität der Daten von der Erhebung bis zur Verwertung und Würdigung der Daten durch das Tatgericht gewahrt ist

Mittelbaren Einfluss auf den Beweiswert der Daten hat damit auch die Nachweisbarkeit der Wahrung von Authentizität und Integrität.

Nach dem Stand der Technik in der IT-Forensik sollen Authentizität und Integrität durch verschiedene Mittel sichergestellt werden. Das umfasst sowohl organisatorische als auch technische Maßnahmen.

Zu den organisatorischen Maßnahmen gehören vor allem das Einhalten der sog. Verwahrungskette (chain of custody), die Dokumentation aller Verarbeitungsschritte und die Beschränkung des Zugangs zu den gesicherten Daten.

Die Verwahrungskette erfordert eine lückenlose chronologische Dokumentation, wer zu welchem Zeitpunkt die sichergestellten Daten in Gewahrsam hatte.

Idealerweise kann hierdurch der gesamte „Lebensweg" der Daten bis zur Quelle ihrer Erhebung zurückverfolgt und somit die Authentizität nachgewiesen werden.

Die Dokumentation aller Verarbeitungsschritte ermöglicht die Nachvollziehbarkeit aller an den Daten vorgenommenen Veränderungen bzw. den Ausschluss von Veränderungen.

Die Beschränkung des (physischen und elektronischen) Zugangs zu den Daten bzw. ihren Datenträgern flankiert beide vorgenannten Maßnahmen, weil sie nicht dokumentierte Veränderungen ausschließt.

Vorliegend gibt es überhaupt keine chronologische Dokumentation der einzelnen Datenerlangung, Bearbeitungen und Zwischenschritte bis zum Datenprodukt, welches uns im hiesigen Verfahren als Beweis vorliegt. Es liegt keinerlei Dokumentation aller Verarbeitungsschritte vor, welche die Nachvollziehbarkeit aller an den Daten vorgenommenen Veränderungen bzw. den Ausschluss von Veränderungen, ermöglichen würde. Der „Lebensweg" der Datei bis zu dessen Quelle ist nicht zurückverfolgbar.

Da der Originaldatensatz sowohl zum Nachweis der Authentizität als auch als

Abgleichsobjekt zum Ausschluss möglicher Veränderungen an späteren Kopien benötigt wird, entspricht es dem IT-forensischen Standard, dass IT-forensische Analysen stets an einer 1:1-Kopie des Originaldatensatzes vorgenommen werden.

Bei einer sog. Live-Sicherung werden die Daten dagegen während des Betriebs des informationstechnischen Systems durch die Verwendung von auf dem System vorhandener Software oder durch das Aufspielen von spezifischer Sicherungssoftware durch die Ermittler gesichert. Die Techniken zur Live-Sicherung sind vielfältig und es lässt sich durch die notwendige Benutzung/Beeinflussung des IT-Systems eine Veränderung der Daten beim Kopiervorgang kaum ausschließen.

Um zumindest die vorgenommenen Veränderungen nachvollziehen zu können, entspricht es dem IT-forensischen Standard, die Veränderungen umfassend zu dokumentieren (z.B. auch durch eine exakte Videodokumentation der am IT-System durch die Ermittler vorgenommenen Handlungen, verwendeten Programme etc.; auch die Verwendung spezieller Computerprogramme zur Dokumentation der ein gegebenen Befehle wird empfohlen) und ggf. die Sicherung nach dem Vier-Augen-Prinzip vorzunehmen.

Um eine Veränderung an erhobenen Datensätzen auszuschließen bzw. eine Manipulation schnell zu erkennen, wird in der IT-forensischen Praxis die Berechnung und der Abgleich sog. Hash-Summen verwendet.

**M I L C H §**                                                    Seite **53** von **59**

Hierfür wird auf das mathematische Werkzeug der sog. Hash-Funktionen zurückgegriffen. Diese Funktionen erzeugen aus dem eingegebenen Datensatz einen „digitalen Fingerabdruck" in Form einer Zeichenfolge.

Die hierfür gebräuchlichen Funktionen weisen zwei zentrale Eigenschaften auf:

Einerseits ist es sehr unwahrscheinlich bis unmöglich, dass es gelingt, aus der errechneten Hash-Summe die eingegebene Datenmenge zu errechnen (Einweg-Funktion).

Andererseits ist es sehr unwahrscheinlich bis ausgeschlossen, dass zwei unterschiedliche Datenmengen zur selben Hash-Summe führen.

Aufgrund dieser beiden Eigenschaften kann man Veränderungen an Kopien von Datensätzen im Vergleich zum Originaldatensatz leicht erkennen bzw. umgekehrt ausschließen, indem man die Hash-Summe der Kopie mit derjenigen des Originaldatensatzes vergleicht. Dementsprechend sollten die Hash-Summen getrennt von den Datensätzen und IT-sicher gespeichert werden.

