UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA                  :

                                           22 CR 493 (JMA)

        -against-                             :

GORAN GOGIC                               :
-----------------------------------------------------------

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTIONS

Joseph R. Corozzo
Angela D. Lipsman
Rubinstein & Corozzo, LLP
*Attorneys for Defendant*
*Goran Gogic*
260 Madison Avenue, 22d Fl.
New York, New York 10016
(212) 545-8777 (ph)
(917) 722-8206 (fax)
jcorozzo@rubcorlaw.com
alipsman@rubcorlaw.com

i

# **TABLE OF CONTENTS**

DISCUSSION.................................................................................................................1

   I. Motion to Preclude the Excel Charts Under FRE 1006 – Summaries to Prove Content.........1

   II. The Excel Data Is Inadmissible Because The Government Cannot Authenticate It..............9

   III. The Excel Data Is Inadmissible Under FRE 403. ............................................................17

   IV. The Excel Data Should Also Be Barred Given FRE 106 – the Rule of Completeness. .....18

   V. Motion to Preclude Evidence from Defendant's Phone Under FRE 401 and FRE 403.......19

   VI. The Court Should Exercise Its Discretion to Preclude Evidence from the Global
Suspicionless Mass Surveillance. ..........................................................................................20

   VII. Motion To Compel Material Under *Brady*, Rule 16, and 3500......................................24

CONCLUSION..............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advanced Mktg. Group v. Business Payment Sys.,* 2012 WL 6101991; 2012 U.S. Dist. LEXIS
    162809 (S.D.N.Y. Nov. 9, 2012) .............................................................................. 2, 5, 7, 8

*Baker v. Goldman Sachs & Co.,* 669 F.3d 105, 111 [2d Cir. 2012] ...........................................19

*Bank of Nova Scotia v. United States*, 487 U.S. 250, 264, 108 S. Ct. 2369, 101 L. Ed. 2d 228
    (1988) (Scalia, J., concurring) ..................................................................................22

*City of Almaty v. Ablyazov*, 2018 WL 11270087, 2018 U.S. Dist. LEXIS 242396, *25 (S.D.N.Y.
    2018)......................................................................................................................1, 5

*Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F. Supp. 2d 732, 742, n. 6 (DNJ 2001)......16

*Cortez v. Lobo (In re World Trade Ctr. Disaster Ctr. Disaster Site Ligit.)*, 722 F.3d 483, 488 (2d
    Cir. 2013)..................................................................................................................16

*D.S. v. N.Y.C. Dep't. of Educ.,* 2024 U.S. Dist. LEXIS 79009, *16 (S.D.N.Y. April 29, 2024),
    *adopted by* 2024 U.S. Dist. LEXIS 89182 (S.D.N.Y. May 14, 2024) ....................................13

*Gem. Fin. Serv. v. City of New York,* 2023 WL 4850523, 2023 U.S. Dist. LEXIS 131092, *32 –
    33 (E.D.N.Y. July 28, 2023) ...................................................................................................1

*In the Matter of Weber,* 2024 NY Slip Op 24258, 2024 N.Y. Misc. LEXIS 8609, *28
    (Surrogate's Court, Saratoga County Oct. 10, 2024).............................................................13

*J.G. v. N.Y.C. Dep't. of Educ.*, 719 F. Supp. 3d 293, 308 (S.D.N.Y. 2024)................................13

*LaMonica v. 72 Fashion Corp. (In re Pretty Girl, Inc.*), 2022 WL 1051098; 2022 Bankr. LEXIS
    943, *17 (Bankr. S.D.N.Y.  April 7, 2022) ............................................................................2

*M.B. v. N.Y.C. Dep't. of Educ.*, 2024 U.S. Dist. LEXIS 13836, *10 (S.D.N.Y. Jan. 24, 2024)....12

*Mata v. Avianca, Inc.,* 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023).............................................13

*Matter of Samuel*, 82 Misc. 3d 616, 620 (Surrogate's Court, Kings County 2024) ..................... 13

*McNabb v. United States*, 318 U.S. 332, 340 [1943] ............................................................ 22, 23

*Nissho-Iwai Am. Corp v. Kline*, 845 F.2d 1300, 1305-06 (5th Cir. 1988) ................................... 16

*Park v. Kim,* 91 F.4th 610, 612 (2d Cir. 2024) ......................................................................... 13

*Smith v. Farwell,* 2282 CV 01197 [Mass. Superior Ct. Feb. 12, 2024], which is available at:

https://masslawyersweekly.com/wp-content/blogs.dir/1/files/2024/02/12-007-24.pdf ............ 13

*Thompson v. Spota,* 2022 WL 17253464, at *12; 2022 U.S. Dist. LEXIS 213649 [E.D.N.Y. Nov.

28, 2022] ............................................................................................................................. 1

*U.S. v. Didani,* 2025 WL 452472 (E.D. Mich. Feb. 10 2025) ...................................................... 9

*United States v. Bazemore*, 2022 U.S. Dist. LEXIS 208404, *3, 2022 WL 16849455 (S.D.N.Y.

Nov. 9, 2022) ...................................................................................................................... 7

*United States v. Bernal*, 2022 U.S. Dist. LEXIS 156826, *1, 2022 WL 3594580 (S.D.N.Y.

August 23, 2022) ................................................................................................................. 7

*United States v. Browne*, 834 F.3d 403, 409 - 411 (3d Cir. 2016) ............................................. 11

*United States v. Budziak*, 697 F.3d 1105 (9th Cir. 2012) ........................................................... 7

*United States v. Cannady*, 2024 WL 4564250, 2024 U.S. Dist. LEXIS 195058, *2 (S.D.N.Y. Oct.

24, 2024) ............................................................................................................................ 7

*United States v. Castro*, 813 F.2d 571, 575-76 [2d Cir. 1987] .................................................. 19

*United States v. Cilins*, 2014 U.S. Dist. LEXIS 7123; 2014 WL 173414 (S.D.N.Y. Jan. 15, 2014)

.......................................................................................................................................... 5

*United States v. Citron*, 783 F.2d 307 (2d Cir. 1986) ........................................................... 5, 8

*United States v. Coffey*, 21 CR 538 (JMA) (E.D.N.Y.) ............................................................. 7

*United States v. Frazier*, 479 F.2d 983, 985 (2d Cir. 1973) ...................................................... 18

*United States v. Getto*, 729 F.3d 221, 228, 230 (2d Cir. 2013) ...................................................22

*United States v. HSBC Bank USA, NA*, 2013 WL 3306161, 2013 U.S. Dist. LEXIS 92438, *11 (E.D.N.Y. July 1, 2013)....................................................................................................22, 23

*United States v. Huang et al.,* 18 CR 428 (BMC) (E.D.N.Y.) ....................................................6

*United States v. Miller*, 954 F.3d 551, 565 [2d Cir. 2020]...........................................................1

