UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                    -against-

GORAN GOGIC,

                                        Defendant.
--------------------------------------------------------------------X

<u>For Online Publication Only</u>

**<u>RULING AND ORDER ON</u>**
**<u>MOTIONS IN LIMINE</u>**
22-CR-493 (JMA)

**FILED**
**CLERK**

10/31/2025 2:03 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Defendant, Goran Gogic, is charged on a multi-count indictment with crimes related to international narcotics trafficking, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501 <u>et seq.</u> (<u>See</u> Indict., ECF No. 1.) In advance of trial, the parties have filed several motions <u>in limine</u> related to evidence of electronic communications that were purportedly seized and decrypted by European law enforcement. (Def.'s Mot. in Limine ("Def.'s MIL,") ECF No. 94, at 1–19; Gov't Mot. in Limine ("Gov't MIL"), ECF No. 96, at 8–13, 22–29; Def.'s Suppl. Mot. in Limine ("Def's Suppl. MIL"), ECF No. 129, at 3–7.) My tentative rulings regarding that evidence are set forth below, with final rulings reserved until trial. My rulings on the parties' other motions <u>in limine</u> will be addressed at the final pretrial conference.

## I.    BACKGROUND

I assume familiarity with the allegations against Defendant, which are discussed at length in previous opinions resolving Defendant's suppression motions (<u>see</u> January 8, 2025 Op. & Order ("January 2025 Op."), ECF No. 79 (denying motion to suppress evidence of electronic communications obtained from French law enforcement); March 17, 2025 Op. & Order ("March

2025 Op."), ECF No. 25 (denying motion to suppress evidence obtained from Defendant's iPhone)), and recount only those facts that are necessary to the resolution of the instant in limine motions.

### A.  The Sky Evidence

 This case involves an alleged conspiracy between Defendant and various members of an international narcotics trafficking network that coordinated the acquisition and transport of large amounts of cocaine from South America to Europe, by way of the United States, on commercial container ships.  Defendant is charged with one count of conspiracy to violate the MDLEA between May 2018 and June 2019 and three substantive violations of the MDLEA in connection with shipments that were seized at U.S. ports on February 27, March 18, and June 19, 2019. (Indict. ¶¶ 1–4.)  At trial, the Government intends to prove that Defendant was a "critical link" between suppliers in South America, ship crewmembers, and distributors in Europe.  (Gov't MIL at 7.)  As evidence, the Government plans to offer excerpts from electronic communications that were allegedly sent between Defendant and other members of the conspiracy over an encrypted messaging platform called Sky ECC ("Sky").  (Id. at 4.)

According to the parties' briefs, the communications in question were seized and decrypted by law enforcement in Europe as part of a joint investigation that involved French, Belgian, and Dutch law enforcement.  (See Def.'s MIL at 20–23 (discussing "international investigation of Sky ECC"); Gov't Resp. to Def.'s MIL ("Gov't Resp."), ECF 107, at 19 n.5 (stating that European law enforcement operation was governed by a "Joint Investigation Team ('JIT') agreement").)  The Government obtained electronic records of certain such communications from a French official, pursuant to a Mutual Legal Assistance Treaty ("MLAT") between the United States and France. (Gov't MIL at 1; Gov't Suppl. Letter Resp. to 10/16 Order, ECF No. 148 ("Gov't Suppl. Letter")

2

at 1–2.)  To obtain the records, a Department of Justice ("DOJ") officer sent a written MLAT request for content associated with specific Sky user accounts, each of which is denominated by a five character "Sky PIN," believed to belong to Defendant.  (See Gov't Suppl. Letter, Ex. B (MLAT Request dated Feb. 14, 2023).)  The MLAT request specifically identified, inter alia, Sky PINs 28A508 and 5UIP0T as belonging to Defendant.  (Id. at 6.)  French officials complied with the MLAT request and transmitted electronically a large set of spreadsheets and media files (the "Sky Evidence").  (See Gov't Reply in Supp. of MIL ("Gov't Reply"), ECF No. 118, at 2, 4, 11–12.)[1]  The transmission was accompanied by an official document that bears the heading *Procès-Verbal* attesting to the file names contained in the transmission and signed by a member of the French National Judicial Police.  (Gov't Suppl. Letter at 1–2.)

The Government has produced to Defendant and submitted to the Court a complete copy of the Sky Evidence in the form that it was received from France, along with a list of the specific excerpts that the Government intends to offer as trial exhibits.  (See Gov't Reply at 2, 4–5; Gov't Exhibit List (Oct. 4, 2025) ("10/14/25 Ex. List") at 3–8.)[2]  Given the somewhat unusual format of the Sky Evidence, I provide a brief description to ground the legal analysis that follows.  The Sky Evidence consists of the following files:

> (1) Two spreadsheets that contain account metadata, including the associated user aliases, for Sky PINs 28A508 and 5UIP0T (the "Metadata Spreadsheets");
>
> (2) 179 separate folders that each contain a spreadsheet of messages from a single conversation thread, or "chat," between two or more Sky users (the "Chat Spreadsheets");

---

[1] The Government received records of communications for many other Sky PINs through a similar process and has marked as potential trial exhibits several such records for other Sky PINs.  (See Gov't Suppl. Letter at 2–3; id. Exs. A, C & D.)  Because the parties' motions in limine explicitly address only evidence of Mr. Gogic's purported communications, I use the phrase "Sky Evidence" to refer solely to the records produced by France in connection with Sky PINs 28A508 and 5UIP0T and confine my analysis accordingly.

[2] The Government's Exhibit List was provided directly to my chambers via USAfx and were not filed on the docket.

(3) Subfolders labeled "media" that contains, inter alia, digital images and recordings (the "Media Subfolders"). (See Gov't Reply at 5–7, 9.)

The Chat Spreadsheets are formatted to show the information for a single message in each row, with the message timestamp, sender's ID, and content of the message separated into distinct column cells.  (See id. at 9.)  There are also columns labeled, inter alia, "language," "ingest_date," and "new since [date]." (See id. at 10.)  According to the Government's brief, the latter columns reflect the workflow of the European intelligence officers who decrypted the seized communications "through an iterative process."  (Id.)  Where there is a Media Subfolder, each file appears to correspond to a row in the Chat Spreadsheet.  (See id.)  Assuming information contained in Metadata Spreadsheets are accurate, the Sky Evidence consists of communications that occurred between June 24, 2019, and March 9, 2021.  (Id. at 6; see GX115 (Metadata Spreadsheet for Sky PIN 28A508) & GX140 (Metadata Spreadsheet for Sky PIN 5UIPOT).)  As the Government acknowledges, many of the Chat Spreadsheets contain duplicate and/or triplicate entries for a single message.  (Gov't Reply at 9.)  The Government states that the reason for the duplication is "unknown," but speculates that it "may be an artifact of the capture or decryption process."  (Id.)  The Government also notes that many of the Chat Spreadsheets reflect one-sided or incomplete conversations because certain messages were either not intercepted or "have not yet been . . . decrypted."  (Id. at 10.)