Ergo müssen sämtliche Datenvorgänge vom Zeitpunkt des Hacks und des ersten Abspeicherns der Daten bis zur finalen aufbereiteten Version, welche dem Gericht als von den Strafverfolgungsbehörden als Beweis vorgelegt worden sind, durch die Verteidigung und das Gericht nachvollziehbar sein.

Die Offenlegung der Original-Rohdaten zum Abgleich der Hashwerte der vorliegenden Dateien (im aufbereiteten Excelformat) mit den Rohdateien im unbearbeiteten Format sind deshalb dringend notwendig um das Beweismittel überprüfen zu können.

Ohne die Möglichkeit der Überprüfung haben die vorliegenden Daten keinen

Beweiswert, was im Umkehrschluss zum Freispruch des Angeklagten führen

muss.


Da, wie aufgezeigt, der IT-forensischen Standards entsprechende Umgang mit

Daten als Beweismittel (insbesondere die Sicherung der Integrität und

Authentizität) sowie die Anwendung IT-forensischer Standards bei der

Datenanalyse zu Beweis zwecken (Verlässlichkeit der Methode, fehlerfreie und

korrekte Anwendung der Methode, Qualifikation der Sachbearbeiter und

Dokumentation aller Arbeitsschritte) entscheidende Bedeutung bei der

Bestimmung des Beweiswerts von Daten und den Ergebnissen von

Datenanalysevorgängen zukommt, kommt der Erschütterung dieses Beweiswerts

durch die Aufdeckung von Fehlern im Umgang mit Daten oder der

Unzuverlässigkeit bzw. überschätzten Verlässlichkeit von Datenanalysemethoden

entscheidende Bedeutung für eine effektive Verteidigung zu.


Damit die Verteidigung Fehler und Fehleinschätzungen der Verlässlichkeit

nachgehen und in der Hauptverhandlung ggf. entsprechende Beweisanträge

stellen kann, muss sie jedoch Zugang zu den als Beweismittel verwendeten

Daten, den Informationen über den Umgang mit den Daten und den

verwendeten Datenanalysemethoden erlangen.


**Digitalforenische Standards- und Methoden**

Die Authentizität von digitalen Beweismitteln ist zentral in forensischen

Untersuchungen. Um sicherzustellen, dass digitale Daten unverändert und

verlässlich sind, gibt es diverse Standards und Methoden in der Digitalforensik,

die angewendet werden. Hier sind einige der wesentlichen Komponenten:

**M I L C H §**                                    Seite **55** von **59**

## 1. Hash-Werte

### a. Hash-Algorithmen

Die Berechnung von Hash-Werten (z. B. mit SHA-256 oder MD5) ist ein etablierter Standard zur Sicherstellung der Datenintegrität. Ein Hash-Wert ist eine Art digitaler Fingerabdruck der Daten und jede Änderung an den Daten wird zu einer Änderung des Hash-Wertes führen.

### b. Konsistenz der Hash-Werte

Für die Authentizität muss sichergestellt werden, dass die Hash-Werte der vorliegenden Daten mit denen der ursprünglichen Daten übereinstimmen. Abweichungen, wie sie im Sachverhalt genannt wurden, deuten auf Manipulation oder Fehler hin und müssen gründlich untersucht werden.

## 2. Zeitstempel-Authentifizierung

### a. Zeitstempel-Analyse

Fehlende, doppelte oder falsche Zeitstempel sind verdächtig und können durch eine genaue Analyse von Logs und anderen Metadaten aufgedeckt werden. Originalzeitstempel sollten mit denen auf Backupkopien und Logdateien übereinstimmen.

### b. Verwendung von Trusted Timestamping Services

Der Einsatz von Trusted Timestamping Services, die eine unveränderliche Aufzeichnung der Zeitstempel garantieren, kann eine Manipulation nahezu ausschließen. Vorliegend ist nicht bekannt, ob bei der Datenabschöpfung diese Methode angewandt worden ist.

Die weiter oben schon dargestellten Auffälligkeiten in den Chats sprechen aber dagegen.

### 3. Chain of Custody

#### a. Dokumentation der Beweismittelkette

Die "Chain of Custody" ist ein Protokoll, das den Weg der Beweismittel von der Erhebung bis zur Vorlage vor Gericht dokumentiert. Jede Übertragungshandlung muss schriftlich festgehalten werden, um Manipulationsmöglichkeiten zu minimieren. Ein lückenloser Nachweis der Beweiskette ist daher unerlässlich. Mangels weiterer Angaben hierzu und fehlender Meta-Daten in den Exceltabellen selbst, ist davon auszugehen, dass die Behörden selbst diesen Mindeststandard der Protokollierung nicht eingehalten haben.

#### b. Compliance mit Standards

Die Beweismittelkette muss internationalen Standards entsprechen, wie dem ISO/IEC 27037:2012 "Guidelines for identification, collection, acquisition, and preservation of digital evidence".