*United States v. Oliver*, 2002 U.S. Dist. LEXIS 47951, *12, 2008 WL 2511751 (N.D. Tex. June 23, 2008)..................................................................................................................................6

*United States v. Payner*, 447 U.S. 727, 735 n. 7 [1980] ...........................................................22

*United States v. Sampson*, 2024 WL 165200; 2024 U.S. Dist. LEXIS 9604, *3 (S.D.N.Y. Jan. 2024)......................................................................................................................................7

*United States v. Smith*, 2023 U.S. Dist. LEXIS 81662, *2 - *3, 2023 WL 3144170 (S.D.N.Y. April 27, 2023);..........................................................................................................................7

*United States v. Tahlil Mohamed,* 2022 WL 15493545, at *9 - 10; 2022 U.S. Dist. LEXIS 195088 [E.D.N.Y. Oct. 26, 2022] ......................................................................................1

*United States v. Williams,* 930 F.3d 44, 58 (2d Cir. 2019)...................................................18, 19

*Zavala-Alvarez v. Darbar Mgmt.*, 617 F. Supp. 3d 870, 885-886 (N.D. Ill. 2022) .....................16

*Zuckerbrot v. Lande,* 2024 N.Y. Misc. LEXIS 1054, *4 - *5, 2024 NY Slip Op 30712(U) (Sup. Ct., N.Y. County March 6, 2024)...........................................................................................6

**Statutes**

28 U.S.C. § 1746.........................................................................................................................16

28 U.S.C. § 1746(1) ...................................................................................................................16

**Other Authorities**

Dana E. Heitz, *When the Witness Is an Algorithm: The Use of AI-Generated Avatars in Court*,

New York Law Journal (June 6, 2025), Available at:

https://www.law.com/newyorklawjournal/2025/06/06/when-the-witness-is-an-algorithm-the-

use-of-ai-generated-avatars-in-court/ (Visited on June 9, 2025) ............................................12

David Weisenfeld, *Cite Once, Check Twice: When courts discover fake AI citations, a lack of

supervision is often the cause*, 111/3 ABA Journal 21 (June/July 2025)................................13

Debra Weiss, *Sanctions imposed for 'collective debacle' involving AI hallucinations and 2 firms,

including K&L Gates*, ABA Journal (May 14, 2025), Available at:

https://www.abajournal.com/web/article/judge-imposes-sanctions-for-collective-debacle-

involving-ai-hallucinations-and-2-law-firms-including-k (visited June 13, 2025). ................13

Fed. R. Evid. 106 Advisory Committee Note [1972 Proposed Rules] ........................................19

Mark Berman, *Authentication and Reliability of AI and Digital Evidence—What Must the Expert

Demonstrate*, New York Law Journal (November 4, 2024), Available at:

https://www.law.com/newyorklawjournal/2024/11/04/authentication-and-reliability-of-ai-and-

digital-evidence-what-must-the-expert-demonstrate/ (visited on Nov. 13, 2024)....................13

NYC Bar Assoc. Professional Ethics Committee, *Formal Opinion 2024-5: Ethical Obligations of

Lawyers and Law Firms Relating to the Use of Generative Artificial Intelligence In the

Practice of Law*, p. 7, New York City Bar Association (August 7, 2024), Available at:

https://www.nycbar.org/wp-

content/uploads/2024/08/20221329_GenerativeAILawPractice.pdf (visited on Nov. 12, 2024)

.................................................................................................................................................12

Stuart Saft, *Lawyers: Beware of AI Hallucinations*, New York Law Journal (Sept. 20, 2024),

    Available at: https://www.law.com/newyorklawjournal/2024/09/20/lawyers-beware-of-ai-

    hallucinations/ (visited on Nov. 13, 2024). ............................................................. 12, 14, 17

**Rules**

Fed. R. Crim. Pro. 16 ......................................................................................................6

FRE 1006 ...............................................................................................................passim

FRE 401 ............................................................................................................... 19, 20

FRE 403 ........................................................................................................... 17, 18, 20

FRE 803(6)(A) – (C) ......................................................................................................10

FRE 901 ...........................................................................................................................9

FRE 902 ...........................................................................................................................9

FRE 902(11) ......................................................................................................... 10, 11, 16

FRE 902(12) ......................................................................................................... 10, 16, 17

FRE 902(13) ......................................................................................................... 11, 14, 16

FRE 902(14) ............................................................................................................. 15, 16

Rule 803(6) ...................................................................................................................11

**Treatises**

6 Weinstein's Federal Evidence § 1006.05 .....................................................................1

**Constitutional Provisions**

Due Process Clause ........................................................................................................25

Fourth Amendment .................................................................................................21, 23

Freedom of Religion .....................................................................................................24

Freedom of Speech.........................................................................................................24

**DISCUSSION**[1]

Defendant incorporates by reference his original Motion, ECF # 70, and reasserts his arguments from same as if set forth herein[2] (except with respect to Points III and IV concerning suppression of evidence from Mr. Gogic's iPhone).

I. Motion to Preclude the Excel Charts Under FRE 1006 – Summaries to Prove Content.

Mr. Gogic moves to preclude all Excel spreadsheets under FRE 1006, and for a hearing as the Government contests a material issue of fact.

Pursuant to FRE 1006, "a court may admit a 'summary, chart, or calculation to prove the content of voluminous writings….' so long as the underlying records are made available to the adverse party, Fed. R. Evid. 1006… and '[t]he offering party… la[id] a proper foundation for admissibility of the underlying materials and show[ed] that the summary is accurate,'" *Gem. Fin. Serv. v. City of New York,* 2023 WL 4850523, 2023 U.S. Dist. LEXIS 131092, *32 – 33 (E.D.N.Y. July 28, 2023) (emphasis added) (citing *United States v. Miller*, 954 F.3d 551, 565 [2d Cir. 2020]; *United States v. Tahlil Mohamed,* 2022 WL 15493545, at *9 - 10; 2022 U.S. Dist. LEXIS 195088 [E.D.N.Y. Oct. 26, 2022] and quoting *Thompson v. Spota,* 2022 WL 17253464, at *12; 2022 U.S. Dist. LEXIS 213649 [E.D.N.Y. Nov. 28, 2022] [which cited 6 Weinstein's Federal Evidence § 1006.05]). See also *City of Almaty v. Ablyazov*, 2018 WL 11270087, 2018 U.S. Dist. LEXIS 242396, *25 (S.D.N.Y. 2018) ("the proponent must make the underlying documents available for examination or copying, and the court may order their production in court") (emphasis added) (citing FRE 1006).

---

[1] To conserve space, the facts are addressed in a Declaration in Support.
[2] Though we also endeavor to give an updated, somewhat more concise, discussion of Mr. Gogic's motions in this memorandum of law.