In addition to seeking admission of the Chat Spreadsheets, the Government's proposed trial exhibits also include PDF files, each of which displays the information contained in the first few columns of a Chat Spreadsheet, formatted to appear as text messages appear on a cell phone— chronologically with the contents of each message in a colored "bubble" below a timestamp.  (See Gov't Reply at 12 (describing exhibit format); see, e.g., GX 116.)  Where the chat contains a reference to a media file, the corresponding image is inserted to appear as a message.  (See Gov't

Reply at 12.)  Duplicate messages are removed and messages written in Spanish are accompanied by an English translation that appears in red font below the original text.[3]  (Id.; see, e.g., GX 116-T.)  In total, the Government's Exhibit list includes PDF versions of 41 complete Chat Spreadsheets and 131 excerpts thereof.  (10/14/25 Ex. List at 3–8.)

### B.  French Certification Documents

Along with proposed excerpts of the Sky Evidence, the Government has also marked as exhibits two additional documents that accompanied the transmissions from France.

First, the Government has provided an English translation of the *Procès-Verbal* that accompanied the transmission of the Sky Evidence from France.  (See Gov't Reply at 2; GX159-C-T.)  The *Procès-Verbal* is dated July 12, 2024 and states that information associated with the two Sky PINs is "contained in [a] database" and would be "compil[ed]  . . using the interface of the Dutch collaborators to the joint investigation team."  (Id.)

Second, the Government has provided a "Certificate of Authenticity," dated August 25, 2025, that purports to "establish that [the Sky Evidence] is self-authenticating pursuant to the Federal Rules of Evidence."  (Gov't Suppl. Letter at 2; see GX158-C.)  The Certificate of Authenticity appears to be signed by a French law enforcement officer and attests, inter alia, that the Sky Evidence was "collected by copying the requested information concerning the two specified SkyECC identifiers via the electronic storage medium that maintains the SkyECC data collected as part of the SkyECC data collected as part of the SkyECC investigation, and which is kept and maintained by law enforcement authorities[.]"  (Id.)  The Certificate further states that the Sky Evidence consists of "duplicates of original records as captured by European law

---

[3] The Government also provides certifications for English translations.  (See, e.g., 165-C.)

enforcement authorities in the joint investigation of SkyECC" and was "generated by an electronic process or system that produces an accurate result." (Id.)

### C. **Related Evidence & Testimony**

In its briefing, the Government has repeatedly referred to the MLAT request and the European joint "law enforcement operation" through which data from the Sky servers was obtained and stored in a "database." (See Gov't MIL at 4, 10 n.6; Gov't Resp. at 3–4, 19 n.5.) However, aside from the *Procès-Verbal*, Certificate of Authenticity, and the aforementioned reference to an "iterative" decryption process, (Gov't Reply at 10), the Government has not made any representations or proffered any evidence that sheds light on how the Sky Evidence was seized, decrypted, or compiled. After reviewing the parties' initial motions in limine, I ordered the Government to file a reply brief clarifying, inter alia, whether the Government intends to offer any additional evidence or elicit testimony related to the seizure, decryption, compilation and/or extraction of the Sky Evidence. (See Aug. 12, 2025 Order, ECF No. 112.) The Government indicated that it does not intend to offer such evidence or elicit such testimony on the view that it is not necessary for authentication and not relevant to any issue at trial. (Gov't Reply at 10–11.) The Government also indicated that the European governments that were "directly involved" in the seizure and decryption operations "will not make witnesses available." (See id. 11 n.10.)

Defendant, by contrast, has made extensive representations about the process by which the Sky Evidence was intercepted, decrypted, and shared with law enforcement in other countries. (See Decl. Joseph Corozzo & Lipsman ("Corozzo Decl."), ECF No. 94-1, ¶¶ 23–169.) Defendant asserts, inter alia, that European law enforcement obtained judicial authorization to intercept all communications on the Sky platform for two multi-month periods between June 2019 and March 2021. (Id. ¶ 52–58.) Defendant further asserts that European officers used multiple software

programs and/or artificial intelligence tools to decrypt, organize, and analyze the intercepted data, including a program called "Chat-X" that rendered the messages "readable and searchable." (Id. ¶¶ 61–62, 101, 106, 108.) Defendant has also filed reports and letters from three purported experts opining on the provenance, format, and reliability of the Sky Evidence. (See Def.'s MIL Exs. A, B, D, I, M & N.) Defendant's experts assert, inter alia, that the Sky Evidence is not the "raw" or "original" data that was intercepted from France, that artificial intelligence was likely used to create the Chat Spreadsheets, and that metadata reveals the Sky Evidence was modified multiple times before it was produced to Defendant. (Corozzo Decl. ¶¶ 110–12, 135–36, 160.) Defendant has noticed the Government that he plans to call each of those experts to testify about the unreliability of the Sky evidence at trial. (Gov't MIL at 7–8; see Def.'s Resp. at 5; 28–32; id. Ex. B, ECF No. 106-4 (Def.'s Expert Witness Disclosure).)

### D. **Motions in Limine**

Both parties have filed in limine motions concerning the Sky Evidence and the scope of permissible testimony related thereto. [4]

The Government moves in limine to admit excerpts from the Sky Evidence on the grounds that they show communications relevant to the charged conduct and can be authenticated through a combination of witness testimony, the French certification documents, and its distinctive contents and/or characteristics. (Gov't MIL at 8–13.) The Government also moves to (1) preclude the Defendant from arguing, commenting, or eliciting testimony about the legality of the operation through which the Sky Evidence was obtained (id. at 25–26); and (2) preclude certain testimony

---

[4] The parties filed their initial motions in limine on June 13, 2025 and their responses on July 21, 2025. (ECF No. 94, 96, 105, 107.) In response to my orders, the Government filed a reply brief on August 21, 2025 (ECF No. 118) and a Supplemental Letter on October 22, 2025 (ECF No. 148). On September 15 and September 17 2025, Defendant filed two supplemental letters in further support of its motions in limine. (ECF Nos. 125 & 129). The Government filed a response to those letters on September 26, 2025 (ECF No. 131). Because these various submissions concern similar and/or overlapping issues, I refer to the parties "motions in limine" collectively, drawing on the arguments and representations set forth in all the different filings.

about the Sky Evidence from the Defendant's putative experts on the grounds that they either lack the requisite qualifications or the proposed testimony is not relevant (id. at 29–31).