### 4. Forensische Bildgebung

#### a. Erstellung forensischer Kopien

Bei der Erfassung digitaler Beweise wird eine unveränderbare "forensische Kopie" der Daten erstellt, häufig in einem schreibgeschützten Format. Diese Kopie dient als Grundlage für alle weiteren Analysen und muss während der gesamten Untersuchung unberührt bleiben (vgl. ISO/IEC 27040).

### 5. Software-Validierung

#### a. Prüfung eingesetzter Analysewerkzeuge

Die eingesetzten Werkzeuge zur Analyse digitaler Beweise müssen selbst überprüfbar und validierbar sein. Dies betrifft besonders Programme zur Datenrekonstruktion, wie erwähnt "Chat X".

Die Validierung dieser Werkzeuge erfolgt normalerweise durch unabhängige Labore und Zertifizierungen. Fraglich ist, ob für „Chat X", sollte dieses hier tatsächlich eingesetzt worden sein, eine Zertifizierung vorliegt.

Wenn die eingesetzten Werkzeuge zur Analyse und Rekonstruktion digitaler Beweise nicht zertifiziert und validierbar sind, wirft dies erhebliche Fragen hinsichtlich der Zuverlässigkeit und Integrität der Beweise auf. Das Gericht könnte die Beweismittel aufgrund fehlender Validierung der eingesetzten Werkzeuge als nicht verwertbar einstufen. Denn die Verwendung nicht zertifizierter Werkzeuge könnte eine Verletzung der Grundsätze der Beweisführung darstellen

Der Einsatz nicht validierter Werkzeuge könnte das Recht des Beschuldigten auf ein faires Verfahren beeinträchtigen. Ein faires Verfahren setzt voraus, dass Beweismittel unter Verwendung zuverlässiger und getesteter Methoden erhoben werden. Denn nicht validierbare Werkzeuge könnten unentdeckte Fehler enthalten, die zu falschen Ergebnissen oder manipulativen Veränderungen der Daten führen könnten, was das Recht des Beschuldigten auf eine ordnungsgemäße Beweisaufnahme und Verteidigung beeinträchtigen kann.

### b. Prüfung der Genauigkeit und Zuverlässigkeit

Werkzeuge müssen konsistent sein und korrekte Ergebnisse liefern. Die Prüfung ihrer Genauigkeit und Zuverlässigkeit erfolgt durch dokumentierte Tests und Benchmark-Studien.

**Zusammenfassung:**

Zur Sicherstellung der Authentizität digitaler Beweismittel müssen etablierte
digital-forensische Standards angewendet werden.

Von zentraler Bedeutung sind dabei die Konsistenz der Hash-Werte, die
überprüfbare Speicherung und Verteilung der Zeitstempel, die lückenlose
Dokumentation der Beweismittelkette, die Erstellung unveränderlicher
forensischer Kopien und die Validierung der eingesetzten Analysewerkzeuge.

Nur durch die Einhaltung dieser Standards kann die Integrität und Authentizität
der digitalen Beweise vor Gericht sichergestellt werden.

Daran mangelt es aber im vorliegenden Fall.

Digital-Forensische Standards wurden vorliegend nicht eingehalten.

Ein faires Verfahren erfordert aber genau das, ansonsten ist das Beweismittel in
Form der „SKY-ECC-Chats" zu verwerfen.

**Handlungsempfehlung:**

**Anregung,**

**Es sollte bei Gericht beantragt werden**:

1. die originalen, in Frankreich abgefangenen, unveränderten Rohdaten im
ursprünglichen, unbearbeiteten Dateiformat, welche noch nicht in Form einer
Exceltabelle aufbereitet worden sind, zur Akte zu reichen.

2. Einsicht in die SKY-ECC-Geo-Lokalisierungsdaten, IP- und MAC-Adressen, IMEI-
Daten und IMSI-Daten der Kommunikation.

3. Einholung einer dienstlichen Stellungnahme der französischen Behörden unter

**M I L C H §**

Offenlegung sämtlicher Personen, die an dem SKY-ECC-Hack und der anschließenden Datenaufbereitung mitgewirkt haben

4. Einholung einer dienstlichen Stellungnahme der französischen Behörden und des FBI unter lückenloser Offenlegung sämtlicher Personen, die an den Dateien seit dem Hack gearbeitet haben

5. Einholung einer dienstlichen Stellungnahme der französischen Behörden über die genaue Vorgehensweise bei der Datenauswertung des Hacks.

Der französischen Behörde soll auferlegt werden folgende Fragen zu beantworten:

Haben bei dem Hack Privatfirmen mitgewirkt?

Wurde für die Datenauswertung des Hacks ein Programm benutzt?

Ist dieses Programm lizensiert?    Falls ja von wem und wie?

Wurde für den Hack und die anschließende Datenauswertung und Aufbereitung künstliche Intelligenz eingesetzt? Falls ja, wie und in welchem Umfang?

Wie war der Datentransfer bei SKY-ECC verschlüsselt, wie erfolgte die Entschlüsselung?

Mit freundlichen Grüßen

**M I L C H**
Andreas
Rechtsanwalt
Fachanwalt für Strafrecht