1

Spreadsheets constitute summaries, <u>NOT</u> underlying data. *LaMonica v. 72 Fashion Corp. (In re Pretty Girl, Inc.*), 2022 WL 1051098; 2022 Bankr. LEXIS 943, \*17 (Bankr. S.D.N.Y. April 7, 2022) ("summary chart, such as his Excel spreadsheet"); *Advanced Mktg. Group v. Business Payment Sys.,* 2012 WL 6101991; 2012 U.S. Dist. LEXIS 162809 (S.D.N.Y. Nov. 9, 2012).

That the spreadsheets are <u>NOT</u> the underlying SkyECC data is confirmed by experts. According to expert Andreas Milch, "It is obvious that the data inserted into the Excel tables are not the raw data, as no communication device in the world has ever communicated in the format of a spreadsheet program like Excel," Ex. A - Milch Report p. 46. Mr. Milch explains that "The Sky-ECC chat data presented here do not represent the original data… Excel stores data in a tabular format, which differs from the original file formats on mobile devices," <u>Id.</u> p. 3. <u>Id.</u> p. 4.

Mr. Milch supports this conclusion with, *inter alia,* discrepancies regarding hash values (digital fingerprints that prove whether or not an electronic file has been changed). For example, the spreadsheets refer to media (such as photographs) allegedly sent in messages. Separate electronic folders contain what the Government purports to be the media files referred to in the spreadsheets.

However, there is no proof that these files are the ones referenced in the spreadsheets.[3] A file will always have the matching digital fingerprint as the message it was sent in.[4] Yet, the media files here do not have the matching fingerprints to the messages in which the media files were allegedly sent, which "suggests that the media files were not sent with the message," and "indicates that these cannot be the original chat data," Ex. A – Milch Report p. 32. He

---

[3] <u>See</u> Exhibit A – Milch Report, p. 30 – 33; Exhibit B – Supp. Milch Report, p. 17.
[4] Ex. A – Milch Report p. 11.

additionally found instances where the spreadsheets refer to media having been sent, but where there is no alleged corresponding media, Ex. A – Milch Report, p. 35 – 38, 43,[5] and evidence that file names had been changed (either manually or with artificial intelligence).[6]

Just as identical twins have different fingerprints, Mr. Milch explains that any time a message is sent, it will have a unique hash value, such that even if a declarant sent the same message multiple times, each duplicate will have its own separate hash value.[7] In contrast, the spreadsheets contain triplicate messages purporting to have matching fingerprints—an impossibility that proves that the Excel data is not the underlying data and is not reliable. Ex. A – Milch Report, p. 42 – 44.

As further proof that the spreadsheets are NOT the underlying data, Mr. Milch's examination of the spreadsheets reveals that the spreadsheets were *altered on multiple occasions.* Ex. A - Milch Report p. 23 – 29. "Such changes can be found in **all** Excel spreadsheets … Therefore, it cannot logically be the case that these are the unchanged messages allegedly intercepted in Europe, as there is clear evidence of modifications." Ex. A - Milch Report p. 28 – 29 (emphasis in original). See also Ex. B - Supp. Milch Report p. 6 – 13.

Expert Lee Koch, having reviewed the spreadsheets and Mr. Milch's report concurs "on all points made… including his methods and conclusions," Ex. D - Letter from Lee Koch dated October 4, 2024.

---

[5] Our office has identified 97 spreadsheets where we do not have alleged corresponding media in the media folder.
[6] Id. p. 31, - 32.
[7] Ex. A – Milch Report, p. 11.

In Mr. Milch's Supplemental Report, responding to the Government's allegations, he again confirms that the Excel data does NOT constitute the underlying data from SkyECC. Ex. B - Supp. Milch Report p. 2 – 3, p. 12 – 13, p. 18 – 19, p. 26.

He also explains that when the Government points to certain alleged metadata of the purported messages, the Government is ignoring his point that the metadata *for the Excel files themselves*, including when the files were created, when they were modified, by whom, and how, has <u>not</u> been turned over by the Government. Ex. B – Supp. Milch Report p. 4.

Expert Yehudi Moskowicz likewise corroborated that the underlying data does <u>not</u> consist of spreadsheets. He explains that the original data includes metadata that is <u>not</u> included in spreadsheets, advising that "Not only did this raise issues in terms of reliability, but it also raises serious questions why and by who this selection is made before providing it to the defense." Ex. E - Moszkowicz Report p. 4.

More recently, we learned that the Columns labeled "Ingest date" do not refer to the date a message was sent, but to the date on which data was loaded into a system. For example, if data is processed three different times on three different days, it would appear in triplicate but with three different ingest dates. Here, where the same messages appear triplicated, but have different "ingest dates," we know that these spreadsheets are not the underlying data, as the data has been processed and reprocessed on multiple dates. Mr. Milch informs us this indicates the use of AI, and would explain the presence of so many duplicate messages.

Additional proof that the spreadsheets are summaries comes from discovery. The Government produced screenshots of purported SkyECC messages between CW-1 and Mr. Gogic that do *not* appear in the Excel data. NO messages with CW-1 appear in the Excel data,

4

and CW-1 is inexplicably missing from the spreadsheet that, according to the Government, contains Mr. Gogic's SkyECC contacts list.

As another example, the Government produced a video purporting to show SkyECC messages between Mr. Gogic and CW-2. While the Government produced a spreadsheet purporting to contain messages between CW-2 and Mr. Gogic, that spreadsheet:

- is missing more than half of the messages shown in the video

- gives different timestamps for messages than are in the video

- and contains duplicate messages that, based on the video, never existed.

We identified over 60 spreadsheets which purport to be conversations between two or more participants, but which only contain messages—in some cases thousands of messages—from one side of the alleged conversations. We could go on, and will be happy to at a hearing.

Thus, under FRE 1006, spreadsheets are NOT admissible when the proponent has not provided the underlying data. *Advanced Mktg. Group,* 2012 WL 6101991; 2012 U.S. Dist. LEXIS 162809, *22 - *23 ("the business records underlying the spreadsheets… were not made available for AMG's review… In these circumstances, the NPC spreadsheets are not a basis upon which Mr. Blesofsky may rely…"). "Defendants <u>must</u> be given the opportunity to review the original documents… to confirm the accuracy and completeness of the information provided <u>in the spreadsheet</u>," *Ablyazov,* 2018 WL 11270087; 2018 U.S. Dist. LEXIS 242396, *26 (emphasis added).