Defendant moves in limine to preclude admission of the Sky Evidence on five distinct grounds.  First, Defendant argues that the spreadsheets transmitted from France are "summaries to prove content" that cannot be admitted without making the underlying data available to the defense.  (Def.'s MIL at 1–5; see Fed. R. Evid. 1006.)  Second, Defendant argues the files cannot be authenticated in the manner proposed by the Government because it does not establish to the requisite degree of certainty how the spreadsheets were created.  (Def.'s MIL at 9–17; Def.'s Resp. to Gov't MIL ("Def.'s Resp."), ECF No. 105, at 3–16; see also Def.'s Suppl. Letter in Supp. of MIL ("Def.'s Sur-Reply"), ECF No. 125, at 11–15 (arguing that the recently produced certification cannot be used to authenticate the Sky Evidence).)  Third, Defendant argues that the admission of one-sided or incomplete conversations would violate Federal Rule of Evidence 106.  (Def.'s MIL at 18–19.)  Fourth, Defendant argues that, without allowing him to examine the "underlying data," the probative value of the Sky Evidence would be substantially outweighed by the risk of unfair prejudice.  (Id. at 17–18.)  Fifth, Defendant argues much of the Sky Evidence—including many of the Government's proposed exhibits—is not relevant to any fact of consequence because the communications postdate the charged conduct and otherwise should be excluded as other acts evidence pursuant to Federal Rule of Evidence 404(b).  (See Def.'s Suppl. MIL, 3–8.)  Defendant also renews his argument that the Sky Evidence should be suppressed as the product of unlawful mass surveillance and, separately, that admitting the spreadsheets without calling the individual who prepared them would violate the Confrontation Clause.  (Def.'s MIL at 22, Def.'s Resp. at 2.)

## II.    LEGAL STANDARD

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence."  United States v. Brown, 606 F. Supp. 2d 306, 311 (E.D.N.Y. 2009).  "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."  United States v. Morel, 751 F. Supp. 2d 423, 428 (E.D.N.Y. 2010).  A district court's "ruling regarding a motion in limine is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the movant's proffer."  United States v. Ozsusamlar, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006) (alteration adopted) (quoting Luce v. United States, 469 U.S. 38, 41 (1984)).

Under the Federal Rules of Evidence, evidence is generally admissible if it is relevant, which means it "has any tendency to make a consequential fact more or less probable that it other wise would be."  United States v. Terranova, 750 F. Supp. 3d 15, 29–30 (E.D.N.Y. 2024) (discussing Fed. R. Evid. 401 & 402).  However, a court "may exclude relevant evidence if its probative value is 'substantially outweighed' by a danger of unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence."  Id. (quoting Fed. R. Evid. 403).

All evidence other than live testimony must also be authenticated prior to being admitted. See Fed. R. Evid. 901(a).  "The requirement of authentication is a condition precedent to admitting evidence," United States v. Vayner, 769 F.3d 125, 129 (2d Cir. 2014), which means that the court must make a preliminary determination about whether the proponent has introduced sufficient proof that a reasonable juror could find that the evidence is what the proponent claims it to be. United States v. Tin Yat Chin, 371 F.3d 31, 37–38 (2d Cir. 2004); see Fed. R. Evid. 104(a) ("The Court must decide any preliminary question about whether . . . evidence is admissible.").  Rule

902 lists "certain items [that] are 'self-authenticating,' meaning that 'they require no extrinsic evidence of authenticity' to be admitted." United States v. Hunt, 534 F. Supp. 3d 233, 253 (E.D.N.Y. 2021) (quoting Fed. R. Evid. 902). For evidence that is not self-authenticating, Rule 901 sets forth a non-exhaustive list of corroborating evidence that may be offered to support authentication, including:

> (1) Testimony of a Witness with Knowledge. Testimony that an item is what it is claimed to be.
>
> ****
>
> (4) Distinctive Characteristics and the Like. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>
> *****
>
> (9) Evidence About a Process or System. Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b)(1), (4), (9).

Rule 901 "does not definitively establish the nature or quantum of proof that is required." Vayner, 769 F.3d at 133 (quoting United States v. Sliker, 751 F.2d 477, (2d Cir. 1984)). The Second Circuit has explained that Rule 901 "does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence." United States v. Gonzalez, 144 F.4th 396, 406 (2d Cir. 2025) (internal quotations and citation omitted). Once the court concludes that a piece of evidence has been authenticated, "the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight, not the admissibility, of the evidence. Gonzalez, 144 F.4th at 406. The "ultimate determination as to whether the evidence is, in fact, what its proponent claims is . . . a matter for the jury." Vayner, 769 F.3d at 130.

### III.    DISCUSSION

#### A.  Renewed Motion to Suppress and/or Exclude the Sky Evidence

Defendant moves to preclude the Sky Evidence as the fruits of "suspicionless mass surveillance" and, relatedly, to renew his motion to suppress the Sky Evidence on the grounds that the U.S. officers were sufficiently involved in the surveillance that the Fourth Amendment applies. (Def.'s MIL at 22–24.)  Judge Ross previously denied Defendant's motion to suppress and/or preclude the Sky Evidence on the same grounds.  (See January 2025 Op. at 9–10 (concluding that the Fourth Amendment was not applicable); id. at 12 (declining to exercise inherent "supervisory powers" to exclude Sky Evidence).)  Because Defendant has not identified a sound basis for revisiting Judge Ross's conclusions, that motion is denied.

After a suppression motion has been decided on the merits, "[r]econsideration is generally appropriate only 'if there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error of law or to prevent manifest injustice.'"  United States v. Tisdol, 450 F. Supp. 2d 191, 194 (D. Conn. 2006) (quoting United States v. Sanchez, 35 F.3d 673, 677 (2d Cir.1994)).  "[T]he standard for reopening a suppression hearing based on new evidence is as stringent as the standard for reconsideration."  United States v. Almonte, 14-CR-86, 2014 WL 3702598, at *3 (S.D.N.Y. July 24, 2014); see also United States v. Lucas, 379 F. Supp. 3d 182, 188–89 (W.D.N.Y. 2019) (collecting cases).

Here, Defendant argues that reconsideration is warranted based on three pieces of "newly available evidence" related to the intelligence operation through which the Sky Evidence was collected.  The first is the trial testimony of a U.S. Drug Enforcement Agency ("DEA") agent named Jason Willock, who testified in a different federal case about the European joint investigation and the various ways that European law enforcement supported European

11

investigators.  (Def.'s MIL at 20–21; id., Exs. AA & BB, ECF Nos. 94-29 & 94-30 (excerpts of trial transcript from United States v. Didani, No. 21-20264 (E.D. Mich. Feb. 25–26, 2025)).  The second piece of new evidence is a purported "deployment plan" written by Dutch law enforcement that details aspects of the European joint investigation, including the use the Chat-X software program to process the intercepted data. (Def.'s MIL, Ex. J, ECF No. 94-12; see also Ex. I, ECF No. 94-11 (letter describing document as "a formal plan, drafted by the Amsterdam police and submitted to the French investigating judge" prior to carrying out the investigation).)  The third is a report dated August 19, 2019 and purportedly written by French law enforcement that describes the joint intelligence operation.  (Def.'s MIL, Ex. K, ECF No. 94-13.)

As a threshold matter, I note that the latter two documents, which were provided by Defendant's putative expert, Yehudi Moszkowicz, both appear to predate Defendant's original suppression motion.  Defendant has not indicated whether and why either should be considered "newly discovered evidence" that could not have previously been discovered through due diligence.  See United States v. Perez, No. 01-CR-848, 2002 WL 1835601, at *1 (S.D.N.Y. Aug. 8, 2002).  Moreover, even assuming these documents were previously unknown and undiscoverable and Defendant could meet the procedural requirements for reconsideration, this Court would, after considering those documents, still deny Defendant's suppression motion on the merits.