In *United States v. Citron*, 783 F.2d 307 (2d Cir. 1986), the Second Circuit reversed a conviction and remanded because "the admission into evidence of the summary chart….constituted prejudicial error requiring a reversal," 783 F.2d 307, 318. <u>See also</u> *United States v. Cilins*, 2014 U.S. Dist. LEXIS 7123; 2014 WL 173414 (S.D.N.Y. Jan. 15, 2014)

5

(granting in part motion to compel original contracts for inspection and testing); *United States v. Oliver*, 2002 U.S. Dist. LEXIS 47951, *12, 2008 WL 2511751 (N.D. Tex. June 23, 2008) (ordering the Government to produce "an exact duplicate (mirror image) of the original hard drive and any seized… devices").[8]

The Government's arguments that the spreadsheets constitute the underlying data lack merit. The Government has not contested that the spreadsheets are not "the data as it exists in… or as it existed in" the SkyECC servers. Government's Opposition to Defendant's Motion to Suppress and Preclude, ECF # 71 ("Opp.") p. 16. Instead, the Government claims that no different data exists. But we can demonstrate at a hearing that different data DOES exist. The Government provided different data in the form of screenshots and video containing purported SkyECC messages that are <u>not</u> in the spreadsheets. The contact list that the Government proffered as proof of the spreadsheets' reliability and authenticity, Opp. p. 6, proves the opposite. That contact list omits CW-1, whose alleged SkyECC communications with Mr. Gogic appear in screenshots batestamped SENSITIVE_GOGIC003073- SENSITIVE_GOGIC3078.

Another of the Government's arguments is that if specialized software is needed to review the underlying data, then spreadsheets should be considered originals. Opp. p. 21. This is absurd.

Software programs are routinely required to review underlying data. For example, Cellebrite software can be used to review data extracted from cellphones, including data from messaging apps. In *United States v. Huang et al.*, 18 CR 428 (BMC) (E.D.N.Y.) the Government

---

[8] <u>Cf.</u> *Zuckerbrot v. Lande,* 2024 N.Y. Misc. LEXIS 1054, *4 - *5, 2024 NY Slip Op 30712(U) (Sup. Ct., N.Y. County March 6, 2024) (ordering Defendant "provide relevant [electronically stored information] in its native format… If… native ESI is unavailable… Defendant shall provide Plaintiffs' expert with access to her electronic devices for forensic examination")

produced spreadsheets summarizing communications extracted from devices, with accompanying media files. However, unlike in the case at bar, the Government never pretended in *Huang* that the spreadsheets and accompanying media were the underlying data. Rather, knowing that spreadsheets and accompanying media are not the underlying data, the U.S. Attorney's Office in *Huang* turned over Cellebrite software in order to review the underlying data and metadata from electronic devices. In *United States v. Coffey*, 21 CR 538 (JMA) (E.D.N.Y.), the Government provided the defense with Cellebrite to review underlying data.

While this was done in *Huang* and in *Coffey* without judicial intervention, courts within this circuit have ordered the Government to provide the defense with any software necessary to review the underlying data and metadata.[9] The Ninth Circuit has gone further, holding it is an abuse of discretion to withhold from the defense software needed to review discovery. *United States v. Budziak*, 697 F.3d 1105 (9th Cir. 2012).

Further, *Excel is a type of software.* Therefore, the Government's argument that the need for software to review data transforms spreadsheets into the original data is illogical on its face.

The Government argues that so long as the spreadsheets are in the same condition as France provided them, the spreadsheets must be the underlying data. Opp. p. 17, 19.

This is illogical. No court has held that if summaries were produced by a third party, rather than by the proponent, then they satisfy the requirement for the underlying records. To the contrary, in *Advanced Mktg. Group*, a third party provided Excel spreadsheets to a defendant

---

[9] *United States v. Cannady*, 2024 WL 4564250, 2024 U.S. Dist. LEXIS 195058, *2 (S.D.N.Y. Oct. 24, 2024); *United States v. Sampson*, 2024 WL 165200; 2024 U.S. Dist. LEXIS 9604, *3 (S.D.N.Y. Jan. 2024); *United States v. Smith*, 2023 U.S. Dist. LEXIS 81662, *2 - *3, 2023 WL 3144170 (S.D.N.Y. April 27, 2023); *United States v. Bazemore*, 2022 U.S. Dist. LEXIS 208404, *3, 2022 WL 16849455 (S.D.N.Y. Nov. 9, 2022); *United States v. Bernal*, 2022 U.S. Dist. LEXIS 156826, *1, 2022 WL 3594580 (S.D.N.Y. August 23, 2022).

after the lawsuit had been filed. The records underlying the data in the spreadsheets were never made available to the Plaintiff. Therefore, the requirements of FRE 1006 had not been met. The fact that that the spreadsheets were prepared by a third party, rather than by the proponent, did not change the fact that the spreadsheets were not the underlying records. *Advanced Mktg. Group*, 2012 WL 6101991; 2012 U.S. Dist. LEXIS 162809.

Suppose that a party proffered spreadsheets purporting to list entries from a visitor's log from the Metropolitan Detention Center. Using the Government's reasoning, as long as the spreadsheets are prepared by a third party, not the proponent, the proponent has no burden to produce the underlying visitor's log to permit the adverse party to inspect the underlying log and confirm the accuracy of the spreadsheets.

Or say a litigant proffered spreadsheets prepared by a third party summarizing bank records. Again, using the Government's reasoning, if the litigant could establish that the spreadsheets were prepared by the third party, then the proponent would be under no obligation to produce the underlying bank records to the opposing party for inspection.

Admitting spreadsheets from a third party without first producing the underlying records to the adverse party is NOT, as the Government asserted, "routine," Opp. p. 4. It is against the letter and the spirit of FRE 1006. See *Citron*, 783 F.2d 307, 316.

The Government alleges that France "certified" the spreadsheets, and that the Federal Rules of Evidence require nothing more.[10] The Government bases this on a one page "procés-verbal" (Ex. F). But as we will discuss *infra*, France has NOT, and legally CANNOT, certify the records.

---

[10] Opp. p. 17.

Because the Government disputes that the spreadsheets are summaries, rather than the underlying data, because Mr. Gogic has expert witnesses who will testify that the spreadsheets cannot be the underlying data, and because this is an issue of fact material to whether the spreadsheets are admissible, Mr. Gogic respectfully requests that the Court schedule an evidentiary hearing, at which Mr. Gogic may call his experts to testify.

This is still an issue of first impression. Subsequent to the Court's denial of Mr. Gogic's motion to suppress, a defendant in the Eastern District of Michigan, after reading an article about Mr. Gogic's case, filed a *pro se* motion to suppress or preclude SkyECC evidence.[11] *Didani's* motion did not raise the issue of FRE 1006; thus, the district court could not rule on it. Instead, the defendant in *Didani* brought a motion on other grounds, which have some overlap with Mr. Gogic's motions. However, while the motion was denied in *U.S. v. Didani,* 2025 WL 452472 (E.D. Mich. Feb. 10 2025), that case is distinguishable as Mr. Gogic is able to support his arguments with evidence from expert witnesses that was not presented to the Eastern District of Michigan during *in limine* practice.