In deciding Defendant's previous motion, Judge Ross assumed Defendant's factual assertions about the European joint investigation, including his assertion that U.S. law enforcement took certain steps to support the investigation, were true.  (See Jan. 2025 Op. at 8, 10.)  She nonetheless concluded that the Fourth Amendment was inapplicable since Defendant had no prior connection to the United States and "successful coordin[ation]" with foreign law enforcement is

12

not enough to trigger the extraterritorial application of the exclusionary rule.  (Id. at 11 (quoting United States v. Getto, 729 F.3d 221, 233 (2d Cir. 2013)).  Judge Ross also declined to exclude the Sky Evidence on the grounds that it was obtained in a manner that "shocks the conscience," knowing full well the scale of the surveillance operation alleged by Defendant.  (Id.; see also id. at 5 (stating that operation intercepted an estimated 1 billion messages).)

Defendant's newly proffered evidence adds little to the analysis.  At most, it establishes that U.S. law enforcement assisted the Europeans by: (1) helping to identify the location of the Sky ECC servers by communicating with U.S. companies; and (2) agreeing to delay certain arrests so as not to interfere with the investigation.  (See Def.'s MIL Exs. AA at 27; Ex. BB at 33.)  Nothing in Agent Willock's testimony or the documents sent by Defendant's experts suggests that the United States was actually the leader of the investigation or relied on foreign law enforcement with the "intent to evade American constitutional requirements."  Getto, 729 F.3d at 232.  Because Defendant's newly proffered evidence is largely cumulative and does not establish that suppression, or even a hearing, is warranted here, Defendant's motion to renew his prior motion is DENIED.

**B.  Authentication of the Sky Evidence**

The Government moves to admit excerpts from the Sky Evidence, which it claims to be a reliable log of "communications by and among the defendant and other co-conspirators that were transmitted over the Sky network."  (Gov't MIL at 8.)  The Government proposes to authenticate the Sky Evidence as such through some combination of the following:  First, the Government will call multiple cooperating witnesses who will testify from firsthand knowledge that Defendant communicated over the Sky network using the accounts associated with Sky PINs 28A508 and 5UIP0T.  (Id. at 11.)  Through those witnesses, the Government will introduce evidence of

communications with accounts 28A508 and 5UIP0T that were captured directly from the
witnesses' phones. (Gov't Reply at 3.) Second, the Government will call a law enforcement
witness who will testify from firsthand knowledge that the Sky Evidence was transmitted to the
Government electronically from France in response to a request for data for the same two accounts.
(Gov't MIL at 11; see Gov't Reply at 5 n.6). Finally, the Government will highlight specific
features of the Sky Evidence that provide circumstantial corroboration that the Chat Spreadsheets
are accurate logs of the Defendant's communications over the Sky network. (Gov't MIL at 11–
12.) Specifically, the Government will show that some messages independently obtained from the
cooperating witnesses also appear in the Chat Spreadsheets. (See Corozzo Decl. ¶ 142; see also
Gov't Reply at 3 n.3 (explaining that the "messages recorded directly from cooperating witness
Sky phones are not *all* replicated within the Sky Evidence received from France" (emphasis
added)).) The Government will also highlight, inter alia, messages that reference travel plans
corresponding to the Defendant's travel records, a reference to a birthday dinner that occurred on
the Defendant's birthday, and various images—including selfies—that correspond to images
obtained from a different cell phone that was seized directly from Defendant at the time of his
arrest. (Id. at 12.) This evidence would purportedly establish that PINs 28A508 and 5UIP0T
belonged to Defendant.

In addition to witness testimony and Sky Evidence excerpts that the Government intends
to introduce at trial, the Government contends that, in resolving the preliminary question of
authenticity, I may also consider the *Procès-Verbal* and the Certificate of Authenticity, though it
is unclear whether the Government intends to put those documents before the jury. (See Gov't
Reply at 4 n.4; Gov't Suppl. Letter Resp. ("Gov't Suppl. Resp."), ECF No. 131, at 4.) Relatedly,
the Government argues that, in resolving the authentication issue, the Court can consider the

numerous concessions in Defendant's filing with this Court about the European law enforcement operation into Sky and the fact that Sky messages were intercepted and decrypted as part of that operation.[5]  (Id. at 3.)  As noted earlier, the Government does not intend to call witnesses who were personally involved in the alleged seizure and decryption of the Sky Evidence or the transmission of that evidence to the DOJ.

Defendant argues that the Government cannot authenticate the Sky Evidence in the manner proposed because, inter alia, the Government's witnesses do not have personal knowledge about the underlying investigation and/or compilation of the Chat Spreadsheets, and the Sky Evidence is not "properly certified."  (Def.'s Resp. at 3–7; Def.'s Sur-Reply at 11–15.)

At the outset, I note that the ambiguity surrounding the underlying European intelligence operation presents a unique challenge for the purpose of authentication.  Contrary to the government's assertion, the Sky Evidence is not "broadly like the kinds of communications data that the government routinely receives from telecommunications and social media companies . . . [,] which federal courts routinely admit into evidence at trial."  (Gov't MIL at 5.)  Such records are ordinarily obtained directly from the company, accompanied by a certification and/or witness testimony detailing the company's recordkeeping practices and business purpose.  See, e.g., United States v. El Gammal, 831 F. App'x 539, 543–44 (2d Cir. 2020) (describing foundation testimony of Facebook records custodian); United States v. Hunt, 534 F. Supp. 3d 233, 254 (E.D.N.Y. 2021) (indicating that records custodian from social media platform could attest to the accuracy of certain aspects of communications exchanged over that platform, including a confirmation that the

---

[5] While the Government contends that the Court can consider these admissions by Defendant in determining the authenticity of the Sky Evidence, the Government has not indicated that it would actually seek to admit any of these statements by defense counsel at trial.

depicted communications took place between certain social media accounts, on particular dates, or at particular times).  The attestation of a qualified records custodian serves as a reliable indicium that the records in question reflect "accounts, communications, location data, etc., that were not 'subject to manipulation or inadvertent distortion.'"  United States v. Abdullah, No. 20 CR. 677, 2024 WL 4519860, at *2 (S.D.N.Y. Oct. 16, 2024) (quoting United States v. Browne, 834 F.3d 403, 414 (3d Cir. 2016)).  Here, by contrast, the Government has supplied virtually no substantive information—and certainly none from a qualified custodian—about the technical method by which the Sky Evidence was collected, decrypted or compiled.  For these reasons, the Sky Evidence is simply not analogous to ordinary business records.