## II. The Excel Data Is Inadmissible Because The Government Cannot Authenticate It.

To be admissible, evidence must first be authenticated under either FRE 901 or FRE 902. The Government argued that the Procés-Verbal from France, Ex. F, constitutes a "certification", which, when combined with testimony by a U.S. agent who received the spreadsheets, will authenticate the spreadsheets. Opp. p. 4. The Government is wrong.

---

[11] *U.S. v. Didani*, 21 CR 20264 (DPH) (KGA) (E.D. Mich.) Doc # 138.

A Government witness in another proceeding, DEA SA Willock, testified that a Procés-Verbal is <u>not</u> a certification, and that France <u>never</u> certified the records.[12]

Even "self-authenticating" records must satisfy certain requirements, including but not limited to being properly certified. The evidence cannot be admitted under FRE 902(12), which only applies "In a civil case", <u>not in criminal cases</u>. FRE 902(12). Nor can it be admitted pursuant to FRE 902(11). First, FRE 902(11) only applies to records that are domestic*, not* foreign. Second, they would have to satisfy the requirements of business records, that is, being made at or near the time of occurrence by someone with knowledge, kept in the course of a regularly conducted activity, and making the record would have to have been a regular practice of that activity. FRE 803(6) (A) – (C).

The alleged certification does not allege that any of the requirements of FRE 803(6) (A) – (C) were met, nor could it. The summaries were not created at or near the time of occurrence by someone with knowledge and made and kept as part of a regularly conducted activity. Rather, they were generated by Artificial Intelligence years after the mass surveillance in response to our Government's requests for evidence in the case at bar. Ex. F - Procés-Verbal; 9/18/24 Email from Gov., ECF # 70-25. (We still do not know why France provided the data.[13]) Additionally, the substantive contents of messages sent via an electronic platform are never the business

---

[12] *Didani,* 21 CR 20264 (E.D. Mich), Doc. # 193 – 3/25/25 Tr. p. 176, L. 20 – 22; p. 177, L. 1 – 5.

[13] There is nothing in the alleged certification that enables the defense to determine that France created the Excel spreadsheets in question. To the contrary, the JIT Agreement suggests Europol created the spreadsheets and provided them to the French authorities.  Aside from the fact that the hack was done by the Dutch, not the French, the JIT Agreement specifies that *Europol*, NOT France, is responsible for disseminating intelligence packages, containing crude data and analysis, with the approval from the parties to the JIT Agreement. JIT Agreement, Doc # 70-9, p. 7 – 8. It is as if the Government does not want to contact Europol in order to avoid obtaining the raw data, or as if Europol could not get consent from all parties to the JIT Agreement to share the raw data with the United States.

10

records of the platform over which they are sent, as explained by the Third Circuit in the context of explaining why users' communications are not Facebook's business records.

> "Rule 803(6) is designed to capture records that are likely accurate and reliable in content, as demonstrated by the trustworthiness of the underlying sources of information and the process by which and purposes for which that information is recorded… **Facebook does not purport to verify or rely on the substantive contents** of the communications in the course of its business… confirmation that the depicted communications took place between certain Facebook accounts, on particular dates, or at particular times… is no more sufficient to confirm the accuracy or reliability of the contents of the… chats than a postal receipt would be to attest to the accuracy or reliability of the contents of the enclosed mailed letter… the Facebook records **are not business records** under Rule 803(6) and thus **cannot be authenticated by way of Rule 902(11)."**

*United States v. Browne*, 834 F.3d 403, 409 - 411 (3d Cir. 2016) (emphasis added) (citations omitted).

FRE 902(13) provides for the authentication of records 1. "generated by an electronic process or system" 2. "that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." FRE 902(13) (emphasis added). Thus, FRE 902(13) clearly requires a certification that the electronic process or system that was used produces an accurate result.

However, nowhere does the Procés-Verbal certify that the process by which the spreadsheets were generated produces an accurate result. The Procés-Verbal only indicates that the French Judicial Police will compile and provide the information to the U.S., and that this involves the use of "the interface of the Dutch collaborators," presumably, Chat-X. Ex. F - Procés-Verbal. It is not even clear if France prepared the spreadsheets or collected and provided spreadsheets prepared by Europol or another nation (nor does it say if the spreadsheets were prepared by AI).

11

Without any representation in the Procés-Verbal as to the process producing an accurate result, the Procés-Verbal CANNOT satisfy the requirements of FRE 902(13).

Although the Government did not provide any information about "the electronic process or system" via which the Excel data was generated, we know from our experts that the Excels were generated with Artificial Intelligence ("AI").

AI is <u>not</u> "a process or system that produces an accurate result."[14] Rather, AI is prone to "hallucinations," meaning "a response generated by AI… which contains false or misleading information presented as fact."[15]

AI is "notorious for inventing false information," *M.B. v. N.Y.C. Dep't. of Educ.*, 2024 U.S. Dist. LEXIS 13836, *10 (S.D.N.Y. Jan. 24, 2024). Because of the inherent unreliability of AI, attorneys have an obligation under Rules of Professional Conduct 1.2(c), 3.1, 3.3 and 1.16 to "'review all [G]enerative AI outputs,'… for accuracy before use for client purposes and submission to a court or other tribunal."[16]

Thus, lawyers have been sanctioned for presenting AI generated information to courts without first verifying the accuracy of AI's results. *Park v. Kim*, 91 F.4th 610, 612 (2d Cir.

---

[14] FRE 902(13).

[15] Stuart Saft, *Lawyers: Beware of AI Hallucinations*, <u>New York Law Journal</u> (Sept. 20, 2024), Available at: https://www.law.com/newyorklawjournal/2024/09/20/lawyers-beware-of-ai-hallucinations/ (visited on Nov. 13, 2024).

[16] NYC Bar Assoc. Professional Ethics Committee, *Formal Opinion 2024-5: Ethical Obligations of Lawyers and Law Firms Relating to the Use of Generative Artificial Intelligence In the Practice of Law*, p. 7, <u>New York City Bar Association</u> (August 7, 2024), Available at: https://www.nycbar.org/wp-content/uploads/2024/08/20221329_GenerativeAILawPractice.pdf (visited on Nov. 12, 2024) (footnotes omitted). <u>Cf.</u> Dana E. Heitz, *When the Witness Is an Algorithm: The Use of AI-Generated Avatars in Court*, New York Law Journal (June 6, 2025), Available at: https://www.law.com/newyorklawjournal/2025/06/06/when-the-witness-is-an-algorithm-the-use-of-ai-generated-avatars-in-court/ (Visited on June 9, 2025) (re: AI-generated avatars, "Its source materials must be provided… The origin of the content… must be disclosed. The procedures by which the AI was generated must be described, possibly accompanied by expert evidence…").