The Sky Evidence also differs in critical respects from a forensic copy or "extraction" taken directly from a defendant's device or account.  See, e.g., United States v. Jean-Claude, No. 18-CR-601, 2022 WL 2334509, at *16 (S.D.N.Y. June 27, 2022) (describing functionality of Cellebrite extraction software), aff'd sub nom. United States v. Gonzalez, 144 F.4th 396 (2d Cir. 2025).  Because the probative value of such evidence "depends on the validity of the underlying method" or technology, Rule 901 generally requires the proponent to offer some further evidence, whether in the form of witness testimony or affidavit, "'describing' the process . . . and 'showing that it produces an accurate result.'"  4 Mueller & Kirkpatrick, Federal Evidence § 9:20 (quoting Fed. R. Evid. 901(b)(9); see United States v. Carter, No. 21-CR-681, 2024 WL 268248, at *3 (S.D.N.Y. Jan. 24, 2024) (describing affidavit detailing collection and decryption of data from iCloud accounts through propriety Apple software).  In many cases, the technology used to make forensic copies is familiar to law enforcement witnesses who can credibly testify to the functionality and reliability of the relevant "forensic tool" and the likelihood that the resulting data "ha[s] been altered or manipulated."  Gonzalez, 114 F.4th at 25.  Some electronic copies may even

16

be self-authenticating under Federal Rules of Evidence 902(13) or 902(14).  See United States v. Palmer, No. 24-CR-67, 2025 WL 2978633, at *10 (S.D.N.Y. Oct. 21, 2025) (admitting certain email and phone records as self-authenticating).

Here, by contrast, the Government's only evidence describing the process by which the Sky Evidence was created is the Certificate of Authenticity that states, generically and in conclusory fashion, that the files were copied from an "electronic storage medium" that contains data and original records that were "collected" and "captured" by European law enforcement authorities in their investigation of SkyECC.  (GX158-C.)  The Government does not intend to elicit any additional testimony about the contents of that storage medium and disavows having technical knowledge of the underlying "capture or decryption process[es]."  (See Gov't Reply at 9–11.)  Standing alone, the Certificate of Authenticity merely supports the contention that that the Sky Evidence reflects an extraction of certain information maintained electronically in a European "electronic storage medium"; it does nothing to establish the origins or reliability of that information.  Further, there are several features of the Sky Evidence that differentiate the Chat Spreadsheets from message logs that have been forensically extracted through well-established means, such as the frequent appearance of duplicate and triplicate messages and the Chat Spreadsheet columns titled "language," "ingest_date," and "new since [date]."  (See id. at 10.) These latter features suggest that the Sky Evidence has been subjected to a degree of post-seizure processing that would not be expected in, say, a Cellebrite extraction.

The fact that the Sky Evidence was purportedly collected by law enforcement and sent pursuant to an MLAT request is, even in light of all the other circumstantial evidence cited by the Government, insufficient.  Notably, other cases admitting evidence from foreign governments involved more substantial evidence in support of the Government's authentication argument.  See,

e.g., United States v. Rommy, 506 F.3d 108, 138 (2d Cir. 2007) (rejecting authentication challenge to transcript of Dutch wiretap investigation because testimony of Dutch detective—who was personally involved in the wiretap investigation and had general practice upon listening to calls intercepted during the investigation to prepare a contemporaneous transcript"—along "with the Dutch production of the transcript in response to" an MLAT request "demonstrated a sufficiently reliable process to authenticate the transcript as a product of the Dutch wiretap investigation"); Jean-Claude, 2022 WL 2334509 at *16 (finding Cellebrite extractions performed by Croatian law enforcement official who did not testify was adequately authenticated through testimony of mobile phone forensics examiner employed by the DOJ who was intimately familiar with Cellebrite program and, inter alia, had personally performed more than 2,000 cell phone extractions using the Cellebrite program, "recognized the extraction reports as having been generated from the Cellebrite forensic tool," and explained how a Cellebrite extraction is performed).

Here, in the absence of additional evidence concerning the underlying investigation, decryption, or recordkeeping practices, I find the Sky Evidence to be more analogous to a collection of chat room conversations copied and pasted into word processing files, see United States v. Jackson, 488 F. Supp. 2d 866, 869 (D. Neb. 2007), than a business record from a telecommunications company.  Such copy-paste documents may be authenticated under Federal Rule of Evidence 901, but generally through the testimony of a witness who participated in the exchange and can testify that the record accurately reflects the content of the conversation.  See United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007); United States v. Tank, 200 F.3d 627, 630 (9th Cir. 2000); United States v. Lanzon, 639 F.3d 1293, 1301 (11th Cir. 2011).

Accordingly, I preliminarily conclude that the Government may not admit the entire universe of Sky Evidence that they have marked as trial exhibits.

That said, the Court believes that the Government may still be able to authenticate a subset of the Sky Evidence involving messages that were purportedly received or sent by witnesses who will testify at trial. Specifically, the Court believes that excerpts of the Sky Evidence can be authenticated if a witness testifies at trial that the purported messages at issue accurately reflect Sky messages that the witness previously saw on their device. Such witness testimony, along with evidence indicating that the relevant excerpt of the Sky Evidence was received from France in response to an MLAT request, should be sufficient to authenticate that excerpt of the Sky Evidence. Cf. Rommy, 506 F.3d at 138; Gagliardi, 506 F.3d at 151.

All other excerpts, including those that contain media files, will be excluded absent a proffer of further evidence of authentication, as the Certificate of Authenticity is standing alone insufficient and, even when all the evidence cited by the Government is considered, there is simply not enough circumstantial evidence to authenticate them as logs of the Defendant's communications.

In so ruling, I make no findings about the European investigation into Sky, or the authenticity and reliability of this other evidence contained in the resulting database referred to in the Certificate of Authenticity. (See GX158-C.) In another case, with different witnesses or corroborating documentation, similar evidence of captured communications could very well be admitted in the absence of testimony from an individual who personally participated in the conversation. Indeed, the Court recognizes that Rule 901 may be satisfied by "circumstantial evidence." Gonzalez, 144 F.4th at 406 (cleaned up). My ruling is confined to the specific facts— and significant gaps—in the evidentiary record before me.

Defendant's cross-examination on the reliability of the Sky Evidence shall be confined, at least preliminarily, to those exhibits I deem admissible at trial, and the specific Chat Spreadsheets

from which those exhibits were adapted.  I anticipate that cross-examination and/or expert testimony about other portions of the Sky Evidence will be curtailed, pursuant to Rule 403, as it is of limited relevance and risks confusing the jury.

## C. Other Grounds for Precluding the Sky Evidence

Defendant moves to preclude some or all the Sky Evidence under Federal Rules of Evidence 1006, 106, 403, and 401.  Each of Defendant's arguments misconstrues either the nature of the Sky Evidence or the relevant rule.

First, Defendant moves to preclude the Chat Spreadsheets as "summaries" of underlying data that has not been made available for him to examine.  (Def.'s MIL at 3.)  Defendant argues that admission of the spreadsheets would therefore run afoul of Rule 1006, which permits the admission of summary charts only after the proponent "makes the underlying originals . . . available for examination or copying[.]"  Fed. R. Evid 1006(b).  The Government counters that the spreadsheets are the original electronic records and contain all the data that produced from France.  (Gov't Resp. at 10.)  The record supports the Government's characterization.  The version of the Sky Evidence produced by the Government (and filed with the Court as Exhibit A) includes 179 different Chat Spreadsheets, some of which contain many thousands of rows.  The timestamps of the messages contained in the spreadsheets span nearly the entire duration of the European surveillance operation—from June 24, 2019 and March 9, 2021.  These details strongly suggest that the spreadsheets reflect all the available data for Sky PINS 28A508 and 5UIP0T on the date the extraction occurred.  The fact that it was extracted from a database into a spreadsheet does not transform it into a "summary" of the "original" data.  See Cellco P'ship v. City of Rochester, 623 F. Supp. 3d 184, 201 (W.D.N.Y. 2022) ("The Court is [] unpersuaded that Federal Rule of Evidence 1006 categorically bars admission of the spreadsheet.")  As the Government points out,

Federal Rule of Evidence 1001 states that, "[f]or electronically stored information, 'original' means any printout — or other output readable by sight — if it accurately reflects the information." Fed. R. Evid. 1001(d). "Because these spreadsheets . . . were not created to summarize underlying data but in fact contain the entire data set from the relevant period, they are not 'summary' charts and are not subject to the requirements of Rule 1006." United States v. Kuthuru, 665 F. App'x 34, 39 (2d Cir. 2016). Any gaps, omissions, or anomalies in the spreadsheets goes to the weight of the evidence, but do not render the spreadsheets inadmissible.