2024).[17] For instance, in *Smith*, a Massachusetts court sanctioned an attorney for submitting a filing that relied on non-existent cases. The court accepted the attorney's "representations that he generally is unfamiliar with AI…, that he had no knowledge that an AI system had been used… and that the Fictitious Case Citations were included… in error… There is, however, a broader lesson… It is imperative that all attorneys…understand that they are obligated…. to ensure that appropriate steps are being taken to verify the truthfulness and accuracy of any AI-generated content before the papers are submitted… The blind acceptance of AI-generated content by attorneys… will lead to other sanction hearings," *Smith*, 2282 CV 01197, 15 – 16 (citations omitted). At least one New York court has held that evidence produced with artificial intelligence, "should properly be subject to a *Frye* hearing prior to its admission," *In the Matter of Weber*, 2024 NY Slip Op 24258, 2024 N.Y. Misc. LEXIS 8609, *28 (Surrogate's Court, Saratoga County Oct. 10, 2024).

Here, according to the U.S. Attorney's Office, France has not provided them with the underlying data, which means the U.S. Attorney's Office has *never* had the opportunity to

---

[17] See also *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023); *Matter of Samuel*, 82 Misc. 3d 616, 620 (Surrogate's Court, Kings County 2024); *D.S. v. N.Y.C. Dep't. of Educ.*, 2024 U.S. Dist. LEXIS 79009, *16 (S.D.N.Y. April 29, 2024), *adopted by* 2024 U.S. Dist. LEXIS 89182 (S.D.N.Y. May 14, 2024); *J.G. v. N.Y.C. Dep't. of Educ.*, 719 F. Supp. 3d 293, 308 (S.D.N.Y. 2024).Mark Berman, *Authentication and Reliability of AI and Digital Evidence— What Must the Expert Demonstrate*, New York Law Journal (November 4, 2024), Available at: https://www.law.com/newyorklawjournal/2024/11/04/authentication-and-reliability-of-ai-and-digital-evidence-what-must-the-expert-demonstrate/ (visited on Nov. 13, 2024); David Weisenfeld, *Cite Once, Check Twice: When courts discover fake AI citations, a lack of supervision is often the cause*, 111/3 ABA Journal 21 (June/July 2025) (citing *Smith v. Farwell,* 2282 CV 01197 [Mass. Superior Ct. Feb. 12, 2024], available at: https://masslawyersweekly.com/wp-content/blogs.dir/1/files/2024/02/12-007-24.pdf); Debra Weiss, *Sanctions imposed for 'collective debacle' involving AI hallucinations and 2 firms, including K&L Gates*, ABA Journal (May 14, 2025), Available at: https://www.abajournal.com/web/article/judge-imposes-sanctions-for-collective-debacle-involving-ai-hallucinations-and-2-law-firms-including-k (visited June 13, 2025).

confirm the accuracy of the output of the AI used to generate the spreadsheets that the Government would proffer as evidence against Mr. Gogic.

While we have been handicapped by not having access to the underlying data, we have still identified evidence that the A.I. used here produced inaccurate results. That evidence includes, but is <u>not limited to</u>:

- the AI created fictitious duplicate messages, with the same digital fingerprints and sent at the exact same time as the original messages, both of which are impossible

- media files that do not have the digital fingerprints of the messages in which the files were allegedly sent, another impossibility

- a spreadsheet allegedly containing the defendant's Contacts list inexplicably omits CW-1, which is directly contradicted by screenshots produced by the Government containing purported SkyECC messages between CW-1 and the defendant

- the spreadsheets omit any conversation between the defendant and CW-1, despite screenshots produced by the Government purporting to contain SkyECC communications between the defendant and CW-1

- a spreadsheet that purportedly contains a SkyECC conversation between the defendant and CW-2 is missing over half of the messages depicted in the video of the same alleged conversation produced by the Government,

- spreadsheets of other alleged conversations between two or more participants were entirely one-sided, etc.

Wherefore, the evidence cannot be authenticated under FRE 902(13). While our experts' reports already conclude that the resulting Excel data is unreliable, we respectfully request a

hearing, at which our experts will explain that the Government has not, and <u>cannot</u> demonstrate, that the spreadsheets were produced by a process that produces an accurate result.

Likewise, the evidence is inadmissible under FRE 902(14), which provides that data is self-authenticating if it was "copied from an electronic device, storage medium, or file, **if authenticated by a process of digital identification,** as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." FRE 902(14) (emphasis added).

FRE 902(14) goes to whether digital forensics methods have been used to authenticate the electronic data. Testimony by a Government witness that the files are in the form they were received from France does not and cannot satisfy this requirement, *because the issue is not whether the data was not altered after being delivered to the United States.*

The issue under FRE 902(14) is whether digital forensics can be used to verify that the spreadsheets are authentic copies of the underlying intercepted SkyECC data. The Procés-Verbal that the Government alleges is a certification of the documents, Ex. F, tells us <u>nothing</u> about the use of any digital identification methods to authenticate the Excel spreadsheets.

Mr. Milch explains that central to authenticating electronic evidence with digital forensics are "the consistency of hash values, the verifiable storage and distribution of timestamps, the seamless documentation of the chain of custody, the creation of immutable forensic copies, and the validation of analysis tools used. Only through adherence to these standards can the integrity and authenticity of digital evidence be ensured in court. However, this is lacking the present case. <u>Digital forensic standards have not been adhered to in this instance,</u>" Ex. A - Milch Report p. 58 (emphasis added).

Therefore, as our experts can testify at a hearing, the Excel data was NOT authenticated by a process of digital identification and the spreadsheets are inadmissible under FRE 902(14).

Likewise, for the same reasons that the spreadsheets were *not* the product of a system that produces accurate results, that they have *not* been authenticated through digital forensics, and that they do *not* consist of the underlying data, the Government has no means of authenticating the files, even under FRE 901.

Wherefore, Mr. Gogic moves for the preclusion of the Excel data, or in the alternative, an evidentiary hearing on this matter.

Before we move on, the requirements of FRE 902 subsections (13) and (14) both include, *inter alia,* "a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."

These requirements are not met by the Procés-Verbal. FRE 902(11) requires that a certification comply "with federal statute or a rule prescribed by the Supreme Court." This can be done via an affidavit or a declaration complying with 28 U.S.C. § 1746, which provides that an unsworn declaration must be "in substantially the following form: (1) if executed without the United States: 'I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." 28 U.S.C. § 1746(1).

Where such language is missing, a document does not meet the certification requirements of FRE 902(11). *Cortez v. Lobo (In re World Trade Ctr. Disaster Ctr. Disaster Site Ligit.)*, 722 F.3d 483, 488 (2d Cir. 2013). See also *Nissho-Iwai Am. Corp v. Kline*, 845 F.2d 1300, 1305-06 (5th Cir. 1988); *Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F. Supp. 2d 732, 742, n. 6 (DNJ 2001); *Zavala-Alvarez v. Darbar Mgmt.*, 617 F. Supp. 3d 870, 885-886 (N.D. Ill. 2022). FRE 902(12) similarly requires that a document "must be signed, in a matter that, if falsely

16

made, would subject the maker to a criminal penalty in the country where the certification is signed," FRE 902(12) (though, again, FRE 902(12) is limited to civil cases).