Second, Defendant argues that introduction of certain Chat Spreadsheets would violate Federal Rule of Evidence 106 because they are incomplete—i.e., they do not show both sides of the conversation. (Def.'s MIL at 18–19.) Rule 106, which partially codified the common law "rule of completeness," United States v. Williams, 930 F.3d 44, 58 (2d Cir. 2019), provides that, "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time." Fed. R. Evid. 106. "The purpose of the rule is to correct, contemporaneously, the 'misleading impression created by taking matters out of context[.]'" Williams, 930 F.3d at 58 (quoting Fed. R. 106 advisory committee note); see also United States v. Castro, 813 F.2d 571, 575–76 (2d Cir. 1987) ("Under [Rule 106], the omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.") By its terms, Rule 106 is a rule that provides for the admission of additional material that may otherwise be inadmissible—not the exclusion of material deemed incomplete. United States v. Avenatti, 559 F. Supp. 3d 274, 281 (S.D.N.Y. 2021) ("[Rule 106] provides that a court should permit the introduction of certain writings or statements 'that in fairness ought to be considered'

21

when other writings or statements are offered; it does not call for <u>exclusion</u> of the writings or statements that are offered in the first instance." (quoting Fed. R. Evid. 106)).  In sum, Rule 106 does not provide a mechanism for precluding portions of Sky Evidence merely because additional context is not available to the defense.

Third, Defendant moves to preclude the Sky Evidence under Federal Rule of Evidence 403 on the grounds that its probative value is substantially outweighed by the unfair prejudice that would result from admitting "summaries of intercepted data" without permitting him to examine the underlying data.  (Def.'s Mot. at 17.)  Defendant claims that such prejudice is "exacerbated" by the fact that the Chat Spreadsheets were "generated by [artificial intelligence]"—a claim that is utterly unsupported by the record, including Defendant's own proposed expert reports.  The most that Defendant's experts claim is that some kind of artificial intelligence tool was used to "reconstruct," "analyze," or "process" the intercepted messages—not that the messages themselves were <u>generated</u> by artificial intelligence.  (<u>See, e.g.</u>, Def.'s MIL, Ex. A at 32, 45, 59; Ex. E at 3.)  Moreover, as explained <u>infra</u>, I am precluding Defendants' expert witnesses from testifying about this topic.  Setting aside the statements about artificial intelligence, Defendant's Rule 403 argument is essentially a restatement of his Rule 1006 and authentication arguments, and fails for the same reasons.  As I have previously explained, Defendant's arguments about the reliability of the Sky Evidence go to weight, not admissibility.

Fourth, Defendant moves to preclude the Sky Evidence under Federal Rules of Evidence 401, 403, and 404(b) on the grounds that the captured communications concern uncharged acts and are not relevant to the charged conduct.  (Def.'s Suppl. MIL at 2–12; <u>see also</u> Def.'s Resp. at 18–20.)  Defendant's contentions are unavailing as a general matter since communications that post-date a charged conspiracy can nonetheless be relevant to proving the charged conduct, such

as demonstrating a relationship between the coconspirators, or corroborating witness testimony. See United States v. Riccardi, 620 F. App'x 11, 15 (2d Cir. 2015); United States v. Germosen, 139 F.3d 120, 128 (2d Cir.1998). Likewise, evidence of uncharged criminal conduct may be admitted "under two doctrines." United States v. Khan, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008). First, it may be relevant "if the uncharged conduct 'arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" Id. (quoting United States v. Carboni, 204 F.3d 39, 44 (2d Cir.2000)). Second, evidence of uncharged criminal conduct may be admissible for a proper purpose under Federal Rule of Evidence 404(b). Id. Here, there may be numerous reasons why messages sent between June 2019, and March 2021 (the date span for the Sky Evidence) might be relevant to proving a conspiracy that ended in July 2019. I cannot, at this time conclude that any specific exhibit should be excluded based on the time the communications in question were sent.

Defendant's motions to generally preclude the Government from admitting excerpts of the Sky Evidence under Federal Rules of Evidence 1006, 106, 401, 403 and 404(b) are DENIED. Defendant can renew this motion as to any particular exhibit when it is offered at trial.

### D. Confrontation & Due Process

In his response to the Government's motion in limine, Defendant argues that admission of the Sky Evidence in the absence of live testimony from the individual who "prepared" the spreadsheets would violate his rights under the Confrontation Clause. (See Def.'s Resp. at 2; see also Def's Mot. to Suppress, ECF No. 69, at 63 (arguing that "[T]he Confrontation Clause gives the defendant the opportunity to . . . inspect the source from which the [Chat Spreadsheets] are generated[.]").) Having reviewed a copy of the Sky Evidence, I agree with the Government that

the Chat Spreadsheets do not implicate the Confrontation Clause because they are not testimonial statements.  (See Gov't Reply at 12.)

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  As the Supreme Court has explained, "[t]he Clause bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her."  Smith v. Arizona, 602 U.S. 779, 783 (2024) (quoting Crawford v. Washington, 541 U.S. 36, 53–54 (2004)).  Since Crawford, much litigation has ensued over the meaning of the phrase "testimonial statements." See United States v. James, 712 F.3d 79, 87–96 (2d Cir. 2013) (summarizing the recent evolution in the case law).  While the law remains in flux, at least three clear principles emerge in the post-Crawford case law.  The first is that forensic analyst reports implicate the Confrontation Clause only if the circumstances suggest the primary purpose of the analyst who authored the report was "to create a record for use at a later criminal trial."  Id. at 95; see also Smith, 602 U.S. at 785–86; Garlick v. Lee, 1 F.4th 122, 134–35 (2d Cir. 2021).

The second, corollary principle, is that most "business records"—i.e., records "prepared in the ordinary course of a regularly conducted activity," Fed R. Evid. 803(6)—do not implicate the Confrontation Clause because they are, by definition, not prepared with a "testimonial" purpose in mind.  See Melendez–Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."); United States v. Qualls, 553 F. Supp. 2d 241, 244–45 (E.D.N.Y. 2008) (finding that admission of

foreign bank records did not implicate the Confrontation Clause); aff'd on other grounds 613 Fed. App'x 25; but see United States v. Cameron, 699 F.3d 621, 644–47 (1st Cir. 2012) (discussing scenario where business records may be considered "testimonial" because they are kept to support law enforcement).