Here, the Procés-Verbal, Ex. F, does not state that it was made "under penalty of perjury," which is (yet another) reason that the Procés-Verbal is NOT a certification and the spreadsheets are NOT self-authenticating.

## III. The Excel Data Is Inadmissible Under FRE 403.

Mr. Gogic moves to preclude the Excel evidence under FRE 403, as any probative value is substantially outweighed by unfair prejudice, confusing the issues, and misleading the jury.

As recognized by FRE 1006, it is unfairly prejudicial to introduce spreadsheets— summaries of intercepted data—without first permitting the defense to examine the underlying data from which the spreadsheets were prepared to test the summaries' accuracy and reliability.

This unfair prejudice is exacerbated here where the spreadsheets were generated by AI— a technology that produces inaccurate results. The burden should not be on the adverse party— nor on the jury—to separate fact from AI hallucination. That burden should be on the Government. Any proponent of AI generated evidence has a professional obligation to not only inform the Court of the use of AI, but to *test the accuracy* of the AI results before offering AI-generated spreadsheets into evidence. "[W]e need to check to make certain that we are not caught up in [AI's] need to respond to every inquiry with an answer," Stuart Saft, *Lawyers: Beware of AI Hallucinations*, New York Law Journal (Sept. 20, 2024), Available at:

https://www.law.com/newyorklawjournal/2024/09/20/lawyers-beware-of-ai-hallucinations/

(visited on Nov. 13, 2024).

The Government cannot have met that obligation here, where the Government never obtained the underlying data, let alone compared it to the Excel spreadsheets.

Adding further to the unfair prejudice are the glaring errors and omissions that are obvious even just from an examination of the AI's output, such as omitting all communications with CW-1, omitting CW-1 from the defendant's alleged contact list, omitting half of numerous alleged conversations, and clearly erroneous digital fingerprints.

Similarly, any probative value of the AI generated spreadsheets will be substantially outweighed by the danger of misleading the jury. Just as an excerpt from a "substantially unintelligible" recording "may leave a misleading impression of the entire conversation," *United States v. Frazier*, 479 F.2d 983, 985 (2d Cir. 1973), so too, presenting the jury with summaries of alleged conversations that are missing substantial portions—and sometimes missing a declarant's entire side of said conversation—can do nothing but mislead the jury.

Wherefore, the defendant moves to preclude the spreadsheets pursuant to FRE 403, or for an evidentiary hearing for findings of fact.


IV. The Excel Data Should Also Be Barred Given FRE 106 – the Rule of Completeness.

Pursuant to FRE 106, where one party "introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." FRE 106. Thus, where part of a conversation has been introduced into evidence, the opposition should be permitted to introduce other portions where "'necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion," *United States v. Williams*, 930

18

F.3d 44, 58 (2d Cir. 2019) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 [2d Cir. 1987]) (and also citing, *inter alia,* *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 111 [2d Cir. 2012]).

The problem is it is impossible to comply with FRE 106 here where the defense has not been provided with the remaining portions of the defendant's alleged SkyECC conversations. 60 spreadsheets are missing all of one declarant's side of the purported conversations, meaning there is no means of placing the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion. Still other spreadsheets, while not fully one-sided, are nevertheless missing large portions of the alleged conversations. For example, the spreadsheet summarizing the purported conversation between Mr. Gogic and CW-2 is missing more than half of the SkyECC messages depicted in the video, bates # SENSITIVE GOGIC004081.

Wherefore, as the defense would be deprived of the ability under FRE 106 "to correct, contemporaneously, the 'misleading impression created by taking matters out of context,'" *Williams*, 930 F.3d 44, 58, (quoting Fed. R. Evid. 106 Advisory Committee Note [1972 Proposed Rules]), we respectfully move to preclude the Excel spreadsheets.


V. Motion to Preclude Evidence from Defendant's Phone Under FRE 401 and FRE 403.

To be relevant, evidence must have "any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FRE 401.

Here, the evidence seized from Defendant's iPhone only has a tendency to make it more or less probable that particular SkyECC PIN numbers were used by Mr. Gogic.

19

Thus, if the Court grants the defendant's motion to preclude the spreadsheets, then corroboration from Mr. Gogic's phone that the PIN numbers had been used by Mr. Gogic become irrelevant to the proceedings.

Wherefore, if the spreadsheets are precluded, then evidence obtained from Mr. Gogic's phone should be precluded as irrelevant pursuant to FRE 401, and/or precluded under FRE 403, on the grounds that any minimal probative value of evidence from the iPhone would be substantially outweighed by a waste of time, confusing the issues, and needlessly presenting cumulative evidence.

VI. The Court Should Exercise Its Discretion to Preclude Evidence from the Global
Suspicionless Mass Surveillance.

As per our Declaration in Support, subsequent to the denial of defendant's motion to suppress evidence from the mass surveillance, important, previously unavailable evidence about the mass surveillance was revealed for the first time.

This includes extensive testimony in March of 2025 from the leading U.S. investigator of SkyECC, SA Willock of the DEA, about the U.S.' role in the international investigation of SkyECC.

In spite of his position that the U.S.' investigation was separate from the Europeans', he testified, *inter alia,* that:

- the U.S. communicated "extensively" with the European authorities;

- the U.S. and the Europeans met in February of 2019 to divide up the
  responsibilities of the various investigators in bringing down the SkyECC
  network and investigating its users and principals

20

- thereafter the U.S. and Europeans continued to meet and to exchange information on the investigation before, throughout, and after the mass surveillance;

- the U.S. requested information on SkyECC from U.S. companies used by the platform, including Blackberry, Google, and AT&T;

- with information from Blackberry, the U.S. was able to determine where the servers were located, and to pass that information on to the Europeans so that the Europeans could follow up on this lead for us;

- with information from AT&T, the U.S. was able to identify SkyECC phones;

- the U.S. agreed not to indict the principals of Sky Global until after SkyECC was terminated, so as not to frustrate the U.S.' and Europeans' shared goal of gathering evidence that users were using the app in furtherance of criminal activity;

- once the mass surveillance was terminated, the U.S. and Europeans terminated the SkyECC service, and the U.S. notified users that the U.S. had seized the company's websites, inviting users to reach out to U.S. law enforcement about same;

- the investigators had discussed the Fourth Amendment, but felt that it would not apply so long as the servers were not physically located on U.S. soil.

Other newly available evidence that was unavailable when Judge Ross ruled on Mr. Gogic's prior Motion, includes the Dutch Deployment Plan[18] and a French Report of August 2019,[19] both of which prove that the mass surveillance was NOT, as our Government and

---

[18] See Exhibit J – D65, beginning at page 15.
[19] Exhibit K – D2.