The third principle is that machine-generated records do not implicate the Confrontation Clause because they are not "statements" that stand in for sworn witness testimony. See Gonzalez, 144 F.4th at 407 ("We need not opine on what makes a statement testimonial because the cellphone extraction reports were not 'statements' in the first place. Rather, they are raw, machine-created data."); Bullcoming v. New Mexico, 564 U.S. 647, 674 (2011) ("Thus, we do not decide whether . . . [the Government] could introduce (assuming an adequate chain of custody foundation) raw data generated by a machine in conjunction with the testimony of an expert witness.") (Sotomayor, J., concurring)); United States v. Buyer, No. 23-7202-CR, 2025 WL 855773, at *3 (2d Cir. Mar. 19, 2025) ("[T]his Court has never applied Bullcoming to data extractions."). This third principle explains why, in the context of forensic evidence, it is generally the analyst's sworn affidavit, certificate, or written attestation that implicates the Confrontation Clause—not the underlying tests the analyst performed. See Melendez-Diaz, 557 U.S. at 310–311 (describing "certificates" deemed testimonial as "affidavits" that "are functionally identical to live, in-court testimony"); Garlick, 1 F.4th at 134 (describing report deemed testimonial as bearing indicia of "solemnity," including formal title, seal, and signed certification).

Applying those principles to the Sky Evidence, I find that the limited subset of Sky Evidence that may be admitted pursuant to this Order are not "statements" that are being offered in place of live testimony. Rather, these documents, if admitted, purportedly reflect copies of Sky

communications.  (See Gov't Reply at 4.)  Therefore, its use at trial does not implicate the Confrontation Clause.

The question of whether the French Certificate of Authenticity implicates the Confrontation Clause is a closer question.  The Certificate of Authenticity does not merely attest that certain data was copied from a European "electronic storage medium."  Rather, the Certificate of Authenticity asserts that—without any further explanation—that Sky data and records were "collected" and "captured" by a European law enforcement operation.  It is ultimately unnecessary for the Court to decide whether admission of this Certificate of Authenticity would violate the Confrontation Clause.  First, it is not even clear that the Government seeks to admit this document.  Second, as explained earlier, even assuming that it is admissible, the conclusory and vague contents of the Certificate are insufficient to authenticate the Sky Evidence.

### E.  Scope of Related Testimony & Discovery

I turn now to the parties' in limine motions concerning the permissible scope of testimony related to the Sky Evidence.  The Government moves to preclude any testimony and argument regarding the legality or propriety of the European law enforcement operation through which the Sky Evidence was obtained, and to preclude Defendant's proposed experts from testifying.  (Gov't MIL at 25–31.)  Defendant opposes the Government's motion insofar as it seeks to preclude all testimony about the origins of the Sky Evidence.  (Def.'s Resp. at 27.)  Defendant also argues that his proposed experts are qualified to offer relevant testimony about the reliability of the Sky Evidence.  (Id. at 28–32.)  The parties also appear to disagree about the scope of material that is discoverable under Rule 16.  (See Def.'s Mot. at 25; Gov't Resp. at 21.)

Regarding the scope of permissible testimony, the parties both acknowledge that the legality of the European intelligence operation is not relevant to any issue at trial.  (See Def.'s

Resp. at 28 (clarifying that Defendant's expert will not testify "regarding points of European law").) I agree. Accordingly, Defendant is ordered to refrain from eliciting testimony or making arguments concerning, inter alia, the legality of the conduct of both European and U.S. law enforcement, including efforts to secure judicial authorization for the interceptions, coordination or support provided by U.S. law enforcement, foreign court decisions regarding the admissibility of obtained through the operation, and other points of European law. Defendant is not, however, precluded from eliciting testimony that concerns the format or reliability of the specific Sky Evidence exhibits I have deemed admissible (and the underlying Chat Spreadsheets from which they were created) including, including, inter alia, testimony about the spreadsheet metadata, duplicate messages, missing messages, and hash values.

The same principles inform my decision regarding Defendant's proposed expert testimony. Defendant has noticed the Government that he plans to call three expert witnesses: Yehudi Moszkowicz, Andreas Milch, and Lee Koch. (Gov't MIL at 7.) For each witness, Defendant has indicated that the testimony he will elicit will be drawn from one of several previously filed "reports," pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C)(iv). (Def.'s Resp., Exs. B & C, ECF Nos. 106-4 & 106-5 (expert witness disclosures).) I address each in turn, considering both the relevance of the proposed testimony and the evaluating the reliability of that testimony in my role as a "gatekeeper" applying the standard set forth in Federal Rule of Evidence 702. United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007); see Fed. R. Evid. 104(a). Under Rule 702, a district court should admit expert testimony only if it concludes that the witness is "qualified as an expert," that their opinion is "based upon reliable data and methodology," and that the expert testimony "will assist the trier of fact." Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005).

I turn first to Mr. Moszkowicz—a Dutch criminal defense attorney with a degree in "audio-engineering" who has experience representing clients in Europe in cases that involve encrypted phone evidence.  (See Def.'s MIL Ex. M, ECF No. 95-15.)  Mr. Moszkowicz's two proffered reports concern the structure and internal communications of the European governments that participated in the joint investigation, with emphasis on the purported involvement of the United States.  (Def.'s MIL Ex. E, ECF No. 95-7; Def.'s MIL Ex. I, ECF No. 95-11.)[6]  His analysis is based on his review of government documents and media reports that describe, inter alia, the role of Europol and the use of Dutch software to analyze communications captured from the Sky network.  (See ECF No. 95-7 at 2.)  Critically, Mr. Moszkowicz's report does not reflect any specialized knowledge and merely summarizes documents that—if they were somehow admissible—could be understood by a lay person.  Additionally, while such information may have borne on issues raised in Defendant's prior suppression motion, it is of minimal relevance to any issue at trial.  The diplomatic details of the underlying investigation simply do not bear on the reliability of the resulting intelligence.  Insofar as the defense intends to elicit Mr. Moszkowicz's opinion about the reliability of the Sky Evidence at issue in this case, such testimony would be speculative because, inter alia, he has not even personally reviewed the discovery.  (See Protective Order, ECF No. 58).  See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) ("[E]xpert testimony should be excluded if it is speculative or conjectural.").  Accordingly, Mr. Moszkowicz is not permitted to testify as an expert at trial.