21

European courts had asserted, a French law enforcement operation. Rather, these documents prove that the Dutch directed the French to apply for the interception of the servers, and the Dutch figured out how to hack the servers and decrypt the communications. They show that the Dutch designed Chat-X, employing AI to select excerpts from the billion intercepted messages. (And they corroborate SA Willock's testimony about the agreement between the U.S. and the Europeans.)

As a result, prosecutors in Europe and the U.S. can no longer hide behind the falsity that this was a French law enforcement operation and therefore governed only by French law.

Due to all of this new evidence, Mr. Gogic respectfully renews his motion to suppress evidence from the suspicionless mass surveillance and/or for the Court to preclude the evidence using the Court's inherent supervisory power, or for an evidentiary hearing on same. As discussed further in the Motion at p. 51 - 60, ECF # 70, incorporated by reference herein, (1) the global mass surveillance was so egregious as to shock the conscience, and (2) the cooperation between the U.S. and foreign agents "may implicate constitutional restrictions."[20]

These grounds are subsets of the Court's broader inherent supervisory authority to protect the judiciary from becoming complicit in unlawful actions.[21] "[E]very United States court has an inherent supervisory authority over the proceedings conducted before it," *Bank of Nova Scotia v. United States*, 487 U.S. 250, 264, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988) (Scalia, J., concurring). This inherent supervisory power "permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar," *HSBC Bank*, 2013 WL 3306161 (quoting *United States v. Payner*, 447 U.S. 727, 735 n. 7 [1980]); and permits courts "to

---

[20] *United States v. Getto*, 729 F.3d 221, 228, 230 (2d Cir. 2013) (citations omitted).
[21] See *United States v. HSBC Bank USA, NA*, 2013 WL 3306161, 2013 U.S. Dist. LEXIS 92438, *11 (E.D.N.Y. July 1, 2013) (quoting *McNabb v. United States*, 318 U.S. 332, 345 [1943]).

fashion 'civilized standards of procedure and evidence' applicable to federal criminal proceedings." *HSBC Bank*, 2013 U.S. Dist. LEXIS 92438, *12 (quoting *McNabb*, 318 U.S. at 340).

Given what we now know to be an extensive partnership between the U.S. and other nations in the SkyECC global investigation, and the egregiousness of the mass surveillance,[22] we implore the Court to exercise its supervisory power to preclude evidence from surveillance tactics that shock the conscience, or to at least hold a hearing on same.

The U.S. was not a mere beneficiary of the mass surveillance, it actively facilitated it, working with the Netherlands and others to find a way to hack SkyECC. The *U.S.* then seized Sky Global's domains, terminating the SkyECC messaging app to facilitate Operation Trojan Shield—deliberately forcing users to shift from SkyECC to the FBI's encrypted messaging app to intercept communications from users without the hassle of following the Fourth Amendment or statutes governing Title III wiretaps.

In the case at bar, the messaging app that was the subject of global suspicionless mass surveillance happened to be SkyECC. If the judiciary is willing to admit evidence from such tactics, the next case may well involve the mass surveillance of all users of WhatsApp or Signal. Approximately 1 out of 3 Americans use WhatsApp alone.

Statistically, the next global mass surveillance will involve the interception of communications of members of America's judicial, legislative, and executive branches, as well as unsuspecting members of the public.[23]

---

[22] Surveillance that took place as a result of forum shopping by the Dutch (not France) after the Dutch had already been told by an Amsterdam judge that the mass surveillance was unlawful.
[23] We say "next", but we will not know that WhatsApp or Signal has been subjected to mass surveillance until it is too late.

Lest the Government allege that this is absurd, European authorities <u>have already</u> publicly proposed the mass surveillance of WhatsApp and other encrypted messaging platforms. It's a proposal the Europeans call "chat control".

The mass surveillance herein was not named after Argus the All Seeing by accident. The Five Eyes nations, including the U.S., want to become omnipotent and are well on their way to being just that.

To illustrate the scope of the invasion of privacy, mass surveillances of all users of a platform allow law enforcement to intercept, *inter alia*, communications about the results of pregnancy tests (and what the tester chooses to do with that information), extramarital affairs, how an individual intends to vote, what an individual says in private about any given politician, how a person chooses to worship, to say nothing of the executive branch's war plans.

Mr. Gogic may not be American, but there can be no doubt that this case will decide whether or not we will deter *our* nation from collaborating with others to deliberately invade the rights of Americans. Global mass surveillance is not only an affront to an inalienable right to privacy. How can Americans exercise our Freedom of Speech if we cannot privately communicate our opinions with individuals of our choosing? How can we exercise our Freedom of Religion if Big Brother can monitor how we choose to worship?

Wherefore, and as discussed in Mr. Gogic's prior Motion, we respectfully request that the Court rule that evidence derived from a suspicionless global mass surveillance is inadmissible.

<u>VII. Motion To Compel Material Under *Brady*, Rule 16, and 3500.</u>

Finally, the defendant reiterates his prior demands for, *inter alia,* the original, underlying SkyECC data, the full metadata (including but not limited to the Excel files' metadata), any intelligence packages concerning Mr. Gogic, all information concerning the interception and

processing of the data, access to Chat-X, and to the MLAT request(s) that the U.S. submitted for the SkyECC data, along with any other communications with the Europeans regarding same (including but not limited to with Europol), Motion, ECF # 70, p. 87 – 91, and we reiterate that it would violate the Due Process Clause to admit the spreadsheets if he is not provided with the underlying data. . Motion, ECF # 70, p. 60 – 63.

## CONCLUSION

WHEREFORE, Defendant Goran Gogic respectfully moves for an Order:

1. Precluding the introduction of the Excel files, and testimony regarding same, pursuant to FRE 1006, FRE 403, and FRE 106; or scheduling an evidentiary hearing;

2. Precluding the introduction of the Excel files as they are not self-authenticating under FRE 902 and cannot be authenticated under FRE 901 or granting an evidentiary hearing;

3. Precluding the introduction of evidence from Mr. Gogic's iPhone pursuant to FRE 401 and 403;

4. Precluding evidence from the suspicionless mass surveillance of all users of SkyECC under the Court's inherent supervisory power or granting an evidentiary hearing;

5. Directing the Government to produce the demanded *Brady* material and discovery; and

6. For such other and further relief as the Court may deem just and proper.

Dated: New York, New York          Respectfully submitted,
       June 13, 2025

                                   */s/ Joseph R. Corozzo*
                                   Joseph R. Corozzo, Esq.
                                   Angela D. Lipsman, Esq.
                                   Rubinstein & Corozzo, LLP
                                   *Attorneys for Defendant*
                                   *Goran Gogic*
                                   260 Madison Avenue, 22d Fl.
                                   New York, New York 10016