I turn next to Mr. Koch—an American lawyer and former "Signals Intelligence & Network Reconstruction Analyst" for the U.S. Air Force.  (Def.'s MIL Ex. D, ECF No 94-6.)  Defendant's

---

[6] Defendant's expert notice does not expressly reference the second "report" dated June 4, 2025 (ECF No. 95-11), and refers instead to an email dated November 26, 2024 that is not part of the record before.  (See ECF No. 106-4.)  Given Defendant's reliance on the second report in his motion in limine, I assume the notice contains a typographical error and refers to the document dated June 4, 2025.

notice regarding Mr. Koch's expected testimony refers to a single page "report" indicating that he has reviewed Sky Evidence and "agree[s] on all points" with the report of Mr. Milch and states that the Sky Evidence "should be suppressed" because it is "incomplete, open to manipulation, unverifiable to an original dataset . . . contains multiple errors, contains multiple omissions, [was] collected and processed by unknown and unverified tools, and lacks timestamps or GPS data." (Id.)  At outset, I note that the primary opinion set forth in the letter is a legal conclusion—namely that the Sky Evidence "should be suppressed"—that would not constitute relevant or permissible testimony at trial.  See United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[A]n expert . . . may not give testimony stating ultimate legal conclusions[.]").  In any case, even if Defendant could elicit Mr. Koch's testimony for a proper purpose, the expert notice does not set forth the "bases and reasons" for Mr. Koch's conclusions.  See Fed. R. Crim. P. 16(b)(1)(C)(iii) ("The disclosure for each expert witness must contain . . . the bases and reasons for [all opinions that the defendant will elicit from the witness[.]").  The sparseness of the expert disclosure for Mr. Koch "not only dooms [the] notice under Rule 16, but also fails to provide the Court with enough information to conduct a rigorous examination' of the [Mr. Koch's] methodology, as required by its gatekeeping function under Daubert."  United States v. Kwok, No. 23-CR-118, 2024 WL 1773143, at *3 (S.D.N.Y. Apr. 24, 2024) (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)).  Therefore, Mr. Koch is not certified as an expert and may not testify as such at trial.

Finally, I turn to Mr. Milch, a German criminal defense lawyer and "certified IT forensics specialist."  (Def.'s MIL Ex. C, ECF No. 95-5.)  Mr. Milch has reviewed the Sky Evidence and drafted two lengthy reports evaluating the reliability of the data and highlighting various "anomalies" in the Chat Spreadsheets.  (Def.'s MIL Ex. A, ECF No. 95-3 (the "Milch Report");

Def.'s MIL Ex. B, ECF No. 95-5 (the "Milch Suppl. Report"); see also MIL Ex. Def.'s Ex. P, ECF No. 94-18.)  Those reports address a wide range of topics related to the Sky Evidence including, inter alia, the functionality and format of the encryption used on the Sky network (Milch Report 4–12); the European "hack" operation (id. at 13–16); and various features of the Chat Spreadsheets and Media Folders (id. at 17–44; Milch Suppl. Report at 3–17).  Mr. Milch's conclusion is that the "integrity" of the Sky Evidence cannot be verified due to the format in which it was transmitted. (Milch Report at 58.)  To start, for reasons I have previously explained, the integrity of the Sky Evidence is relevant to issues at trial, as it bears on the reliability of the Government's evidence of the conspiracy.  I also find that Mr. Milch is qualified to opine on the format and reliability of the Sky Evidence based on his certification as an IT forensics specialist and experience litigating multiple cases involving similar evidence.[7]  (See ECF No. 94-5)  "Federal Rule 702 does not require that an expert attend a specific type or number of trainings for a specific length of time, and the Second Circuit has advised that '[t]he words qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of [Rule 702].'" United States v. Ramsey, No. 21-CR-495, 2023 WL 2523193 (E.D.N.Y. Mar. 15, 2023), aff'd, 2024 WL 5199288 (2d Cir. Dec. 23, 2024) (quoting United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985)).  I also find that some (but not all) of Mr. Milch's analysis is based on sufficient facts and sound methods—namely the close review of the Chat Spreadsheets and associated Media Folders.  His speculation about the tools and methods of European law enforcement, by contrast, do not rest on a sufficient foundation.  Finally, I conclude that Mr. Milch's explication and analysis of certain topics would be helpful to the jury, who are likely to be unfamiliar with topics such as encryption, metadata digital forensic standards that bear on the reliability of the Sky Evidence.

---

[7] Mr. Milch is not, however, qualified as an expert in the tactics of European law enforcement and lacks personal knowledge to testify about the investigation.

Accordingly, I will permit Mr. Milch to testify as an expert on the following limited list of topics set forth in his reports:

- The functionality and format of Microsoft Excel;

- the format and content of the Chat Spreadsheets, including metadata; and

- general digital forensic standards and methods.

In addition to the general limitations on irrelevant testimony set forth above, I will not permit Mr. Milch to testify on the following topics addressed in his reports, he lacks any personal or specialized knowledge about them:

- The method by which European law enforcement captured, stored, analyzed, or decrypted communications from the Sky network;

- the use of artificial intelligence;

- the existence or availability of other "versions" of the Sky Evidence or related datasets (such as geolocation data) that Mr. Milch has not personally reviewed;

- statements made by other tribunals or government entities about the reliability of evidence obtained from the Sky network.

Further, Mr. Milch will likely be required to confine his analysis to those exhibits of the Sky Evidence I have deemed admissible and to not discuss any other files that were transmitted from France.

Finally, in light of the scope of permissible testimony I have outlined above, the Government is instructed to ensure it has produced to the Defendant any materials in its possession that reveal the way(s) the Sky Evidence was seized, decrypted, or transmitted, including the MLAT request(s) that elicited the transmission of the Sky Evidence from France. Such materials are "relevant and vital to the defense, if they are to mount an attack on the [Sky Evidence] at trial" and therefore fall within the purview of Federal Rule of Criminal Procedure 16. United States v. Juan Vincent Gomez Castrillon, No. 05- CR-156, 2007 WL 2398810, at *5 (S.D.N.Y. Aug. 15, 2007);

see Fed. R. Crim. Pro. 16(a)(1)(e)(i) (listing "item[s] "material to preparing the defense" as information subject to disclosure at the defendant's request).  If the Government maintains that any information should be redacted from the MLAT requests or any other discovery set out above, the Government shall identify that information and its reasons for requesting redaction in a sealed and ex parte filing.

### IV.    CONCLUSION

For the reasons set forth herein:

- Defendant's motion in limine to renew his motion to suppress and/or preclude the Sky Evidence is DENIED;

 - the Government's motion in limine to admit the Sky Evidence is preliminarily GRANTED with respect to exhibits that can be authenticated by witness testimony as set forth above, and DENIED as to all other exhibits;

- Defendant's various motions in limine to preclude some or all of the Sky Evidence under FRE 1006, 106, 401, 403 and 404(b) are DENIED;

- Defendant's motion in limine to condition the admission of the Sky Evidence on the availability of live testimony from an individual who prepared the exhibits is DENIED;

- the Government's motion in limine to preclude testimony about the legality of the European investigation is GRANTED;

- the Government's motion in limine to preclude expert testimony is GRANTED as to Mr. Moszkowicz and Mr. Koch and DENIED as to Mr. Milch, subject to the limitations set forth above.

Pursuant to Rule 16, the Government is ordered to produce to Defendant the Rule 16 materials described above.  Rulings on all other motions in limine are reserved at this time.  A final Pretrial Conference is scheduled for Thursday, November 6 at 12:30PM, at which time I will address any outstanding pretrial matters.

**SO ORDERED.**
Dated:   October 31, 2025
         Brooklyn, New York

_____
                /s/
         JOAN M. AZRACK

_____
UNITED STATES DISTRICT JUDGE